IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| Assiniboine & Sioux Tribes of the Fort | ) | Civil Action No. 02-0035 (JR) |
| Peck Indian Reservation v. Norton, *et al.*, | ) | |
| | ) | |
| Standing Rock Sioux Tribe | ) | Civil Action No. 02-0040 (JR) |
| v. Norton, *et al.*, | ) | |
| | ) | |
| Three Affiliated Tribes of the Fort | ) | Civil Action No. 02-0253 (JR) |
| Berthold Reservation v. Norton, *et al.*, | ) | |
| | ) | |
| Shoshone-Bannock Tribes of the Fort | ) | Civil Action No. 02-0254 (JR) |
| Hall Reservation v. Norton, *et al.*, | ) | |
| | ) | |
| Chippewa Cree Tribe of the Rocky Boy's | ) | Civil Action No. 02-0276 (JR) |
| Reservation v. Norton, *et al.*, | ) | |
| | ) | |
| Yankton Sioux Tribe v. Norton, *et al.*, | ) | Civil Action No. 03-1603 (JR) |
| | ) | |
| Osage Tribe of Indians of Oklahoma | ) | Civil Action No. 04-0283 (JR) |
| v. United States of America, *et al.*, | ) | |
| | ) | |
| Crow Creek Sioux Tribe | ) | Civil Action No. 04-0900 (JR) |
| v. Kempthorne, *et al.*, | ) | |
| | ) | |
| Omaha Tribe of Nebraska | ) | Civil Action No. 04-0901 (JR) |
| v. Kempthorne, *et al.*, | ) | |
| | ) | |
| Oglala Sioux Tribe v. Kempthorne, *et al.*, | ) | Civil Action No. 04-1126 (JR) |
| | ) | |
| The Confederated Tribes of the Colville | ) | Civil Action No. 05-2471 (JR) |
| Reservation v. Norton, *et al.*, | ) | |
| | ) | |
| Wyandot Nation of Kansas | ) | Civil Action No. 05-2491 (JR) |
| v. Kempthorne, *et al.*, | ) | |
| | ) | |
| Rosebud Sioux Tribe v. Kempthorne, *et al.*, | ) | Civil Action No. 05-2492 (JR) |
| | ) | |
| Winnebago Tribe of Nebraska | ) | Civil Action No. 05-2493 (JR) |
| v. Kempthorne, *et al.*, | ) | |
| | ) | |
| Lower Brule Sioux Tribe | ) | Civil Action No. 05-2495 (JR) |
| v. Kempthorne, *et al.*, | ) | |

|  |  |  |
|---|---|---|
| Prairie Band of Potawatomi Nation v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 05-2496 (JR) |
| Te-Moak Tribe of Western Shoshone Indians v. Norton, *et al.*, | ) ) ) | Civil Action No. 05-2500 (JR) |
| Cheyenne River Sioux Tribe v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-1897 (JR) |
| Stillaguamish Tribe of Indians v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-1898 (JR) |
| Iowa Tribe of Kansas and Nebraska v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-1899 (JR) |
| Confederated Tribes of the Goshute Reservation v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-1902 (JR) |
| Muskogee (Creek) Nation of Oklahoma v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2161 (JR) |
| Eastern Shawnee Tribe of Oklahoma v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2162 (JR) |
| Northwestern Band of Shoshone v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2163 (JR) |
| Red Cliff Band of Lake Superior Indians Indians v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2164 (JR) |
| Pechanga Band of Luiseno Mission Indians v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2206 (JR) |
| Colorado River Indian Tribes v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2212 (JR) |
| Tohono O'Odham Nation v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2236 (JR) |
| Nez Perce Tribe, *et al.*, v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2239 (JR) |
| Passamaquoddy Tribe of Maine | ) | Civil Action No. 06-2240 (JR) |

v. Kempthorne, *et al.*,                               )
                                                       )
Salt River Pima-Maricopa Indian        )        Civil Action No. 06-2241 (JR)
Community v. Kempthorne, *et al.*,     )
                                                       )
Coeur D'Alene Tribe v. Kempthorne, *et al.*,  )   Civil Action No. 06-2242 (JR)
                                                       )
Ak-Chin Indian Community               )        Civil Action No. 06-2245 (JR)
v. Kempthorne, *et al.*,                        )
                                                       )
Sokaogon Chippewa Community            )        Civil Action No. 06-2247 (JR)
v. Kempthorne, *et al.*,                        )
                                                       )
Gila River Indian Community            )        Civil Action No. 06-2249 (JR)
v. Kempthorne, *et al.*,                        )
                                                       )
Northern Cheyenne Tribe of Indians     )        Civil Action No. 06-2250 (JR)
v. Kempthorne, *et al.*,                        )
                                                       )
Haudenosaunee: The Onondaga Nation     )        Civil Action No. 06-2254 (JR)
v. Kempthorne, *et al.*,                        )
_____)


**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR REMAND AND
STAY OF LITIGATION**

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     Tribal Trust Accounts Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.     Types of Tribal Trust Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       B.     Interior Bureaus and Offices Responsible for Managing Current
              Tribal Trust Accounts and Providing Historical Accountings . . . . . . . . . . . . . . 5

II.    History and Evolution of Tribal Trust Accounting at Interior . . . . . . . . . . . . . . . . . . . . . 5

       A.     Historical Policies and Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       B.     The Tribal Reconciliation Project and the American Indian Trust
              Reform Management Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       C.     Congressional Response to the TRP and Subsequent Litigation . . . . . . . . . . . . 11

III.   Current Accounting Work at Interior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       A.     Accounting-Related Work of the Office of Historical Trust
              Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       B.     Trust Reform Regulatory Initiative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.    Issues and Considerations to be Addressed to Complete the Accountings Owed to
       the Tribes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.     Relief Requested in Plaintiffs' Various Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I.     THE COURT SHOULD REMAND TO THE DEPARTMENT OF THE
       INTERIOR AND STAY THIS LITIGATION BASED ON APPLICATION OF
       THE PRIMARY JURISDICTION DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       A.     Preparation of an Historical Accounting Plan Raises Issues of Fact
              Not Within the Conventional Experience of Courts . . . . . . . . . . . . . . . . . . . . . 25

B.     Preparation of a Tribal Historical Accounting Plan Requires the
Expertise of Interior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.     Remand to Interior Appropriately Lessens the Potential for
Inconsistent Outcomes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

II.    THE COURT SHOULD REMAND TO THE DEPARTMENT OF THE
INTERIOR AND STAY THIS LITIGATION BASED ON PRINCIPLES OF
ADMINISTRATIVE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

A.     This Court Should Exercise Its Clear Authority to Remand to
Interior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1.     Substantial and Legitimate Grounds Justify a Remand and
Stay of This Litigation to Permit Interior to Prepare a
Historical Accounting Plan for Tribal Trust Accounts . . . . . . . . . . . . . 30

2.     Remand is Appropriate to Allow Interior to Consider and
Incorporate Additional Evidence Related to Interior's
Accounting for Historical Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

3.     Intervening Events Warrant Remand for
Completion of an Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Allnet Communications Service Inc. v. National Exchange Carrier Ass'n.*,
965 F.2d 1118 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

*American Ass'n of Cruise Passengers v. Cunard Line Ltd.*,
31 F.3d 1184 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*American Indians Residing On Maricopa-Ak Chin Reservation v. U. S.*,
667 F.2d 980 (Ct. Cl. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Atchison, Topeka & Santa Fe. Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800 (1973) . . . . . . . . 27

*Brawner Building, Inc. v. Shehyn*, 442 F.2d 847 (D.C. Cir. 1971) . . . . . . . . . . . . . . . . . . . 23, 28

*Checkosky v. SEC*, 23 F.3d 452 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Cobell v. Norton*, 428 F.3d 1070 (D.C. Cir 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 26-28, 30, 33

*Ethyl Corp. v. Browner*, 989 F.2d 522 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Ford Motor Co. v. NLRB*, 305 U.S. 364 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Himmelman v. MCI Commc'n Corp.*, 104 F. Supp. 2d 1 (D.D.C. 2000) . . . . . . . . . . . . . . . 23, 24

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474 (8th Cir. 1988) . . . . . . . . . . . . 22

*Reiter v. Cooper*, 507 U.S. 258 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Rohr Indus. Inc. v. Washington Metro. Area Transit Auth.*,
720 F.2d 1319 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*SBC Communications Inc. v. F.C.C.*, 138 F.3d 410 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . 32

*SKF USA INC. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . 29, 30, 35

*Total Telecommunications Services, Inc. v. AT & T*,
919 F. Supp. 472 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*United States v. Western Pacific R.R.*, 352 U.S. 59 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FEDERAL STATUTES

25 U.S.C. § 1401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25 U.S.C. § 162a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25 U.S.C. § 4011(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

25 U.S.C. § 4043(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25 U.S.C. § 4044 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11, 31, 35

25 U.S.C. §§ 155 & 161b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25 U.S.C. §§ 161a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25 U.S.C. §§ 162a(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

25 U.S.C. §§ 4041-43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25 U.S.C. §§ 461 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

P.L. 103-412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Pub. L. 100-202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 100-446 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 100-71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 101-121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 101-512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 102-154 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 102-381 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 103-138 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 103-332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. No. 107-153 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 32, 36

Pub. L. No. 109-158 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 32

## SUMMARY OF ARGUMENT

Defendants respectfully submit this Memorandum in support of their Motion for a Remand and Stay of Litigation.  In the thirty-seven tribal trust accounting cases pending before this Court, plaintiffs have asked this Court to order defendants to provide historical accountings of the tribes' trust funds and assets.  To the extent that the central focus of all these cases will necessarily be on providing historical tribal trust accountings, defendants request remand in these cases to the Department of the Interior ("Interior"), so that Interior can prepare and issue a plan setting forth the accountings to be prepared for all tribes including the scope and supporting rationale.  Defendant further requests that Interior be allowed six months from this Court's grant of remand to prepare and present the historical tribal accounting plan and that the cases be stayed while Interior prepares that plan.  As set forth in the accompanying declaration of Ross O. Swimmer, the Special Trustee for American Indians, devising such a plan requires the consideration of a host of complicated factual, technical, fiscal, legal and policy factors, more properly addressed by Interior in the first instance.  *See* Declaration of Ross O. Swimmer (hereinafter "Swimmer Decl.") (August 10, 2007).  Interior is committed to completing and issuing the historical tribal trust accounting plan during the remand period.  *Id.*

Defendants' remand request is rooted in the need to fully consider, among other things, (1) the application of the tribal accounting work-related expertise that the Office of Historical Trust Accounting ("OHTA") has developed since 2002; (2) the arguments that have been raised about the accounting duties and obligations owed to the tribes; and (3) the structure of the programmatic approach for resolving the tribal historical accountings.  Defendants request a remand based on the application of the primary jurisdiction doctrine, which allows for remand to

an agency to apply its expertise to coordinate administrative and judicial decisionmaking, and avoid inconsistent results.  As the agency to whom Congress has delegated authority for oversight and accounting of tribal trust accounts, Interior has developed certain substantial expertise in carrying out its responsibilities.  A programmatic approach to tribal trust accountings, such as the one that Interior intends to set forth in its historical tribal trust accounting plan, will most certainly reduce the potential for conflicting or competing demands on Interior.

Defendants further request a voluntary remand based on additional substantial and legitimate reasons; that is, to fully consider all factual, technical, fiscal, legal and policy concerns at issue as part of crafting a plan to address the requests for trust fund and non-monetary trust asset accountings made by tribes (including those in these thirty-seven cases).  As explained below, Congress delegated responsibility for tribal trust accounting to Interior; Congress directed Interior to undertake work to resolve disputes with tribes over the previous accounting-related products provided to tribes; and a remand will allow Interior to apply its insights gained from its accounting-related work to date, as well as to consider lessons learned from intervening events.  Moreover, as Interior has not yet set forth its programmatic historical trust accounting plan to guide all tribal trust accountings, the appropriate record for judicial review is presently incomplete.  Remand to the agency will benefit this Court's review by allowing for a complete record.

As also set forth in the supporting Declaration of Ross O. Swimmer, over the past several years, Interior has focused its efforts related to tribal accounting to addressing specific accounting issues raised by those tribes that had filed litigation prior to December 2006.  *See*

Swimmer Decl. ¶ 16.  As most of those tribal plaintiffs expressed an interest in pursuing resolution of their accounting claims in Alternative Dispute Resolution ("ADR") or other direct negotiations, Interior at that time sought to resolve accounting disputes on a case-by-case and tribe-by-tribe basis, while it investigated and developed measures that might be more broadly acceptable to all tribes.  This approach has resulted in Interior's collection and analysis of a large body of information and data applicable to tribal accounting issues.  Given the present posture of the thirty-seven tribal trust cases before this Court, however, a different approach that addresses all of the tribes' accounting demands is required.  Accordingly, defendants request a brief six month remand period to allow it to analyze and apply its existing body of accounting work, and to articulate its proposed programmatic approach to resolution of plaintiffs' requests for accountings.

**STATEMENT OF FACTS**

I.    **Tribal Trust Accounts Overview.**

The United States began holding money in trust for tribes in the early nineteenth century and currently holds money and lands in trust for American Indian Tribes as specified in federal treaties, statutes, regulations, and Executive Orders.  *See, e.g.,* Title 25 U.S.C. Chapter 4, Performance by United States of Obligations to Indians.  The number of tribal trust fund accounts under Interior's management has grown over time as a result of events such as agreements between the federal government and tribes, and legislation.  *See* Swimmer Decl. ¶ 4. Interior currently maintains approximately 1,450 tribal trust fund accounts for over 300 different tribal entities.  *Id.* ¶ 25.  As of September 30, 2006, the United States held over $2.9 billion on behalf of tribes.  *Id.*

3

## A.    Types of Tribal Trust Funds.

The two most common kinds of tribal trust fund accounts are "proceeds of labor" accounts and judgment or award accounts.  *Id.* ¶ 4.  "Proceeds of labor" accounts relate to revenue generated from activities that tribes authorize to occur on tribal lands, such as oil and gas development, farming and grazing.  *See* 25 U.S.C. §§ 155 & 161b.  Judgment or award accounts consist of judgments or awards that tribes have received from federal courts and Congress for past use or alleged misuse of tribal assets.[1]  *See* 25 U.S.C. § 1401.  In addition, certain accounts for tribes were previously also maintained as Individual Indian Money (IIM) accounts.  *See* Swimmer Decl. ¶ 4.  These accounts, sometimes called voluntary deposit accounts or tribal IIM accounts, were established for a variety of purposes, e.g., revolving loan funds, tribal enterprises (such as timber mill operations), and income from tribes' undivided interests in allotted lands.  *Id.*  Key differences exist between tribal trust fund accounts and IIM accounts.  For example, the tribal trust fund accounts are not pooled for investment purposes, as are the IIM accounts.  *Id.*  Also, tribal trust fund account disbursements are handled differently and normally require different types of authorization including but not limited to tribal council actions.  *Id.*

---

[1]  In 1946, Congress established the Indian Claims Commission (ICC) to settle all tribal claims against the Government which existed prior to August 13, 1946.  *See* Indian Claims Commission Act of 1946 § 12, 60 Stat. 1049.  Tribes were given until August 13, 1951 to file claims before the Commission or they were deemed to have waived their historic claims.  *Id.*  Congress included claims against the United States for accountings as well as mismanagement of tribal trust funds within the jurisdiction of the ICC.  *Id.* § 2.

**B.     Interior Bureaus and Offices Responsible for Managing Current Tribal Trust Accounts and Providing Historical Accountings**.

In 1994, Congress created the Office of the Special Trustee for American Indians ("OST") and charged the Special Trustee with the responsibility of ensuring that Interior properly reform its measures for discharging its trust fund management and associated duties. *See* 25 U.S.C. §§ 4041-43.  In particular, Congress tasked the Special Trustee with overseeing a "fair and accurate accounting" of the trust accounts.  *See* 25 U.S.C. § 4043(b)(2)(A).  In 1996, the Secretary of the Interior transferred certain responsibilities for managing and administering Interior's trust funds from the Bureau of Indian Affairs (BIA) to OST, by Secretarial Order.  *See* Swimmer Decl. ¶ 10.  In 2001, the Secretary established the OHTA and charged it with the responsibility of planning, organizing, directing and executing the historical accounting for IIM account holders.  *Id.*  In July 2002, the Secretary amended the Order to expand OHTA's responsibility to include tribal historical accountings.  *Id.* ¶ 15.  As of June 25, 2007, OHTA performs historical accounting work under the direction of the Special Trustee.  *Id.*

## II.     History and Evolution of Tribal Trust Accounting at Interior.

### A.     Historical Policies and Practices.

Over the years, Interior has developed and implemented its own policies, regulations, specialized business systems and forms for handling funds and maintaining and reporting its records of account.  *See* Swimmer Decl. ¶ 5.  Prior to 1951, each BIA Agency Office (typically located on Indian reservations) accounted for financial activity using handwritten ledgers and journals.  *Id.*  In the early 1950s, Interior installed a more centralized accounting system in BIA Area (regional) Offices.  *Id.*  All fund types – Individual Indian Money ("IIM") as well as tribal – were integrated into this system.  *Id.*  Beginning in 1965, BIA began further centralizing its

accounting functions on a mainframe computer in Albuquerque, New Mexico. *Id.* The conversion to a computer system was completed in the late 1960s. *Id.* A new automated accounting system was developed and implemented in 1968 and modified in 1974. *Id.* The earliest date for which Interior now has electronic account and transaction data available is July 1, 1972 (the "Tribal Electronic Ledger Era"). *Id.* Interior utilized this system, known as the Trust Funds Management System ("TFMS"), until OST converted to the Omnitrust system for tribal trust fund accounts in April 1995. *Id.*

With regard to reporting account balances, historically Interior prepared and distributed to tribes periodic reports, which provided information on beginning and ending balances, along with receipts and disbursements. *Id.* ¶ 6. As another example of the historical reporting of trust fund information, specific information about tribal trust fund accounts was also reported until the early 1970s in Treasury's Combined Statement of Receipts, Expenditures and Balances of the United States Government (Combined Statement), a published report submitted annually to Congress. *Id.*

**B.     The Tribal Reconciliation Project and the American Indian Trust Reform Management Act.**

In the late 1980s, Interior focused on improving its accounting for tribal trust funds following several critical reports and investigated the feasibility of transferring certain money management responsibilities for Indian trust funds to a private bank. *See* Indian Trust Funds; Consultation Process to Procure Collection, Accounting, Advisory Investment Services and Custodial Services, 52 Fed. Reg. 12,348-49 (April 15, 1987). In response to Indian Country's concerns about the transfer of trust fund management to third parties, in a supplemental appropriation for Interior in 1987, Congress prohibited Interior from transferring any funds to

6

any third party management until "the funds held in trust for such tribe . . . have been audited and reconciled, and the tribe . . . has been provided with an accounting of such funds . . .." Act of July 11, 1987, Pub. L. 100-71, 101 Stat. 391, 416 (1987).  Substantially identical provisions were contained in the appropriation acts for the next two fiscal years.  *See* Act of December 22, 1987, Pub. L. 100-202, 101 Stat. 1329-214, 1329-229 (1987); Act of September 27, 1988, Pub. L. 100-446, 102 Stat. 1774, 1794 (1988).

By 1989, Congress was aware of some of the practical difficulties associated with conducting a wide-scale retrospective reconciliation of the trust fund accounts.  Accordingly, the 1990 fiscal year appropriations legislation carried a modified version of the previous language which recognized the impracticability of reconciliation.  *See* Act of October 23, 1989, Pub. L. 101-121, 103 Stat. 701, 714 (1989) (changing the language to prohibit any transfer until the funds have been "audited and reconciled to the earliest possible date, [and] the results of such reconciliation have been certified by an independent party as the most complete reconciliation of such funds possible").[2]

In May 1991, BIA hired an accounting firm Arthur Andersen LLP ("Andersen") to conduct agreed-upon procedures for the tribal trust accounts.  That work is commonly known as the Tribal Reconciliation Project ("TRP").  *See* Swimmer Decl. ¶ 7.  Interior also consulted extensively with tribal groups, including what now is known as the Inter-Tribal Monitoring Association ("ITMA"), a national tribal consortium consisting of numerous federally-

---

[2] Similar provisions were included in the appropriations bills for 1991-1995.  *See* Act of Nov. 5, 1990, Pub. L. 101-512, 104 Stat. 1915, 1929; Act of Nov. 13, 1991, Pub. L. 102-154, 105 Stat. 990, 1004; Act of Oct. 5, 1992, Pub. L. 102-381, 106 Stat. 1374, 1389; Act of Nov. 11, 1993, Pub. L. 103-138, 107 Stat. 1379, 1391; and Act of Sept. 30, 1994, Pub. L. 103-332, 108 Stat. 2499, 2511.

recognized tribes, concerning the procedures that Andersen would use. *Id.*

In 1994, Congress enacted the American Indian Trust Fund Management Reform Act of 1994, Pub .L. No. 103-412 (codified at 25 U.S.C. §§ 161a, 162a and 4001-4061) ("1994 Trust Fund Reform Act")). This law recognized the government's trust responsibility for Indian trust accounts, and identified some of Interior's trust duties in that regard. *See, e.g.,* 25 U.S.C. § 162a. Congress adopted yet another variation of the requirement contained in the prior years' appropriations bills that Interior reconcile tribal accounts. *See* 25 U.S.C. § 4044. Congress also directed Interior to conclude the TRP by a specific date. *Id.* Section 304 of the 1994 Trust Fund Reform Act required Interior to provide a report to Congress on the TRP, and added new requirements that the Secretary of the Interior consult with the Special Trustee on the TRP, reconcile tribal trust fund account balances as of September 30, 1995, and report to Congress by May 31, 1996. *See* 25 U.S.C. § 4044.

In early 1996, Interior provided the results of the TRP reports to tribes. *See* Swimmer Decl. ¶ 8. The information provided to tribes as part of the TRP generally included: (1) transaction by transaction account statements (receipts, interest earnings, disbursements, balances, etc.) for tribal trust fund accounts for the period from July 1, 1972 (Fiscal Year 1973), to September 30, 1995 (Fiscal Year 1995); (2) a report describing the procedures performed for the FY 1973 to FY 1992 period and the results thereof; and (3) electronic images of source documents[3] that supported certain FY 1973 to FY 1992 transactions. *Id.* ¶ 7.

---

[3]    Source documents are the various trust-fund related financial documents, including those related to non-investment receipt transactions (e.g., deposit ticket, schedule of collections, and journal voucher), investment transactions (e.g., accounts distribution sheet and Treasury market securities purchase form), and non-investment disbursement transactions (e.g., request for withdrawal and voucher and schedule of payment). *See* Swimmer Decl. at ¶ 7, n.1.

In transmitting each reconciliation report to a tribe, Interior, as required by 25 U.S.C. § 4044 (2), also requested that the tribe complete and return an attestation form indicating whether it accepted or disputed the account balances, and explain any objections to the reported account balances.  *See* Swimmer Decl. ¶ 8; *see also* Declaration of Dawn M. Boswell (hereinafter "Boswell Decl.") at Attach. A (*Recommendations of the Secretary of the Interior for Settlement of Disputed Tribal Trust Accounts* (Nov. 13, 1997) at 9).  Of the attestation responses received from the fifty-four tribes, who now have thirty-seven accounting cases pending before this Court, four of the Tribes accepted the accuracy of the balances provided to them:  the Gila River Indian Community, the Oneida Nation[4], the Northern Cheyenne and the Stillaguamish.  The other responses received from the tribes represented in the thirty-seven cases before this Court were distributed as follows: seventeen tribes disputed the results and ten tribes requested more time for review.  *Id.*  Twenty-one tribes never responded.[5]  *Id.*  On May 31, 1996, Interior provided a report on the TRP to Congress as required by the 1994 Trust Fund Reform Act.  *Id.*; *see also* Boswell Decl. at Attach. B (*Letters and Report from Bruce Babbitt, Secretary of the Interior to Hon. John McCain and Hon. Don Young* (May 31, 1996)).

During the TRP, Interior spent about $21 million for contract costs to locate supporting documentation, analyze historical trust transactions, and perform other reconciliation

---

[4] The Oneida Nation is part of the Haudenosaunee Confederation.  *See* Swimmer Decl. ¶ 8, n.2. There are five additional tribes under Haudenosaunee who sent separate responses *Id.* ¶ 8, n.3.

[5]  Of note the Wyandot Nation of Kansas and the Mohawk Nations did not receive a TRP.  The additional eleven named plaintiffs under the *Nez Perce* class action had their own responses. Passamaquoddy had two governing entities, of which only one responded.  *See* Swimmer Decl. at ¶ 8, n.3.

procedures to validate tribal account balances.  *See* Boswell Decl. at Attach. A

(*Recommendations of the Secretary of Interior for Settlement of Disputed Tribal Trust Fund*

*Accounts* (Nov. 13, 1997) at 1).  Following completion of the TRP, Interior attempted to resolve

the disputed tribal account balances of which it had been made aware. *See* Swimmer Decl. ¶ 9.

In part, this was done through consultations with tribes (including, but not limited to those with

accounting cases pending before this court).  *Id.*  Interior also continued to work to reconcile

even more of the non-investment transactions than had been completed within the

Congressional deadline set for the completion of the TRP.  *Id.*

In accordance with the directive in the 1994 Trust Fund Reform Act to make efforts to

resolve any disputed tribal account balances, Interior submitted a legislative proposal for

resolving those disputes to Congress in December 1996.  *See* Boswell Decl. at Attach. C

(Letters from Bruce Babbitt, Secretary of the Interior, to Hon. John McCain and Hon. Don

Young (Dec. 11, 1996), enclosing *Proposed Legislative Options in Response to Tribal Trust*

*Fund Reconciliation Project Results* (1996)).  After tribal consultations, which led to significant

changes to the options set forth in Interior's December 1996 report, Interior again submitted its

recommendations to Congress in November 1997.  *See Id.* at Attach. A (*Recommendations of*

*the Secretary of Interior for Settlement of Disputed Tribal Trust Fund Accounts* (Nov. 13, 1997)

at 9).  A key feature of the legislative proposal Interior submitted to Congress was mandatory

mediation, *i.e.*, a tribe-by-tribe, Government-to-Government settlement process which would

take into account the specific circumstances and claims of each Tribe.  *Id.* at 21-22.

Importantly, Interior contemplated that "[a]s part of the negotiations, there would be an

opportunity to obtain additional data or undertake additional analysis to the extent it would be

constructive in reaching a satisfactory resolution of claims." *Id.* In other words, Interior made

clear to Congress in 1997 that further accounting efforts were possible and also expressed that it

would pursue such accounting where appropriate in order to address the individual

circumstances of each tribe. *Id.* Congress held at least one hearing on the legislative proposal,

but took no further action on that legislation.

###     C.      Congressional Response to the TRP and Subsequent Litigation.

It was not until 2002 that Congress passed additional legislation regarding the TRP.

Aware that some tribes were filing suits to preserve their objections to the TRP,[9] Congress

amended the 1994 Act to extend the date that tribes would be deemed to have received their

TRP reports. *See* An Act to Encourage the Negotiated Settlement of Tribal Claims, Pub. L. No.

107-153, 116 Stat. 79 (2002) (codified at 25 U.S.C. § 4404 note). This legislation essentially

deferred the deadline for tribes to object to the TRP by extending the statute of limitations until

December 31, 2005. Congress' expressly stated purpose in passing this legislation was to

encourage settlement negotiations between tribes and the United States. Congress noted that

the extension was to provide tribes with "the opportunity to postpone the filings of claims, or to

facilitate the voluntary dismissal of claims, to encourage settlement negotiations with the

United States." Pub. L. No. 107-153, § 1(b); *see also* Rep. No. 107-138. The extension also

allowed for the creation of a process to settle trust fund accounting claims. *See* 148 Cong. Rec.

H704-01 (Mar. 6, 2002) (statement of Rep. Hansen). In 2005, Congress extended, for an

additional year, the date on which tribes would be deemed to have received their TRP reports by

---

[9] There were 13 such cases pending before the Court of Federal Claims and this Court in April 2002.

another amendment to the 1994 Act. *See* An Act to Amend Public Law 107-153 to Modify a Certain Date, Pub. L. No. 109-158.[7/]

## III.     Current Accounting Work at Interior

As stated above, the Secretary of the Interior transferred responsibility for trust funds management from BIA to OST in 1996. *See supra.* Since the transfer, OST has been performing what Interior thus terms the "current accounting" work for tribes. *See* Swimmer Decl. ¶ 13. One important component of the current accounting work is the preparation and delivery of periodic statements of performance, which are required by the 1994 Trust Fund Reform Act to be sent quarterly to each tribe (although tribes may request more frequent statements, and the majority of tribes are receiving monthly statements). *Id.* Statements of performance include information on the types of receipts, income and disbursements, and financial investment holdings including earnings, gains and losses. *Id.*

Since April 1995, Interior has utilized two widely used, commercial trust management systems to account for activity in tribal trust fund accounts, including financial asset holdings. *Id.* ¶¶ 12, 14. From 1995 to 1998, Interior used the Omnitrust system to report receipt, disbursement and investment activity and holdings to the tribes. *Id.* In 1999, OST converted tribal trust accounts into the Trust 3000 system, commonly referred to as the Trust Fund Accounting System (TFAS). *Id.* ¶ 14. TFAS allows Interior to provide periodic statements of performance. *Id.*; *see also* 25 C.F.R. § 115.803. Further, Interior's current reports to tribes also

---

[7/] The second extension provided in part: "Notwithstanding any other provision of law, for purposes of determining the date on which an Indian tribe received a reconciliation report for purposes of applying a statute of limitations, any such report provided to or received by an Indian tribe . . . shall be deemed to have been received by the Indian tribe on December 31, 2000."

include detailed information about the investments held for each account.  *Id.* ¶ 14.

Another significant trust reform measure in the post-1994 period relates to the consolidation and safeguarding of Indian records.  To date, Interior has indexed and consolidated over 156,000 boxes of inactive Indian-related records, containing an estimated 392 million pages, at the American Indian Records Repository ("AIRR") in Lenexa, Kansas.[8]  *Id.* ¶ 11.  The AIRR is a national repository for American Indian records created in 2004 pursuant to a Memorandum of Understanding between Interior and the National Archives and Records Administration (NARA).  *Id.*  Well over half of these boxes contain records pertaining to trust funds and trust assets, while the remainder relate to other BIA programs (such as law enforcement, education and general administration).  *Id.*  A significant number of additional boxes of Indian-related records are retained at various other NARA Federal Record Centers and at National Archives such as that in Washington, D.C., as well as various Interior and Treasury offices across the country.  *Id.*

A.      **Accounting-Related Work of the Office of Historical Trust Accounting**

Between 2002-06, OHTA's tribal work focused largely on the specific issues and questions raised by those tribes that filed cases prior to December 2006.  *Id.* ¶ 16.  Rather than proceed with active litigation, most of those tribes expressed a preference for working with Interior in the context of settlement negotiations (including ADR).  *Id.*  As part of this process, OHTA has provided briefings on the TRP to these and other tribes; examined the TRP Andersen work papers as well as related document collections; and prepared various accounting

---

[8]Inactive records are those that are no longer required for the agency's day-to-day activities and that have met the applicable schedule for retirement.  *See* Swimmer Decl. ¶ 11, n.4.

analyses and data compilations of trust account-related materials.  *Id.*  It also has performed

work to (1) aggregate historical electronic transaction data in such a way that it can be

compared to a control source (*i.e.,* contemporaneous account statements produced for, or by,

BIA and/or OST) and (2) test the data to ensure that aggregate fund balances roll forward

appropriately across reporting periods and from one system to another.  *Id.*  The ultimate goal of

this work is to compile transaction records and data from disparate historical systems into a

single, uniform dataset that will facilitate analyses and tests of transaction data and account

balances.  *Id.*  Further, in recognition of the fact that reconciling a single account transaction

may well exceed the amount of many transactions at issue, OHTA has used statistical sampling

methods to reach valid conclusions on the accuracy of land-based IIM accounts and to reduce

costs and time of reaching those conclusions.  *Id. ¶* 18.

Since 2003, OHTA also has worked to develop a programmatic approach to tribal

accounting issues for tribes, including tribes that had not filed cases prior to December 2006.

*Id.* ¶ 17.  As one important project, OHTA entered into a Cooperative Agreement with ITMA in

2004.  *Id.*  ITMA is a national non-profit tribal consortium the membership of which is

comprised of sixty-five Indian tribes.  *See* Pl.'s Unopposed Mot. To Extend Temporary Stay of

Proceedings (August 7, 2007) at 2, ¶ 4, *Coeur D'Alene Tribe v. Kempthorne*, No. 06-02242

(D.D.C.).  ITMA's mission, among other things, includes providing a forum for tribal

consultation on trust related issues.  *Id*. at 2, ¶ 5.  OHTA has provided financial support under

the terms of the Cooperative Agreement that has enabled ITMA to hire accountants and other

experts to help seven of its member tribes (who ITMA selected) to participate in this Project to

better understand their TRP results and then work with OHTA to develop a methodology that

aims to produce information to resolve any still-disputed tribal account balances. *See* Swimmer

Decl. ¶ 17. To date, the Project has produced a draft methodology that proposes to test

disbursements, evaluate investments and assess the completeness of tribal accounts. *Id.*

### B.    Trust Reform Regulatory Initiative.

Moreover, beginning in 2004, Interior also began to consult with tribes on the

development of regulations intended to establish an administrative agency process for resolving

trust account holder questions or concerns about their trust funds accountings. *Id.* ¶ 19. Interior

first described the concepts of this draft regulation in a September 2004 letter to the leaders of

federally-recognized tribes. *Id.* Interior received written comments from only four tribes in

response; all of which requested more specific information on this proposal. *Id.* On December

27, 2005, and July 7, 2006, Interior shared copies of the preliminary draft of the regulatory

language with the leaders of federally-recognized tribes as well as other organizations in Indian

Country, again seeking comments and recommendations. *Id.* Interior also presented those

preliminary drafts to - and sought comments from - tribes at three tribal consultation meetings:

in Albuquerque, New Mexico, on February 14, 2006; in Portland, Oregon, on August 15, 2006;

and in Albuquerque on August 17, 2006. *Id.*

**IV.     Issues and Considerations to be Addressed to Complete the Accountings Owed to the Tribes**

As stated above, if the Court grants Interior's remand and litigation stay requests, Interior will prepare and present an accounting plan that addresses the plaintiffs' requests for accountings of their trust funds and non-monetary trust assets, and fully articulates the agency's factual and legal determinations of its various tribal accounting duties under law.  *Id.* ¶ 22.  In particular, while producing this accounting plan, among considering other issues and questions, as set forth in the Swimmer Decl. ¶¶ 20-26, Interior will address and determine a slate of factors including, but not limited to, whether or how:

- prior accountings, reconciliation, auditing and reporting efforts by Interior, other government agencies and private accountants may be relied upon in the present accounting effort, particularly in avoiding duplicative efforts by Interior;

- to conduct a formal cost benefit analysis of the value of any further work;

- to determine accurate cash balances in tribal accounts, such as by analyses and tests (including but not limited to those that use statistical sampling methods) of the accuracy and completeness of the postings to accounts;

- to determine the types, quantity and quality of documents necessary for the analyses and tests of the accuracy and completeness of the postings to accounts;

- to present accounting information to each tribe and determine the degree of detail to provide for each transaction;

- to include other accounts in the accounting, such as tribal IIM accounts and closed accounts;

- to establish a starting and ending date for the tribal accountings, which may vary by tribe or account;

- to conduct and incorporate into its accountings a review and accounting of non-monetary assets, such as real property and natural resources;

- to sequence its accountings - such as by tribe, account type, time period, sample basis, revenue source, or pilot scale and full scale testing;

- to solicit the input of tribes into accounting issues raised by tribes and the exceptions they have raised to accounting products provided to date;

- to incorporate ADR, other negotiation processes, and exceptions to any general rules for tribal accountings into its plan and process for administratively completing accountings;

- to allocate its budget among settlement efforts, litigation support, and formal tribal accountings, as well as between tribal and IIM work;

- to promulgate a formal rule to cover some or all of these matters, including an administrative appeal process;

- to address prior reports criticizing Interior's trust asset management and accounting;

- other applicable law, such as the Indian Claims Commission Act, the Interior appropriations riders and acts and many aspects of Title 25 of the United States Code regarding trust asset management, affects the determination of what accounting is owed;

- a tribe's response or failure to respond to the TRP affects its claim to any further accounting; and

- to exercise its discretion as to other aspects of the accounting to the extent permitted by law.

Additionally, in the tribal accounting plan, Interior will analyze and evaluate the similarities and differences between IIM accountings and those that have been and will be performed for tribal accounts. *Id.* ¶ 23. In conducting this analysis and evaluation, Interior will examine closely all of the relevant trust fund and non-monetary trust resource characteristics of the tribes. *Id.* Unlike the IIM account holders, the tribes with trust fund accounts were provided the results of the TRP which included, among other things, a statement of account balances as of a given date and an accompanying request to verify the accuracy of that stated balance. *Id.*

In contrast to the IIM accountings, tribal accountings implicate the Government-to-Government relationship that exists between the federal government and each individual tribe.

17

*Id.* ¶ 24.  The Indian Reorganization Act of 1934 (c. 576, 48 Stat. 984, *codified as amended at* 25 U.S.C. §§ 461 *et seq*.) and other laws have given tribes a great deal of autonomy over the management of their trust assets.  *Id.*  Some tribes have existed continuously as sovereign entities since time immemorial, and have trust assets dating back to the nineteenth century; others have been federally-recognized only in recent decades.  *Id.*  Some tribes have considerable assets, others very few; some tribes have only a single trust account, consisting perhaps of a judgment fund, while others have multiple types of accounts, dating from different times and containing funds from different sources (such as timber or other natural resource revenues).  *Id.*  In addition, each tribe has a potentially different starting date for the historical accountings of each of its accounts, depending upon factors such as when that account was opened, the effect of the Indian Claims Commission Act, and whether any tribal rights to an accounting as to any specific tribal account have been extinguished through litigation.  *Id.*

As part of its tribal accounting plan, Interior will also review and address the tribes' non-monetary trust asset accounting claims.  *Id.* ¶ 26.  This review and determination requires Interior to consider and decide numerous factual issues.  *Id.*  For instance, some tribes have never had any land held in trust for them by the United States, while some tribes have land-based assets which are not now or, at various times, have not been under federal management and control but instead are or have been held and entirely managed by those tribes themselves.  *Id.*  Interior needs to determine the level of land-based or non-monetary asset accounting owed to those tribes in all of those situations.  *Id.*  Interior also needs to examine and determine the significance and impact, if any, of all of the already-existing accounting-related products that have been available to the tribes.  *Id.*

In preparing its tribal accounting plan, Interior will consider and decide whether and how to apply the accounting expertise that it has developed in the tribal trust litigation since 2002, and the insights that it has gained in its consultations with tribes in Indian Country on the regulatory initiative since 2004, among other factors. *Id.* ¶ 21. In doing so, Interior needs to provide due consideration to tribes' specifications of any defects they believe exist in any financial information Interior previously has provided to them (including, but not limited to, the TRP results, account statements and source documents). *Id.*

Further, the determination of what additional work to perform in the production of an historical accounting for a particular tribe must be made after careful analysis of all the relevant characteristics of a tribe. Each tribal nation has unique features. As a result, the features of the historical accountings for tribes may differ from tribe to tribe, although the production of all tribal accountings will be guided by the tribal accounting plan Interior intends to produce on remand.

## V.    Relief Requested in Plaintiffs' Various Complaints

A significant number of tribes with tribal trust fund accounts have filed suits against Interior, Treasury, and/or the United States regarding their trust funds and trust assets. There are presently 102 tribal trust accounting and trust management lawsuits pending in the Federal District Court for the District of Columbia, the Court of Federal Claims, and various Federal District Courts in Oklahoma.[9] There are twenty-eight different judges presiding over the 102

---

[9]   Specifically, of the 102 cases, 56 cases are in the Court of Federal Claims, 37 are in the Federal District Court for the District of Columbia, and nine are in various Federal District Courts in Oklahoma. *See, e.g.*, Exh. 1, Unopposed  Motion for Extension of Time to File Remand Motion, Docket No. 23, *Confederated Tribes of the Goshute Reservation v. Kempthorne*, (Civ. No. 06-cv-01902).

cases.  Additionally, in two of the thirty-seven cases filed here in the District of Columbia, two groups of named tribes seek class action status to represent over 250 tribes.  *See Nez Perce Tribe, et al., v. Kempthorne*, (D.D.C. No. 06-cv-02239); *Te-Moak Tribe of Western Shoshone Indians v. Kempthorne*, (D.D.C. No. 05-cv-02500).  The thirty-seven cases pending before this Court involve fifty-four named tribal plaintiffs.  *See* Swimmer Decl. at ¶ 8.

In the thirty-seven cases pending before this Court, the tribes make essentially similar allegations regarding the trust accounting and trust duties and responsibilities owed by the defendants.  *Compare Compl. in Ak-Chin Cmty. v. Kempthorne* (Civ. No. 06-cv-02245) ¶ 16, and *Compl. in Confederated Tribes of the Goshute Reservation v. Kempthorne* (Civ. No. 06-cv-01902) ¶ 24, with *Compl. of The Osage Tribe of Indians of Oklahoma v. Kempthorne* (Civ. No. 04-cv-00283) ¶¶ 6-14; 19-21.  While each of these tribal suits pleads diverse facts, each and every plaintiff requests this Court to declare that the tribe has not received "complete" accountings of its tribal trust accounts.  *See, e.g.*, *Compl. in Ak-Chin Cmty. v. Kempthorne* (Civ. No. 06-cv-02245) ¶ 37-38; *Compl. in Confederated Tribes of the Goshute Reservation v. Kempthorne* (Civ. No. 06-cv-01902) ¶ 30; *Compl. of The Osage Tribe of Indians of Oklahoma v. Kempthorne* (Civ. No. 04-cv-00283) ¶ 34.  The tribes also are unanimous in asking this Court to define the required accounting and order Interior and/or the Treasury to provide a complete accounting.  *See, e.g., Compl. in Ak-Chin Cmty. v. Kempthorne* (Civ. No. 06-cv-02245) ¶ 42; *Compl. in Confederated Tribes of the Goshute Reservation v. Kempthorne* (Civ. No. 06-cv-01902) ¶ 34; *Compl. of The Osage Tribe of Indians of Oklahoma v. Kempthorne* (Civ. No. 04-cv-00283) ¶ 38.

20

**ARGUMENT**

As set forth below, this Court has authority to grant defendants' remand motion based on application of the primary jurisdiction doctrine, which allows an agency to resolve issues within the agency's expertise before they are adjudicated.  Here, the presentation of an historical accounting plan setting forth the complicated factual, technical, fiscal and policy matters that must be decided to conduct an historical accounting of tribal trust accounts does not fall within the conventional experience of courts, requires application of Interior's expertise, and, in enabling Interior to craft an overarching programmatic approach, lessens the potential for inconsistent conflicting outcomes.

Another similar though distinct basis upon which this Court can grant a remand is the Court's equitable authority.  Good cause exists to hold these cases in abeyance while Interior prepares to present its plan detailing the scope of historical tribal accountings.  As explained more fully below, applicable precedent fully supports granting an agency's request for a voluntary remand when the agency's reasons for seeking the remand are "substantial and legitimate," when the agency seeks a remand to reconsider a prior action or decision, or when intervening events prompt the agency to seek to revisit or reconsider a prior action or decision in light of those events.  Under these factual circumstances, the appropriate course is for this Court to grant defendants' motion for a remand to Interior so that it may present its historical accounting plan for tribal trust accounts.

I.    **THE COURT SHOULD REMAND TO THE DEPARTMENT OF THE INTERIOR AND STAY THIS LITIGATION BASED ON APPLICATION OF THE PRIMARY JURISDICTION DOCTRINE.**

Under the primary jurisdiction doctrine, a Court can remand an issue to the expert agency to decide the matter in the first instance. Plaintiffs have requested that this Court order defendants to provide them with full and complete accountings for their tribal trust fund accounts. *See supra*. The first step in providing a full and complete accounting is the preparation of a historical accounting plan detailing how the accountings should take place. Defendants request a remand so that Interior can provide this Court and plaintiffs with just such a historical tribal accounting plan. As detailed throughout the Swimmer Declaration, in crafting a plan capable of guiding accountings for the unique situations of all tribal trust accounts, Interior must make numerous factual, technical, fiscal, legal and policy determinations. *See generally* Swimmer Decl. To the extent that the expertise required to make these determinations lies within the specialized abilities of the agency, providing Interior the opportunity to craft a systematic and programmatic approach, lessens the potential for inconsistent conflicting outcomes given that twenty-eight judges are handling these cases. The Court should remand to Interior and stay the litigation based on the primary jurisdiction doctrine.

The primary jurisdiction doctrine is a "common law doctrine used to coordinate administrative and judicial decisionmaking." *Red Lake Band of Chippewa Indians v. Barlow,* 846 F.2d 474, 476 (8th Cir. 1988) (case involving tribe's claims that Interior had not given suitable accounting of trust funds remanded to Interior on basis of primary jurisdiction doctrine). It "comes into play whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative

body." *United States v. Western Pacific R.R.*, 352 U.S. 59, 64 (1956) (*Western Pacific*);  *see also*

*Reiter v. Cooper*, 507 U.S. 258, 268 (1993) (recognizing that primary jurisdiction applies to

claims "contain[ing] some issue within the special competence of an administrative agency");

*Brawner Building, Inc. v. Shehyn*, 442 F.2d 847, 856 (D.C. Cir. 1971) (same).

Although no fixed formula exists for its application, "the question is whether the reasons

for the existence of the [primary jurisdiction] doctrine are present and whether the purposes it

serves will be aided by its application in the particular litigation." *Western Pacific*, 352 U.S. at

64.  "The primary jurisdiction doctrine is premised on a desire for uniform outcomes and on the

inherent advantage in allowing an agency . . . to apply its expert judgment to the issues in

dispute." *Total Telecommunications Services, Inc. v. AT & T,* 919 F. Supp. 472, 478 (D.D.C.

1996), *aff'd,* 99 F.3d 448 (D.C. Cir. 1996).  Primary jurisdiction "is concerned with promoting

proper relationships between the courts and administrative agencies charged with particular

regulatory duties." *Western Pacific*, 352 U.S. at 63.  The posture of a suit - such as these thirty-

seven cases - as a declaratory judgment "strengthen[s] the case for primary jurisdiction" because

federal declaratory judgments "are not to be used to preempt and prejudge issues that are

committed for initial decision to an administrative body." *Allnet Communications Service Inc. v.

National Exchange Carrier Ass'n.,* 965 F.2d 1118, 1121 (D.C. Cir. 1992) (quotation marks and

internal citations omitted).

Under the doctrine, a court should refer a matter to an administrative agency for

resolution, "even if the matter is otherwise properly before the court, if it appears that the matter

involves technical or policy considerations which are beyond the court's ordinary competence

and within the agency's particular field of expertise." *Himmelman v. MCI Commc'n Corp.*, 104

F. Supp. 2d 1, 3-5 (D.D.C. 2000) (quoting *MCI Commc'n Corp. v. AT&T*, 496 F.2d 214, 220 (3d

Cir. 1974) (quotation marks and citation omitted)); *see also Allnet Commc'n Service, Inc.,* 965

F.2d at 1120 ("Expertise, of course, is not merely technical but extends to the policy judgments

needed to implement an agency's mandate."); *American Ass'n of Cruise Passengers v. Cunard

Line Ltd.*, 31 F.3d 1184, 1186 (D.C. Cir. 1994).  Remand to an agency is appropriate where "a

prior agency adjudication of [the dispute] will be a material aid in ultimately deciding [the

issue]."  *Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 305 (1973).

      The courts traditionally have considered four factors in determining whether to apply the

primary jurisdiction doctrine whether: (1) the question at issue is within the conventional

expertise of judges; (2) the question at issue lies particularly within the agency's discretion or

requires the exercise of agency expertise; (3) there exists a substantial danger of inconsistent

rulings; and (4) a prior application to the agency has been made.  *See Total Telecommunications,*

919 F. Supp. at 478 (citing *AT&T v. MCI,* 837 F. Supp. 13, 16 (D.D.C. 1993)).  The fourth factor

– whether a prior application to the agency has been made – is essentially inapplicable to the

situation here because none of the tribes have alleged they requested an accounting from Interior

prior to filing the instant suits (or, more importantly, that Interior denied them a previously

requested accounting).  Based on application of the three applicable factors, the Court should

remand to Interior for preparation of a tribal historical accounting plan and stay this litigation

during the pendency of the remand.

A.    **Preparation of an Historical Accounting Plan Raises Issues of Fact Not Within the Conventional Experience of Courts.**

As to the first of the four elements of primary jurisdiction, the doctrine emphasizes that the court should defer to the appropriate specialized agency in cases that raise "issues of fact not within the conventional experience of judges." *Himmelman,* 104 F. Supp. 2d at 4 (quoting *Far East Conference v. United States*, 342 U.S. 570, 574 (1952)).  The issues of fact pertinent here arise largely from Interior's trusteeship of and responsibility to account for, funds held in trust by the United States for the benefit of an Indian tribe pursuant to federal law, and the 1994 Trust Fund Reform Act, in particular.  For over a century, Interior has developed and implemented its own policies, regulations, specialized business systems and forms for handling funds and maintaining its records of account, under varied statutory and treaty-based mandates.  *See* Swimmer Decl. ¶ 5 (generally discussing the historical and current systems for tribal trust fund accounting throughout the years).  The many technical and intricate questions regarding the parsing and organization of Interior's accounting records are not within the conventional experience of courts.  Interior is in a better position to distill the facts and circumstances regarding trust funds management presented in these cases, such as ascertaining ownership of particular accounts and interpreting  Interior's forms and records.  *See* Swimmer Decl. ¶ 20-26 (discussing other factors to be taken into account while setting forth a historical tribal accounting plan).

The Court also should delay forging ahead in these cases when there is a strong likelihood that agency action may simplify a complex fact pattern.  *See Rohr Indus. Inc. v. Washington Metro. Area Transit Auth.*, 720 F.2d 1319, 1325 (D.C. Cir. 1983).  This proposition is well established even in the trust accounting context, where, for example, the Indian Claims

25

Commission adopted a procedure in adjudicating accounting claims filed by Tribes that

obligated the government to compile an accounting after a Tribe's filing of a petition, but prior

to judicial review. *See Sioux Tribe v. United States*, 12 Ind. Cl. Comm. 541, 549-50 (1963)

(Exh. 1); *American Indians Residing On Maricopa-Ak Chin Reservation v. U. S.*, 667 F.2d 980,

1002 n.62 (Ct. Cl. 1981). Thus, the fact that preparation of a historical tribal accounting plan is

outside the conventional experience of courts weighs in favor of applying the doctrine here.

**B.      Preparation of a Tribal Historical Accounting Plan Requires the Expertise of Interior.**

The second factor - whether the question at issue lies particularly within the agency's

discretion or requires the exercise of agency expertise - conclusively applies in these cases

because the 1994 Trust Fund Reform Act plainly vests responsibility for providing an accounting

for Indian tribes with Interior. *See* 25 U.S.C. § 4011(a). It is settled that the Act's text "offers

little help in defining the accounting's scope." *Cobell v. Norton*, 428 F.3d 1070, 1074 (D.C. Cir

2005) ("Cobell XVII"). The accounting "require[s] subject-matter expertise and judgment about

the allocation of scarce resources" that is best left to the discretion of administrators. *Id*. The

same is true for setting forth the scope of the historical tribal trust accountings. Here, Interior is

the actor with primary responsibility for "'work[ing] out compliance' with the broad statutory

mandate." *Id.* at 1076 (citation omitted). Accordingly, Interior should determine and then set

forth the scope of the historical tribal accountings within its historical tribal trust accounting

plan.

Interior is expressly charged under the 1994 Trust Fund Reform Act in particular with

weighing a host of technical and policy considerations regarding the discharge of its trust

accounting duties that call upon its expertise. For example, Interior can best determine the costs

26

and benefits of performing a wide range of accounting tasks for a host of individual tribes with many overlapping similarities as well as differences. *See* Swimmer Decl. ¶ 22 & 26; *Cobell XVII*, 428 F.3d at 1076 (noting that because neither the congressional record nor common law trust precepts establish a definitive balance between exactitude and cost, this Court owes substantial deference to the scope of an accounting as devised by Interior). For example in properly drawing upon its expertise, Interior intends to consider statistical sampling along with other methods for determining the accuracy and completeness of tribal trust fund accounts as a component of its historical tribal accounting plan. *See* Swimmer Decl. ¶ 18; *see also Cobell XVII*, 428 F.3d at 1077-79 (holding that the use of "statistical sampling" by the Secretary in the context of an accounting for IIM accounts was an appropriate use of discretion by the agency). Thus, the fact that Interior has unique expertise provides definitive support for application of the doctrine.

**C.    Remand to Interior Appropriately Lessens the Potential for Inconsistent Outcomes.**

The third factor also weighs in favor of a remand, because a substantial danger of inconsistent outcomes exist if the accounting issues are not remanded. This factor targets the possibility of this Court issuing a ruling on a matter requiring the weighing of competing policies before the agency charged with fulfilling a statutory mandate has itself completed its decisionmaking on the same matter. *See Atchison, Topeka & Santa Fe. Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 821 (1973) ("A court should refrain from expressing a preliminary view on what national transportation policy permits, before the ICC expresses its view."); *but cf. Allnet Communication Service*, 965 F.2d at 1120 (concern relates to disparate courts resolving issues inconsistently). This sort of conflict between the role of the court and the agency has already

27

arisen in the related case of *Cobell v. Kempthorne*, where the Court of Appeals for the D.C. Circuit reversed this Court's entry of an injunction on the basis, *inter alia*, that it wrongfully "treated the character of the accounting as its domain . . . [and] erroneously displaced Interior as the actor with primary responsibility for 'work[ing] out compliance with the broad statutory mandate.'" *Cobell XVII*, 428 F.3d at 1076 (citations omitted). Likewise, "sound discretion may require that the judicial tribunal wait until there is initial consideration by an agency." *Brawner Building*, 442 F.2d at 855. Here, the plaintiffs would have the Court specify defendants' historical accounting and other obligations. But, assuming arguendo that such claims are properly before this Court, it would nevertheless be error for the Court to specify such duties before Interior has first articulated its view as to the proper scope of historical accountings for tribal trust funds and other assets, especially because the accountings may vary by tribe, account, or other significant attribute. Further, the accountings should be coordinated by Interior through one historical tribal accounting plan that considers and weighs the proper sequence of tasks necessary to perform accountings for the plaintiffs and other tribes, all within the limited budgets allocated by Congress for that singular task, and to avoid court orders or other litigation developments from placing inconsistent demands upon Interior. Application of the third factor also results in this Court remanding to Interior.

## II.    THE COURT SHOULD REMAND TO THE DEPARTMENT OF THE INTERIOR AND STAY THIS LITIGATION BASED ON PRINCIPLES OF ADMINISTRATIVE LAW.

### A.    This Court Should Exercise Its Clear Authority to Remand to Interior.

Even outside the context of primary jurisdiction cases such as this one, this Court's authority to grant a remand to the agency is well established. As the Supreme Court has noted:

> There is nothing . . . in the principles governing judicial review of administrative action, which precludes the court from giving an administrative body an opportunity to meet objections to its order by correcting irregularities in procedure, or supplying deficiencies in its record, or making additional findings where these are necessary, or supplying findings validly made in the place of those attacked as invalid. The application for remand in this instance was not on frivolous grounds or for any purpose that might be considered dilatory or vexatious.

*Ford Motor Co. v. NLRB*, 305 U.S. 364, 375 (1939). Moreover, when a reviewing court is unsure of an agency's reasoning, the proper course is to remand "to afford the agency an opportunity to set forth its view in a manner that would permit reasoned judicial review." *Checkosky v. SEC*, 23 F.3d 452, 462-63 (D.C. Cir. 1994) (separate opinion of Silberman, J.) ("[R]eviewing courts will often and quite properly pause before exercising full judicial review and remand to the agency for a more complete explanation of a troubling aspect of the agency's decision.").

The Court of Appeals for the Federal Circuit in *SKF USA INC. v. United States* has more recently identified a series of well-accepted grounds for granting a request for a voluntary remand:

> [T]he agency may seek a remand to reconsider its decision because of intervening events outside of the agency's control . . . [E]ven in the absence of intervening events, the agency may request a remand, without confessing error, to reconsider its previous position. Finally, . . . the agency may request a remand because it believes that its original decision was incorrect on the merits and it wishes to change the result.

*SKF USA INC. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001) (citing *Lawrence v. Chater*, 516 U.S. 163 (1996)). Moreover, while a court may refuse to grant a remand if the agency's request is frivolous or in bad faith, *see, e.g., Ford Motor Co.,* 305 U.S. at 375, if the agency's concern is "substantial and legitimate, a remand is usually appropriate." *SKF USA*

29

*INC.,* 254 F.3d at 1029.

> **1**.   **Substantial and Legitimate Grounds Justify a Remand and Stay of This Litigation to Permit Interior to Prepare a Historical Accounting Plan for Tribal Trust Accounts.**

Defendants seek a voluntary remand to Interior so that Interior can present a written plan detailing its policies and process for the completion of historical tribal accountings.  *See* Swimmer Decl. ¶¶ 20-26.  Plaintiffs have brought claims requesting historical accountings of their tribal trust accounts and other assets.  *See supra*.  Interior proposes to provide plaintiffs with a major step towards historical tribal accountings, that is, a plan setting forth the scope of such historical tribal accountings.  *See* Swimmer Decl. ¶¶ 20-26.  In formulating that plan, Interior recognizes that it must consider accounting-related products previously provided to the tribes throughout the years, including the TRP materials provided in 1996 pursuant to the 1994 Trust Fund Reform Act.  *Id.* ¶ 22. Further, Interior recognizes that it also must provide a full explanation of its decisions as to the scope of the historical accountings detailed in its forthcoming plan.  *Id*.  Interior has set forth its commitment to providing a plan to give historical accountings for tribal trust accounts.  *Id.* ¶¶ 2 & 20.  In these circumstances, it is in the best interests of all parties, the judicial process, and the Court to afford Interior the opportunity on remand to complete a plan to accomplish that historical accounting.

As noted above, it is incontrovertible that Congress has delegated to Interior the responsibility to account for tribal trust accounts.  *See* 25 U.S.C. §§ 162a(d), 4011 & 4044.  As such, Interior is "the actor with primary responsibility for 'work[ing] out compliance with the broad statutory mandate'" of the 1994 Trust Fund Reform Act, *see Cobell XVII*, 428 F.3d at 1076 (quoting *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004)), and

Interior is the entity with the technical, factual, fiscal and policy knowledge needed to prepare and present an historical tribal trust accounting plan. Interior has set forth policies and intra-agency guidance, and has developed expert understanding of the various accounting systems used throughout the years for tribal trust accounts, as well as of the records they generated. Defendants seek a remand at this time so that Interior can apply the significant information and expertise that it has obtained as the result of its work over the past several years on the tribal and IIM accounting fronts. *See* Swimmer Decl. ¶ 21 (discussing Interior seeking a remand so it can apply the tribal accounting expertise it has developed as the result of its 2002-06 accounting-related work with the earliest tribal trust plaintiffs, the insights gained from its 2004-06 consultations on the Regulatory Initiative and the other factors described in the declaration). The resolution of disputes with tribes over historic trust account balances and other accounting-related claims is a complex, multi-faceted endeavor and does not have easy solutions. *See* Swimmer Decl. ¶¶ 20-26 (discussing the various technical, policy, fiscal and legal decisions that must be made in setting forth a historical tribal trust accounting plan). This Court should permit Interior to explain how it intends to comply with its broad statutory mandate in its historical accounting plan for tribes.

In addition, the 1994 Trust Fund Reform Act makes clear that Congress intended for Interior to have the opportunity to undertake additional accounting work in response to a tribe's objections to a TRP. *See* 25 U.S.C. § 4044(3) (specifying that the Secretary "will undertake to resolve the dispute" over the balance of the account holder's account as reconciled in the TRPs). With regard to the tribes in these cases, Interior has not yet had an opportunity to complete an administrative process as contemplated in the 1994 Trust Fund Reform Act to address the

31

seventeen tribal plaintiffs who disputed their account balances.[10]  *See* Swimmer Decl. ¶ 8.  Nor has Interior set forth an overarching historical tribal accounting plan to guide accountings for other time periods for all tribes.  Interior intends to address how a tribe's response to the TRP may affect its claims to further accounting work as one part of its historical accounting plan. The requested remand will allow the agency to "undertake to resolve" those disputed account balances and any other criticisms or exceptions to its accounting-related work to date, by preparing an historical accounting plan for tribal accounts for these plaintiffs and all tribes.

Congress has also expressed a strong preference for the negotiated settlement of tribal trust accounting disputes, as evidenced by legislation that for several years extended the statute of limitations applicable to TRP disputes, with the aim of encouraging Interior and tribes to negotiate settlements of those claims in lieu of litigation.  *See* The Act to Encourage the Negotiated Settlement of Tribal Claims, Pub. L. No. 107-153, 116 Stat. 79 (2002), as amended Pub. L. No. No. 109-158, 119 Stat. 2954 (2005) (codified at 25 U.S.C. § 4044 note).  In light of Congressional policy to encourage settlement, Interior thus initially organized its tribal historical accounting work to support settlement negotiations with tribes in a case-by-case basis.  *See* Swimmer Decl. ¶ 16; *see also SBC Communications Inc. v. F.C.C.*, 138 F.3d 410, 421 (D.C. Cir. 1998) (stating that it is appropriate for an agency "to make policy choices in small steps, and only as a case obliges it to.").  But, the increase in litigation demanding formal accountings, as of December 2006, is a development that warrants an opportunity for Interior to fully and publicly articulate its rationale as to the form and content of the historic accounting for tribes.

---

[10] In addition, of the tribal plaintiffs here, twenty-one never responded to their Interior about their TRP balances, *see* Swimmer Decl. ¶ 8.  Surely such circumstances weigh in favor of remand.

Importantly, as part of its programmatic approach to a historical tribal trust accounting, Interior intends to consider building in the flexibility to continue with ADR or negotiation processes. *See* Swimmer Decl. ¶ 22.

Third, it would benefit this Court and the parties to have a full administrative record prior to any adjudication of plaintiffs' claims on the merits. The administrative record for historical tribal trust accountings for these plaintiffs has not yet been fully developed. Hence, the Court cannot fully assess the reasonableness of Interior's decisions on these accounting claims until and unless Interior has the opportunity to articulate the bases of its decisions. Particularly since the record would benefit from additional articulation and action by Interior, the Court should not supplant Interior's role as the agency with primary responsibility for tribal trust fund accountings. This is particularly true with regard to making judgments about the allocation of scarce resources in striking a balance between exactitude and cost in defining the scope of the accounting. *Cobell XVII*, 428 F.3d at 1076 (citing *Heckler v. Cheney*, 470 U.S. 821, 831-32 (1985)). In short, it will save the parties and the Court time and expense if the Court remanded the action to Interior at this juncture so Interior may both apply its expertise and present a full record.

Finally, plaintiffs will not be prejudiced by a remand of the record considering the early stage of litigation at which this motion is filed. Litigation of the cases has not advanced significantly; dispositive motions and the administrative record have not yet been filed, and the Court has not yet established a briefing schedule in any of these cases. In fact, some of these cases have been administratively stayed and are proceeding on a settlement track. The likelihood of any prejudice is further diminished by the fact that, even in those cases where

plaintiffs have proposed a case management order to the Court, those plaintiffs have proposed

that the Court proceed in phases, with the first phase to result in a declaratory judgment from this

Court specifying defendants' accounting obligations.  *See, e.g.,* Joint Report Pursuant to Fed. R.

Civ. P. 26(f) and Local Civil Rule 16.3 (Dkt. No. 12) at pp. 9-10, 16-17, *Ak-Chin Indian*

*Community v. Kempthorne*, (Civ. No. 06-cv-22245).  The remand process presents a superior

alternative as a remand will permit Interior first to offer an administrative interpretation of its

accounting obligations.

> ### 2.    Remand is Appropriate to Allow Interior to Consider and Incorporate Additional Evidence Related to Interior's Accounting for Historical Periods.

In *Ethyl Corp.*, the court granted EPA's motion for voluntary remand of the

administrative record to allow the agency to consider new evidence and to make a new decision.

*Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993).  That same rationale justifies a

remand in these cases, to the extent Interior's TRP reports (or other account statements) are

considered to be final agency actions currently reviewable under the Administrative Procedure

Act (APA).[1]  Since furnishing the TRP reports and other account statements to tribes, Interior

has continually updated its body of historical accounting knowledge.  *See* Swimmer Decl. ¶ 16

(explaining that in the settlement and ADR context, Interior has offered briefings to explain the

TRP data and results; examined the TRP Andersen work papers, as well as related document

collections; and prepared numerous accounting analyses and data compilations of trust account-

related materials for those cases); *see also id.* ¶¶ 19 & 21 (stating that Interior intends to consider

---

[1] Under the general review provision of the APA, the agency action challenged by plaintiffs must be identified specifically and must be final agency action.  *See* 5 U.S.C. § 704; *Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990).

the insights gained from its 2004-06 consultations on the Regulatory Initiative during remand).

Moreover, in devising its historical tribal trust accounting plan, Interior will consider and decide

whether and how to apply the accounting expertise that it has developed previously while

negotiating with other tribal entities regarding trust claims. *Id.* ¶ 22. Remand is appropriate to

allow Interior to evaluate the lessons learned as the result of its various accounting efforts

implemented since 2003 while it assesses and defines the nature and extent of tribal accounting

work necessary during remand. *Id.* ¶¶ 18 & 21.

### 3.    Intervening Events Warrant Remand for Completion of an Accounting.

The passage of new legislation or the issuance of a new legal decision that affects the

validity of an agency action are examples of intervening events that will often require a remand

to provide the agency the opportunity to revisit its actions in light of the new developments. *See*

*SKF USA INC.*, 254 F.3d at 1028. In this case, the establishment of trust fund accounting

principles in the *Cobell v. Kempthorne* litigation, based on the 1994 Trust Fund Reform Act (a

statute that applies to accounting obligations for both tribal and IIM trust funds) is a significant

intervening event that warrantS remand to Interior.

Congress' actions with respect to tribal trust fund accounting since 1996 provide another

series of intervening events that warrant remand. As explained above, Congress in the 1994

Trust Fund Reform Act recognized that the TRP reports might not be the final historical

accounting product as it specified that Interior would propose means of resolving account

balance disputes. *See* 25 U.S.C. § 4044(3) (requiring, as part of its report to Congress, a

statement by Interior outlining what efforts Interior will undertake to resolve disputes with tribes

over the TRPs). Congress, however, has never adopted any such legislation. Instead, Congress

35

over the years encouraged Interior to pursue negotiated settlements of such tribal trust

accounting disputes, and even extended the statute of limitations as to the TRP disputes, with the

explicit aim of encouraging Interior and tribes to negotiate settlements of those claims in lieu of

litigation.  The Act to Encourage the Negotiated Settlement of Tribal Claims, Pub. L. No. 107-

153 (2002), read in the context of other legislative actions on tribal trust fund issues,

demonstrates Congress' strong preference that Interior take the initiative in pursuing an

administrative approach to resolving tribal trust fund accounting disputes.  *See* An Act to

Encourage the Negotiated Settlement of Tribal Claims, Pub. L. No. 107-153, 116 Stat. 79

(codified at 25 U.S.C. § 4044 note).  That legislation, the effects of which expired on Dec. 31,

2006, constitutes a significant intervening event that provides further justification for the grant of

the requested remand at this time.

## CONCLUSION

For the foregoing reasons this Court should remand the issues in these cases to Interior

and stay these cases until Interior has completed its final accountings.

Respectfully submitted this 10th day of August 2007,

> RONALD J. TENPAS
> Acting Assistant Attorney General
>
> *s/Maureen E. Rudolph*
> MAUREEN E RUDOLPH
> ANTHONY P. HOANG
> MARTIN J. LALONDE
> KEVIN J. LARSEN
> United States Department of Justice
> Environment and Natural Resources
> Division
> Natural Resources Division
> P.O. Box 663
> Washington, D.C.  20044-0663

Tel: (202) 305-0479
Tel: (202) 305-0241
Tel: (202) 305-0258
Fax: (202) 353-2021

JOHN H. MARTIN
United States Department of Justice
Natural Resources Section
1961 Stout Street, Eighth Floor
Denver, CO 80294
john.h.martin@usdoj.gov
TEL: (303) 844-1383
FAX: (303) 844-1350


Attorneys for Defendant

OF COUNSEL:

PAUL SMYTH
ELIZABETH BRANDON
THOMAS BARTMAN
GLADYS I. COJOCARI
SHANI N. WALKER
Office of the Solicitor
United States Department of the Interior
Washington, D.C.  20240

TERESA DAWSON
Office of the Chief Counsel
Financial Management Service
United States Department of the Treasury
Washington, D.C.  20227

12 Ind. Cl. Comm. 541                                                                541

BEFORE THE INDIAN CLAIMS COMMISSION

| | | |
|---|---|---|
| THE SIOUX TRIBE OF INDIANS OF THE CHEYENNE RIVER RESERVATION, SOUTH DAKOTA, | ) ) ) | Docket No. 114 |
| THE SIOUX TRIBE OF INDIANS OF THE CROW CREEK RESERVATION, SOUTH DAKOTA, | ) ) ) | Docket No. 115 |
| THE SIOUX TRIBE OF INDIANS OF THE LOWER BRULE RESERVATION, SOUTH DAKOTA, | ) ) ) | Docket No. 116 |
| THE SIOUX TRIBE OF INDIANS OF THE PINE RIDGE RESERVATION, SOUTH DAKOTA, | ) ) ) | Docket No. 117 |
| THE SIOUX TRIBE OF INDIANS OF THE ROSEBUD RESERVATION, SOUTH DAKOTA, | ) ) ) | Docket No. 118 |
| THE SIOUX TRIBE OF INDIANS OF THE STANDING ROCK RESERVATION, NORTH DAKOTA AND SOUTH DAKOTA, | ) ) ) ) | Docket No. 119 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| THE UNITED STATES OF AMERICA, | ) ) ) | |
| Defendant. | ) | |

Decided: August 29, 1963

Appearances:

William Howard Payne, Attorney of
Record in Docket No. 114

Marvin J. Sonosky, Attorney of
Record in Dockets Nos. 115, 116,
118 and 119

Arthur Lazarus, Jr., Attorney of
Record in Docket No. 117

Attorneys for Plaintiffs,

Maurice H. Cooperman, with whom
was Mr. Assistant Attorney General,
Ramsey Clark,

Attorneys for Defendant.

Exhibit 1 to Motion for Remand

12 Ind. Cl. Comm. 541                                                542

## OPINION OF THE COMMISSION

PER CURIAM.  These cases are before the Commission as a result of certain motions filed by defendant and petitioners.  All of the cases are extensions of prior Court of Claims cases heard under a jurisdictional act passed in 1920.  Under that act (41 Stat. 738) an accounting was had up to June 30, 1925.  Upon the passage of the Indian Claims Commission Act (49 Stat. 1069) petitions were filed in the above cases wherein it was alleged that the prior accounting had taken place and that as of the end of that accounting period there existed certain balances belonging to the respective petitioners.  It was prayed that defendant be required to audit each and all of petitioners' funds beginning on July 1, 1925 and that such audit show the use and purpose for which petitioners' funds were used or expended from any and all funds then or theretofore in the hands of defendant.

In accordance with the prayers of these various petitions the defendant caused its General Accounting Office to begin preparation of reports setting forth an accounting as requested in the petitions.  Due to the extensive nature of the research made necessary by the course and age of the transactions between the defendant and the various tribes it was obvious that such an undertaking would extend over a period of several years.  For instance, the original accounting under the jurisdictional act in the Sioux cases had taken some nine years to complete.  Because of this the Commission entered orders in these cases allowing defendant sixty days from the date of receipt of the General Accounting Office report in which to answer these petitions.

Exhibit 1 to Motion for Remand

The procedure employed by defendant in these cases under consideration had been to file the General Accounting Office report pertinent to each case along with a motion for a more definite statement or for summary judgment. The body of said motion reads as follows:

> Comes now the defendant, by its Assistant Attorney General, and pursuant to Rule 11(e) moves the Commission for an order directing the plaintiffs to file within sixty days an amended petition making its claim more definite in the following respects:
>
> By specifying separately, with full particulars and details, the instances wherein plaintiffs claim that the defendant is at fault and the particulars upon which the plaintiffs rely to sustain their present general allegation "that their various funds have been depleted by the defendant by improper and illegal disbursements made from said funds by defendant from time to time." (Petition, p. 6).
>
> In the alternative, the defendant moves for summary judgment against the plaintiffs and in support of its motion shows the Commission as follows:
>
> 1. This action seeks to obtain an accounting, subsequent to June 30, 1925, which will show the purposes for which the plaintiffs' funds were used and expended by the defendant since that date. It asks judgment "in such amount as may be found by this Commission to have been illegally or improperly expended by the defendant from the plaintiffs' said funds." (Petition, p. 7).
>
> 2. A prior General Accounting Office report covering the period to June 30, 1925 submitted in 1932, has been adjudicated by the Court of Claims and is not here questioned or involved. (Sioux Tribe v. United States, 105 C. Cls. 658, 725).
>
> 3. On May 22, 1961, the General Accounting Office submitted a supplemental report covering the period from July 1, 1925 to June 30, 1951, setting forth in detail all receipts and disbursements showing uses and purposes with respect to all funds and property of the plaintiffs under all treaties, agreements and acts of Congress. A copy of this report is in the possession of the plaintiffs. The original of this report is herewith tendered as Def. Ex. 1, and is made a part hereof by this reference.

Exhibit 1 to Motion for Remand

12 Ind. Cl. Comm. 541                                            544

> Wherefore, having rendered its full accounting to
> June 30, 1951, the defendant prays that the Commission enter
> an order (1) requiring the plaintiffs to make their peti-
> tion more definite and certain by alleging specifically
> wherein the defendant has improperly or illegally spent
> or disbursed their funds; and (2) providing that, if the
> petition is not made definite within sixty days, the
> plaintiffs shall be deemed to have no objection to the
> accounting rendered by the defendant and to have abandoned
> the assertion of any claim herein, and that summary judg-
> ment of dismissal shall thereupon be entered against the
> plaintiffs in this action.

Petitioner filed a response in opposition to this motion in which

it is stated that the General Accounting Office report shows certain

expenditures but that it, "* * * does not show that said expenditures

were for the benefit of the Crow Creek Indians or were not made in

order to satisfy obligations of the United States under treaties or

agreements." Petitioner's response goes on to say that, "The burden

of proof is upon defendant to demonstrate that its disbursements from

petitioner's trust funds are legal and proper. Sioux Tribe v. United

States, supra, at p. 802." In connection with this same principle

petitioner cites also Seminole Nation v. United States, 316 U. S. 286

(1941) and Menominee Tribe v. United States, 101 C. Cls. 10 (1944).

In addition to the responses to defendant's motions filed by counsel in

Docket Nos. 115, 116, 118 and 119, there were filed motions for further

accounting facts alleging that the General Accounting Office report,

"* * * does not show by what authority the Tribe's funds were expended,

how and for what purposes expenditures were made, or that the funds were

ever expended."

Petitioner in Docket No. 114 in its response to defendant's motion

raises in different language the same contention that the General Accounting

Exhibit 1 to Motion for Remand

Office report is not responsive and that the procedure used by defendant in these cases is an improper attempt on its part to shift the burden of proof from itself to the petitioners.

Petitioner in Docket No. 117 has filed the same response in opposition to defendant's motion as did petitioners in Docket Nos. 115, 116, 118 and 119.

These motions were set for hearing on August 5, 1963, and were argued together by counsel for all parties in the above-entitled cases. The Commission also had the benefit of argument by counsel for other petitioners and defendant in related cases. The motion of defendant in each case is the same and the responses are sufficiently similar that disposition of one will control all.

The question is the procedure to be followed in these accounting cases. A cursory examination indicates that the remaining accounting cases probably are of the same type and therefore capable of being adapted to the same procedure. With that thought in mind the Commission will set forth its determination as to the proper procedure and will follow it henceforth wherever applicable.

As stated above the procedure used by defendant in these cases consists of the filing of a motion for a more definite statement or for summary judgment and making the General Accounting Office report a part thereof by reference. It is the position of defendant that the filing of the General Accounting Office report is all of the response required of it at this stage of the proceedings and will enable petitioners to point out specifically the instances, if any, wherein they contend that

Exhibit 1 to Motion for Remand

12 Ind. Cl. Comm. 541                                              5:6

defendant has failed to properly account in the handling of their
funds. This, defendant, contends, will then put the parties at issue.
Petitioners, on the other hand, contend that it is defendant's burden
to prove that these expenditures were legal and proper. They maintain
that the General Accounting Office report does not constitute a pleading
on the part of defendant and that an answer as such must be filed by
defendant.

With this the Commission does not agree. The filing of the General
Accounting Office reports is a proper response to the petitions. The
reports set forth all receipts and disbursements on behalf of the various
tribes since July 1, 1925, in accordance with the prayers of the various
petitions. The report filed in Docket 114, Sioux Tribe of Indians of
the Cheyenne River Reservation, South Dakota, states in part as follows
in the introductory on pages 1 and 2:

> The petition of the Sioux Tribe of Indians of the Cheyenne
> River Reservation, South Dakota, number 114, was filed before
> the Indian Claims Commission May 24, 1951, under authority
> of the Act of August 13, 1946, 60 Stat. 1049.
>
> The plaintiffs, on pages 5 and 6 of their petition,
> allege that the United States held a balance of not less
> than $1,579,133.01 of plaintiffs' funds on July 1, 1925;
> that the record in a prior action shows a course of im-
> proper conduct by the United States in the use and dis-
> position of funds belonging to plaintiffs; and that funds
> arising out of the sale of lands under the act of March 2,
> 1889, 25 Stat. 888, or funds from miscellaneous receipts
> and other sources have not been accounted for by defendant
> subsequent to June 30, 1925. Plaintiffs request a complete
> audit of all of their funds now or heretofore in the
> hands of defendant, showing use and purpose for which same
> were used or expended, beginning July 1, 1925.

Exhibit 1 to Motion for Remand

The accounting features of this report are divided into three parts, designated as parts I, II, and III as set out in the table of contents. Part I contains the summary of disbursements; Part II, the accounting under the treaty of April 29, 1868, the agreement of September 26, 1876, and various acts of Congress; and Part III sets out the disbursements under other than treaty appropriations. Part IV contains a tabulation of specific treaty appropriations and funds under or from which disbursements were made.

Thus the report shows the primary authority under which expenditures were made. From this report, the treaties and agreements, and the documents available to petitioners in the General Accounting Office it is possible for petitioners to determine which of the various items, if any, reflect a failure on the part of defendant to properly account for its actions in the handling of those particular items.

It is the opinion of this Commission that the desirable procedure to be followed in these accounting cases consists of the filing of the General Accounting Office report by defendant in pursuance of the petition along with such appropriate motion as defendant may see fit under the circumstances. Petitioner will then file in writing within ninety (90) days its specific exceptions, if any, along with its reasons therefor, to any item or items which it contends are in violation of a proper accounting and which should be disallowed. Defendant will file an answer within the usual time. The parties will then be at issue and may proceed to a hearing on the matter. This is the procedure apparently favored by the Commission in prior cases where the problem has arisen although it has never been set forth in its entirety. It appears also to be the procedure followed by the Court of Claims. See The Sioux Tribe, et al v. The United States, 97 C. Cls. 391, 397. In the accounting phase of the

Exhibit 1 to Motion for Remand ·

case of Klamath and Modoc, et al., Docket No. 100-B, the Commission granted defendant's motion to make more definite and certain. A distinction appears to be proper in that the Klamath case petition makes certain affirmative allegations indicating knowledge on the part of petitioner of specific acts on the part of defendant, while these cases contain primarily requests for a general accounting of certain funds already in existence. It appears that Klamath not only seeks an accounting under various acts of Congress but seeks to create funds thereunder. Under those circumstances a motion to make more definite and certain would lie. We do not believe that the motion lies under a normal accounting case where there exists a fund, general or specific, over which defendant has exercised control and was under a duty to maintain proper accounting records to substantiate its actions.

The contention of petitioners that it is defendant's duty to prove that these expenditures were legal and proper may be applicable, but at a later stage. The question involved here is not one of evidence but of pleading and procedure whereby the production of evidence is regulated. The above contention of petitioners is regulated by substantive law first and by pleading and procedure secondly. The burden of proof is a matter which has concerned many legal writers and appears to be resolved primarily on the basis of what experience has shown to be fair under a specific situation. There seems to be no single rule which can cover all the situations that may arise.

This Commission sitting as both judge and jury must ultimately decide the qeustion of whether the burden of proof has been carried in

Exhibit 1 to Motion for Remand

both the sense of the risk of non-persuasion and of going forward with
the evidence.  The question immediately before us concerns the deter-
mination of a method based upon both the substantive law and pleading
whereby both parties to these accounting cases may fairly share the
burden of proof in both its senses.  We do not believe that the pro-
cedure outlined above is an unfair shifting of the burden of proof to
either party.  On the contrary, we feel that by this procedure the burden
is and will be at all times where it should be, depending upon the parti-
cular stage of the proceedings.

     To begin with the accounting report is in response to the petition
and sets forth all of the available information concerning which peti-
tioners have inquired in their petitions.  There is as yet no issue in
controversy under the pleadings and the problem now is to create an
issue or issues if such exists.  To do this the defendant must be
apprised of what item or items, if any, petitioners are aggrieved.  If
there are no such items then the matter is terminated and defendant
should have summary judgment.  To call upon defendant to file an
accounting and then point out to petitioners wherein that accounting
is wrong under the guise of having to carry the burden of proof, as
petitioners seem to wish, would be improper.  This is not a burden to
be placed on defendant at this time.  The accounting reports set forth
all monies received and all expenditures made on behalf of the peti-
tioning tribes by defendant.  It will not be presumed by this Commission
that those figures represent improper conduct on the part of defendant.
To place on defendant at this stage of the pleadings the burden of proof

Exhibit 1 to Motion for Remand

as that term is broadly used by petitioners, would be, in effect, to indulge that presumption.  Therefore it is necessary that petitioners place, if possible, an issue or issues before this Commission by the most reasonable method.  That method consists of exceptions supported by reasons therefor.  In this sense the petitioners are carrying the risk of non-persuasion if they would not have the Commission, sitting as judges, grant a motion for summary judgment.

When the exceptions are properly filed the issues are drawn and possibly no other pleading would be necessary in order to go to a hearing. However, in the interest of simplifying those issues and expediting the hearing and decision of the case, it will be required that defendant file an answer admitting or denying, as the case may be, the item or items to which objection has been made and asserting any other matter by way of defense which it may have.

Upon the filing of the answer by defendant the matter may then proceed to a hearing on its merits if desired by either party or the Commission. At such hearing petitioner and defendant will have an opportunity to examine any witness with regard to the accounting report.  If no hearing is desired the matter may be submitted on briefs with the right of oral argument if desired by either party or the Commission.  This appears to the Commission to be the procedure which is most fair to both parties.

The motions of defendant for a more definite statement or for summary judgment in Dockets Nos. 114, 115, 116, 117, 118 and 119 are denied.

Petitioners' motions for further accounting facts in Docket Nos. 115, 116, 118 and 119 are denied.

Exhibit 1 to Motion for Remand

12 Ind. Cl. Comm. 541                                            551

Petitioners will proceed to file their exceptions within the time specified.

Orders to that effect will be entered and copies thereof as well as copies of this opinion will be filed in each of the above captioned cases.

Arthur V. Watkins
Chief Commissioner

Wm. M. Holt
Associate Commissioner

T. Harold Scott
Associate Commissioner

Exhibit 1 to Motion for Remand

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation v. Norton, *et al.*, ) | Civil Action No. 02-0035 (JR) |
| Standing Rock Sioux Tribe v. Norton, *et al.*,) | Civil Action No. 02-0040 (JR) |
| Three Affiliated Tribes of the Fort Berthold Reservation v. Norton, *et al.*, ) | Civil Action No. 02-0253 (JR) |
| Shoshone-Bannock Tribes of the Fort Hall Reservation v. Norton, *et al.*, ) | Civil Action No. 02-0254 (JR) |
| Chippewa Cree Tribe of the Rocky Boy's Reservation v. Norton, *et al.*, ) | Civil Action No. 02-0276 (JR) |
| Yankton Sioux Tribe v. Norton, *et al.*, ) | Civil Action No. 03-1603 (JR) |
| Osage Tribe of Indians of Oklahoma v. United States of America, *et al.*, ) | Civil Action No. 04-0283 (JR) |
| Crow Creek Sioux Tribe v. Kempthorne, *et al.*, ) | Civil Action No. 04-0900 (JR) |
| Omaha Tribe of Nebraska v. Kempthorne, *et al.*, ) | Civil Action No. 04-0901 (JR) |
| Oglala Sioux Tribe v. Kempthorne, *et al.*, ) | Civil Action No. 04-1126 (JR) |
| The Confederated Tribes of the Colville Reservation v. Norton, *et al.*, ) | Civil Action No. 05-2471 (JR) |
| Wyandot Nation of Kansas v. Kempthorne, *et al.*, ) | Civil Action No. 05-2491 (JR) |
| Rosebud Sioux Tribe v. Kempthorne, *et al.*, ) | Civil Action No. 05-2492 (JR) |
| Winnebago Tribe of Nebraska v. Kempthorne, *et al.*, ) | Civil Action No. 05-2493 (JR) |
| Lower Brule Sioux Tribe v. Kempthorne, *et al.*, ) | Civil Action No. 05-2495 (JR) |

1

| | | |
|---|---|---|
| Prairie Band of Potawatomi Nation<br>v. Kempthorne, *et al.*, | )<br>)<br>) | Civil Action No. 05-2496 (JR) |
| Te-Moak Tribe of Western Shoshone<br>Indians v. Norton, *et al.*, | )<br>)<br>) | Civil Action No. 05-2500 (JR) |
| Cheyenne River Sioux Tribe<br>v. Kempthorne, *et al.*, | )<br>)<br>) | Civil Action No. 06-1897 (JR) |
| Stillaguamish Tribe of Indians<br>v. Kempthorne, *et al.*, | )<br>)<br>) | Civil Action No. 06-1898 (JR) |
| Iowa Tribe of Kansas and Nebraska<br>v. Kempthorne, *et al.*, | )<br>)<br>) | Civil Action No. 06-1899 (JR) |
| Confederated Tribes of the Goshute<br>Reservation v. Kempthorne, *et al.*, | )<br>)<br>) | Civil Action No. 06-1902 (JR) |
| Muskogee (Creek) Nation of Oklahoma<br>v. Kempthorne, *et al.*, | )<br>)<br>) | Civil Action No. 06-2161 (JR) |
| Eastern Shawnee Tribe of Oklahoma<br>v. Kempthorne, *et al.*, | )<br>)<br>) | Civil Action No. 06-2162 (JR) |
| Northwestern Band of Shoshone<br>v. Kempthorne, *et al.*, | )<br>)<br>) | Civil Action No. 06-2163 (JR) |
| Red Cliff Band of Lake Superior Indians<br>Indians v. Kempthorne, *et al.*, | )<br>)<br>) | Civil Action No. 06-2164 (JR) |
| Pechanga Band of Luiseno Mission Indians<br>v. Kempthorne, *et al.*, | )<br>)<br>) | Civil Action No. 06-2206 (JR) |
| Colorado River Indian Tribes<br>v. Kempthorne, *et al.*, | )<br>)<br>) | Civil Action No. 06-2212 (JR) |
| Tohono O'Odham Nation<br>v. Kempthorne, *et al.*, | )<br>)<br>) | Civil Action No. 06-2236 (JR) |
| Nez Perce Tribe, *et al.*,<br>v. Kempthorne, *et al.*, | )<br>)<br>)<br>) | Civil Action No. 06-2239 (JR) |

2

| | | |
|---|---|---|
| Passamaquoddy Tribe of Maine<br>v. Kempthorne, *et al.,* | ) ) ) | Civil Action No. 06-2240 (JR) |
| Salt River Pima-Maricopa Indian<br>Community v. Kempthorne, *et al.,* | ) ) ) | Civil Action No. 06-2241 (JR) |
| Coeur D'Alene Tribe v. Kempthorne, *et al.,* | ) ) | Civil Action No. 06-2242 (JR) |
| Ak-Chin Indian Community<br>v. Kempthorne, *et al.,* | ) ) ) | Civil Action No. 06-2245 (JR) |
| Sokaogon Chippewa Community<br>v. Kempthorne, *et al.,* | ) ) ) | Civil Action No. 06-2247 (JR) |
| Gila River Indian Community<br>v. Kempthorne, *et al.,* | ) ) ) | Civil Action No. 06-2249 (JR) |
| Northern Cheyenne Tribe of Indians<br>v. Kempthorne, *et al.,* | ) ) ) | Civil Action No. 06-2250 (JR) |
| Haudenosaunee: The Onondaga Nation<br>v. Kempthorne, *et al.,* | ) ) ) | Civil Action No. 06-2254 (JR) |

## DECLARATION OF ROSS O. SWIMMER
## IN SUPPORT OF DEFENDANTS' MOTION FOR VOLUNTARY REMAND

Pursuant to 28 U.S.C. § 1746, I, Ross O. Swimmer, declare as follows:

1.     I am the Special Trustee for American Indians in the United States Department of the

Interior (Interior). I have held this position since 2003. As Special Trustee, my responsibilities

include, but are not limited to, oversight of reform efforts for the operation of the Indian fiduciary

trust by Interior's various offices and bureaus, and the direction and oversight of Interior's

current and historical Indian trust accounting activities. I previously served as Interior's

Assistant Secretary-Indian Affairs, from 1985 to 1989, in which capacity I was responsible for

Interior's general policies regarding Indian affairs and for the oversight of Indian activities,

3

principally through the Bureau of Indian Affairs (BIA). I am an enrolled member of the

Cherokee Nation of Oklahoma, and I served three successive terms as its Principal Chief, from

1975 to 1985.

2.      I make this declaration in support of Interior's request for a voluntary remand and

associated stay of the tribal trust accounting and trust mismanagement litigation claims in the

cases specified above, so that Interior can prepare and provide a plan to address the tribes'

request for accountings, as required by law. As described in greater detail below, in preparing

this proposed accounting plan (which it proposes to apply to all tribes), Interior will make a

number of factual, technical, fiscal, legal and policy determinations. Also, as described

specifically below, Interior will review and consider the trust accounting work that it and others

have undertaken in the past and that it is currently undertaking. I recognize and appreciate the

significance of this matter and am committed to having Interior dedicate the necessary and

appropriate resources, within the limits of funding provided by Congress, to prepare and provide

the accounting plan in a timely manner. Specifically, if the Court grants Interior's remand

request and stays the litigation, I am committed to having Interior produce its tribal accounting

plan within six (6) months of the date of the Court's decision granting the remand and staying the

litigation.  In my judgment, after consultation with the offices most involved in the preparation

of a tribal accounting plan, this is a reasonable time period considering the pending workload, the

time necessary to gather additional information from accountants and researchers, and the

possibility of decisions from this Court in the *Cobell* litigation which may affect some of the

considerations in the plan.

3.      I summarize below some of the past and current analyses, data and document collection

4

efforts, and other work by Interior that is directly associated with or relevant to Interior's proposed tribal accounting plan. I believe that this background information is helpful to the Court's consideration of Interior's remand and litigation stay requests. The background information demonstrates tribal accounting work Interior has been doing for the past and Interior's present capability to prepare the proposed tribal accounting plan.

### Tribal Trust Funds and Reports Made to Tribes Before 1994

4.    Interior holds money and lands in trust for American Indian Tribes according to federal law. The number of tribal trust fund accounts under Interior's management has grown over time as a result of events such as agreements and legislation. The two most common kinds of tribal trust fund accounts are known as proceeds of labor accounts and judgment or award accounts. Proceeds of labor accounts relate to revenue generated from activities that tribes authorize to occur on tribal trust lands, *e.g.,* oil and gas development, farming and grazing, while judgment or award accounts relate to judgments or awards that tribes received from federal courts and Congress. Tribes sometimes have had accounts within the Individual Indian Monies (IIM) system; these accounts, sometimes called voluntary deposit accounts or Tribal IIM accounts (as distinct from the "tribal trust fund accounts" I discuss elsewhere in this declaration), were created for a variety of purposes, such as revolving loan funds, tribal enterprises (such as timber mill operations), and income from tribes' undivided interests in allotted lands. Key differences exist between management of tribal trust accounts and IIM accounts such as the tribal trust accounts are not pooled as are the IIM accounts. Also, tribal trust account disbursements are handled differently and normally require different types of authorization (including from tribal councils).

5.    Over the years, Interior has developed and implemented specialized policies, regulations,

5

business systems and forms for handling trust funds and maintaining and reporting its records of account. Prior to 1951, each BIA Agency Office (typically located on Indian reservations) accounted for financial activity using handwritten ledgers and journals. In the early 1950s, Interior installed a more centralized accounting system in the BIA Area (Regional) Offices that integrated all fund types, such as IIM and Tribal. Beginning in 1965, BIA began further centralizing its accounting functions using a mainframe computer, with that conversion completed in the late 1960s. The Trust Funds Management System (TFMS or Finance) was developed and implemented in 1968 and modified in 1974. The earliest date for which Interior now has electronic account and transaction data available for tribes is July 1, 1972 (the Tribal Electronic Ledger Era). These electronic data came from the TFMS system starting in 1982 and were keyed from hard copy TFMS system reports for July 1, 1972-1982. For the period before July 1, 1972 (the Tribal Paper Ledger Era), account and transaction information currently is available only in hard copy reports and ledgers. The Office of Trust Funds Management (OTFM) used TFMS until it converted in April 1995 to the Omnitrust system, a commercial trust management system used by private-sector trust entities, for activity in tribal trust fund accounts. OTFM converted tribal trust fund accounts from Omnitrust to Trust 3000, another commercial trust management system, on March 1, 1999. Interior has the electronic transaction data from the Omnitrust and Trust 3000 time periods.

6.     As tribal leader from 1975-1985, I recall receiving reports from BIA that provided information on beginning and ending balances, receipts and disbursements. (Interior presently provides tribes with more detailed information in their periodic statements of performance, as I discuss below.) I am aware that account specific information about tribal trust fund accounts was

also reported until the early 1970s in the Department of the Treasury's (Treasury) Combined

Statement of Receipts, Expenditures and Balances of the United States Government (Combined

Statement), a published report required to be submitted annually to Congress.

### The Tribal Reconciliation Project

7.    In May 1991, BIA hired the accounting firm, Arthur Andersen LLP (Andersen), to

conduct agreed-upon procedures for the tribal trust fund accounts, commonly known as the

Tribal Reconciliation Project (TRP).  Interior also consulted extensively with tribal groups,

including what now is known as the Inter-Tribal Monitoring Association (ITMA), a national

tribal consortium consisting of numerous federally-recognized tribes, concerning the procedures

that Andersen would use.  The information provided to tribes as part of the TRP results generally

included (1) transaction by transaction account statements (receipts, interest earnings,

disbursements, balances, etc.) for tribal trust fund accounts for the July 1, 1972 (Fiscal Year

1973), to September 30, 1995 (Fiscal Year 1995) period;  (2) a report describing the procedures

performed for the FY 1973 to FY 1992 period and the results thereof, and (3) electronic images

of source documents[1] that supported certain FY 1973 to FY 1992 transactions.

8.    The results of the TRP were provided in early 1996 to tribes with tribal trust fund

accounts.  Those tribes then were asked to attest to the accuracy of their account balances, as

stated in their TRP results, as of September 30, 1995.  I have reviewed the attestation responses

provided by many of the tribes who now have 37 accounting cases pending before this Court.  I

---

[1] Source documents are the various trust fund-related financial documents, including those related to non-investment receipt transactions (e.g., deposit ticket, schedule of collections and journal voucher), investment transactions (e.g., accounts distribution sheet and Treasury market securities purchase form), and non-investment disbursement transactions (e.g., request for withdrawal and voucher and schedule of payment).

note that, for example, four of the tribes: Gila River Indian Community, the Oneida Nation, the Northern Cheyenne and the Stillaguamish each accepted the accuracy of the balances provided to them.[2] The other responses received from the 54 tribes represented in the 37 cases[3] before this Court were distributed as follows: 17 tribes disputed the results; 10 tribes requested more time for review. Twenty-one tribes never responded. Interior then reported to Congress on the TRP results, including these responses from tribes, as required by 25 U.S.C. § 4044.

9.      Following the completion of the TRP, from 1996-1998, Interior attempted to resolve the disputed tribal account balances of which it had been made aware. In part, this was by consulting with tribes (including, but not limited to those with accounting cases before this Court) and then submitting legislative proposals to Congress that recommended measures such as mediation in order to settle each individual tribe's specific claims. Interior also continued to work to reconcile even more of the non-investment transactions than had been completed within the deadline Congress had set for the completion of the TRP.

### Overview of Selected Trust Reform Measures, 1994-Present

10.     In 1994, Congress created the Office of the Special Trustee for American Indians (OST) and charged the Special Trustee with the responsibility to ensure that Interior developed and implemented appropriate reform measures to further discharge its trust duties. In particular, Congress tasked the Special Trustee with monitoring a "fair and accurate accounting" of the trust

---

2 Oneida is part of the Haudenosaunee confederation.

3 Wyandot Nation of Kansas and Mohawk Nations did not receive a TRP. The additional 11 named Plaintiffs under Nez Perce had their own responses; there are five (5) additional tribes under Haudenosaunee. Passamaquoddy had two governing entities, of which only one responded.

accounts. (25 U.S.C. § 4043(b)). By Secretarial Order No. 3197, the Secretary of Interior then transferred OTFM and certain other Agency personnel, with responsibility for managing and administering trust funds, from the BIA to OST in 1996.

11.     Another significant trust reform measure in the post-1994 period relates to the consolidation and safeguarding of Indian records. To date, Interior has indexed and consolidated over 156,000 boxes of inactive Indian-related records, containing an estimated 392 million pages, at the American Indian Records Repository (AIRR) in Lenexa, Kansas.[4] The AIRR is a national repository for American Indian records created in 2004 pursuant to a Memorandum of Understanding between Interior and the National Archives and Records Administration (NARA). Well over half of these boxes contain records pertaining to trust funds and trust assets, while the remainder relate to other BIA programs (such as law enforcement, education and general administration). A significant number of additional boxes of Indian-related records are retained at various other NARA Federal Record Centers and at National Archives such as that in Washington, D.C., as well as at various Interior and Treasury offices across the country.

## Current Accounting Work

12.     As noted above, on April 1, 1995, OTFM began using the Omnitrust system, a commercial trust management system, to account for activity in tribal trust fund accounts, including financial investment holdings. OTFM used Omnitrust to report receipt, disbursement and investment activity to the tribes. The Omnitrust account statements also provided tribes with detail about investment purchases, maturities, and earnings, as well as information about tribes'

---

4 Inactive records are those that are no longer required for the agency's day-to-day activities and that have met the applicable schedule for retirement.

financial investment holdings, as of the date of each statement.

13.    Since OST assumed responsibility for trust funds management in 1996, it has been

performing the current accounting activities.  One important outcome of that current accounting

work is the preparation and delivery of periodic statements of performance, which are required

by the American Indian Trust Fund Management Reform Act of 1994 (the 1994 Act) to be sent at

least quarterly (although tribes may request more frequent statements, and the majority of tribes

are receiving monthly statements).  Statements of performance include information such as types

of receipts, income and disbursements; beginning and ending balances; and financial investment

holdings including earnings, gains and losses.

14.    In 1998, OST began converting trust accounts into the Trust 3000 system, commonly

referred to as the Trust Fund Accounting System (TFAS).  OST converted tribal trust accounts

to TFAS in March 1, 1999.  TFAS facilitates regular reporting to tribes concerning their trust

funds and investment activities.  In addition to the statements of performance described above,

TFAS also provides Interior with reconciliation tools for daily activity.  This daily activity is then

reconciled with the daily financial activity posted at Treasury.  Interior's reporting to tribes also

includes detailed information about the investments held for each account.  On a monthly basis,

OST reconciles financial investment holdings on TFAS to the custodian holding the securities.

Interior works continuously to make key improvements in its trust fund accounting systems and

controls.

## Tribal Work of the Office of Historical Trust Accounting

15.    By Secretarial Order No. 2321, the Secretary of the Interior on July 10, 2001, established

the Office of Historical Trust Accounting (OHTA) within the Office of the Secretary, and

initially charged it with the responsibility to plan, organize, direct, and execute the historical

accounting for IIM account holders. In July 2002, the Order was amended to expand OHTA's

responsibility to include tribal historical accountings. OHTA now performs its historical

accounting work under my direction and oversight, as of June 25, 2007.

16.     Between 2002-2006, OHTA's tribal work focused largely on the specific issues and

questions raised by those tribes that had filed cases prior to December 2006. Rather than proceed

with active litigation, most of those tribes expressed a preference for working with Interior in the

context of settlement negotiations (including ADR). As part of this process, OHTA has provided

briefings on the TRP to these and other tribes; has examined the TRP work papers of Andersen

as well as related document collections; and has prepared various accounting analyses and data

compilations of trust account-related materials. In addition, OHTA has collected a wide variety

of documents to reconcile or otherwise explain tribal transactions, including for periods before

the 1972 start of the TRP (that is, during the Tribal Paper Ledger Era). It also has performed

work to (1) aggregate historical electronic transaction data in such a way that it can be compared

to a control source (i.e., contemporaneous account statements produced for, or by, BIA and/or

OST) and (2) test the data to ensure that aggregate fund balances roll forward appropriately

across reporting periods and from one system to another. The ultimate goal of this work is to

compile transaction records and data from disparate historical systems into a single, uniform data

set that will facilitate analyses and tests of transaction data and account balances.

17.     In the years from 2003 to the present, OHTA also has worked to develop a programmatic

approach to tribal accounting issues for tribes, including tribes that had not filed cases prior to

December 2006. As one important project, OHTA entered into a Cooperative Agreement with

ITMA in 2004. OHTA has provided financial support under the terms of the Cooperative Agreement that has enabled ITMA to hire accountants and other experts to help seven of its member tribes (who were selected by ITMA) to participate in this Project to better understand their TRP results and then work with OHTA to develop a methodology that aims to produce information to resolve any still-disputed tribal account balances. To date, the Project has produced a draft methodology that proposes to test disbursements, evaluate investments and assess the completeness of tribal accounts.

18.    OHTA also has used statistical sampling methods to reach valid conclusions on the accuracy of land-based IIM accounts and to reduce the costs and time of reaching those conclusions. The cost of reconciling a single account transaction may well exceed the amount of many transactions at issue. Similarly, OHTA expects to decide whether and how to utilize statistical sampling methods to test the accuracy and completeness of tribal trust fund accounts. Under my direction, OHTA will evaluate its "lessons learned" from the various accounting-related tasks it has performed to date as Interior assesses and defines the nature and extent of its tribal accounting work during remand.

### The "Regulatory Initiative"

19.    Interior routinely engages in Government-to-Government consultations with federally-recognized tribal nations, as all federal agencies are required to do by, for example, various Presidential directives and Executive Orders.[5] Beginning in 2004, Interior began to consult with tribes on the development of regulations intended to establish an administrative agency process

---

5    *See, e.g.,.* Exec. Order No. 13175, 65 Fed. Reg. 67249 ("Consultation and Coordination with Indian Tribal Governments") (Nov. 6, 2000) *and* Pres. Mem. of April 29, 1994, 59 Fed. Reg. 22951 (*both reprinted in* 25 U.S.C. § 450).

for resolving trust account holder questions or concerns about their trust funds accountings.

Interior first described the concepts of this draft regulation in a September 2004 letter to the

leaders of federally-recognized tribes, which I co-signed.  However, Interior received written

comments from only four tribes in response, and all requested more specific information on this

proposal.  On December 27, 2005, and again on July 7, 2006, Interior next shared copies of the

preliminary draft of the regulatory language with the leaders of federally-recognized tribes as

well as other organizations in Indian Country, again seeking comments and recommendations.

Interior also presented those preliminary drafts to and sought comments from tribes at three tribal

consultation meetings - in Albuquerque, New Mexico, on February 14, 2006, in Portland,

Oregon, on August 15, 2006, and again in Albuquerque on August 17, 2006.  The comments we

received during (and after) these tribal consultation meetings identified several issues that

continue to influence Interior's consideration of the manner in which it will produce accountings

for tribes.  Interior expects to decide whether and how to proceed with this rule-making process

as part of the work it will undertake during the remand period.

### **Interior's Request for Voluntary Remand**

20.     I am committed to ensuring that Interior provides tribes with historical accountings in

accordance with its understandings and interpretations of applicable law.  Interior seeks remand

at this time so that it may further consider, and act upon, the implications of certain recent factual

and policy developments, particularly with respect to the *Cobell* litigation (including the various

judicial decisions as well as the upcoming October 2007 trial) and the anticipated impacts of the

many new tribal suits filed in December 2006.

21.     More specifically,  Interior seeks remand so that it may apply the tribal accounting

13

expertise it has developed as the result of its 2002-2006 accounting-related work with the earliest

tribal trust plaintiffs, the insights gained from its 2004-06 consultations on the Regulatory

Initiative, and other factors (such as those I have described in this declaration) to prepare its

fully-articulated explanations of the features of an historic accounting for tribes that it deems

compliant with law.   In doing so, Interior also welcomes and will give due consideration to all

specifications that may be made by the Tribes of any defects they believe exist in any financial

information Interior previously has provided to them (including, but not limited to, the TRP

results, account statements and source documents).

### **Considerations to be Addressed in Providing Historical Accountings to Tribes**

22.    Interior intends to prepare an accounting plan and accompanying record that fully

articulates its understanding and interpretations of its various tribal accounting duties under law.

In producing the plan, among other issues and questions, Interior will consider various factors

such as, but not limited to, whether or how:

- prior accountings, reconciliation, auditing and reporting efforts by Interior, other government agencies and private accountants may be relied upon in the present accounting effort, particularly in avoiding duplicative efforts by Interior;

- to conduct a formal cost benefit analysis of the value of any further work;

- to determine accurate cash balances in tribal accounts, such as by analyses and tests (including but not limited to those that use statistical sampling methods) of the accuracy and completeness of the postings to accounts;

- to determine the types, quantity and quality of documents necessary for the analyses and tests of the accuracy and completeness of the postings to accounts;

- to present accounting information to each tribe and determine the degree of detail to provide for each transaction;

- to include other accounts in the accounting, such as tribal IIM accounts and closed

14

accounts;

- to establish a starting and ending date for the tribal accountings, which may vary by tribe or account;

- to conduct and incorporate into its accountings a review and accounting of non-monetary assets, such as real property and natural resources;

- to sequence its accountings - such as by tribe, account type, time period, sample basis, revenue source, or pilot scale and full scale testing;

- to solicit the input of tribes into accounting issues raised by tribes and the exceptions they have raised to accounting products provided to date;

- to incorporate ADR, other negotiation processes, and exceptions to any general rules for tribal accountings into its plan and process for administratively completing accountings;

- to allocate its budget among settlement efforts, litigation support, and formal tribal accountings, as well as between tribal and IIM work;

- to promulgate a formal rule to cover some or all of these matters, including an administrative appeal process;

- to address prior reports criticizing Interior's trust asset management and accounting;

- other applicable law, such as the Indian Claims Commission Act, the Interior appropriations riders and acts and many aspects of Title 25 of the United States Code regarding trust asset management, affects the determination of what accounting is owed;

- a tribe's response or failure to respond to the TRP affects its claim to any further accounting; and

- to exercise its discretion as to other aspects of the accounting to the extent permitted by law.

23.     Further, in the tribal accounting plan, Interior will analyze and evaluate the similarities and differences between IIM accountings and those that have been and will be performed for tribal accounts.  In conducting this analysis and evaluation, Interior will examine closely all of the relevant characteristics of each tribe.  Unlike the IIM account holders, tribes with tribal trust

fund accounts were provided the results of the TRP which included, among other things, a statement of account balances as of a given date and accompanying requests to verify the accuracy of that stated balance.

24.    In contrast to the IIM accountings, tribal accountings also implicate the Government-to-Government relationship that exists between the federal government and each individual tribe. The Indian Reorganization Act of 1934 ( c. 576, 48 Stat. 984, *codified as amended at* 25 U.S.C. §§ 461 *et seq.*) and other laws have given tribes a great deal of autonomy over the management of their trust assets.    Some tribes have existed continuously as sovereign entities since time immemorial, and have trust assets dating back to the nineteenth century; others have been federally-recognized only in recent decades.    Some tribes have considerable assets, others very few; some tribes have only a single trust account, consisting perhaps of a judgment fund; others have multiple types of accounts, dating from different times and containing funds from different sources (such as timber or other natural resource revenues).    Tribes also play significant roles in leasing and other asset management decisions, many through their own corporations, and they reside in close proximity to their assets (unlike individuals, who can live thousands of miles away from their often-fractionated assets).    Thus, each tribe has a potentially different starting date for the historical accountings of each of its accounts, depending upon factors such as when that account was opened, the effect of the Indian Claims Commission Act, and whether any tribal rights to an accounting as to any specific tribal account have been extinguished through litigation.

25.    Interior currently maintains approximately 1,450 tribal trust fund accounts for over 300 different tribal entities, as contrasted with the approximately 365,000 IIM accounts implicated in

the *Cobell* litigation. I understand that, as of September 30, 2006, the total trust fund balances held for tribes exceeds $2.9 billion, six times more than that held for individual Indians.[6] The dollar throughput for a tribal trust account generally is much greater than that for any single individual Indian's account. All of these and other distinctions in turn may affect Interior's resolution of issues such as the cost-benefit analysis that will most certainly be a part of its decision-making about the performance of particular accounting or reconciliation tasks.

26.    As part of its tribal accounting plan, Interior will review and address the tribes' non-monetary trust asset accounting claims. The review and determination requires Interior to consider and decide numerous factual issues. For instance, some tribes have never had any land held in trust for them by the United States, while some tribes have land-based assets which are not now, or at various times have not been, under federal management and control, but instead are or have been held and entirely managed by those tribes themselves. Interior needs to determine the level of land-based or non-monetary asset accountings owed to those tribes in those situations. Interior also needs to examine and determine the significance and impact, if any, of all of the already-existing accounting-related products that have been available to the tribes.

---

6 According to the *U.S. Department of Interior Office of the Inspector General: Independent Auditors' Report on the Tribal and Other Trust Funds and Individual Indian Monies Trust Funds Financial Statements for Fiscal Years 2006 and 2005 Managed by the Office of the Special Trustee for American Indians, Report No. Q-IN-OST-0001-2006.*

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 10,

2007.

ROSS O. SWIMMER

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation v. Norton, *et al.*, | ) ) ) | Civil Action No. 02-0035 (JR) |
| Standing Rock Sioux Tribe v. Norton, *et al.*, | ) ) | Civil Action No. 02-0040 (JR) |
| Three Affiliated Tribes of the Fort Berthold Reservation v. Norton, *et al.*, | ) ) ) | Civil Action No. 02-0253 (JR) |
| Shoshone-Bannock Tribes of the Fort Hall Reservation v. Norton, *et al.*, | ) ) ) | Civil Action No. 02-0254 (JR) |
| Chippewa Cree Tribe of the Rocky Boy's Reservation v. Norton, *et al.*, | ) ) ) | Civil Action No. 02-0276 (JR) |
| Yankton Sioux Tribe v. Norton, *et al.*, | ) ) | Civil Action No. 03-1603 (JR) |
| Osage Tribe of Indians of Oklahoma v. United States of America, *et al.*, | ) ) ) | Civil Action No. 04-0283 (JR) |
| Crow Creek Sioux Tribe v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 04-0900 (JR) |
| Omaha Tribe of Nebraska v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 04-0901 (JR) |
| Oglala Sioux Tribe v. Kempthorne, *et al.*, | ) ) | Civil Action No. 04-1126 (JR) |
| The Confederated Tribes of the Colville Reservation v. Norton, *et al.*, | ) ) ) | Civil Action No. 05-2471 (JR) |
| Wyandot Nation of Kansas v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 05-2491 (JR) |
| Rosebud Sioux Tribe v. Kempthorne, *et al.*, | ) ) | Civil Action No. 05-2492 (JR) |
| Winnebago Tribe of Nebraska v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 05-2493 (JR) |
| Lower Brule Sioux Tribe v. Kempthorne, *et al.*, | ) ) ) ) ) | Civil Action No. 05-2495 (JR) |

Prairie Band of Potawatomi Nation )    Civil Action No. 05-2496 (JR)
v. Kempthorne, *et al.*, )
)
Te-Moak Tribe of Western Shoshone )    Civil Action No. 05-2500 (JR)
Indians v. Norton, *et al.*, )
)
Cheyenne River Sioux Tribe )    Civil Action No. 06-1897 (JR)
v. Kempthorne, *et al.*, )
)
Stillaguamish Tribe of Indians )    Civil Action No. 06-1898 (JR)
v. Kempthorne, *et al.*, )
)
Iowa Tribe of Kansas and Nebraska )    Civil Action No. 06-1899 (JR)
v. Kempthorne, *et al.*, )
)
Confederated Tribes of the Goshute )    Civil Action No. 06-1902 (JR)
Reservation v. Kempthorne, *et al.*, )
)
Muskogee (Creek) Nation of Oklahoma )    Civil Action No. 06-2161 (JR)
v. Kempthorne, *et al.*, )
)
Eastern Shawnee Tribe of Oklahoma )    Civil Action No. 06-2162 (JR)
v. Kempthorne, *et al.*, )
)
Northwestern Band of Shoshone )    Civil Action No. 06-2163 (JR)
v. Kempthorne, *et al.*, )
)
Red Cliff Band of Lake Superior Indians )    Civil Action No. 06-2164 (JR)
Indians v. Kempthorne, *et al.*, )
)
Pechanga Band of Luiseno Mission Indians )    Civil Action No. 06-2206 (JR)
v. Kempthorne, *et al.*, )
)
Colorado River Indian Tribes )    Civil Action No. 06-2212 (JR)
v. Kempthorne, *et al.*, )
)
Tohono O'Odham Nation )    Civil Action No. 06-2236 (JR)
v. Kempthorne, *et al.*, )
)
Nez Perce Tribe, *et al.*, )    Civil Action No. 06-2239 (JR)
v. Kempthorne, *et al.*, )
)
)

2

| | | |
|---|---|---|
| Passamaquoddy Tribe of Maine v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2240 (JR) |
| Salt River Pima-Maricopa Indian Community v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2241 (JR) |
| Coeur D'Alene Tribe v. Kempthorne, *et al.*, | ) ) | Civil Action No. 06-2242 (JR) |
| Ak-Chin Indian Community v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2245 (JR) |
| Sokaogon Chippewa Community v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2247 (JR) |
| Gila River Indian Community v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2249 (JR) |
| Northern Cheyenne Tribe of Indians v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2250 (JR) |
| Haudenosaunee: The Onondaga Nation v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2254 (JR) |

## DECLARATION OF DAWN M. BOSWELL

Pursuant to 28 U.S.C. section 1746, I, Dawn M. Boswell, declare as follows:

1. I am employed by the United States Department of the Interior (Interior).

2. I am the Records Section Chief of the Information Management Branch, National Business Center. I have held this position since April of 2006. In my capacity as Chief, I oversee the maintenance of Interior's Secretarial Records. I certify that the attached documents are true and correct copies of Interior department records.

• Recommendations of the Secretary of the Interior for Settlement of Disputed Tribal Trust Fund Accounts (Nov. 13, 1997);

• Letters and Report from Bruce Babbitt, Secretary of the Interior to Hon. John McCain and

3

Hon. Don Young (May 31, 1996);

- Letters and Report from Bruce Babbitt, Secretary of the Interior to Hon. John McCain and

  Hon. Don Young (December 11, 1996), enclosing Proposed Legislative Options in Response

  to Tribal Trust Fund Reconciliation Project Results (1996).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief, and that this declaration was executed on August 10, 2007.

DAWN M. BOSWELL

# ATTACHMENT A

# TO BOSWELL

# DECLARATION

# PART 1



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:

NOV 1 3 1997

Dear Tribal Leader:

Enclosed you will find the Department of the Interior's report entitled Recommendations of the Secretary of the Interior for Settlement of Disputed Tribal Trust Fund Accounts. These recommendations constitute the culmination of our multiyear effort, under the Indian Trust Funds Management Reform Act of 1994, to outline measures to resolve disputed Tribal trust fund account balances. A press release is also enclosed.

This proposal builds on the legislative options for settlement that the Department submitted to Congress on December 11, 1996, and that we sent to you at the same time. After submitting the options to Congress, the Department consulted with and provided an opportunity for written comments from Tribal representatives throughout the country about the approaches we were considering. As you will note from our recommendations, we have significantly altered many of our initial suggestions based on your comments.

The following objectives guided the formulation of this proposal:

- acknowledge and respect Tribal sovereignty;

- achieve a settlement that is fair to both the Indian community and the general public;

- achieve the most resource-efficient settlement of claims (in terms of conserving federal government and Tribal time, money, and staff);

- encourage settlement by providing incentives to settle and disincentives to litigate;

- use the most informal settlement processes available rather than litigation to encourage Tribal participation;

- obtain funding for the settlement without reducing appropriations for the BIA and Office of the Special Trustee budgets and Tribal programs; and

- achieve agreement on account balances through September 30, 1992, or the date of settlement, as an agreed-upon starting point for the future.

The legislation which we propose seeks to settle claims relating to the Department's management of Tribal trust funds for the period July 1, 1972 through at least September 30, 1992, and at each Tribe's option, for the period after 1992 through the date of settlement. Unlike the options presented in the Department's December report, we do not recommend a settlement involving a singular, programmatic action such as an Indian Development Bank. Rather, the proposal recommends a two-stage settlement process for resolving accounting claims. First, the government would pay each Tribe for known errors (regardless of whether it accepts any settlement offer) and would offer each Tribe the opportunity to settle other claims immediately for a specific sum based on a formula that takes into account the particular characteristics of the Tribe's accounts. If the Tribe accepts the offer, claims would be settled according to the formula, and the matter would be closed. If the Tribe does not accept the offer, it would be withdrawn and stage one would be concluded.

In stage two, Tribes would have the opportunity to engage in government-to-government non-binding settlement negotiations with the assistance of a mediator. This opportunity for individual Tribal negotiations was not proposed in the December report, but it was recommended by numerous Tribes during the consultation process. As part of the negotiations, there would be an opportunity to obtain additional data or undertake additional analysis to the extent it would be constructive in reaching a satisfactory resolution of claims. In the event that the mediation process is not successful, a Tribe would be authorized to file a claim in the United States Court of Federal Claims within the parameters defined by Congress in the legislation.

The reconciliation project encompassed the reconstruction of $17.7 billion in non-investment transactions, of which $15.3 billion -- about 86 percent -- were reconciled. For the reconciled transactions, approximately $1.87 million in transactions were in error -- an error rate of only .01 percent. The remaining transactions ($2.4 billion) were deemed to be "unreconciled," meaning that the Department could not locate all source documents required under the Project procedures to verify the accuracy of the general ledger entry for the transactions within the time frame allotted to the reconciliation process. While this does not mean that the $2.4 billion is lost or missing, it indicates that the poor condition of the records and systems did not allow the federal government to conduct a complete audit or provide the level of assurance to account holders that was expected. Work on the unreconciled transactions has continued, reducing the total value of those transactions from $2.4 billion to $1.97 billion.

This proposal is one aspect of a larger, three-pronged effort to account and provide compensation for inadequacies of the past, and reform the Department's management of trust funds. Remedying these inadequacies is a major goal of Secretary Babbitt. First, we have embarked on a concerted program to implement key elements of the strategic plan of the Special Trustee for American Indians to improve the underlying trust management and accounting systems. If we receive the necessary funding for our initiative, significantly upgraded systems will be in place nationwide in three years. Second, we have proposed legislation to halt and reverse fractionated ownership of Indian land. We believe this is a

2

critical element in assuring our ability to manage trust funds properly.

This proposal to settle past claims is the third component. This proposal could affect the interests of all Tribal trust account holders. I encourage you to review this material and participate in the Congressional process through which the proposal will be considered.

Sincerely,

Hilda A. Manuel

Deputy Commissioner of Indian Affairs

Enclosures

3



# Recommendations of the Secretary of the Interior for Settlement of Disputed Tribal Trust Fund Accounts



# TABLE OF CONTENTS

Executive Summary ................................................................................................ 1

1. Trust Funds: An Overview ........................................................................... 3

    Objectives for Settlement Proposal ........................................................ 4

    The Nature of Trust Funds ....................................................................... 4

2. Background On Efforts To Resolve The Problems ............................ 6

    Actions to Reconcile the Accounts ......................................................... 6

    American Indian Trust Fund Management Reform Act of 1994 ....... 7

    The Reconciliation Project Results ......................................................... 8

    Tribes Address the Reconciliation .......................................................... 9

    The Limitations of the Reconciliation ................................................... 9

3. The Department's December Report On Settlement Options ......... 10

    Type 1 Claims ............................................................................................. 10

    Type 2 Claims ............................................................................................. 11

    Type 3 and Other Claims Outside the Scope of the Project ............. 11

    Tribal Comments on the Options ............................................................ 11

4. The Settlement Proposal ............................................................................... 13

    Scope of the Settlement ............................................................................. 13

    Global Settlement ....................................................................................... 14

    Overview of the Settlement Proposal .................................................... 14

    Additional Reconciliation ........................................................................ 15

    Settlement of Known Errors ..................................................................... 16

    Rate of Interest ........................................................................................... 17

    Netting and Forgiveness ........................................................................... 18

    Settlement of Claims for the Period 1972 Through the Date of Settlement ........................ 20

    Stage One: The Settlement Offer ............................................................ 20

    Stage Two: Government-to-Government Negotiations ....................... 21

    Litigated Resolution of Claims for the Period 1972 to Date of Settlement ......................... 22

    Resource Requirements for the Settlement Process ........................... 24

5. Conclusion ........................................................................................................ 26



# EXECUTIVE SUMMARY

The Administration is pursuing a three-pronged strategy to address issues related to the Department of the Interior's administration and management of Indian trust funds. First, in this report we are proposing a legislative approach that utilizes informal dispute resolution mechanisms to address claims that Tribes may have with regard to the Department's past management of Tribal trust fund accounts. Second, in conjunction with the Special Trustee for American Indians, we have developed recommendations for improving the underlying trust management and accounting systems, and are in the process of implementing those improvements. Third, we have proposed legislation to end the increasing fractionation of ownership of Indian allotted lands. This fractionation of interests not only undermines the economic vitality of allottee-owned land, but it also severely complicates the government's management of trust assets and resources.

The recommendations encompassed in this report are the culmination of a five-year, $21-million effort to reconcile Tribal trust accounts as mandated by Congressional directives beginning in 1987, and reconfirmed in the American Indian Trust Fund Management Reform Act of 1994 ("the Act"). As of August 1, 1997, the Secretary of the Interior, through the Office of the Special Trustee (OST), maintains approximately 1,500 accounts for 338 Tribal entities with assets in excess of $2.5 billion. Each year, more than $802 million passes through the Tribal trust funds system. Although not the focus of this report, the OST also maintains over 300,000 individual Indian money (IIM) trust fund accounts through which over $300 million pass each year.

The Tribal Reconciliation Project (the "Project") was undertaken by Arthur Andersen, LLP, ("Arthur Andersen") under the supervision of the Department. The basic reconciliation procedures of the Project encompassed the reconstruction of $17.7 billion in non-investment transactions, of which $15.3 billion — about 86 percent — were reconciled. For the reconciled transactions, approximately $1.87 million in transactions were in error — an error rate of .01 percent. The remaining 14 percent of transactions ($2.4 billion) were deemed to be "unreconciled," meaning that the Department could not locate all source documents required under the Project procedures to verify the accuracy of the general ledger entry for the transactions within the time frame allotted to the reconciliation process. (As described below, reconciliation work has continued resulting in the reconciliation of almost $.5 billion of previously unreconciled transactions). While this does not mean that the $1.97 billion is lost or missing, it indicates that the poor condition of the records and systems did not allow the federal government to conduct a complete audit or provide the level of assurance to account holders that was expected. The results of the Project are described in more detail in this and the earlier reports described below.

Upon completion of the Project, the Act directed the Secretary of the Interior to prepare a report to Congress by May 31, 1996, outlining the Project results and the efforts the Secretary will undertake to resolve disputes regarding Tribal trust account balances. Because Tribes required additional time to review their Project reports, an interim report was submitted to Congress on May 31, 1996, with a supplemental report filed on December 11, 1996 (the "December Report"). The December report also described a series of legislative options for resolving disputes regarding Tribal account balances. The Department engaged in a consultation process with Tribes on those options, including four public meetings and the opportunity to file written comments. The legislative recommendations for resolving disputed account balances contained in this report are based in part on the options in the December report and the comments of Tribal representatives in the consultation process.

The legislation which we propose seeks to settle claims relating to the Department's management of Tribal trust funds for at least the period July 1, 1972 through September 30, 1992, and at the Tribes' option, for the period after 1992 through the date of settlement. Unlike the options presented in the Department's December report and the recommendations of the Special Trustee, we do not recommend a settlement involving a singular, programmatic action such as an Indian Development Bank. Rather, there would be a Tribe-by-Tribe, government-to-government settlement process which would take into account the specific circumstances and claims of each Tribe.

The OST, in conjunction with the accounting firm of Chavarria, Dunne & Lamey, LLC, has continued its efforts to locate documents and reconcile some of the previously unreconciled disbursement transactions utilizing the same procedures used by Arthur Andersen in the Project. Once this process has been completed, the Tribes will be provided with a report describing the impact of the additional work. Under the settlement we propose, the government would identify all errors identified by both the Project and the additional subsequent work ("known errors"), and would pay the Tribes where money was found to be owed, with compound interest, as soon as possible. Because the government, as trustee, is obligated to correct its errors, these payments would be made notwithstanding a Tribe's willingness to settle its other claims.

The proposal then recommends a two-stage settlement process for resolving accounting claims

other than those relating to known errors. First, the government would offer each Tribe the opportunity to settle claims immediately for a specific sum based on a formula that would take into account the particular characteristics of the Tribe's accounts. If the Tribe accepts the offer, claims would be settled by payment according to the formula, and the matter would be closed. If the Tribe does not accept the offer, it would be withdrawn and stage one would be concluded.

In stage two, Tribes would have the opportunity to engage in government-to-government nonbinding settlement negotiations with a mediator. This opportunity for individual Tribal negotiations was not proposed in the December report, but it was recommended by numerous Tribes during the consultation process. As part of the negotiations, there would be an opportunity to obtain additional data or undertake additional analysis to the extent it would be constructive in reaching a satisfactory resolution of claims. If the mediation process is not successful, a Tribe would be authorized to file a claim in the United States Court of Federal Claims within the parameters defined by Congress in the legislation.

This report provides a brief historical overview of Indian trust funds (Part 1), some background on efforts to address the problems relating to trust fund management and accounting, including the Reconciliation Project (Part 2), a description of the Department's December report, including the options for settlement of Tribal claims and Tribal response (Part 3), and in Part 4, a detailed discussion of the Department's settlement proposal.



# 1.  TRUST FUNDS: AN OVERVIEW

For nearly 70 years, Congress and the Executive Branch have made repeated efforts to improve the Bureau of Indian Affairs' accounting systems and procedures. These efforts, however, have never received the resource commitment necessary to keep pace with the task. Meanwhile, the problems and the costs of addressing them have continued to increase.

For the first time in the last six decades, real progress is being made. Secretary Babbitt has made proper accounting and management of Indian trust funds a major priority for the Department. We are proposing to work closely with Congress to compensate any Tribal trust fund account holders that have been harmed by past accounting and financial/trust fund management practices and to fix the systems and practices that led to problems in the first place. With a major reconciliation of the Tribal trust funds completed — at great cost to the United States — and with plans under development to repair and upgrade the basic accounting systems, the Secretary believes that we have a historic opportunity finally to resolve this issue.

This report and proposal is one component of a three-part effort to address this very complex matter. It is the culmination of many years of intensive work and it proposes what we believe is a comprehensive, logical and fair process for compensating Tribes for any losses they may have suffered from July 1, 1972 through September 30, 1992, as a result of the trust fund management and accounting systems in place. At the Tribes' option, settlement could also be reached for the period after 1992 through the date of settlement. We believe that addressing problems of the past is a fundamental component of facing the future.

A second and separate initiative involves building on some of the work of the Special Trustee to overhaul the trust management systems. Earlier this year, the Special Trustee submitted his recommendations to Congress on improving the trust management and accounting systems. The Department reviewed the specific details of the Special Trustee's five-year, $167 million proposal and requested that the Special Trustee further develop the costs and benefits of his system proposals, along with alternatives for achieving the necessary system improvements. As a result, the Secretary and the Special Trustee have developed a more limited approach that focuses specifically on data cleanup, elimination of trust asset processing backlogs and revamping the trust management and accounting systems over the next three years. The Administration will continue to seek funds in its annual budgets to carry out these efforts.

The third component of this effort involves the problem of fractionated ownership of Indian lands. Past Federal law and policy left a legacy of thousands of individual parcels of land in Indian Country with scores or even hundreds of owners. This impedes the ability of the Department and the landowners to maintain the economic viability of the land, and adds massive complexity and expense to the trust management and accounting responsibilities of the federal government. On June 18, 1997, the Administration submitted a legislative proposal to address this issue. If we hope to resolve the problems affecting the federal government's ability to discharge its trust fund responsibilities effectively, all three components of this plan must be implemented.

Resolving claims of the past — the subject of this report — is extremely difficult and there is not one right way to do it. If these were simple and straightforward matters, they would have been resolved long ago. We are proposing what we believe to be a fair, judicious and efficient process for resolving Tribal trust fund claims, taking into account the fact that there is much supporting documentation that has not been found.

Our overriding objective is to achieve fairness and justice with respect to disputes over Tribal trust

account balances. We are committed to doing the best job we can, recognizing the limitations of the current systems and the availability of records, to settle valid Tribal claims. The effort must be principled and undertaken in good faith, paying those to whom money is owed, with due regard to fiduciary obligations, while, at the same time, not providing a windfall where little or no reasonable likelihood of loss exists. Our proposal is consistent with these principles.

## Objectives for Settlement Proposal

The following objectives guided the formulation of this proposal for a legislated settlement of Tribal trust fund claims:

- acknowledge and respect tribal sovereignty;

- achieve a settlement that is fair to both the Indian community and the general public;

- achieve the most resource-efficient settlement of claims (in terms of conserving federal government and Tribal time, money, and staff, including attorneys' and expert witness fees);

- encourage settlement by providing incentives to settle and disincentives to litigation;

- use the most informal settlement processes available rather than litigation to encourage Tribal participation;

- obtain funding for the settlement without reducing appropriations for the OST and BIA budgets and Tribal programs; and

- achieve agreement on account balances through September 30, 1992, or the date of settlement, as an agreed-upon starting point for the future.

This report is a follow-up to an earlier report, submitted to Congress in December, that outlined proposed options for settlement of disputes related to Tribal trust funds. Since submission of that report, we have engaged in consultation with the Indian community on the proposals contained in the report, and Tribal leaders have offered invaluable advice and suggestions on ways to improve the options.

## The Nature of Trust Funds

There are two broad categories of trust fund accounts held by the government for Indians. One type comprises some 300,000 Individual Indian Money (IIM) accounts, each held for a single individual, or in some cases a Tribe, or as a holding account for certain "special deposits." The IIM accounts are currently the subject of a class action lawsuit brought by IIM account holders against the United States, Cobell v. Babbitt, 1:96CV01285 RCL (D.D.C.), and are not covered by the proposal in this report. The parties are working diligently to define a process by which those individual claims pertaining to IIM accounts will be examined and adjudicated.

The other type of accounts — which are the subject of this report — comprise some 1,500 Tribal trust fund accounts held for 338 Tribal account holders, rather than for individuals. The Tribal trust fund accounts contained assets in excess of $2.5 billion, as of August 1, 1997. Each year, more than $800 million in non-investment receipts, transfers and disbursements pass through these Tribal trust accounts. There are several types of Tribal trust accounts, although most fall under the following three categories:

- funds derived from trust resources such as timber, grazing, oil & gas (often designated Indian Money Proceeds of Labor);

- funds derived from awards of the Indian Claims Commission or other judgment awards (judgment funds);

- funds derived from various legislation, including land and water claims settlements (settlement funds, also often called judgment funds).

This proposal sets out a process for resolving claims arising from the Department's management of the Tribal trust fund accounts, from July 1972 through at least September 1992, and at the Tribes' option, for the period October 1992 through the date of settlement.



# 2. BACKGROUND ON EFFORTS TO RESOLVE THE PROBLEMS

Concern about the management of Tribal trust funds has been longstanding. Indeed, the General Accounting Office (GAO) — the investigative research arm of Congress — issued reports as early as 1928 documenting weak accounting practices and other problems in BIA's trust fund management. Prior to 1951, accounting activities were undertaken at each BIA Agency Office (typically located on Indian reservations), using handwritten ledgers and journals. In 1951, an accounting system designed and approved by GAO was installed in BIA Area (regional) Offices. All fund types — IIM as well as Tribal — were integrated in this system. GAO released reports in 1952 and 1955 describing management and systems concerns.

Beginning in 1965, BIA began centralizing its accounting functions on a mainframe computer in Albuquerque, New Mexico. The conversion to the computer system was complete in 1967, although a duplicate manual set of Tribal fund "control accounts" were maintained in Albuquerque until 1987. A new automated accounting system was developed and implemented in 1968 and modified in 1974. In 1982, GAO once again issued reports critical of the management systems. The Environment, Energy and Natural Resources Subcommittee of the House Committee on Government Operations encouraged a three-year investigation into the issue, leading to a report issued on April 22, 1992, entitled *Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund.* The Special Trustee attributes many of today's problems to the failure to upgrade the systems adequately over the past twenty to thirty years.

Congressional appropriators were concerned as well. In 1987, after a series of oversight reports by the GAO, a supplemental appropriations bill directed that trust fund accounts be reconciled and audited. Congress also prevented the outsourcing of trust fund services to a commercial bank until the funds had been audited and recon-

ciled. In 1988, 1989 and 1990, Congress again directed the BIA to take steps to reconcile Indian trust fund accounts back to the earliest possible date. The FY 1990 appropriations language further required that "the results of such reconciliation [be] certified by an independent party as the most complete reconciliation of such funds as possible."

## Actions to Reconcile the Accounts

The BIA began its reconciliation of Tribal trust accounts in 1990. The BIA, the GAO, and the Department's Inspector General worked in conjunction with an ad hoc Tribal advisory group, later named the Intertribal Monitoring Association (ITMA), to develop a "request for proposal" for a reconciliation contract. In May 1991, the reconciliation project contract was awarded to a national accounting firm, Arthur Andersen LLP.

The initial work, called Phase I, sought to determine what records were available, what procedures would be necessary, and what the cost would be of a complete reconciliation for both Tribal and IIM accounts. It found that not all supporting documents could be located, but those that were found could be examined, and that some BIA trust policies, procedures, and systems had deficiencies. As a result, it was agreed through discussions involving the Department, the Office of Management and Budget (OMB), Congress, and ITMA, that a conventional financial audit was not likely to produce meaningful results.

In view of this, the Department, in consultation with OMB and ITMA, began to look at alternative methodologies and approaches. The goal was to produce as accurate an accounting as practicable. Ultimately, methodological procedures were agreed upon by the Department, OMB and Tribal representatives, and were incorporated into the contract with Arthur Andersen. The procedures do not constitute an audit in accordance with

generally accepted auditing standards; however, they were deemed to be the best available approach, given the constraints of the incomplete documentation. These procedures were used by Arthur Andersen to reconcile the Tribal trust fund accounts for the period July 1, 1972 through September 30, 1992.

Appropriation language directed that funds be "audited and reconciled to the earliest possible date." The reconciliation project went back as far as July 1, 1972, in order to focus on the time period that was deemed to likely be the most susceptible to problems or errors. July 1, 1972, is a critical date for several reasons.

On July 1, 1972, all Tribal Treasury appropriation accounts were consolidated into a single Treasury account (approximately 1,000 accounts were combined). Prior to this date, Treasury maintained separate accounts for each Tribal trust fund, typically with separate accounts for principal and interest. These dual sets of accounts would generally make it easier to detect differences; for example, if Treasury received a cash receipt that was not posted by BIA it would be easy to isolate the difference — a variance would show up between the specific account on BIA's books and the specific account on Treasury's books. Such differences were not as easy to identify when the accounts were collapsed into one account. Rather, the sum of approximately 1,000 accounts on BIA books would need to be compared to the one balance on Treasury's books, and if the totals were different, it could be necessary to review the activity in all 1,000 accounts to determine which individual account caused the variance. Nevertheless, consolidation occurred to alleviate the administrative burden of Treasury maintaining a dual system of Tribal trust accounts.

Additionally, in the year following July 1, 1972, Treasury discontinued calculating and posting semi-annual interest income to trust fund accounts. From 1928 to 1972, Treasury had com-

puted and distributed interest on a semi-annual basis for funds residing in Treasury accounts. BIA Offices deposited and posted interest earned from investment activity outside of Treasury. Beginning July 1, 1972, BIA was responsible for computing and distributing the Treasury interest on uninvested funds. For these reasons, July 1, 1972, was considered to be a logical starting point for the reconciliation.

## American Indian Trust Fund Management Reform Act of 1994

In 1994, while the Arthur Andersen reconciliation efforts were ongoing, Congress passed the American Indian Trust Fund Management Reform Act of 1994, 25 U.S.C. §§ 4001-4061, which established the Office of the Special Trustee for American Indians. Under this legislation, the Special Trustee is responsible for oversight, reform, and coordination of the policies, procedures, systems and practices used by various Departmental agencies in managing Indian trust assets. The statute requires that the Secretary transmit to Congress a report that describes the methodology and results of the trust fund reconciliation, includes Tribal attestations as to disputed account balances, and outlines efforts the Secretary will undertake to resolve such disputes. An initial report was submitted to Congress on May 31, 1996, and another on December 11, 1996,[1] with a commitment to provide this final report on the Secretary's

---

[1] Because most Tribes did not have sufficient time to review their reconciliation reports and submit attestations as to their account balances by the May 31 deadline, the Secretary submitted an interim report describing the reconciliation procedures on May 31, and set a deadline of September 27, 1996, for submission of attestation responses. With the extension of the deadline for submitting attestation responses, the Secretary promised to submit a supplemental report to Congress, including proposed legislative options to address disputed account balances, later in the year. The options were discussed in the December 11, 1996, report.

pecific recommen... ...ons fore... ...ling disputed
Tribal account balances.

In accord with the Congressional mandate to have
an independent certification of the Tribal trust
fund reconciliation results, BIA awarded the
certification contract to Coopers and Lybrand LLP
in September 1993. However, due to a projected
cost that far exceeded available resources, the
Special Trustee, after consultation with GAO,
OMB and Departmental officials, terminated the
contract in October 1995, before the certification
was completed. At the Special Trustee's request,
Coopers and Lybrand provided a close-out letter
summarizing the work performed prior to termi-
nation. The letter stated that no conclusions could
be drawn from the preliminary information
reported because the certification work was not
completed. Later, Arthur Andersen investigated
and cleared all Coopers and Lybrand's comments
on the preliminary reports.

## The Reconciliation Project Results

In January 1996, the Department released Project
reports, along with electronic copies of supporting
Project workpapers to Tribal trust fund account
holders summarizing the results of the Project.
The report also requested that Tribes submit
attestations as to whether they accepted or dis-
puted their account balances. The agreed-upon
procedures used in the reconciliation were in-
tended to accomplish the following:

- verify that non-investment financial
  transactions posted to the BIA's official
  accounting records are in agreement with
  available supporting financial source
  documents (the "basic reconciliation");

- assess the accuracy of investment income
  posted to Tribal accounts;

- recalculate the U.S. Treasury interest
  earnings;

- reconcile BIA general ledger balances with
  U.S. Treasury balances;

- verify that financial transactions posted to
  BIA accounting records are in agreement
  with the originating lease or sale
  agreements, permits, or contract terms (not
  completed for all transactions); and

- determine the timeliness of the deposit of
  receipts.[2]

As of December 1995, Arthur Andersen had
examined $17.7 billion in non-investment transac-
tions (251,432 transactions) for the 20-year period
from 1972 to 1992 in the basic reconciliation.
Of that amount, 86 percent of the transactions
(totaling $15.3 billion) were reconciled; that is,
financial records were located to support the
accuracy of the transactions as reflected on BIA's
general ledger. Of the $15.3 billion in reconciled
transactions, an error rate of about .01 percent was
reported. Errors included both overstatements
and understatements of Tribal account balances
by the government, as well as payments made to
the wrong account or Tribe. The 14 percent of
transactions (32,901 transactions) that were not
reconciled totaled $2.4 billion, and included the
following categories of transactions:[3]

$1.1 billion in receipts (payments to accounts);

$808 million in disbursements (drawdowns from
Tribal accounts);

$479 million in transfers between accounts of the
same Tribe.

---

[2] The agreed-upon procedures are described in detail in
the Special Trustee's May 1996 report to Congress.

[3] All values for unreconciled transactions are, rounded
to the nearest million, and expressed in terms of
absolute dollars, which means that the positive and
negative values of the transactions are disregarded.

As described more fully below, OST has continued its efforts to reconcile the outstanding $2.4 billion of non-investment transactions. As a result of those efforts, the unreconciled transaction have been reduced from $2.4 billion to $1.97 billion.

## Tribes Address the Reconciliation

The Project reconciliation procedures and the proposed adjustments to account balances are detailed in the Project report and were explained to the Tribal account holders at a national meeting on February 14 and 15, 1996, in Albuquerque, New Mexico. More detailed individual consultation with OST was provided to Tribal account holders at a series of regional meetings held through July 1996. Upon the conclusion of the meetings, in August 1996, the Special Trustee sent a second request for the Tribes to submit attestations as to acceptance or dispute of their account balances on or before September 27, 1996.

As of May 1997, the OST had received attestation responses from 92 Tribal trust fund account holders. 41 Tribal account holders accepted the account balances as reflected in the reconciliation reports, and 51 account holders disputed the balance. 47 account holders requested additional time for their response. 171 account holders filed no attestation response. Among the reasons given by those account holders that disputed their account balances were inadequate reconciliation procedures, that they needed additional time, and that the records were inadequate. Other more specific comments were also made that do not fall into one of these frequently stated categories.

## The Limitations of the Reconciliation

As noted, despite five years of effort and the expenditure of $21 million, the Project provides a less than complete accounting of the state of the Tribal trust funds. The inadequacy of the trust management systems, policies, procedures and practices, the condition and availability of the trust records, and funding constraints all contributed to the limitations of the Project.

The Project did identify some specific errors (known errors) which resulted in both understatements and overstatements of Tribal trust fund account balances. Those errors should be corrected. The most difficult issues, however, relate to the unreconciled transactions where all required records could not be located to support $1.97 billion of non-investment transactions for the 20-year period of the Project, and to those transactions outside the scope and time period covered by the Project.

Of the $1.97 billion in unreconciled transactions, about $1.1 billion are transactions involving receipt of funds by the government on behalf of a Tribal account from third parties, $363 million are disbursements and $479 million involve transfers among different accounts of the same Tribe.[4]

_____

[4] It is highly unlikely that the $479 million in transfers and approximately $117 million of the unreconciled disbursements actually resulted in any losses to Tribes. Of the disbursements, some $60 million are positive disbursements (i.e., receipts), where even had there been an error, it would have benefitted the Tribe. An additional $22 million was for attorney and expert witness fees and $35.8 million were disbursements of settlement funds to Alaska Native corporations, and it is reasonable to presume that these entities would have filed claims had the payments not been made. Likewise, where transfers among a Tribe's accounts were posted to the general ledger, it is likely that the Tribe had use of the funds, even if they were posted to the wrong account of the Tribe. Nevertheless, because the supporting documentation could not be located for the transactions to be reconciled, for purposes of settlement they will be treated as other unreconciled transactions and compensated through the process described later in this report.

# ATTACHMENT A

# TO BOSWELL

# DECLARATION

# PART 2



# 3. THE DEPARTMENT'S DECEMBER REPORT ON SETTLEMENT OPTIONS

The Department's December report categorized potential Tribal claims into three types (Type 1, 2 or 3) and presented options for resolving each type of claim. As a result of our consultation with Tribes, the proposals contained in this report are significantly different from the settlement options described in the December report. As background, a brief description of the options contained in the December report, as well as Tribal comments on those options, follows:

## Type 1 Claims

Type 1 claims included those claims based on transactions in which an error was identified in the Reconciliation Project, or known errors. The options to address Type 1 claims outlined in the December report were fairly straightforward, because it is the Department's view that known errors due to Tribes must be paid. The options focused on how to pay them. Some of the known errors involved transactions where a Tribe's account balances were understated; others involved overstatements of Tribal account balances. In fact, more errors involved overstatements of Tribes' balances ($14 million plus interest) than understatement ($13.1 million plus interest). Therefore, a total of slightly more than $27 million (absolute value) of known errors was identified for the entire Project.

Type 1 claims also included interest due to a "lag time" between when funds were collected by the BIA and when they were deposited in an account and began to earn interest. Lag time also occurred during the time between when money was deposited by the Minerals Management Service (MMS) and when it was actually credited to the Tribal accounts by BIA. Sometimes, that "lag time" period was longer than it reasonably should have been. We assumed an appropriate period would be no longer than six days for the first type of lag time and that interest be paid beginning immediately when funds are deposited by MMS for the second type. The lost interest calculated as a

result of unreasonable "lag time" amounts to about $4 million ($3.5 million is attributed to BIA deposits and $.5 million is attributable to MMS deposits).

Another category of Type 1 claims is called undocumented "roll forward" amounts. An undocumented roll forward amount occurs when the account balance on the last day of an accounting period (usually a year) was not the same as the account balance on the first day of the next accounting period. Sometimes the balances went up, sometimes the balances went down. Excluding roll forward differences that netted to zero among a single Tribe's accounts, there were $17.5 million in unexplained decreases (no netting) at the conclusion of the Project. This amount has since been reduced to $902, as a result of further OST and Arthur Andersen work to research and document such decreases.

The options identified in the December report for resolving Type 1 claims provided that the government would pay a Tribe where a known error resulted in an understatement of the Tribe's account balance, and would net out and forgive amounts due where the Tribe's account balance was overstated by the government. In addition, the options discussed whether to repay the Tribes with simple interest or compound interest at the so-called Tribal benchmark rate, which is the average annual yield of invested Tribal trust funds for the period. This rate tends to be skewed to the high side because of one large account holder's long-term investments. The December report suggested repayment with simple interest.

The options also addressed whether all overstatements to the accounts should be forgiven and all understatements restored, or whether overstatements should be netted against understatements at the "Tribal" level (all overstatements and understatements to a Tribe's accounts netted against each other notwithstanding whether the errors occurred in the same or different accounts

of that Tribe) or netted at the account level (netting of overstatements and understatements in each account of the Tribe). The report proposed netting at the Tribal level, with forgiveness of any net overstatement.

## Type 2 Claims

Type 2 claims involved circumstances in which a Tribe had additional documentation relating to the Tribal account balance as reconciled that could evidence a previously unidentified error. In addition, Type 2 claims included so-called "passed adjustments," where BIA and Arthur Andersen disagreed on the adequacy of documentation to reconcile a transaction. There were $10,954,684 (absolute value) in "passed" adjustments, of which $4.3 million (absolute value) was subsequently reviewed and cleared by Arthur Andersen. The December report suggested an informal negotiation process between the Tribe and the OST under the auspices of a mediator, in the event there was a disagreement about reconciling a transaction based on the additional Tribal documentation. If mediation was unsuccessful, the transaction would be resolved as a Type 3 claim.

## Type 3 and Other Claims Outside the Scope of the Project

Type 3 claims represented those arising from the $2.4 billion in unreconciled transactions initially identified in the Project. Comments also were sought regarding possible approaches for resolving other claims, including those outside the time frame and scope of transactions considered in the Project. These include, for example, not only pre-1972 claims relating to management and accounting of trust funds, but also those involving the Department's management of the underlying trust assets in any time period.

Developing an equitable process for resolving potential Type 3 claims was not a simple task. On

the one hand, guidelines governing the Project indicated that a transaction would not be considered reconciled without certain documentation to verify that funds were handled as reflected in the general ledger. On the other hand, there was no indication during the course of the Project that Tribal funds had been intentionally misposted, misappropriated, or misdirected, although the Project did not specifically include procedures to examine fraud. And, as noted above, for the 86 percent of non-investment transactions reconciled in the basic reconciliation procedures of the Project, the error rate was low — .01 percent.

To resolve potential claims relating to unreconciled transactions, the Special Trustee's Advisory Board proposed a payment of $300 million to be distributed proportionately to all Tribal account holders, based on the product of the percentage of the Tribe's unreconciled disbursements plus interest and the total of all unreconciled disbursements plus interest. In addition, the Advisory Board proposed a general settlement amount of $300 million that would be used as partial capital for a proposed Development Bank for American Indians, in further settlement of claims arising from the unreconciled transactions. The Department's December report solicited views on whether Tribes would support a global settlement, such as a Development Bank, some other Tribal economic development initiative, or a fractionated ownership land acquisition fund, or whether Tribes preferred individual settlements with each Tribe.

## Tribal Comments on the Options

A series of meetings with affected Tribes was held after the Department submitted its December report to Congress. Tribes also were given 60 days to submit written comments. All of the comments — oral and written — were carefully analyzed and considered in the preparation of our current proposal. A total of 35 different Tribes participated in the four regional hearings held in Portland,

Oregon (January 6, 1997); Denver, Colorado (January 8, 1997; Phoenix, Arizona (January 10, 1997); and Washington, D.C. (January 24, 1997). Transcripts of the hearings were maintained. In addition, written comments were received from 15 Tribes by the closing date of February 12, 1997.

The consultation process was provided as an opportunity for Tribes to comment on the specific options outlined, but the comments went beyond the scope of those options. Rather than summarizing the comments on the specific options here, we have attempted to address many of the comments in describing our settlement proposal and how it was changed from the December report options. In addition, we maintained transcripts of the consultation hearings and those transcripts and the written comments are available for public inspection from the BIA. Some Tribes expressed the following, more generic concerns, which serve as a useful backdrop for the Tribal comments on the options themselves.

Some of the Tribes, both in comments at the meetings and in formal written comments, questioned the nature and scope of the Project and said it was not a reliable foundation on which to base a settlement. They pointed to the fact that its examination of accounts was limited to 1972 through 1992. Others pointed out that some reconciliation tasks (investment analysis) were not performed between fiscal years 1972 and 1977, arguing that the Project amounted to a study of 15 years, rather than 20 years. They also asserted that they had had difficulties accessing the Arthur Andersen work papers. A number of Tribes commented that the Special Trustee had recommended that the Tribes not accept the Project findings. While recognizing the limitations of the Project, we describe the Department's reasons for relying on the reconciliation results in our discussion of the settlement proposal following this section.

A number of Tribes also found fault with the limited time given Tribes to comment between receipt of the options paper in December 1996 and the four regional hearings in January and the deadline for written comments in mid-February 1997. We understand that Tribes may have desired more than 60 days to review and comment on our proposed options; however, we believe that there will be further opportunity for Tribal input as we work with Congress to reach a final resolution of this issue.



# 4.   THE SETTLEMENT PROPOSAL

## Scope of the Settlement

There was significant discussion during the consultation process about the period that should be covered by a settlement. Some suggested that the settlement should cover all Tribal trust fund accounting claims arising during the period 1946 to the date of settlement, since any claims preceding 1946 were extinguished by the Indian Claims Commission Act. Others argued that claims from any period that the Department managed trust accounts should be covered, even as far back as 150 years. There also is a credible argument that 1984 to the date of settlement may be the appropriate period, based on the Tucker Act's general six-year statute of limitations for claims against the government. The basis for this argument is the annual Appropriations Acts for fiscal years 1991 through 1997, which toll the statute of limitations on any claim concerning losses to or mismanagement of trust funds until the affected tribe or individual Indian has been furnished with an accounting of such funds. Accordingly, the Appropriations language preserves all existing claims as of its enactment in 1990, which would include only those six years old or less — in other words, claims from 1984 forward.

After considering all these arguments, the proposed settlement covers at least the period July 1, 1972, through September 30, 1992, and at Tribes' option, through the date of settlement. We have chosen this period for several practical and policy reasons. First, we believe there is little or no legal basis to include claims arising prior to 1946. The Indian Claims Commission statute quite clearly specified that the Commission proceedings were to be the process by which all claims arising prior to 1946, whether in law or equity or based upon fair and honorable dealings, would be settled. That Tribes understood this included claims based on trust fund management is demonstrated by the fact that a significant number of claims involving

federal government management of trust funds were heard and decided by the Commission.

With respect to the possibility of using either 1946 or 1984 as the cutoff points, there are also credible statute of limitations arguments (although the argument for the 1984 date is more persuasive). Nevertheless, we believe the 1984 date would produce a harsh result. In addition, the Committee report language accompanying the Appropriations Acts specifies that the language is intended to preserve claims for discrepancies uncovered during the Reconciliation Project (which covered 1972 to 1992). Most important, we have developed a significant amount of data regarding the Tribal accounts and potential claims from July 1, 1972 through September 30, 1992, and have been performing daily reconciliation of accounts since that time. In contrast, we have accumulated no data about Tribal accounts for the 1946-1972 period. At this juncture any effort to quantify discrepancies and possible losses for the pre-1972 period would be little more than conjecture.

Moreover, the July 1, 1972 date is a natural demarcation because it represents the date on which there was a fundamental change in the manner in which trust funds were managed. As previously noted, prior to 1972, the Department of the Treasury had Tribal accounts listed within its systems, although BIA had some role in reporting the amounts to be placed in the accounts. It was not until 1972 that BIA took on exclusive management responsibility for Tribal trust funds (with one combined account for all Tribes at Treasury).

Finally, this proposal is in the form of a legislated settlement. The July 1, 1972 to September 30, 1992 period, with optional settlement of the post-1992 period, is supported by the extensive analysis performed in the reconciliation and the internal OTFM reconciliation procedures for post-1992, and is a middle ground between the other alterna-

tives, none of which is without legal dispute. Certainly, in the context of a legislated settlement, Congress has the discretion to define the period for which it will agree to settle trust funds claims or even allow the courts to entertain litigation. Should Congress determine that pre-July 1, 1972 claims should be settled, however, the Department could be directed to evaluate possible approaches to determining whether losses were suffered as a result of the management of the Tribal accounts. One approach could be through an extension of the reconciliation process. We are skeptical, however, that such an effort would produce satisfactory results. There is a significant likelihood that many of the relevant documents, more than 25 years old, will not be found. Moreover, the effort would likely be very costly, given that the reconciliation for the July 1972 - September 1992 period took five years and cost $21 million.

Alternatively, there may be statistical or sampling methods that could be used to estimate potential losses. Although it is not yet clear whether sufficient information can be efficiently gathered to develop statistically reliable estimates, if an approach could be successfully developed, it would result at best in a rough estimate of any losses. In short, setting aside the uncertainty about whether the statute of limitations would bar such claims, the Department does not now recommend a settlement process for years preceding July 1, 1972, because it has virtually no data relating to transactions in that period.

## Global Settlement

There has been ample debate about the prudence of attempting to construct a "global settlement" that would resolve the universe of all Tribal claims through some singular, programmatic action. One global settlement suggestion is the Special Trustee's proposal that the settlement proceeds partially fund an Indian Development Bank, with some $600 million in capitalization, to finance Tribal projects. Without endorsing the concept of a global settlement approach, the December report sought comments from Tribes on their interest in such an approach and identified several possible alternatives in addition to a development bank, including a general development fund and a fund for Tribes to purchase fractionated interests in land. The December report noted that in order to be viable, a large portion of Tribes would have to agree to participate in a global settlement. There also would have to be consensus on what the global settlement mechanism would be and what each Tribe's entitlement and participation would be.

Based on comments received during the consultations with Tribes, the Department does not believe that the global settlement approach is workable or desirable. Tribes generally appeared to favor government-to-government negotiations which recognize the individual circumstances of each Tribe and its claims against the federal government. There appeared to be little consensus on what type of global settlement mechanism would be appropriate. In particular, there did not appear to be broad-based support for a development bank, if it were to be funded with money due to individual Tribes. Because there was no consensus on whether a global settlement approach would be appropriate and what form it should take, and because Tribes generally favored an approach recognizing their individual circumstances, this proposal focuses on a process to make settlement payments directly to Tribes. Those payments would, in part, reflect the value of each Tribe's actual claims and would allow Tribes to use their settlement funds as each deems appropriate.

## Overview of the Settlement Proposal

The Department's proposal is designed to provide an opportunity for Tribes to settle all of their Tribal trust fund accounting claims with the government for the period July 1, 1972 through

September 30, 1992, and potentially through the date of settlement.[5] The government would report to Tribes all known errors, and would credit Tribes' accounts in the amount of those known errors due Tribes on a net basis, with compound interest, as soon as possible after the results of the additional reconciliation work have been presented to the Tribes for their review and consideration, and funds are appropriated. The government would credit known errors up front, whether or not a Tribe accepts the government's settlement offer for any other claims.

After crediting the known error amounts to Tribes' accounts, the proposal entails a two-stage settlement opportunity for resolving accounting claims other than those relating to known errors. In stage one, the government would offer each Tribe the opportunity to settle claims immediately for a specific sum based on a formula that takes into account the particular characteristics of the Tribe's accounts. If the Tribe accepts the offer, the settlement would be paid according to the formula and all covered claims against the government would be extinguished. If the Tribe does not accept the offer, it would be withdrawn and stage one would be concluded.

In stage two, Tribes would have the opportunity to engage in government-to-government settlement negotiations with a mediator. The mediation process would be non-binding. As part of this process, there would be a limited opportunity to obtain additional data or undertake additional analysis to the extent it would be constructive in reaching a satisfactory resolution of claims. This aspect of the proposal is a fundamental change from the December report, and is designed to respond to the requests of the Tribes to respect the sovereignty and individual circumstances of each Tribe in settling their claims. If the mediation process does not successfully resolve the Tribe's claims against the government, a Tribe could file a claim in the U.S. Court of Federal Claims.

## Additional Reconciliation

Since completion of the Project, the Department, through the firm of Chavarria, Dunne & Lamey LLC, supported by OST staff, has continued to search for additional documentation to reconcile more of the $2.4 billion in unreconciled non-investment transactions. That work has focused solely on disbursement transactions. Employing the same agreed-upon procedures used in the Project, as of September 30, 1997, OST has reconciled an additional $445 million or 55 percent of previously unreconciled disbursements, thereby reducing the unreconciled transaction from $2.4 billion to $1.97 billion. The results of this additional reconciliation work will be presented to the Tribes for their review and consideration in the near future.

In addition to settlement of claims based on further research of transactions during the Project period of July 1, 1972 - September 30, 1992, the proposal is intended to cover, at the Tribe's option, any claims arising since September 30, 1992, through the date of settlement, based on the ongoing internal reconciliation being performed by OST. For each year since FY 1992, OST has been performing various internal cash and investment reconciliation procedures and providing some form of reports on Tribal trust investments. These procedures, for the periods, October 1, 1992 to March 31, 1995, and April 1, 1995 to present, are as follows:

---

[5] For purposes of the settlement, accounting claims would include claims relating to the governments's management and accounting of trust funds from the point of their collection though disbursement, including collection of the appropriate amounts under lease, permit or sale agreements or other contracts, proper recording of transactions, timely collection of revenues, appropriate investments and proper disbursements. The settlement process would not address claims related to management of the underlying trusts assets because the Project was focused on addressing accounting issues, not resource management issues.

From October 1, 1992 to March 31, 1995:

- Tribal Trust cash receipts and cash disbursements were processed and confirmed by the U.S. Treasury and were reconciled to Tribal Trust cash transactions posted to the OTFM Trust Funds Management System (TFMS).

- Tribal Trust TFMS investment balances were reconciled to a Moneymax subsidiary investment ledger.

- Periodically, then monthly, custodian investment statements were reconciled to the Moneymax subsidiary system (at Par value).

- MMS oil and gas receipts information was faxed daily from MMS to OTFM (for investment purposes) and was verified to intergovernmental transfer documents known as Voucher and Schedule of Withdrawal and Credits (SF-1081s).

From April 1, 1995 to present:

- Tribal Trust Funds cash receipts and cash disbursements have been processed and confirmed by the U.S. Treasury and have been reconciled daily and monthly to Tribal Trust Funds cash transactions posted to the Omnitrust System.

- Investments have been reconciled daily to the Omnitrust System and have been reconciled monthly to custodial account statements (at Par value).

- MMS oil and gas receipts information has been faxed daily from MMS to OTFM (for investment purposes) and has been verified to respective SF-1081s.

The reconciliations to the U.S. Treasury suggest that there has been an accounting and reporting of all OTFM (trust) transactions, thereby mitigating discrepancy and loss concerns after September 30, 1992.

Some of the largest proposed adjustments for the twenty-year reconciliation period resulted from errors in investment income posted to Tribal accounts, recalculation of U.S. Treasury interest earnings, and differences between general ledger transactions versus U.S. Treasury transactions. Procedures implemented after September 30, 1992, as described above, are considered adequate to ensure that these errors do not reoccur. In addition, the group of errors referred to as undocumented "roll forward" amounts also have been eliminated by the procedures and systems implemented after FY 1992.

The post-FY 1992 procedures do not address the circumstances that result in unacceptable lag times (the time between when the United States received payment and when the payment was deposited in a Tribal account and began earning interest), however, so it may be presumed that post-FY 1992 errors due to excessive lag times will be consistent with those identified by the Reconciliation Project for the July 1972 to September 1992 time period. Based on these procedures and account information, the Department will formulate a settlement proposal to provide Tribes the opportunity to resolve all accounting claims through the date of settlement.

## Settlement of Known Errors

After the initial presentation to the Tribes of the additional reconciliation information, the first step of the proposed settlement process would be for the government to compensate Tribes for losses associated with errors it discovered during the Project, and losses identified as a result of the additional reconciliation work (identified as "known errors" or Type 1 claims in the December

report).  Compensation would include principal plus interest as described below.  Known errors would be paid as soon as possible, regardless of a Tribe's willingness to accept the proposed settlement of any other claims based on remaining unreconciled transactions.

As discussed above, there are three types of claims relating to known errors.  First, in the basic reconciliation portion of the Project, approximately $1.87 million in non-investment transactions (excluding interest) were found to be in error — an error rate of about .01 percent.[6]  An additional $25.2 million (absolute value) in proposed adjustments were identified in the entire Project, which, in addition to the basic reconciliation, included the assessment of the accuracy of investment income posted to Tribal accounts; recalculation of U.S. Treasury interest earnings; reconciliation of general ledger transactions with U.S. Treasury transactions; verification that financial transactions posted to the accounting records were in agreement with the originating lease or sale agreements, permits, or contract terms; and a determination of the timeliness of the deposit of receipts.  All such known errors identified in the Project, as well as those identified in subsequent research efforts, due to Tribes would be paid.

Second, there are Tribal accounts which may be due interest because of unacceptable "lag times" — the time between when the United States received payment and when the payment was deposited in a Tribal account and began earning interest.  Because of the remote locations of many BIA agency offices, and the fact that electronic funds transfer was not prevalent during much of the July 1972 to September 1992 period, we believe the government is entitled to a commercially reasonable time to post funds to an interest-earning account.  Accordingly, we propose to compensate for interest that should have begun to accrue six days after funds were paid to the BIA.  However, with respect to funds deposited by MMS in the Treasury, interest would be paid from the date of deposit.  Interest owed to the Tribes as a result of lag times is estimated to be about $4 million.

The third type of known errors involves so-called undocumented "roll forward" amounts.  These amounts resulted from end-of-accounting period account balances in BIA's general ledger that did not equal the balance (whether higher or lower) recorded in the general ledger at the beginning of the subsequent accounting period.  The December report identified $26.1 million in principal in cases where an account balance increased and $17.5 million in principal where a Tribe's account balance decreased.  With respect to instances where account balances increased, we proposed that the government "forgive" any such amounts, without performing further research to explain the increase.  That recommendation has not changed.  With respect to decreases, the December report stated that OST was continuing its efforts to research and document roll forward adjustments where a Tribe's balance decreased from one accounting period to the next.  These efforts have continued and the results have been reviewed by Arthur Andersen.  As a result of that effort, there remains only $902 of undocumented roll forward adjustments where account balances decreased.  The Department proposes that any remaining undocumented roll forward amounts should be paid, subject to netting against any other amounts owed by the Tribe, as described below.

## Rate of Interest

The December report recommended that for settlement, Tribes be paid simple interest at a Tribal benchmark rate, which is defined as the

---

[6] The $1.87 million does not include adjustments of less than $1,000 that were accepted without further research. These are referred to as "scoped adjustments" and total $83,417.00 (absolute value). These scoped adjustments would also be considered known errors and paid.

average annual yield on invested Tribal trust funds. While the general practice in litigation is for interest to be paid at a rate established by statute for funds that are improperly disbursed by the federal government, we felt that the Tribal benchmark rate, which generally would be more generous than the statutory rate, more closely approximates what Tribes would have earned on their investments. This higher rate also is intended to serve as an incentive to settle rather than litigate. When OTFM converted to the OMNI Trust System in fiscal year 1995, it began using an average Five Year Treasury rate in lieu of the Tribal benchmark rate.

There was considerable opposition among Tribes in the consultation to the payment of simple rather than compound interest. The December report indicated that the government is required to pay only simple interest on improperly disbursed funds in a litigation context. Tribes persuasively argued during consultation, however, that they would have earned compound interest had errors not been made. Moreover, since the Department's objective is to provide an additional incentive for settlement, compound interest is more appropriate. The Department agrees with these comments, and now proposes that in paying known errors, interest be annually compounded and paid at the Tribal benchmark rate through fiscal year 1994, and the average Five Year Treasury rate for years beginning in fiscal year 1995.

## Netting and Forgiveness

The Project results indicated that, of the errors reported, some were to the detriment of the Tribes ($13.1 million) while others were to the benefit of the Tribe ($14 million). Thus, if all errors were simply to be paid without netting the positive and negative errors against each other and without forgiveness, Tribes, in the aggregate, would owe the government more than the government would owe Tribes.

The Department concluded that Tribes should not be required to pay money to the government for errors that accrued to the Tribes' benefit, because we thought it would be inequitable and unduly burdensome to do so, given the government's responsibility for the errors. At the same time, we wanted to avoid the potential windfall that could occur if the government paid Tribes for its errors but Tribes would not have to pay the government for errors to its benefit. Accordingly, some form of netting and forgiveness of errors due to and due from a Tribe was considered appropriate. There were two principal netting options considered: (1) errors (including interest) within each account owned by a Tribe would be netted against each other, and payments would be made to each account with a net balance due (netting to the "account level"); or (2) errors (including interest) occurring in all accounts of a Tribe would be netted against each other and one aggregate payment of any net amount due would be made to the Tribe, to be allocated among accounts as each Tribe deemed appropriate (netting to the "Tribal level"). The two methodologies produce different aggregate outcomes because of the associated concept of "forgiveness," whereby the government would forgive any amounts due from a Tribe to the government after netting.

The December report recommended netting at the Tribal level because forgiving errors representing amounts owed by Tribes to the government while paying for errors representing amounts owed by the government to the Tribes would result in what could be considered a windfall for the Tribes. Netting of errors to the Tribal level would prevent that windfall. A Tribal-level netting and forgiveness policy would result in the government paying approximately $3.5 million in principal and $6.6 million in compound interest, and forgiving approximately $4.4 million in principal and $3.7 million in compound interest. Netting at the account level, rather than the Tribal level, is estimated to increase the cost another $15.7 million, including principal and compound interest.

No netting at all, coupled with a forgiveness policy, would add $21.2 million in principal and compound interest costs.

Some Tribes were highly critical of the netting/forgiveness proposal. They argued that because the Project covered only a 20-year period, netting within this limited time frame was unfair, as expanding the Project in scope or time frames covered might have detected additional errors that would offset the errors identified for the 1972-1992 period. Some Tribes also asserted that certain accounts (primarily judgment accounts) were established to compensate Tribes for particular losses and that netting to the Tribal level against other judgment accounts or against non-judgment accounts might unlawfully deny the Tribe funds appropriated to achieve certain compensatory purposes.

We believe there is merit to Tribal assertions that adjustments to a particular judgment account should not be netted against non-judgment accounts or other judgment accounts. These judgment accounts were created pursuant to legislation or judicial decree to remedy a particular grievance. Distribution of these funds is generally governed by the Indian Tribal Judgment Funds Use and Distribution Act (25 U.S.C. §§1401-1408) or other specific Tribal judgment fund distribution acts that Congress has enacted. Under the Use and Distribution Act and for the most part, other distribution acts, a portion of the judgment account may be distributed to Tribal members on a per capita basis and the remainder allocated for particular purposes. To the extent those purposes are fulfilled and/or per capita payments made, the funds' governing provisions typically specify that any remaining funds be returned to the Tribe.

To prevent the dilution of the intended compensation paid by judgment funds, we propose a netting process in which judgment and non-judgment fund accounts would be netted sepa-

rately. With respect to judgment fund accounts, we would net to the overall fund level for each judgment fund where the law pertaining to the use and purpose of a particular judgment account does not dictate that a specific percentage or amount be used for a particular purpose (i.e., where the law states that such funds shall be available for use "for educational, social welfare, economic development," but does not specify a particular amount to be used for such purposes). This would allow a Tribe to allocate the netted payment from the government, as it deems appropriate, to any specific activity or purpose consistent with that judgment fund's governing provisions. Netting would include principal and interest.

For judgment funds where the law pertaining to the use of such funds mandates that a specific percentage or amount of the fund be used for a particular purpose, we propose to net to the subaccount or activity level within the judgment account where possible. In this regard, it would be virtually impossible to reconstruct and adjust prior per capita payments to reflect either errors of overpayment or underpayment, since per capita payments are usually made based on the Tribal rolls existing at the time of the award. Moreover, current laws pertaining to the use and purpose of judgment accounts generally provide for the return of uncollected per capita payments to the Tribe after a specific period of time. The Tribe, in its discretion, could in turn choose to use these funds to supplement a specific activity as needed.

Non-judgment fund accounts would be netted at the Tribal level as previously proposed. This approach prevents windfall payments to Tribes and also prevents arbitrarily favoring those Tribes with multiple accounts over those with fewer accounts. Before any netting occurs, interest would be computed so that full credit would be given for an error notwithstanding at what point during the 20-year period the error occurred.

With respect to Tribal assertions that netting of errors based only on transactions from July 1, 1972 to September 30, 1992 is potentially unfair, we note that any additional errors that might be found if the reconciliation were expanded beyond the 1972-1992 period would be as likely to work to a Tribe's detriment as to its benefit. Absent reconciliation of all accounts for all time periods, a settlement covering any limited period could potentially result in an inequity. This will be taken into consideration in the settlement formula calculations. Finally, because Congress would authorize both the netting and forgiveness process by statute, we do not believe there are any legal infirmities in netting as we have proposed.

Based on the assumptions outlined in this proposal for payment of known errors, including interest, netting, and forgiveness of any net amounts that might be considered "due" to the government, the combination of cash paid out plus amounts forgiven results in a total cost to the government of approximately $55,875,846 ($16,471,145 paid to Tribes, and $39,404,701 forgiven). Disregarding any forgiven amounts, the out-of-pocket cost for settling known errors as of September 30, 1996, is approximately $16,471,145 (which comprises $4,634,453 in principal and $11,836,692 in interest). Interest would continue to accrue until payment occurs.

## Settlement of Claims for the Period 1972 Through the Date of Settlement

After paying known errors, the Department proposes to undertake a two-stage settlement process. In stage one, the Department would present each Tribe with a specific settlement proposal. The objective of this first stage is to minimize the transaction costs associated with developing a targeted settlement and direct that money to the Tribes, not to lawyers and accountants. Tribes that believe the proposal is fair would have the opportunity to end the uncertainty, distraction, administrative burdens

and cost of further negotiations or litigation by accepting the settlement. For those Tribes that elect not to accept the proposal, stage two of the settlement process would provide an opportunity for government-to-government negotiations. We would employ the services of a mediator to participate with the Tribes and the Department in non-binding mediation. Only if these two informal dispute resolution mechanisms fail would formal adjudication of a Tribe's claims in a court of law become necessary or available.

## Stage One: The Settlement Offer

The government will present each Tribe with a specific settlement offer. This offer would be separate from the payment of known errors, which would be paid regardless of whether the Tribe accepted the settlement offer. The settlement proposal would be developed taking into account a number of factors specific to the Tribe. These factors would likely include the dollar value of each type of unreconciled transaction (receipts, disbursements and transfers), the error rates determined in the reconciliation for each type of that Tribe's transactions, the level of activity in the Tribe's accounts, including the amount of money flowing through the Tribe's accounts, and possible claims relating to investment yield, overnight interest earnings, deposit lag times and other errors. The proposal would cover the time period from July 1, 1972 to the date of settlement; however, the proposal would be in two parts which could be segregated: one covering July 1972 to September 1992, and one covering October 1992 to the date of settlement. In other words, Tribes would have the option of settling for only the 1972-1992 period, or settling for the entire period from 1972 through the date of settlement.

To provide Tribes with an incentive to settle at this stage, we would employ a formula for calculating the settlement proposal which assesses likely potential losses, utilizes assumptions favorable to

Tribes, and takes into account the resources saved by an early settlement. Initial work has begun to develop a formula that meets these requirements. The formula used to develop the settlement for July 1972 through September 1992 will employ information from the reconciliation project; a separate settlement calculation will be used to determine the amount for settlement of periods from July 1992 to the date of settlement. All Tribes, regardless of whether they accepted or disputed their account balances in the attestation process, would be presented with a settlement opportunity.

All Tribes would have the opportunity to have the settlement offer explained and any questions answered during the three months following the date of the offer. Each Tribe would then have four months from that time (a total of seven months from the date of the offer) to decide whether to accept the offer or to reject it and enter into government-to-government negotiations. Tribes that accept the offer would enter into an agreement that would resolve all accounting claims against the government for either the time period from July 1, 1972 through September 30, 1992, or July 1, 1972 to the date of settlement, whichever option is chosen. Tribes that accept the settlement offer only for the 1972-1992 period, however, would not be entitled to attempt to negotiate settlement of claims from the post-1992 period in the later, government-to-government negotiation phase (Stage Two). Any post-1972 claims not settled in stage one would have to be resolved through litigation. Department of Justice concurrence in all settlement agreements would be required.

If the settlement offer is not accepted (or no response is received) within seven months, it would be withdrawn. Tribes that fail to respond to the offer within seven months would lose the opportunity to participate in subsequent government-to-government negotiations, and as a consequence, would also lose the ability to bring a lawsuit regarding any claims covered by the settlement. Because the settlement offer would employ assumptions favorable to Tribes (e.g. forgiveness, compound interest, etc.) and would take into account the resource savings that an early settlement would provide, the settlement offer would not be the starting point for subsequent government-to-government negotiations should the settlement offer be rejected. Rather, the government-to-government negotiations process would be distinct and entirely separate.

## Stage Two:  Government-to-Government Negotiations

If a Tribe rejects the government's settlement offer, it would have the opportunity to initiate government-to-government negotiations that would take the form of non-binding mediation. The process would be conducted with the assistance of mediators appointed by the Federal Mediation and Conciliation Service. Both the Tribe and the government would designate teams for the negotiation process. We expect that the government would be represented by Departmental employees and consultants, including employees of OST and the Office of the Solicitor, with assistance from Department of Justice attorneys.

Tribes would be given an opportunity at this stage to submit any additional documentation they may have with regard to transactions within the scope of the Project, and for the July 1, 1972 through September 30, 1992 time period, which demonstrates that an error related to trust fund accounting claims was made by BIA with respect to those transactions. A request for additional Tribal documentation was initially made during the course of the Project and this would allow one more opportunity for Tribes to produce any information they may have. Tribes could also submit additional information about transactions which were deemed to be reconciled even though

BIA and Arthur Andersen disagreed about the adequacy of the documentation to support the transaction (these were called "passed adjustments" in the Project).

At the request of the account holder or the mediator, the government could determine whether additional limited research or analysis would facilitate a settlement between the parties. If so, the additional work would be undertaken at the expense of the government. Any additional work would focus on additional, specific information-gathering activities or statistical analyses to fill in significant gaps in the Project. The legislation would include parameters governing the circumstances under which additional work would be considered appropriate for purposes of furthering settlement negotiations.

Under the auspices of the mediator, the Tribe and the government would seek to negotiate a settlement acceptable to both parties. The government-to-government negotiations with each Tribe would proceed for a period of no more than 12 months unless both sides agree to extend them. If a settlement is reached, the government, with Department of Justice concurrence, would be authorized to pay the settlement amount, in satisfaction of the Tribe's claims. If there is no agreement, the negotiation process would terminate. At that point, the Tribe would have six months to file a lawsuit according to the procedures and rules described below. At any time during the 12-month negotiation period, the Tribe and the federal government may mutually agree to terminate negotiations, and the Tribe would then have six months from that date to file litigation.

There is no basis to estimate with precision how many Tribes will accept the initial settlement offer and how many will initiate government-to-government negotiations. Certainly, the Department would seek to resolve the claims of as many Tribes as possible through these means. Because the negotiation process may be resource

intensive, the legislation should authorize the Department to establish priorities for commencing negotiations. However, no Tribe would be prejudiced with regard to the time limits for commencing and concluding negotiations, as well as for filing a claim in court, as a result of the priorities established for the negotiation process.

Although GAO recommended that binding arbitration be employed to force a settlement of claims, the Department rejected this approach for several reasons. Some Tribes have expressed concern or skepticism about a binding, non-judicial approach to dispute resolution. Moreover, because arbitration results are binding, rules of discovery, evidence and procedure tend to be formalistic, inflexible and often almost as burdensome as actual litigation. In contrast, nonbinding mediation may present greater opportunities for a more collegial, informal, and flexible approach to defining the critical issues and developing innovative approaches to development and settlement of claims. Finally, the Department believes that a more efficient mediation process will lead to informal settlements, obviating the need for formal dispute resolution before the courts.

## Litigated Resolution of Claims for the Period 1972 to Date of Settlement

While the overarching purpose of this proposal is to encourage settlement of Tribal trust funds claims, it is not to force a settlement with Tribes who choose instead to litigate. Efforts have been made to build into this proposal incentives to settle, including the use of informal processes and a generous settlement offer at the beginning of the process. The Department believes it is in the interest of both the Tribes and the government to pay claims quickly and fairly rather than paying fees to attorneys and accountants for lawsuits. Nonetheless, should a Tribe desire to engage in litigation, this proposal does not prevent it from doing so. As stated above, however, a Tribe that

fails to respond to the government's settlement offer and does not participate in the government-to-government negotiation phase would be barred from filing suit for claims covered by the settlement (this would include claims from 1972 through the date a response to the settlement offer was due).

Based on our preference for informal dispute resolution approaches, the proposal would preclude the filing of any new claims after November 12, 1997 (the date this proposal is being submitted to Congress), where such claims arise from the federal government's management and accounting of Tribal trust funds for the period July 1, 1972 through September 30, 1992, until after the claims have been submitted to the government-to-government negotiation process described above and that process has not produced a settlement. This limitation on filing new claims is not an absolute bar to filing claims. Rather, it simply requires Tribes to utilize the informal dispute resolution mechanisms outlined in this proposal before resorting to litigation. Moreover, the filing of any such claims would be required within six months of the conclusion of any unsuccessful government-to-government negotiations. Claims would be filed in the U.S. Court of Federal Claims. This venue is recommended because the Court of Claims is familiar with the Indian trust fund issues as well as claims for money damages against the government. Claims filed prior to November 12, 1997 would be unaffected by this proposal.

In any such litigation, once the Tribal account holder makes a prima facie case on liability, the government would bear the burden of demonstrating that the Tribe's accounts are correct. The legislation would provide that the government could meet this burden by putting in the record the results of the reconciliation and other efforts undertaken before and during the government-to-government negotiations to account for the Tribe's trust funds. There are several reasons for legislatively determining the quantum of evidence necessary to meet the government's burden of proof. By this point, the government will have invested considerable effort to reconstruct and reconcile accounts. It would be wasteful of limited government resources for a court to direct the government to engage in any additional wholesale document collection exercises. Given the condition of the records and accounting systems, and after the expenditure of $21 million over a five-year period, we believe we have accumulated most of the available documents. The cost of locating additional records would likely be very high and yield little additional information. Moreover, courts have accepted similar accounting information as sufficient in previous trust fund accounting cases. See, e.g., Red Lake Band v. United States, 17 Cl. Ct. 362 (1989); Minnesota Chippewa Tribe v. United States, 14 Cl. Ct. 116 (1987). Accordingly, once all available reconciliation data and related work product have been placed in the record, the burden of persuasion would shift to the Tribal plaintiff to demonstrate that it suffered a loss by virtue of the government's trust fund management or accounting practices.

A Tribe also would be precluded from introducing any Tribal documents demonstrating errors in the litigation that it did not produce during the government-to-government negotiation process. Given the significant investment of time and resources that both the Tribe and the government will allocate to this process, there is no reason why a Tribe should withhold these records until the litigation stage. This requirement would be consistent with the underlying objective of resolving claims in the informal dispute resolution stage.

We also want to ensure that a Tribe has the opportunity to be represented by capable counsel should it believe the government did not propose to compensate it fairly for its claims. At the same time, we do not want this process to benefit

primarily lawyers, rather than Tribal account holders. Accordingly, we propose to limit the amount attorneys could be paid to twenty percent of the total amount the Tribe receives through either a settlement or judgment in the litigation for awards up to $1 million, and for any awards above $1 million, up to twenty percent of that portion below $1 million, and up to ten percent of the portion above $1 million of the amount the Tribe receives.

The proposal also seeks to establish a fixed rate of simple interest at four percent that will apply to any amounts found payable to Tribes as the result of litigation. This rate of interest is the minimum rate provided by statute for the Tribal trust funds deposited in the Treasury. See 25 U.S.C. § 161a, § 161b.

The Department's legislative proposal also would clarify what we believe to be the Congressional intent that provisions in recent appropriations laws tolling the statute of limitations apply only to those claims for which the statute of limitations had not already run. In addition, the favorable treatment of claims with respect to netting, forgiveness and interest in the settlement context would not apply in litigation.

## Resource Requirements for the Settlement Process

The legislation needs to include a number of budgetary mechanisms to support the settlement process. The Department proposes the following budgetary framework to support the settlement proposal:[7]

- **Payment of Known Errors:**
  **Permanent Definite Budget Authority**

The Department proposes that permanent definite budget authority be provided to pay known errors, currently estimated at $16.5 million. In this case, the government's liability is clear, and as

such, with the exception of the difference between compound and simple interest, direct spending is offset by the government's liability.

- **Settlement Offer:**
  **Permanent Indefinite Appropriations**
      Under 31 U.S.C. § 1304

- **Negotiated Settlement Amounts:**
  **Permanent Indefinite Appropriations**
      Under 31 U.S.C. § 1304

Department of Justice-approved settlements are, in effect, the same as judgments or compromise settlements of imminent or existing litigation and are therefore payable under the permanent indefinite appropriation for judgments established by 31 U.S.C. § 1304.

- **Additional Analysis under Settlement Negotiations:**
  **Permanent Definite Budget Authority**

---

[7] **Definite authority** is stated as a specific amount or "not to exceed" a specific aggregate amount at the time the authority is granted, whether in an appropriations act or other law, and the full amount so provided is recorded as budget authority for that period.

**Indefinite authority** is not stated as a specific amount. Rather, the amount provided is determined by specified variable factors, such as the amount of the receipts from a specified source, the amount of the proceeds from the sale of financial assets with recourse, or the amount necessary to cover obligations associated with entitlement.

**Current authority** requires congressional appropriations action on the request for new budget authority for the year involved.

**Permanent authority** becomes available pursuant to standing provisions of law without further appropriations action by Congress after transmittal of the budget for the year involved. When permanent budget authority is enacted, it is treated as permanent authority the first year it becomes available, as well as in succeeding years.

The Department proposes that the additional analysis that may be ordered by the mediators during the government-to-government negotiations be funded under permanent definite budget authority. The Department proposes permanent authority as it is critical that the funds be available to support the negotiations, otherwise the negotiations would not be an option and Tribes would increasingly have to rely on litigation. The amount available should be authorized at a specific annual amount to ensure that additional work is directed only at worthwhile analysis.

- Federal Negotiation Teams and Authorization for Annual/Current Mediation Services: Discretionary Appropriations

The Department proposes that funding to support Federal negotiation teams be provided under annual discretionary appropriations. There should be sufficient lead time to help ensure funding is available.

- Overdrafts & Accounting Deficiencies: Permanent Indefinite Budget Authority

The Department proposes that permanent indefinite budget authority be provided to cover overdrafts & accounting deficiencies. As discussed in the December report, these amounts relate to the restoration of overdraft interest clearing accounts (which apply only to IIM accounts) and settlement of miscellaneous losses (which apply to both Tribal and IIM accounts). Essentially, the funding is required to eliminate an overall "trust fund deficit" resulting from trust fund liabilities exceeding trust fund assets. While not directly related to the Tribal settlement proposal, it is critical that once these discrepancies have been investigated, authority and funding be available to make the appropriate accounting adjustments; otherwise, liability for these errors continues. The Office of Special Trustee has completed research on the discrepancies for Tribal accounts, and projects that the initial research on the IIM account discrepancies will be completed sometime in fiscal year 1998. The preliminary estimate of funds required to cover these deficiencies is $ 51.1 million, although the amount ultimately could be substantially lower or higher.



# 5. CONCLUSION

The Department's management and administration of Tribal trust funds has been the focus of numerous reports, recommendations and critiques over several decades. While there may be disagreements about the magnitude of Tribal losses, there is no dispute about several key principles. First, Tribes are entitled to management and administration of their funds in a manner that meets the Secretary's trust obligations and legal requirements, and assures the proper accounting and investment of funds. Second, the complexity of the Department's management and administrative responsibilities have far outstripped the capabilities of the Department's systems and practices and they must be upgraded. Third, fractionation of ownership interests on Indian allottee lands must be halted and reversed. Fourth, if Tribes have lost money as a result of inadequacies in the Department's systems and practices, they should be compensated.

Never before has the federal government been so determined to achieve these objectives. At the direction of Congress, it has completed a five year, S21 million reconciliation to identify shortcomings in accounting for Tribal funds. It has proposed legislation to address fractionation. The Special Trustee has submitted a strategic plan and he and the Department are now together focusing attention on effectively reforming the management and accounting systems. This report offers the final piece — an approach to reimburse any losses that may have occurred.

Certainly, this is not the only way to address the issue of potential Tribal losses. But it puts forth for public discussion and debate a framework upon which to proceed. The Administration looks forward to working with Congress and Tribes to enact legislation that will meet all of these goals.

# ATTACHMENT B

# TO BOSWELL

# DECLARATION

# PART 1



THE SECRETARY OF THE INTERIOR

WASHINGTON

MAY 31 1996

Honorable John McCain
Chairman, Committee on Indian Affairs
United States Senate
Washington, DC 20510

Dear Mr. Chairman:

Section 304 of the American Indian Trust Fund Management Reform Act of 1994, P.L. 103-412 (25 U.S.C. §4001, et seq.) provides for the submittal of a report by the Secretary of the Interior to the Committee on Natural Resources of the House of Representatives and the Committee on Indian Affairs of the Senate by May 31, 1996, regarding the reconciliation of Tribal trust fund accounts.

Tribal trust fund accounts were reconciled for the period of July 1, 1972, through September 30, 1992, by Arthur Andersen LLP using procedures in a contract with the Bureau of Indian Affairs. Commencing in January 1996, each account holder was provided a report on the reconciliation of its accounts along with account statements that show account balances, reconciled transactions, and proposed adjustments. Each account holder was also provided account statements for the period of October 1, 1992, through September 30, 1995, which were reconciled internally by the Office of Trust Funds Management. In addition, each account holder was provided images on CD ROM of the financial documents reconciled by Arthur Andersen LLP. The imaged documents are Arthur Andersen LLP's actual working papers.

Subsequent to the distribution of the reconciliation report and account statements, a national meeting, to which all account holders were invited, was held in Albuquerque, New Mexico, to explain the reconciliation methodology and the report and account statement format, content, and terminology. A series of five (5) regional meetings, of which two (2) have been held, were also scheduled to work directly with each account holder to address questions and issues on its specific report and account statements. At the national and two regional meetings, account holders stated that they want their comments to be included in any report to the Congress.

Through April 30, 1996, seventy seven (77) account holders have responded. Specifically, two (2) account holders have accepted and three (3) account holders have disputed their account balances. The balance of the account holders have requested additional time and/or a meeting. Because all of the scheduled meetings have not been held to receive and discuss account holder issues and comments and since many account holders have not communicated their acceptance or dispute of their account balances, only an interim report on the account holders' attestation can be provided at this time. Accordingly, we submit herein the results of the account holders' communications through April 30, 1996, as an interim report. Once the remaining scheduled meetings have been held and account

0637

Attachment B Part 1 to Boswell Declaration

2

holders have had an opportunity to communicate their reaction to the balances, a final report on account holder attestations will be submitted to the Congress. The final report will be sent by November 15, 1996.

As required by Section 304, the following report on the reconciliation of Tribal trust fund accounts includes:

(1) A description of the methodology in reconciling trust fund accounts,

(2) information on attestations by each account holder that they accept the balances in the account statements or that they dispute the balances along with the reasons for their dispute, and

(3) the efforts the Secretary will undertake to resolve the disputes.

## METHODOLOGY

The methodology used to reconcile the Tribal trust fund accounts consisted of agreed-upon procedures applied to specific elements, accounts or items of a financial statement. The agreed-upon procedures methodology was followed after alternative methodologies and approaches were considered by the Department of the Interior, the Office of Management and Budget, the General Accounting Office and the Intertribal Monitoring Association. The performance of the work and the reporting of the findings were governed by the Statement on Auditing Standards 35 issued by the Auditing Standards Board, American Institute of Certified Public Accountants. The work performed, however, is not an audit as defined by the American Institute of Certified Public Accountants because all the necessary financial records required to perform an audit could not be located. Consequently, the conclusions that can be drawn from the results can only be related to the records reviewed and cannot be applied to any unreconciled transaction. The specific procedures applied by Arthur Andersen LLP are described in its "Agreed-Upon Procedures and Findings Report of Independent Public Accountants" dated December 31, 1995 (see Enclosure I). Also, enclosed is a copy of a "Sample" report submitted to each account holder which demonstrates the report format, detailed description of the reconciliation methodology and the terminology used (see Enclosure II).

## ATTESTATION

Distribution of the agreed-upon procedures report and account statements to account holders commenced in January 1996. The report and account statements were sent to 280 account holders (see Enclosure III). The whereabouts of nine (9) account holders were unknown and distribution could not be made. Also, account statements were not sent to individual Indians who received a per capita distribution of Tribal trust funds.

To assist account holders in making an informed decision on the Agreed-Upon Procedures and Findings Report and account statements, account holders were invited to send representatives to a

0638

3

national meeting held February 14 and 15, 1996, in Albuquerque, New Mexico. At this meeting, the Office of the Special Trustee for American Indians and Arthur Andersen LLP discussed the methodology and findings resulting from applying the agreed-upon procedures and described in detail the format, content and terminology of the report and account statements. A demonstration on the use and content of the CD ROM was also provided. A listing of the account holders that attended this meeting is presented in Enclosure IV.

In addition to the national meeting, a series of five regional meetings were scheduled throughout the country to provide account holders with individual consultation on their report and account statements. The first two (2) regional meetings have been completed and a list of the account holders that attended each meeting is contained in Enclosure V. None of the account holders attending these meetings accepted or disputed their account balances. The regional meetings schedule is as follows:

| | |
|---|---|
| March 19-22, 1996 | Sacramento, California |
| April 9-12, 1996 | Portland, Oregon |
| June 3-7, 1996 | Tulsa, Oklahoma |
| June 18-21, 1996 | Billings, Montana |
| July 16-19, 1996 | Albuquerque, New Mexico |

In addition to the regional meetings, final exit conferences were held with four (4) of the five (5) Tribes that participated in the Five Tribes Pilot to discuss their individual report findings and account statements. The Five Tribes Pilot project involved the Hopi, Yakama, Flathead, Fort Berthold, and Fort Peck Tribes and had two components. First, it used available records to reconcile the accounts of those Tribes on an expedited basis. Second, staff worked on site to compare the terms of leases with the actual amount of cash collected. The Hopi representative only sought clarification of the Tribe's report, statements, and the settlement process. The Tribe has not communicated a decision as to acceptance or dispute of their account balances. At the meeting with the Yakama Tribal representatives, we received a resolution from the Yakama Tribal Council that set forth measures to meet the local needs and priorities of the Tribe but did not directly address the account balance issue. A copy of the resolution is provided as Enclosure VI. The Flathead Tribe advised by a formal statement (see Enclosure VII) that they did not accept the account balances and requested meetings to attempt a negotiated settlement. The Fort Peck Tribe maintained their position that they would accept only a full accounting of their trust assets and that the reconciliation project was not sufficient. A final exit conference with the Fort Berthold Tribe is pending. The full text of the response of Assiniboine and Sioux Tribes of the Fort Peck Reservation is enclosed as Enclosure VIII.

Through April 30, 1996, 28 percent of the account holders that were provided a report and account statements have communicated with us concerning their account balances. Included with each account holder's individual report and account statements was an "Acknowledgment" form (see Enclosure IX) for the convenience of the account holder to communicate its acceptance or dispute of its account balances. Through April 30, 1996, 77 of the 280 account holders that were sent a report and account statements have responded (see Enclosure X) by use of the acknowledgment form or other formal written communication. Specifically, two (2) account holders have accepted (see Enclosure XI) and three (3) account holders have disputed their account balances (see Enclosures VI , VII and XII).

0639

4

Three (3) of the 77 account holders only requested a meeting to discuss their specific questions or concerns regarding the report and account statements, but did not request additional time.  Sixty-nine (69) responded that they required additional time to review the reports and made no response as to acceptance or dispute of the account balances.  Thirty (30) of this latter category also requested an individual meeting to discuss their report and statements.  The purpose of the regional meetings is to accommodate the account holders wishing individual meetings.

## DISPUTE RESOLUTION

Subsection 3 of Section 304 of the Act requires "a statement by the Secretary with regard to each account balance disputed by the account holder outlining efforts the Secretary will undertake to resolve the dispute."  Through April 30, 1996, three (3) of the 280 account holders have disputed the balance of their accounts.  Until we complete our regional meetings and the Tribes have had an opportunity to analyze the reports and documentation they have been provided, the Department will not know how many Tribes will dispute the balance of their accounts.  At that time, the Department will be in a position to propose a mechanism to resolve any such disputes.

Sincerely,

Enclosures



THE SECRETARY OF THE INTERIOR

WASHINGTON

MAY 31 1996

Honorable Don Young
Chairman, Committee on Resources
House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

Section 304 of the American Indian Trust Fund Management Reform Act of 1994, P.L. 103-412
(25 U.S.C. §4001, et seq.) provides for the submittal of a report by the Secretary of the Interior to the
Committee on Natural Resources of the House of Representatives and the Committee on Indian
Affairs of the Senate by May 31, 1996, regarding the reconciliation of Tribal trust fund accounts.

Tribal trust fund accounts were reconciled for the period of July 1, 1972, through September 30,
1992, by Arthur Andersen LLP using procedures in a contract with the Bureau of Indian Affairs.
Commencing in January 1996, each account holder was provided a report on the reconciliation of its
accounts along with account statements that show account balances, reconciled transactions, and
proposed adjustments. Each account holder was also provided account statements for the period of
October 1, 1992, through September 30, 1995, which were reconciled internally by the Office of Trust
Funds Management. In addition, each account holder was provided images on CD ROM of the
financial documents reconciled by Arthur Andersen LLP. The imaged documents are Arthur Andersen
LLP's actual working papers.

Subsequent to the distribution of the reconciliation report and account statements, a national meeting,
to which all account holders were invited, was held in Albuquerque, New Mexico, to explain the
reconciliation methodology and the report and account statement format, content, and terminology. A
series of five (5) regional meetings, of which two (2) have been held, were also scheduled to work
directly with each account holder to address questions and issues on its specific report and account
statements. At the national and two regional meetings, account holders stated that they want their
comments to be included in any report to the Congress.

Through April 30, 1996, seventy seven (77) account holders have responded. Specifically, two (2)
account holders have accepted and three (3) account holders have disputed their account balances.
The balance of the account holders have requested additional time and/or a meeting. Because all of
the scheduled meetings have not been held to receive and discuss account holder issues and comments
and since many account holders have not communicated their acceptance or dispute of their account
balances, only an interim report on the account holders' attestation can be provided at this time.
Accordingly, we submit herein the results of the account holders' communications through April 30,
1996, as an interim report. Once the remaining scheduled meetings have been held and account

0641

2

holders have had an opportunity to communicate their reaction to the balances, a final report on account holder attestations will be submitted to the Congress. The final report will be sent by November 15, 1996.

As required by Section 304, the following report on the reconciliation of Tribal trust fund accounts includes:

(1) A description of the methodology in reconciling trust fund accounts,

(2) information on attestations by each account holder that they accept the balances in the account statements or that they dispute the balances along with the reasons for their dispute, and

(3) the efforts the Secretary will undertake to resolve the disputes.

## METHODOLOGY

The methodology used to reconcile the Tribal trust fund accounts consisted of agreed-upon procedures applied to specific elements, accounts or items of a financial statement. The agreed-upon procedures methodology was followed after alternative methodologies and approaches were considered by the Department of the Interior, the Office of Management and Budget, the General Accounting Office and the Intertribal Monitoring Association. The performance of the work and the reporting of the findings were governed by the Statement on Auditing Standards 35 issued by the Auditing Standards Board, American Institute of Certified Public Accountants. The work performed, however, is not an audit as defined by the American Institute of Certified Public Accountants because all the necessary financial records required to perform an audit could not be located. Consequently, the conclusions that can be drawn from the results can only be related to the records reviewed and cannot be applied to any unreconciled transaction. The specific procedures applied by Arthur Andersen LLP are described in its "Agreed-Upon Procedures and Findings Report of Independent Public Accountants" dated December 31, 1995 (see Enclosure I). Also, enclosed is a copy of a "Sample" report submitted to each account holder which demonstrates the report format, detailed description of the reconciliation methodology and the terminology used (see Enclosure II).

## ATTESTATION

Distribution of the agreed-upon procedures report and account statements to account holders commenced in January 1996. The report and account statements were sent to 280 account holders (see Enclosure III). The whereabouts of nine (9) account holders were unknown and distribution could not be made. Also, account statements were not sent to individual Indians who received a per capita distribution of Tribal trust funds.

To assist account holders in making an informed decision on the Agreed-Upon Procedures and Findings Report and account statements, account holders were invited to send representatives to a

3

national meeting held February 14 and 15, 1996, in Albuquerque, New Mexico. At this meeting, the Office of the Special Trustee for American Indians and Arthur Andersen LLP discussed the methodology and findings resulting from applying the agreed-upon procedures and described in detail the format, content and terminology of the report and account statements. A demonstration on the use and content of the CD ROM was also provided. A listing of the account holders that attended this meeting is presented in Enclosure IV.

In addition to the national meeting, a series of five regional meetings were scheduled throughout the country to provide account holders with individual consultation on their report and account statements. The first two (2) regional meetings have been completed and a list of the account holders that attended each meeting is contained in Enclosure V. None of the account holders attending these meetings accepted or disputed their account balances. The regional meetings schedule is as follows:

| | |
|---|---|
| March 19-22, 1996 | Sacramento, California |
| April 9-12, 1996 | Portland, Oregon |
| June 3-7, 1996 | Tulsa, Oklahoma |
| June 18-21, 1996 | Billings, Montana |
| July 16-19, 1996 | Albuquerque, New Mexico |

In addition to the regional meetings, final exit conferences were held with four (4) of the five (5) Tribes that participated in the Five Tribes Pilot to discuss their individual report findings and account statements. The Five Tribes Pilot project involved the Hopi, Yakama, Flathead, Fort Berthold, and Fort Peck Tribes and had two components. First, it used available records to reconcile the accounts of those Tribes on an expedited basis. Second, staff worked on site to compare the terms of leases with the actual amount of cash collected. The Hopi representative only sought clarification of the Tribe's report, statements, and the settlement process. The Tribe has not communicated a decision as to acceptance or dispute of their account balances. At the meeting with the Yakama Tribal representatives, we received a resolution from the Yakama Tribal Council that set forth measures to meet the local needs and priorities of the Tribe but did not directly address the account balance issue. A copy of the resolution is provided as Enclosure VI. The Flathead Tribe advised by a formal statement (see Enclosure VII) that they did not accept the account balances and requested meetings to attempt a negotiated settlement. The Fort Peck Tribe maintained their position that they would accept only a full accounting of their trust assets and that the reconciliation project was not sufficient. A final exit conference with the Fort Berthold Tribe is pending. The full text of the response of Assiniboine and Sioux Tribes of the Fort Peck Reservation is enclosed as Enclosure VIII.

Through April 30, 1996, 28 percent of the account holders that were provided a report and account statements have communicated with us concerning their account balances. Included with each account holder's individual report and account statements was an "Acknowledgment" form (see Enclosure IX) for the convenience of the account holder to communicate its acceptance or dispute of its account balances. Through April 30, 1996, 77 of the 280 account holders that were sent a report and account statements have responded (see Enclosure X) by use of the acknowledgment form or other formal written communication. Specifically, two (2) account holders have accepted (see Enclosure XI) and three (3) account holders have disputed their account balances (see Enclosures VI , VII and XII).

0643

4

Three (3) of the 77 account holders only requested a meeting to discuss their specific questions or concerns regarding the report and account statements, but did not request additional time. Sixty-nine (69) responded that they required additional time to review the reports and made no response as to acceptance or dispute of the account balances. Thirty (30) of this latter category also requested an individual meeting to discuss their report and statements. The purpose of the regional meetings is to accommodate the account holders wishing individual meetings.

## DISPUTE RESOLUTION

Subsection 3 of Section 304 of the Act requires "a statement by the Secretary with regard to each account balance disputed by the account holder outlining efforts the Secretary will undertake to resolve the dispute." Through April 30, 1996, three (3) of the 280 account holders have disputed the balance of their accounts. Until we complete our regional meetings and the Tribes have had an opportunity to analyze the reports and documentation they have been provided, the Department will not know how many Tribes will dispute the balance of their accounts. At that time, the Department will be in a position to propose a mechanism to resolve any such disputes.

Sincerely,

Enclosures

0644

**Enclosure I**.

ARTHUR ANDERSEN LLP

## Agreed-Upon Procedures and Findings Report of
## Independent Public Accountants

To the U.S. Department of the Interior, Bureau of Indian Affairs:

At your request, and in accordance with the U.S. Department of the Interior, Bureau of Indian Affairs (the Bureau) contract number CMK00129395, as modified at various dates (the Contract), we have performed the following agreed-upon procedures (see items numbered one (1) through seven (7) below) with respect to the Tribal Trust account transactions of the _____ (the Tribe) for the period from July 1, 1972 (Fiscal Year 1973) through September 30, 1992 (Fiscal Year 1992) (i.e., reconciliation period), except as otherwise noted. As a result of applying the agreed-upon procedures, findings were noted (see Attachments A through F-3 for detail of findings).

The Congressional mandate for the Bureau Tribal Trust Funds Reconciliation Project (Reconciliation Project) requires an accounting to each Tribe for each of their Trust accounts. The primary objective of the Reconciliation Project, as stated in the Contract, is to reconstruct historical transactions, to the extent practicable, for all years for which records are available for all Tribal Trust accounts managed by the Bureau. Phase I of the Reconciliation Project substantiated that not all records would be available for a full accounting of such funds. Due to the unavailability of some records, the scope of the Reconciliation Project is designed to provide reasonable assurance as to the accuracy of each Tribal Trust account balance. The agreed-upon procedures performed, as required by the Contract, represent the Bureau's standard of reasonableness.

Below are summaries of the agreed-upon procedures applied. Attachments A through F-3 further detail certain procedures, findings and reportable conditions and are incorporated by reference into this report. Attachments A through F-3 include information marked "Supplemental Information" which has been included at the Bureau's request to further clarify the report. This supplemental information has not been subjected to the agreed-upon procedures described below.

Source documents used in performing all of the following agreed-upon procedures were obtained by the Bureau and provided to us for reconciliation purposes. The Bureau has advised us that not all of the source documents for the reconciliation period could be located. The number and percentage of transactions that were reconciled to source documents are shown in Attachments A-1 and A-2, "Summary of Basic Reconciliation Results for All Tribes" and "Summary of Basic Reconciliation Results for the Tribe", respectively.

1. **Account Statements**

   We prepared account statements including detail of transactions, balances, results of reconciliations and proposed adjustments using Bureau provided financial records. The accompanying Tribal account statements should be read in conjunction with this report.

The accompanying statements do not include award accounts with multiple tribal beneficiaries for the period the award was undistributed. Such statements have been delivered to the Bureau for appropriate dissemination.

## 2   Basic Reconciliation

We performed the following procedures to reconcile individual account transactions:

a.   **Receipts** - We verified (i.e., traced and agreed) non-investment receipts posted to each of the Tribe's accounts, to the extent source documentation was provided, as to amount, date and account number to deposit tickets and/or related collection vouchers, journal vouchers and/or other relevant collection documentation (see Attachments A, A-1 and A-2 for "Summary of Basic Reconciliation Procedures", "Summary of Basic Reconciliation Results for All Tribes" and "Summary of Basic Reconciliation Results for the Tribe", respectively).

b.   **Disbursements** - We verified (i.e., traced and agreed) non-investment disbursements posted to each of the Tribe's accounts, to the extent source documentation was provided, as to amount, date and account number to U.S. Treasury ("Treasury") processed SF1166 documents (Voucher and Schedule of Payment), Treasury reports (GOALS) of processed SF1166's, journal vouchers and/or other relevant disbursement documentation. We also verified (i.e., traced and agreed), to the extent source documentation was provided, the posted disbursement transactions as to amount, date and account number to the requests for withdrawal from the Tribe and/or the Bureau (see Attachments A, A-1, A-2 and A-3 for "Summary of Basic Reconciliation Procedures", "Summary of Basic Reconciliation Results for All Tribes", "Summary of Basic Reconciliation Results for the Tribe" and "Summary of Basic Reconciliation Disbursement Transaction Results for the Tribe", respectively).

c.   **Investment Transactions** - We also performed procedures similar to 2a and 2b above for certain investment transactions (i.e., purchases and maturities) in Fiscal Years 1986 through 1991. However, these procedures were discontinued and these transactions were tested through alternative procedures such as Investment Yield Analysis and Treasury Interest Recalculation (see Attachments B-1, B-1a, B-2 and B-2a for "Summary of Investment Yield Analysis Procedures", "Summary of Investment Yield Analysis Results for the Tribe", "Summary of Treasury Interest Recalculation Procedures" and "Summary of Treasury Interest Recalculation Results for the Tribe", respectively).

## 3.   Investment Analysis

The following procedures were applied to Fiscal Years 1978 through 1992. General ledger income/cost codes needed to determine whether a transaction is interest related were not available for years prior to Fiscal Year 1978 and, therefore, interest receipts could not be identified for comparison.

a.   **Investment Yield Analysis** - We calculated annual investment interest yields on each of the Tribe's accounts and compared to the Annual Tribal Fund Benchmark rates (Benchmark) (see Attachment B-1) to identify potential errors in interest earnings. We investigated unusual fluctuations from the Benchmark parameters (see Attachment B-1 for discussion of parameters) to determine whether amounts were properly posted. This analysis also provides information to Tribes as to the

Attachment B Part 1 to Boswell Declaration

0647

performance of their specific accounts compared to the Tribal Trust Fund as a whole, as reported by the Bureau (see Attachments B-1 and B-1a for "Summary of Investment Yield Analysis Procedures" and "Summary of Investment Yield Analysis Results for the Tribe", respectively).

b. **Treasury Interest Recalculation** - We recalculated Treasury Overnighter interest earnings and statutory Treasury interest earnings received by the Tribe on the daily cash balance in each of the Tribe's Trust accounts using the applicable Treasury interest rates and daily balances provided by the Bureau (see Attachments B-2 and B-2a for "Summary of Treasury Interest Recalculation Procedures" and "Summary of Treasury Interest Recalculation Results for the Tribe", respectively).

c. **Pro Forma Calculations** - We performed, for informational purposes only, pro forma calculations of interest income on uninvested funds for Fiscal Years 1978 through 1992 for all of the Tribe's Trust accounts. This calculation is an estimate of what might have been earned had uninvested funds yielded returns comparable to the Benchmark rates. The calculation is an automated calculation of interest based on Bureau provided general ledger reported balances and the Benchmark rates (see Attachments B-3 and B-3a for "Summary of Pro Forma Procedures" and "Summary of Pro Forma Results for the Tribe", respectively).

4. **Analytical Review**

We prepared graphs for non-investment and non-judgment receipt and disbursement transactions (see Attachments A-1 and A-2 for "Summary of Basic Reconciliation Results for All Tribes" and "Summary of Basic Reconciliation Results for the Tribe") for Fiscal Years 1978 through 1992 (see Attachment C-1 for "Analytical Review Graphs for the Tribe", if applicable).

In addition, for fifteen (15) tribes selected by the Bureau, we investigated unusual fluctuations in receipts and disbursements activity (see Attachment C-2 for "Summary of Analytical Review Procedures and Reportable Conditions for the Tribe", if applicable).

5. **Systems Reconciliation**

a. We reconciled the MoneyMax System (Bureau investment subsidiary detail) investment balances to the Finance System (general ledger) investment balances for all Tribes as of September 30, 1992, with the exception of certain investment transactions affecting several tribes which were reconciled internally by the Bureau. Any adjustments resulting from such internal reconciliations are not reflected in this report or in the accompanying Tribal account statements (see Attachments D-1, D-1a and D-1b for "Summary of MoneyMax System to Finance System Reconciliation Procedures", "Summary of MoneyMax System to Finance System Reconciliation Results for All Tribes" and "Summary of MoneyMax System to Finance System Reconciliation Results for the Tribe", respectively).

b. We reconciled Fiscal Year 1992 Bureau cash transactions reported by the U.S. Treasury (Treasury) to the Bureau's Finance System (General Ledger System Reconciliation) and reports submitted to the Treasury (Treasury Reporting Reconciliation). The resulting variances were investigated for tribal trust funds (Appropriation 8365) and resolved, to the extent supporting documentation was provided by the Bureau (see Attachments D-2, D-2a and D-2b for "Summary of U.S. Treasury System to Finance System Reconciliation

Attachment B Part 1 to Boswell Declaration

Procedures", "Summary of U.S. Treasury System to Finance System Reconciliation Results for All Tribes" and "Summary of U.S. Treasury System to Finance System Reconciliation Results for the Tribe", respectively).

6. **Deposit Lag Time**

We compared, for informational purposes only, the lag time from the apparent date of receipt of funds (as defined in Attachment E) to the deposit date posted to the general ledger accounts and summarized the results (see Attachments E, E-1 and E-2 for "Summary of Deposit Lag Time Procedures", "Summary of Deposit Lag Time Results for All Tribes" and "Summary of Deposit Lag Time Results for the Tribe", respectively).

7. **Fill the Gap**

On a sample basis, we verified (i.e., traced and agreed) receipt amounts posted to the general ledger to original lease agreements, sales agreements, contracts, permits or other documentation as appropriate, to the extent provided, to determine that the amounts received and the allocation of such amounts to general ledger accounts were properly recorded based on such documentation (see Attachments F, F-1, F-2 and F-3 for "Summary of Fill the Gap Procedures", "Summary of Fill the Gap Results for All Tribes", "Summary of Surface Lease Results for the Tribe" and "Summary of Timber Sales Results for the Tribe", respectively, if applicable).

Because the above procedures do not constitute an audit made in accordance with generally accepted auditing standards, we do not express an opinion on any of the elements referred to above. Had we performed additional procedures or had we made an audit of the financial statements of the Trust Funds managed by the Bureau in accordance with generally accepted auditing standards, other matters might have come to our attention that would have been reported to you. Further, it is beyond our professional competence to provide advice regarding legal matters. Accordingly, we cannot and do not make any representations regarding any legal issues raised in conjunction with performing our procedures. This report relates only to the elements specified above and does not extend to any financial statements of the Trust Funds managed by the Bureau taken as a whole.

This report is solely for the information of the Bureau to assist the Bureau in determining whether the objective described in the second paragraph of this report has been met and is not to be used, referred to or distributed for any other purpose.

*Arthur Andersen LLP*

Albuquerque, New Mexico
December 31, 1995

-4-

**Enclosure II**

0650

# Sample Agreed-Upon Procedures and Findings Report

SAMPLE
For Discussion Purposes Only

ARTHUR ANDERSEN LLP

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
**SAMPLE**
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

0652

January 31, 1996

**SAMPLE**
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
**SAMPLE**
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

#### Table of Contents

Agreed-Upon Procedures and Findings Report of Independent Public Accountants

#### Attachments

| | |
|---|---|
| Summary of Basic Reconciliation Procedures | A |
| Summary of Basic Reconciliation Results for All Tribes | A-1 |
| Summary of Basic Reconciliation Results for the Tribe | A-2 |
| Summary of Basic Reconciliation Disbursement Transaction Results for the Tribe | A-3 |
| Summary of Proposed Date Changes for the Tribe | A-4 |
| Summary of Investment Yield Analysis Procedures | B-1 |
| Summary of Investment Yield Analysis Results for the Tribe | B-1a |
| Summary of Treasury Interest Recalculation Procedures | B-2 |
| Summary of Treasury Interest Recalculation Results for the Tribe | B-2a |
| Summary of Pro Forma Procedures | B-3 |
| Summary of Pro Forma Results for the Tribe | B-3a |
| Summary of Analytical Review Procedures | C |
| Analytical Review Graphs for the Tribe (if applicable) | C-1 |
| Summary of Analytical Review Procedures and Reportable Conditions for the Tribe (if applicable) | C-2 |
| Summary of MoneyMax System to Finance System Reconciliation Procedures | D-1 |
| Summary of MoneyMax System to Finance System Reconciliation Results for All Tribes | D-1a |
| Summary of MoneyMax System to Finance System Reconciliation Results for the Tribe | D-1b |
| Summary of U.S. Treasury System to Finance System Reconciliation Procedures | D-2 |
| Summary of U.S. Treasury System to Finance System Reconciliation Results for All Tribes | D-2a |
| Summary of U.S. Treasury System to Finance System Reconciliation Results for the Tribe | D-2b |
| Summary of Deposit Lag Time Procedures | E |
| Summary of Deposit Lag Time Results for All Tribes | E-1 |
| Summary of Deposit Lag Time Results for the Tribe | E-2 |
| Summary of Fill the Gap Procedures | F |
| Summary of Fill the Gap Results for All Tribes | F-1 |
| Summary of Surface Lease Results for the Tribe (if applicable) | F-2 |
| Summary of Timber Sales Results for the Tribe (if applicable) | F-3 |

SAMPLE
For Discussion Purposes Only

ARTHUR ANDERSEN LLP

## Agreed-Upon Procedures and Findings Report of
## Independent Public Accountants

To the U.S. Department of the Interior, Bureau of Indian Affairs:

At your request, and in accordance with the U.S. Department of the Interior, Bureau of Indian Affairs (the Bureau) contract number CMK00129395, as modified at various dates (the Contract), we have performed the following agreed-upon procedures (see items numbered one (1) through seven (7) below) with respect to the Tribal Trust account transactions of the **SAMPLE** (the Tribe) for the period from July 1, 1972 (Fiscal Year 1973) through September 30, 1992 (Fiscal Year 1992) (i.e., reconciliation period), except as otherwise noted.  As a result of applying the agreed-upon procedures, findings were noted (see Attachments A through F-3 for detail of findings).

The Congressional mandate for the Bureau Tribal Trust Funds Reconciliation Project (Reconciliation Project) requires an accounting to each Tribe for each of their Trust accounts. The primary objective of the Reconciliation Project, as stated in the Contract, is to reconstruct historical transactions, to the extent practicable, for all years for which records are available for all Tribal Trust accounts managed by the Bureau.  Phase I of the Reconciliation Project substantiated that not all records would be available for a full accounting of such funds.  Due to the unavailability of some records, the scope of the Reconciliation Project is designed to provide reasonable assurance as to the accuracy of each Tribal Trust account balance.  The agreed-upon procedures performed, as required by the Contract, represent the Bureau's standard of reasonableness.

Below are summaries of the agreed-upon procedures applied.  Attachments A through F-3 further detail certain procedures, findings and reportable conditions and are incorporated by reference into this report.  Attachments A through F-3 include information marked "Supplemental Information" which has been included at the Bureau's request to further clarify the report.  This supplemental information has not been subjected to the agreed-upon procedures described below.

Source documents used in performing all of the following agreed-upon procedures were obtained by the Bureau and provided to us for reconciliation purposes.  The Bureau has advised us that not all of the source documents for the reconciliation period could be located. The number and percentage of transactions that were reconciled to source documents are shown in Attachments A-1 and A-2, "Summary of Basic Reconciliation Results for All Tribes" and "Summary of Basic Reconciliation Results for the Tribe", respectively.

## 1.   Account Statements

We prepared account statements including detail of transactions, balances, results of reconciliations and proposed adjustments using Bureau provided financial records.  The accompanying Tribal account statements should be read in conjunction with this report.

0654

The accompanying statements do not include award accounts with multiple tribal beneficiaries for the period the award was undistributed. Such statements have been delivered to the Bureau for appropriate dissemination.

2.  **Basic Reconciliation**

We performed the following procedures to reconcile individual account transactions:

a.  **Receipts** - We verified (i.e., traced and agreed) non-investment receipts posted to each of the Tribe's accounts, to the extent source documentation was provided, as to amount, date and account number to deposit tickets and/or related collection vouchers, journal vouchers and/or other relevant collection documentation (see Attachments A, A-1 and A-2 for "Summary of Basic Reconciliation Procedures", "Summary of Basic Reconciliation Results for All Tribes" and "Summary of Basic Reconciliation Results for the Tribe", respectively).

b.  **Disbursements** - We verified (i.e., traced and agreed) non-investment disbursements posted to each of the Tribe's accounts, to the extent source documentation was provided, as to amount, date and account number to U.S. Treasury ("Treasury") processed SF1166 documents (Voucher and Schedule of Payment), Treasury reports (GOALS) of processed SF1166's, journal vouchers and/or other relevant disbursement documentation. We also verified (i.e., traced and agreed), to the extent source documentation was provided, the posted disbursement transactions as to amount, date and account number to the requests for withdrawal from the Tribe and/or the Bureau (see Attachments A, A-1, A-2 and A-3 for "Summary of Basic Reconciliation Procedures", "Summary of Basic Reconciliation Results for All Tribes", "Summary of Basic Reconciliation Results for the Tribe" and "Summary of Basic Reconciliation Disbursement Transaction Results for the Tribe", respectively).

c.  **Investment Transactions** - We also performed procedures similar to 2a and 2b above for certain investment transactions (i.e., purchases and maturities) in Fiscal Years 1986 through 1991. However, these procedures were discontinued and these transactions were tested through alternative procedures such as Investment Yield Analysis and Treasury Interest Recalculation (see Attachments B-1, B-1a, B-2 and B-2a for "Summary of Investment Yield Analysis Procedures", "Summary of Investment Yield Analysis Results for the Tribe", "Summary of Treasury Interest Recalculation Procedures" and "Summary of Treasury Interest Recalculation Results for the Tribe", respectively).

3.  **Investment Analysis**

The following procedures were applied to Fiscal Years 1978 through 1992. General ledger income/cost codes needed to determine whether a transaction is interest related were not available for years prior to Fiscal Year 1978 and, therefore, interest receipts could not be identified for comparison.

a.  **Investment Yield Analysis** - We calculated annual investment interest yields on each of the Tribe's accounts and compared to the Annual Tribal Fund Benchmark rates (Benchmark) (see Attachment B-1) to identify potential errors in interest earnings. We investigated unusual fluctuations from the Benchmark parameters (see Attachment B-1 for discussion of parameters) to determine whether amounts were properly posted. This analysis also provides information to Tribes as to the

SAMPLE
For Discussion Purposes On...

performance of their specific accounts compared to the Tribal Trust Fund as a whole, as reported by the Bureau (see Attachments B-1 and B-1a for "Summary of Investment Yield Analysis Procedures" and "Summary of Investment Yield Analysis Results for the Tribe", respectively).

b. **Treasury Interest Recalculation** - We recalculated Treasury Overnighter interest earnings and statutory Treasury interest earnings received by the Tribe on the daily cash balance in each of the Tribe's Trust accounts using the applicable Treasury interest rates and daily balances provided by the Bureau (see Attachments B-2 and B-2a for "Summary of Treasury Interest Recalculation Procedures" and "Summary of Treasury Interest Recalculation Results for the Tribe", respectively).

c. **Pro Forma Calculations** - We performed, for informational purposes only, pro forma calculations of interest income on uninvested funds for Fiscal Years 1978 through 1992 for all of the Tribe's Trust accounts. This calculation is an estimate of what might have been earned had uninvested funds yielded returns comparable to the Benchmark rates. The calculation is an automated calculation of interest based on Bureau provided general ledger reported balances and the Benchmark rates (see Attachments B-3 and B-3a for "Summary of Pro Forma Procedures" and "Summary of Pro Forma Results for the Tribe", respectively).

4. **Analytical Review**

We prepared graphs for non-investment and non-judgment receipt and disbursement transactions (see Attachments A-1 and A-2 for "Summary of Basic Reconciliation Results for All Tribes" and "Summary of Basic Reconciliation Results for the Tribe") for Fiscal Years 1978 through 1992 (see Attachment C-1 for "Analytical Review Graphs for the Tribe", if applicable).

In addition, for fifteen (15) tribes selected by the Bureau, we investigated unusual fluctuations in receipts and disbursements activity (see Attachment C-2 for "Summary of Analytical Review Procedures and Reportable Conditions for the Tribe", if applicable).

5. **Systems Reconciliation**

a. We reconciled the MoneyMax System (Bureau investment subsidiary detail) investment balances to the Finance System (general ledger) investment balances for all Tribes as of September 30, 1992, with the exception of certain investment transactions affecting several tribes which were reconciled internally by the Bureau. Any adjustments resulting from such internal reconciliations are not reflected in this report or in the accompanying Tribal account statements (see Attachments D-1, D-1a and D-1b for "Summary of MoneyMax System to Finance System Reconciliation Procedures", "Summary of MoneyMax System to Finance System Reconciliation Results for All Tribes" and "Summary of MoneyMax System to Finance System Reconciliation Results for the Tribe", respectively).

b. We reconciled Fiscal Year 1992 Bureau cash transactions reported by the U.S. Treasury (Treasury) to the Bureau's Finance System (General Ledger System Reconciliation) and reports submitted to the Treasury (Treasury Reporting Reconciliation). The resulting variances were investigated for tribal trust funds (Appropriation 8365) and resolved, to the extent supporting documentation was provided by the Bureau (see Attachments D-2, D-2a and D-2b for "Summary of U.S. Treasury System to Finance System Reconciliation

Attachment B Part 1 to Boswell Declaration                                    0656

SAMPLE
For Discussion Purposes Only

Procedures", "Summary of U.S. Treasury System to Finance System Reconciliation Results for All Tribes" and "Summary of U.S. Treasury System to Finance System Reconciliation Results for the Tribe", respectively).

6.  **Deposit Lag Time**

We compared, for informational purposes only, the lag time from the apparent date of receipt of funds (as defined in Attachment E) to the deposit date posted to the general ledger accounts and summarized the results (see Attachments E, E-1 and E-2 for "Summary of Deposit Lag Time Procedures", "Summary of Deposit Lag Time Results for All Tribes" and "Summary of Deposit Lag Time Results for the Tribe", respectively).

7.  **Fill the Gap**

On a sample basis, we verified (i.e., traced and agreed) receipt amounts posted to the general ledger to original lease agreements, sales agreements, contracts, permits or other documentation as appropriate, to the extent provided, to determine that the amounts received and the allocation of such amounts to general ledger accounts were properly recorded based on such documentation (see Attachments F, F-1, F-2 and F-3 for "Summary of Fill the Gap Procedures", "Summary of Fill the Gap Results for All Tribes", "Summary of Surface Lease Results for the Tribe" and "Summary of Timber Sales Results for the Tribe", respectively, if applicable).

Because the above procedures do not constitute an audit made in accordance with generally accepted auditing standards, we do not express an opinion on any of the elements referred to above. Had we performed additional procedures or had we made an audit of the financial statements of the Trust Funds managed by the Bureau in accordance with generally accepted auditing standards, other matters might have come to our attention that would have been reported to you. Further, it is beyond our professional competence to provide advice regarding legal matters. Accordingly, we cannot and do not make any representations regarding any legal issues raised in conjunction with performing our procedures. This report relates only to the elements specified above and does not extend to any financial statements of the Trust Funds managed by the Bureau taken as a whole.

This report is solely for the information of the Bureau to assist the Bureau in determining whether the objective described in the second paragraph of this report has been met and is not to be used, referred to or distributed for any other purpose.

Albuquerque, New Mexico
December 31, 1995

-4-

0657

SAMPLE
For Discussion Purposes O.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF BASIC RECONCILIATION PROCEDURES

## PROCEDURES

We performed the following procedures to reconcile individual account transactions:

a. **Receipts** - We verified (i.e., traced and agreed) non-investment receipts posted to each of the Tribe's accounts, to the extent source documentation was provided, as to amount, date and account number to deposit tickets and/or related collection vouchers, journal vouchers and/or other relevant collection documentation.

b. **Disbursements** - We verified (i.e., traced and agreed) non-investment disbursements posted to each of the Tribe's accounts, to the extent source documentation was provided, as to amount, date and account number to U.S. Treasury ("Treasury") processed SF1166 documents (Voucher and Schedule of Payment), Treasury reports (GOALS) of processed SF1166's, journal vouchers and/or other relevant disbursement documentation. We also verified (i.e., traced and agreed), to the extent source documentation was provided, the posted disbursement transactions as to amount, date and account number to the requests for withdrawal from the Tribe and/or the Bureau.

c. **Exceptions** - As a result of applying the above procedures, differences were noted between the source document(s) and the posting to the general ledger.

Exceptions fell into one (1) of four (4) basic categories:

1. **Cleared Exceptions** - Exceptions resolved (cleared) through additional follow-up and/or obtaining additional supporting documentation. These items did not result in proposed adjustments.

2. **Proposed Adjustments** - Exceptions identified in the reconciliation process that through additional follow-up and discussions with the Bureau, it was determined that an error occurred resulting in a misstatement of the account. With Bureau concurrence, adjustments were proposed for these items.

3. **Passed Adjustments** - Exceptions identified in the reconciliation process that were not approved for adjustment by the Bureau. Although no requested additional supporting documentation could be provided, the Bureau concluded that a subsequent correction was made to the account, or the exception is no longer valid based on the Bureau's review of the account statement, other general ledger reports, or knowledge of the accounting system.

4. **Scoped Adjustments** - Exceptions identified in the reconciliation process that were determined to be insignificant by the Bureau (less than or equal to $1,000 each). At the Bureau's direction, no additional follow-up procedures were performed.

0658

Attachment B Part 1 to Boswell Declaration

**SAMPLE**
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
~~SAMPLE~~

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF BASIC RECONCILIATION PROCEDURES

d.  **Investment Transactions** - We also performed the procedures described in a and b above for certain investment transactions (i.e., purchases and maturities) in Fiscal Years 1986 through 1991. However, these procedures were discontinued and these transactions were tested through alternative procedures such as Investment Yield Analysis and Treasury Interest Recalculation (see Attachments B-1, B-1a, B-2 and B-2a for "Summary of Investment Yield Analysis Procedures", "Summary of Investment Yield Analysis Results for the Tribe", "Summary of Treasury Interest Recalculation Procedures" and "Summary of Treasury Interest Recalculation Results for the Tribe", respectively).

## SUPPLEMENTAL INFORMATION

The objectives have been included here as supplemental information to the reader. No conclusions have been made regarding the achievement of these objectives by applying the agreed-upon procedures.

### Contract Objectives

The primary objective of the reconciliation project was to reconstruct historical transactions, to the extent practicable, for all years where records were available for all Tribal Trust accounts managed by the Bureau.

### Objectives

- To ensure all receipt and disbursement activity recorded in the Tribe's Tribal Trust accounts, for which documentation is available, is properly reflected and supported.

- To ensure all receipts and disbursements made, for which documentation is available, were properly recorded to the appropriate Tribal Trust account.

## FINDINGS

See Attachments A-1, A-2, A-3 and A-4 for "Summary of Basic Reconciliation Results for All Tribes", "Summary of Basic Reconciliation Results for the Tribe", "Summary of Basic Reconciliation Disbursement Transaction Results for the Tribe" and "Summary of Proposed Date Changes for the Tribe", respectively.

### Adjustments

Any resulting adjustments affecting the Tribe's Trust Accounts are reported in the accompanying Tribal Account Statements and referenced to the adjustment number identifying the relevant supporting documents that have been imaged and will be provided to the Tribe separately on compact disk.

SAMPLE
For Discussion Purposes O.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF BASIC RECONCILIATION RESULTS FOR
ALL TRIBES

The following summarizes the results of the reconciliation of the posting of source documents performed as part of the Basic Reconciliation Procedures. Reconciled investment transactions represent those reconciled early in the reconciliation process. Investment transactions were tested through alternative procedures such as Investment Yield Analysis and Treasury Interest Recalculation. The following schedule represents absolute dollar coverage (the sum of the gross value of all transactions without consideration of mathematical plus (+) and minus (-) sign) for the entire reconciliation period.

|  | Transactions | Percent | Absolute Dollars | Percent |
|---|---|---|---|---|
| **Non-Investment Transactions** |  |  |  |  |
| Reconciled | 218,531 | 87 % | $15,333,094,983 | 86 % |
| Unreconciled | 32,901 | 13 % | $2,411,574,165 | 14 % |
|  | 251,432 | 100 % | $17,744,669,148 | 100 % |
| **Investment Transactions** |  |  |  |  |
| Reconciled | 65,267 | 16 % | $21,306,350,015 | 24 % |
| Tested Through Alternative Procedures | 335,146 | 84 % | $67,210,929,523 | 76 % |
|  | 400,413 | 100 % | $88,517,279,538 | 100 % |
| **Total** | 651,845 | 100 % | $106,261,948,686 | 100 % |

Note: Treasury interest transactions are excluded from this schedule (see Attachments B-2 and B-2a for Summary of Treasury Interest Recalculation Procedures and Summary of Treasury Interest Recalculation Results for the Tribe, respectively).

Attachment B Part 1 to Boswell Declaration

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF BASIC RECONCILIATION RESULTS FOR
THE TRIBE

The following summarizes the results of the reconciliation of the posting of source documents performed as part of the Basic Reconciliation Procedures. Reconciled investment transactions represent those reconciled early in the reconciliation process. Investment transactions were tested through alternative procedures such as Investment Yield Analysis and Treasury Interest Recalculation. The following schedule represents absolute dollar coverage (the sum of the gross value of all transactions without consideration of mathematical plus (+) and minus (-) sign) for the entire reconciliation period.

|  | Transactions | Percent | Absolute Dollars | Percent |
|---|---|---|---|---|
| **Non-Investment Transactions** |  |  |  |  |
| Reconciled | 2,224 | 95 % | $120,303,357 | 98 % |
| Unreconciled | 113 | 5 % | $2,723,329 | 2 % |
|  | 2,337 | 100 % | $123,026,686 | 100 % |
| **Investment Transactions** |  |  |  |  |
| Reconciled | 973 | 20 % | $107,937,426 | 21 % |
| Tested Through Alternative Procedures | 3,966 | 80 % | $399,960,452 | 79 % |
|  | 4,939 | 100 % | $507,897,878 | 100 % |
| **Total** | 7,276 | 100 % | $630,924,564 | 100 % |

Note: Treasury interest transactions are excluded from this schedule (see Attachments B-2 and B-2a for Summary of Treasury Interest Recalculation Procedures and Summary of Treasury Interest Recalculation Results for the Tribe, respectively).

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF BASIC RECONCILIATION DISBURSEMENT TRANSACTION RESULTS FOR
THE TRIBE

At the request of the Bureau, codes were assigned to reconciled disbursement transactions indicating the
level of supporting documentation.  All transactions with an alpha code (disbursement code) assigned are
reconciled transactions.  An unreconciled transaction indicates that we were not provided with all
documents necessary to verify (i.e., trace and agree) the transaction to the general ledger.

| Disbursement Code(s) | Transactions | Amount |
|---|---|---|
| C | 126 | ($24,382,389.10) |
| L | 103 | ($13,831,918.46) |
| G | 8 | ($2,678,679.58) |
| GL | 16 | ($5,367,062.37) |
| JL | 7 | ($735,130.51) |
| JLZ | 8 | ($32,681.29) |
| Other | 7 | ($681,358.28) |
| Total Reconciled | 275 | ($47,709,219.59) |
| Unreconciled | 35 | $158,505.27 |
| Total Disbursements | 310 | ($47,550,714.32) |

Disbursement Reconciliation Code Legend

C - The complete disbursement voucher package was reconciled.
G - Transaction did not have a Treasury stamp to indicate the SF1166 cleared Treasury.
J - Document contained insufficient accounting information (i.e., appropriation numbers were not on documentation).
    Tribal identification and reference tables were used to verify posting.
L - The disbursement was to the Tribe in care of Superintendent or third party (Bank) and did not have both Tribal and
    other governmental signed authorization.
Z - Additional third party documents were provided that support the disbursement transaction.

Other - Represents other reconciliation code combinations.

SAMPLE
For Discussion Purposes Only

ATTACHMENT A-4
Page 1 of 1

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF PROPOSED DATE CHANGES FOR THE TRIBE
FISCAL YEARS 1973 TO 1977

| | Number of Transactions | Absolute Dollar Value of Transactions | Number of Days Difference | Compounded Interest Effect (Proposed Adjustment) (1) |
|---|---|---|---|---|
| Due from Tribe | 2 | $148,584.97 | 1 to 3 | ($132.91) |
| | 0 | $.00 | 4 to 6 | $.00 |
| | 0 | $.00 | 7 to 10 | $.00 |
| | 0 | $.00 | 11 to 30 | $.00 |
| | 3 | $44.40 | More than 30 | ($14.17) |
| Total Due from Tribe | 5 | | | ($147.08) |
| Due to Tribe | 3 | $398,550.79 | 1 to 3 | $731.93 |
| | 0 | $.00 | 4 to 6 | $.00 |
| | 0 | $.00 | 7 to 10 | $.00 |
| | 0 | $.00 | 11 to 30 | $.00 |
| | 2 | $22.20 | More than 30 | $7.08 |
| Total Due to Tribe | 5 | | | $739.01 |
| Total Adjustment | 10 | | | $591.93 |

(1)  Represents the interest impact from the effective date of the proposed date change through September 30, 1994.
     The interest impact was calculated based on Bureau provided Benchmark rates (see Attachment B-1) which are based
     on the overall yield of the invested pool and assumes annual compounding.  Benchmark rates may not be representa-
     tive of any single tribe's actual investment yields.

Note:  Proposed date changes subsequent to fiscal year 1977 are included in the Summary of Treasury Interest
       Recalculation Results for the Tribe (see Attachment B-2a).

Attachment B Part 1 to Boswell Declaration

-10-

0663

# ATTACHMENT B

# TO BOSWELL

# DECLARATION

# PART 2

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF INVESTMENT YIELD ANALYSIS PROCEDURES

### PROCEDURES

The following procedures were applied to Fiscal Years 1978 through 1992.  General ledger income/cost codes needed to determine whether a transaction is interest related were not available for years prior to Fiscal Year 1978 and, therefore, interest receipts could not be identified for comparison.

We calculated annual investment interest yields on each of the Tribe's accounts and compared to the Annual Tribal Fund Benchmark rates (Benchmark) (see Attachment B-1, page 5 of 6) to identify potential errors in interest earnings.  We investigated unusual fluctuations from the Benchmark parameters (see below for discussion of parameters) to determine whether amounts were properly posted.  This analysis also provides information to Tribes as to the performance of their specific accounts compared to the Tribal Trust Fund as a whole, as reported by the Bureau.

Below is a summary of detailed procedures applied to Investment Yield Analysis.

- We calculated interest yield for each appropriation for each fiscal year based on total interest postings to the general ledger for the year divided by the average daily invested balance.

- We compared the calculated yield to a benchmark rate.  Benchmarks for each year were provided by the Bureau and were based upon the overall yield of all Tribes' investments for a particular fiscal year.  A tolerable range of variation from the benchmark rate was established by the Bureau.  We reviewed account detail and/or investment detail and source documentation as necessary to investigate the potential for error and/or explain the variation for accounts with variations from this established tolerance.  The tolerance was established as follows:

  o a calculated yield no less than the benchmark rate - 2% or

  o a calculated yield no greater than the benchmark rate + 5% and

  o a calculated dollar impact of the variance greater than $1,000.

- We prepared an analysis which summarizes the yield by appropriation and by Tribe over the fifteen (15) year time period (Fiscal Years 1978 - 1992) and reviewed it for the purpose of identifying potential timing issues, etc.

- We printed account detail for all appropriations that produce variances outside the tolerable range.

- We reviewed account detail in order to determine what might have caused the variance in the calculated yield, such as:

  o Negative interest postings

  o Maturities posted without interest

  o Interest posted without maturities

  o Unusually large interest postings

Attachment B Part 2 to Boswell Declaration

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
GRAVEL:
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF INVESTMENT YIELD ANALYSIS PROCEDURES

- Timing differences, such as:

  o  Investments maturing early in the fiscal year but purchased in the previous year

  o  Investments purchased during the year but not maturing until subsequent years

- Based upon our initial analysis of the detailed statement and the summarized yield report, we requested supporting documentation, when appropriate, from the Bureau to help resolve or explain the variance.

## SUPPLEMENTAL INFORMATION

The objectives have been included here as supplemental information to the reader. No conclusions have been made regarding the achievement of these objectives by applying the agreed-upon procedures.

### Contract Objectives

The primary objective of the reconciliation project was to reconstruct historical transactions, to the extent practicable, for all years where records were available for all Tribal Trust accounts managed by the Bureau.

### Objectives

- To ensure that all Tribal funds were invested, and if not, uninvested funds are identified to the extent possible for the account holder.

- To ensure that investment balances are properly reflected for each Tribal account.

- To ensure interest earnings on invested funds are properly posted to Tribal accounts (interest reasonable).

### Other

Investment purchases and maturities and interest transactions were initially part of the Basic Reconciliation procedures. However, at the Bureau's direction, Basic Reconciliation procedures for investment transactions were discontinued. The Bureau determined the tracing of these transactions to internally prepared source documents was not accomplishing the primary objective of the reconciliation project, which was to determine if interest earned on investment transactions was properly reflected as a result of invested funds or funds available for investment.

The Bureau approved of the current procedures, which include calculation of yield on invested funds for comparison to Benchmark rates (i.e., yield analysis) in order to identify potential material errors. Initial Investment Yield Analysis was to be performed for twenty (20) Fiscal Years (1973 - 1992). However, general ledger income/cost codes must be present to determine whether a transaction is investment related and whether it is a principal or interest posting. General ledger income/cost codes were not available for years prior to Fiscal Year 1978. As a result, the Bureau directed Arthur Andersen LLP to perform Investment Yield Analysis procedures on Fiscal Years 1978 through 1992.

0665

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF INVESTMENT YIELD ANALYSIS PROCEDURES

Below is a list of codes and respective descriptions to be used when reading Attachment B-1a,
"Summary of Investment Yield Analysis Results for the Tribe".

| Code | Description |
| --- | --- |
| A. | Calculated variance fell within the tolerable range previously defined (see B-1, page 1 of 6). |

Variances that fell outside of the tolerable range described in Code A above were investigated. The
Codes below reflect the results of our investigation.

B.    We reviewed appropriate supporting documentation and found the variance to be timing
related:

- Investments maturing in the current fiscal year related to the prior fiscal year(s) overstate
interest in the current year since interest is posted at maturity. In addition, investments
held at year end which mature in the following year(s) understate interest since interest is
not accrued.

- Due to the absence of original transaction dates in the general ledger, assumed dates were
used based on the document reference or the reporting month (see accompanying account
statements for more detail) for the calculation of yields. Through further investigation,
better transaction dates were identified and the yields recalculated. When the timing
differences are taken into account, yields are within the tolerable range.

C.    We reviewed account detail and supporting documentation (i.e., general ledger transaction
detail, MoneyMax/investment reports, source documents), as appropriate, noting a
misposting of either the purchase, maturity or interest. The mispostings were subsequently
corrected either by the client or as a proposed adjustment in the Finance/MoneyMax
reconciliation. Any effective date discrepancies affecting cash balances were considered in
connection with Treasury interest recalculations. No adjustments were proposed.

D.    We reviewed appropriate supporting documentation and determined that the variance was
due to a misposting not subsequently corrected. Appropriate adjustments were proposed
and either approved or unapproved (passed) by the Bureau.

E.    We reviewed appropriate supporting documentation and noted that the variance still exists
due to actual investments made at interest rates either below or above benchmark. No
adjustments were proposed.

Attachment B Part 2 to Boswell Declaration

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF INVESTMENT YIELD ANALYSIS PROCEDURES

| Code | Description |
| --- | --- |

F.  We reviewed supporting documentation (i.e., journal voucher) indicating no interest was posted due to one of the following reasons:

- The appropriation was overinvested.
- Interest was forgone on a buyout.
- No interest was accrued on a buyout.

No adjustments were proposed.

G.  We reviewed documentation and found it insufficient to complete the work on the appropriation. The Bureau was unable to provide additional sufficient documentation. No adjustments were proposed.

H.  We reviewed appropriate supporting documentation and found that the posting was made under an inaccurate element component category. For example, other receipts may have been posted as interest. Taking into account the misclassifications in recalculating the yield, yields fell within tolerable range and no adjustments were proposed.

I.  We reviewed appropriate supporting documentation and found interest was posted to accounts other than the accounts where the related purchases and maturities of investments were posted. The documentation provided by the Bureau supported such postings. No adjustments were proposed.

J.  We reviewed appropriate supporting documentation and found that banks where funds were invested went into conservatorship and no interest was received at maturity. The Bureau has informed us that interest from the date of closure to the date of posting has been credited to the appropriate accounts subsequent to September 30, 1992. Calculations of potential interest impact of these items was provided to the Bureau. No adjustments were proposed.

For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF INVESTMENT YIELD ANALYSIS PROCEDURES

The table below represents Benchmark rates provided by the Bureau and utilized in the work performed for Investment Yield Analysis and calculations of interest impact of proposed adjustments. These Benchmarks may not be representative of any single Tribe's actual investment yields.

### Annual Tribal Fund Benchmark Rates

| Fiscal Year Ended | Rates |
|---|---|
| 06/30/73 | 7.04% |
| 06/30/74 | 8.48% |
| 06/30/75 | 9.19% |
| 06/30/76 | 6.64% |
| 09/30/76 | 6.64% |
| 09/30/77 | 6.43% |
| 09/30/78 | 7.67% |
| 09/30/79 | 10.41% |
| 09/30/80 | 12.04% |
| 09/30/81 | 14.74% |
| 09/30/82 | 14.48% |
| 09/30/83 | 10.88% |
| 09/30/84 | 10.54% |
| 09/30/85 | 10.17% |
| 09/30/86 | 8.36% |
| 09/30/87 | 7.42% |
| 09/30/88 | 7.60% |
| 09/30/89 | 8.90% |
| 09/30/90 | 8.78% |
| 09/30/91 | 7.68% |
| 09/30/92 | 6.80% |
| 09/30/93 | 6.14% |
| 09/30/94 | 6.23% |

Attachment B Part 2 to Boswell Declaration

0668

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF INVESTMENT YIELD ANALYSIS PROCEDURES

The following is a column by column description for "Summary of Investment Yield Analysis Results for the Tribe" (see Attachment B-1a).

**Fiscal Year** - The period from October 1 to September 30.

**Average Daily Invested Balance** - Average dollars invested on a daily basis for the fiscal year.

**Total Earned Interest Posted on Investments** - Actual posted interest to the general ledger for a particular appropriation for the fiscal year.

**Calculated Yield** - Calculation based on "Total Earned Interest Posted on Investments" divided by the "Average Daily Invested Balance".

**Benchmark** - Bureau provided annual yield based on the overall yield for all tribes' investments.

**Variance** - Difference between "Calculated Yield" and "Benchmark".

**Calculated Variance** - "Variance" multiplied by the "Average Daily Invested Balance".

**Disposition** - Relevant codes described above.

**Average Annual Invested Balance** - Sum of "Average Daily Invested Balance" divided by the number of years reviewed.

**Average Annual Interest Posted** - Sum of "Total Earned Interest Posted on Investments" divided by the number of years reviewed.

**Weighted Average Yield** - "Average Annual Invested Balance" divided by "Total Earned Interest Posted on Investments".

**Weighted Average Benchmark** - The summation for each fiscal year reviewed of calculated benchmark interest ("Benchmark" X "Average Daily Invested Balance") divided by the number of years reviewed, divided by the "Average Annual Invested Balance".

Note 1: Data is only reflected for those fiscal years in which an account had activity.

Note 2: Principal and related interest accounts, if applicable, were combined (i.e., all 7XXX and 9XXX accounts) for the calculations. The accounts were combined for all years of the analysis.

## FINDINGS

See Attachment B-1a for "Summary of Investment Yield Analysis Results for the Tribe".

### Adjustments

Any resulting adjustments affecting the Tribe are reported in the accompanying Tribal Account Statements.

Attachment B Part 2 to Boswell Declaration

0669

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1978 | $30,084.97 | $1,516.90 | 5.04 % | 7.67 % | (2.63)% | ($791.23) | A |
| 1979 | $30,969.63 | $3,936.27 | 12.71 % | 10.41 % | 2.30 % | $712.30 | A |
| 1980 | $34,996.55 | $3,627.21 | 10.36 % | 12.04 % | (1.68)% | ($587.94) | A |
| 1981 | $130,928.51 | $17,452.17 | 13.33 % | 14.74 % | (1.41)% | ($1,846.09) | A |
| 1982 | $416,018.83 | $56,448.87 | 13.57 % | 14.48 % | (.91)% | ($3,785.77) | A |
| 1983 | $415,803.19 | $43,095.33 | 10.36 % | 10.88 % | (.52)% | ($2,162.18) | A |
| 1984 | $1,072,889.22 | $115,490.76 | 10.76 % | 10.54 % | .22 % | $2,360.36 | A |
| 1985 | $1,491,680.37 | $116,845.86 | 7.83 % | 10.17 % | (2.34)% | ($34,905.32) | B |
| 1986 | $1,372,735.02 | $142,095.45 | 10.35 % | 8.36 % | 1.99 % | $27,317.43 | A |
| 1987 | $1,169,566.20 | $81,645.55 | 6.98 % | 7.42 % | (.44)% | ($5,146.09) | A |
| 1988 | $473,673.35 | $36,894.67 | 7.79 % | 7.60 % | .19 % | $899.98 | A |
| 1989 | $236,648.98 | $24,068.00 | 10.17 % | 8.90 % | 1.27 % | $3,005.44 | A |
| 1990 | $16,775.58 | $1,495.29 | 8.91 % | 8.78 % | .13 % | $21.81 | A |

——————— Summary for this Account ———————

| | |
|---|---|
| Average Annual Invested Balance | $530,213.11 |
| Average Annual Interest Posted | $49,585.56 |
| Weighted Average Yield | 9.35 % |
| Weighted Average Benchmark | 9.57 % |

Attachment B Part 2 to Boswell Declaration

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1992 | $2,730,484.10 | $80,340.46 | 2.94 % | 6.80 % | (3.86)% | ($105,396.69) | BE |

———————— Summary for this Account ————————

| | |
|---|---|
| Average Annual Invested Balance | $2,730,484.10 |
| Average Annual Interest Posted | $80,340.46 |
| Weighted Average Yield | 2.94 % |
| Weighted Average Benchmark | 6.80 % |

Attachment B Part 2 to Boswell Declaration

0671

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1984 | $997,911.19 | $16,908.18 | 1.69 % | 10.54 % | (8.85)% | ($88,315.14) | B |
| 1985 | $4,153,772.70 | $499,685.02 | 12.03 % | 10.17 % | 1.86 % | $77,260.17 | A |
| 1986 | $1,450.24 | $124.64 | 8.59 % | 8.36 % | .23 % | $3.34 | A |
| 1990 | $659.26 | $51.60 | 7.83 % | 8.78 % | (.95)% | ($6.26) | A |
| 1991 | $2,296.37 | $174.27 | 7.59 % | 7.68 % | (.09)% | ($2.07) | A |
| 1992 | $2,431.50 | $75.58 | 3.11 % | 6.80 % | (3.69)% | ($89.72) | A |

——————— Summary for this Account ———————

| | |
|---|---|
| Average Annual Invested Balance | $859,753.54 |
| Average Annual Interest Posted | $86,169.88 |
| Weighted Average Yield | 10.02 % |
| Weighted Average Benchmark | 10.24 % |

Attachment B Part 2 to Boswell Declaration

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1984 | $85,076.30 | $9,888.09 | 11.62 % | 10.54 % | 1.08 % | $918.82 | A |
| 1985 | $9,379.82 | $955.36 | 10.19 % | 10.17 % | .02 % | $1.88 | A |

—————— Summary for this Account ——————

| | |
|---|---|
| Average Annual Invested Balance | $47,228.06 |
| Average Annual Interest Posted | $5,421.72 |
| Weighted Average Yield | 11.48 % |
| Weighted Average Benchmark | 10.50 % |

Attachment B Part 2 to Boswell Declaration

0673

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1985 | $6,703.59 | $277.76 | 4.14 % | 10.17 % | (6.03)% | ($404.23) | A |
| 1986 | $40,938.06 | $2,799.49 | 6.84 % | 8.36 % | (1.52)% | ($622.26) | A |
| 1987 | $29,828.96 | $2,088.73 | 7.00 % | 7.42 % | (.42)% | ($125.28) | A |
| 1988 | $37,060.49 | $2,303.07 | 6.21 % | 7.60 % | (1.39)% | ($515.14) | A |
| 1989 | $40,569.42 | $4,846.43 | 11.95 % | 8.90 % | 3.05 % | $1,237.37 | A |
| 1990 | $38,185.77 | $4,165.68 | 10.91 % | 8.78 % | 2.13 % | $813.36 | A |
| 1991 | $39,872.65 | $2,697.65 | 6.77 % | 7.68 % | (.91)% | ($362.84) | A |
| 1992 | $57,022.93 | $1,753.69 | 3.08 % | 6.80 % | (3.72)% | ($2,121.25) | B |

———— Summary for this Account ————

| | |
|---|---|
| Average Annual Invested Balance | $36,272.73 |
| Average Annual Interest Posted | $2,616.56 |
| Weighted Average Yield | 7.21 % |
| Weighted Average Benchmark | 7.94 % |

Attachment B Part 2 to Boswell Declaration

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1. 1972 THROUGH SEPTEMBER 30. 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1986 | $6,935.00 | $490.25 | 7.07 % | 8.36 % | (1.29)% | ($89.46) | A |
| 1987 | $12,894.32 | $372.24 | 2.89 % | 7.42 % | (4.53)% | ($584.11) | A |
| 1988 | $17,137.67 | $1,068.57 | 6.24 % | 7.60 % | (1.36)% | ($233.07) | A |
| 1989 | $18,447.75 | $2,237.19 | 12.13 % | 8.90 % | 3.23 % | $595.86 | A |
| 1990 | $15,550.00 | $1,725.72 | 11.10 % | 8.78 % | 2.32 % | $360.76 | A |
| 1991 | $15,702.36 | $1,045.70 | 6.66 % | 7.68 % | (1.02)% | ($160.16) | A |
| 1992 | $23,563.36 | $721.56 | 3.06 % | 6.80 % | (3.74)% | ($881.27) | A |

——————— Summary for this Account ———————

| | |
|---|---|
| Average Annual Invested Balance | $15,747.21 |
| Average Annual Interest Posted | $1,094.46 |
| Weighted Average Yield | 6.95 % |
| Weighted Average Benchmark | 7.85 % |

Attachment B Part 2 to Boswell Declaration

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1985 | $71,946.24 | $.00 | .00 % | 10.17 % | (10.17)% | ($7,316.93) | B |
| 1986 | $575,062.97 | $50,383.82 | 8.76 % | 8.36 % | .40 % | $2,300.25 | A |
| 1987 | $636,524.63 | $41,684.34 | 6.55 % | 7.42 % | (.87)% | ($5,537.76) | A |
| 1988 | $681,149.05 | $26,497.03 | 3.89 % | 7.60 % | (3.71)% | ($25,270.63) | B |
| 1989 | $731,497.37 | $59,095.01 | 8.08 % | 8.90 % | (.82)% | (*5,998.28) | A |
| 1990 | $772,990.50 | $116,593.65 | 15.08 % | 8.78 % | 6.30 % | $48,698.40 | B |
| 1991 | $864,381.92 | $63,627.17 | 7.36 % | 7.68 % | (.32)% | ($2,766.02) | A |
| 1992 | $925,653.90 | $33,055.78 | 3.57 % | 6.80 % | (3.23)% | ($29,898.62) | B |

——————— Summary for this Account ———————

| | |
|---|---|
| Average Annual Invested Balance | $657,400.82 |
| Average Annual Interest Posted | $48,867.10 |
| Weighted Average Yield | 7.43 % |
| Weighted Average Benchmark | 7.92 % |

Attachment B Part 2 to Boswell Declaration

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1983 | $1,249,685.77 | $126,040.39 | 10.09 % | 10.88 % | (.79)% | ($9,872.52) | A |
| 1984 | $1,670.21 | $189.63 | 11.35 % | 10.54 % | .81 % | $13.53 | A |
| 1990 | $817.14 | $62.03 | 7.59 % | 8.78 % | (1.19)% | ($9.72) | A |
| 1991 | $2,884.49 | $218.27 | 7.57 % | 7.68 % | (.11)% | ($3.17) | A |
| 1992 | $3,096.75 | $95.95 | 3.10 % | 6.80 % | (3.70)% | ($114.58) | A |

——————— Summary for this Account ———————

| | |
|---|---|
| Average Annual Invested Balance | $251,630.87 |
| Average Annual Interest Posted | $25,321.25 |
| Weighted Average Yield | 10.06 % |
| Weighted Average Benchmark | 10.86 % |

Attachment B Part 2 to Boswell Declaration

0677

SAMPLE
For Discussion Purposes On

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1983 | $33,705.15 | $2,827.89 | 8.39 % | 10.88 % | (2.49)% | ($839.26) | A |
| 1984 | $908.30 | $176.75 | 19.46 % | 10.54 % | 8.92 % | $81.02 | A |

——————— Summary for this Account ———————

| | |
|---|---|
| Average Annual Invested Balance | $17,306.73 |
| Average Annual Interest Posted | $1,502.32 |
| Weighted Average Yield | 8.68 % |
| Weighted Average Benchmark | 10.87 % |

Attachment B Part 2 to Boswell Declaration

0678

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1983 | $17,647.53 | $1,558.54 | 8.83 % | 10.88 % | (2.05)% | ($361.77) | A |
| 1984 | $10,383.68 | $1,118.84 | 10.77 % | 10.54 % | .23 % | $23.88 | A |
| 1985 | $25,423.03 | $2,382.46 | 9.37 % | 10.17 % | (.80)% | ($203.38) | A |
| 1986 | $25,445.01 | $2,503.87 | 9.84 % | 8.36 % | 1.48 % | $376.59 | A |
| 1987 | $15,126.51 | $732.63 | 4.84 % | 7.42 % | (2.58)% | ($390.26) | A |
| 1988 | $15,117.42 | $939.46 | 6.21 % | 7.60 % | (1.39)% | ($210.13) | A |
| 1989 | $16,249.16 | $1,985.43 | 12.22 % | 8.90 % | 3.32 % | $539.47 | A |
| 1990 | $13,967.58 | $1,542.10 | 11.04 % | 8.78 % | 2.26 % | $315.67 | A |
| 1991 | $13,689.00 | $926.28 | 6.77 % | 7.68 % | (.91)% | ($124.57) | A |
| 1992 | $20,553.62 | $638.90 | 3.11 % | 6.80 % | (3.69)% | ($758.43) | A |

——————————— Summary for this Account ———————————

| | |
|---|---|
| Average Annual Invested Balance | $17,360.25 |
| Average Annual Interest Posted | $1,432.85 |
| Weighted Average Yield | 8.25 % |
| Weighted Average Benchmark | 8.71 % |

Attachment B Part 2 to Boswell Declaration

0679

SOURCE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1978 | $307,883.73 | $15,219.50 | 4.94 % | 7.67 % | (2.73)% | ($8,405.23) | B |
| 1979 | $320,948.29 | $39,063.40 | 12.17 % | 10.41 % | 1.76 % | $5,648.69 | A |
| 1980 | $237,390.97 | $32,552.30 | 13.71 % | 12.04 % | 1.67 % | $3,964.43 | A |
| 1981 | $124,223.35 | $13,999.55 | 11.27 % | 14.74 % | (3.47)% | ($4,310.55) | B |
| 1982 | $142,007.74 | $26,943.87 | 18.97 % | 14.48 % | 4.49 % | $6,376.15 | A |
| 1983 | $164,223.96 | $16,379.83 | 9.97 % | 10.88 % | (.91)% | ($1,494.44) | A |
| 1984 | $180,195.82 | $22,483.58 | 12.48 % | 10.54 % | 1.94 % | $3,495.80 | A |
| 1985 | $201,977.95 | $19,598.38 | 9.70 % | 10.17 % | (.47)% | ($949.30) | A |
| 1986 | $220,229.33 | $20,324.05 | 9.23 % | 8.36 % | .87 % | $1,916.00 | A |
| 1987 | $209,383.51 | $8,399.71 | 4.01 % | 7.42 % | (3.41)% | ($7,139.98) | B |
| 1988 | $255,218.80 | $15,937.62 | 6.24 % | 7.60 % | (1.36)% | ($3,470.98) | A |
| 1989 | $273,932.86 | $32,455.94 | 11.85 % | 8.90 % | 2.95 % | $8,081.02 | A |
| 1990 | $295,143.92 | $30,497.08 | 10.33 % | 8.78 % | 1.55 % | $4,574.73 | A |
| 1991 | $323,089.16 | $23,327.09 | 7.22 % | 7.68 % | (.46)% | ($1,486.21) | A |
| 1992 | $348,197.76 | $10,332.11 | 2.97 % | 6.80 % | (3.83)% | ($13,335.97) | B |

——————— Summary for this Account ———————

| | |
|---|---|
| Average Annual Invested Balance | $240,269.81 |
| Average Annual Interest Posted | $21,834.27 |
| Weighted Average Yield | 9.09 % |
| Weighted Average Benchmark | 9.27 % |

Attachment B Part 2 to Boswell Declaration

0680

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1978 | $480.02 | $.22 | .05 % | 7.67 % | (7.62)% | ($36.58) | A |

——————— Summary for this Account ———————

| | |
|---|---|
| Average Annual Invested Balance | $480.02 |
| Average Annual Interest Posted | $.22 |
| Weighted Average Yield | .05 % |
| Weighted Average Benchmark | 7.67 % |

Attachment B Part 2 to Boswell Declaration

0681

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1978 | $163,610.69 | $8,810.64 | 5.39 % | 7.67 % | (2.28)% | ($3,730.32) | BI |
| 1979 | $16,762.14 | ($6,752.48) | (40.28)% | 10.41 % | (50.69)% | ($8,496.73) | BI |
| 1980 | $6,546.96 | $.00 | .00 % | 12.04 % | (12.04)% | ($788.25) | A |
| 1981 | $6,582.56 | $325.18 | 4.94 % | 14.74 % | (9.80)% | ($645.09) | A |
| 1982 | $7,372.96 | $1,240.26 | 16.82 % | 14.48 % | 2.34 % | $172.53 | A |
| 1983 | $8,474.90 | $831.74 | 9.81 % | 10.88 % | (1.07)% | ($90.68) | A |
| 1984 | $7,922.28 | $996.20 | 12.57 % | 10.54 % | 2.03 % | $160.82 | A |
| 1985 | $5,808.13 | $569.52 | 9.81 % | 10.17 % | (.36)% | ($20.91) | A |
| 1986 | $6,333.55 | $577.24 | 9.11 % | 8.36 % | .75 % | $47.50 | A |
| 1987 | $12,183.63 | $237.70 | 1.95 % | 7.42 % | (5.47)% | ($666.44) | A |
| 1988 | $20,959.57 | $1,328.34 | 6.34 % | 7.60 % | (1.26)% | ($264.09) | A |
| 1989 | $22,471.52 | $2,646.38 | 11.78 % | 8.90 % | 2.88 % | $647.18 | A |
| 1990 | $18,303.33 | $2,039.01 | 11.14 % | 8.78 % | 2.36 % | $431.96 | A |
| 1991 | $18,999.00 | $1,283.74 | 6.76 % | 7.68 % | (.92)% | ($174.79) | A |
| 1992 | $28,521.11 | $874.80 | 3.07 % | 6.80 % | (3.73)% | ($1,063.84) | B |

——————— Summary for this Account ———————

| | |
|---|---|
| Average Annual Invested Balance | $23,390.16 |
| Average Annual Interest Posted | $1,000.55 |
| Weighted Average Yield | 4.28 % |
| Weighted Average Benchmark | 8.41 % |

Attachment B Part 2 to Boswell Declaration

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1978 | $262,160.46 | $5,691.09 | 2.17 % | 7.67 % | (5.50)% | ($14,418.83) | BI |
| 1979 | $218,798.45 | ($4,368.63) | (2.00)% | 10.41 % | (12.41)% | ($27,152.89) | BI |
| 1980 | $218,798.45 | $.00 | .00 % | 12.04 % | (12.04)% | ($26,343.33) | BI |
| 1981 | $206,519.36 | $.00 | .00 % | 14.74 % | (14.74)% | ($30,440.95) | BI |
| 1982 | $199,668.13 | $46,898.32 | 23.49 % | 14.48 % | 9.01 % | $17,990.10 | B |
| 1983 | $252,926.77 | $22,962.38 | 9.08 % | 10.88 % | (1.80)% | ($4,552.68) | A |
| 1984 | $303,626.81 | $37,316.88 | 12.29 % | 10.54 % | 1.75 % | $5,313.47 | A |
| 1985 | $339,778.98 | $32,685.33 | 9.62 % | 10.17 % | (.55)% | ($1,868.78) | A |
| 1986 | $370,204.67 | $33,569.10 | 9.07 % | 8.36 % | .71 % | $2,628.45 | A |
| 1987 | $351,656.53 | $14,305.91 | 4.07 % | 7.42 % | (3.35)% | ($11,780.49) | B |
| 1988 | $428,770.57 | $26,761.05 | 6.24 % | 7.60 % | (1.36)% | ($5,831.28) | A |
| 1989 | $460,155.96 | $54,481.87 | 11.84 % | 8.90 % | 2.94 % | $13,528.59 | A |
| 1990 | $461,998.69 | $46,906.64 | 10.15 % | 8.78 % | 1.37 % | $6,329.38 | A |
| 1991 | $538,677.11 | $40,412.48 | 7.50 % | 7.68 % | (.18)% | ($969.62) | A |
| 1992 | $485,801.72 | $17,656.51 | 3.63 % | 6.80 % | (3.17)% | ($15,399.91) | B |

——————— Summary for this Account ———————

| | |
|---|---|
| Average Annual Invested Balance | $339,969.51 |
| Average Annual Interest Posted | $25,018.60 |
| Weighted Average Yield | 7.36 % |
| Weighted Average Benchmark | 9.18 % |

Attachment B Part 2 to Boswell Declaration

0683

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1978 | $19,750.19 | $424.90 | 2.15 % | 7.67 % | (5.52)% | ($1,090.21) | BI |
| 1979 | $18,798.45 | ($230.22) | (1.22)% | 10.41 % | (11.63)% | ($2,186.26) | BI |
| 1980 | $18,798.45 | $.00 | .00 % | 12.04 % | (12.04)% | ($2,263.33) | BI |
| 1981 | $18,798.45 | $.00 | .00 % | 14.74 % | (14.74)% | ($2,770.89) | BI |
| 1982 | $20,854.82 | $4,175.97 | 20.02 % | 14.48 % | 5.54 % | $1,155.36 | B |
| 1983 | $24,031.56 | $2,101.17 | 8.74 % | 10.88 % | (2.14)% | ($514.28) | A |
| 1984 | $26,387.12 | $3,249.13 | 12.31 % | 10.54 % | 1.77 % | $467.05 | A |
| 1985 | $29,524.94 | $2,846.76 | 9.64 % | 10.17 % | (.53)% | ($156.48) | A |
| 1986 | $32,188.83 | $2,921.55 | 9.08 % | 8.36 % | .72 % | $231.76 | A |
| 1987 | $30,573.24 | $1,257.99 | 4.11 % | 7.42 % | (3.31)% | ($1,011.97) | B |
| 1988 | $37,266.24 | $2,309.29 | 6.20 % | 7.60 % | (1.40)% | ($521.73) | A |
| 1989 | $40,000.10 | $4,756.17 | 11.89 % | 8.90 % | 2.99 % | $1,196.00 | A |
| 1990 | $42,820.09 | $4,471.49 | 10.44 % | 8.78 % | 1.66 % | $710.81 | A |
| 1991 | $47,222.96 | $3,408.13 | 7.22 % | 7.68 % | (.46)% | ($217.23) | A |
| 1992 | $50,929.95 | $1,567.23 | 3.08 % | 6.80 % | (3.72)% | ($1,894.59) | B |

——————— Summary for this Account ———————

| | |
|---|---|
| Average Annual Invested Balance | $30,529.69 |
| Average Annual Interest Posted | $2,217.30 |
| Weighted Average Yield | 7.26 % |
| Weighted Average Benchmark | 9.20 % |

Attachment B Part 2 to Boswell Declaration

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1978 | $203.60 | $4.38 | 2.15 % | 7.67 % | (5.52)% | ($11.24) | A |
| 1979 | $193.79 | ($2.37) | (1.22)% | 10.41 % | (11.63)% | ($22.54) | A |
| 1980 | $138.04 | $.00 | .00 % | 12.04 % | (12.04)% | ($16.62) | A |

──────────── Summary for this Account ────────────

| | |
|---|---|
| Average Annual Invested Balance | $178.48 |
| Average Annual Interest Posted | $.67 |
| Weighted Average Yield | .38 % |
| Weighted Average Benchmark | 9.79 % |

Attachment B Part 2 to Boswell Declaration

0685

SAMPLE
For Discussion Purposes O.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1978 | $329,607.51 | $34,519.86 | 10.47 % | 7.67 % | 2.80 % | $9,229.01 | A |
| 1979 | $320,375.99 | $127,215.51 | 39.71 % | 10.41 % | 29.30 % | $93,870.17 | BI |
| 1980 | $313,193.80 | $69,196.85 | 22.09 % | 12.04 % | 10.05 % | $31,475.98 | BI |
| 1981 | $410,443.46 | $104,573.21 | 25.48 % | 14.74 % | 10.74 % | $44,081.63 | BI |
| 1982 | $550,499.84 | $110,160.59 | 20.01 % | 14.48 % | 5.53 % | $30,442.64 | B |
| 1983 | $616,499.48 | $54,269.70 | 8.80 % | 10.88 % | (2.08)% | ($12,823.19) | B |
| 1984 | $651,298.15 | $79,424.51 | 12.19 % | 10.54 % | 1.65 % | $10,746.42 | A |
| 1985 | $727,742.58 | $69,968.00 | 9.61 % | 10.17 % | (.56)% | ($4,075.36) | A |
| 1986 | $793,098.38 | $71,613.49 | 9.03 % | 8.36 % | .67 % | $5,313.76 | A |
| 1987 | $757,791.73 | $33,249.59 | 4.39 % | 7.42 % | (3.03)% | ($22,961.09) | B |
| 1988 | $917,607.28 | $54,732.95 | 5.96 % | 7.60 % | (1.64)% | ($15,048.76) | A |
| 1989 | $984,375.16 | $116,803.36 | 11.87 % | 8.90 % | 2.97 % | $29,235.94 | A |
| 1990 | $1,011,544.38 | $100,150.62 | 9.90 % | 8.78 % | 1.12 % | $11,329.30 | A |
| 1991 | $1,175,062.58 | $87,614.83 | 7.46 % | 7.68 % | (.22)% | ($2,585.14) | A |
| 1992 | $1,074,696.27 | $55,572.41 | 5.17 % | 6.80 % | (1.63)% | ($17,517.55) | A |

——————— Summary for this Account ———————

| | |
|---|---|
| Average Annual Invested Balance | $708,922.44 |
| Average Annual Interest Posted | $77,937.70 |
| Weighted Average Yield | 10.99 % |
| Weighted Average Benchmark | 9.20 % |

Attachment B Part 2 to Boswell Declaration

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1978 | $107,063.42 | $2,303.39 | 2.15 % | 7.67 % | (5.52)% | ($5,909.90) | BI |
| 1979 | $101,902.89 | ($1,247.98) | (1.22)% | 10.41 % | (11.63)% | ($11,851.31) | BI |
| 1980 | $101,902.89 | $.00 | .00 % | 12.04 % | (12.04)% | ($12,269.11) | BI |
| 1981 | $101,902.89 | $.00 | .00 % | 14.74 % | (14.74)% | ($15,020.49) | BI |
| 1982 | $112,763.21 | $22,146.18 | 19.64 % | 14.48 % | 5.16 % | $5,818.58 | B |
| 1983 | $129,866.32 | $11,538.95 | 8.89 % | 10.88 % | (1.99)% | ($2,584.34) | A |
| 1984 | $110,133.77 | $14,063.73 | 12.77 % | 10.54 % | 2.23 % | $2,455.98 | A |
| 1985 | $116,850.67 | $11,404.79 | 9.76 % | 10.17 % | (.41)% | ($479.09) | A |
| 1986 | $127,543.18 | $11,458.41 | 8.98 % | 8.36 % | .62 % | $790.77 | A |
| 1987 | $121,114.56 | $5,079.28 | 4.19 % | 7.42 % | (3.23)% | ($3,912.00) | B |
| 1988 | $147,809.61 | $9,312.77 | 6.30 % | 7.60 % | (1.30)% | ($1,921.52) | A |
| 1989 | $158,466.89 | $19,177.35 | 12.10 % | 8.90 % | 3.20 % | $5,070.94 | A |
| 1990 | $176,698.93 | $18,198.65 | 10.30 % | 8.78 % | 1.52 % | $2,685.82 | A |
| 1991 | $114,691.84 | $8,418.26 | 7.34 % | 7.68 % | (.34)% | ($389.95) | A |
| 1992 | $108,423.20 | $3,297.71 | 3.04 % | 6.80 % | (3.76)% | ($4,076.71) | B |

——————————— Summary for this Account ———————————

| | |
|---|---|
| Average Annual Invested Balance | $122,475.62 |
| Average Annual Interest Posted | $9,010.10 |
| Weighted Average Yield | 7.36 % |
| Weighted Average Benchmark | 9.62 % |

Attachment B Part 2 to Boswell Declaration

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF INVESTMENT YIELD ANALYSIS RESULTS FOR
THE TRIBE

Tribe SAMPLE (x99999)
Principal and Related Interest Account Have Been Combined for this Analysis.

| Fiscal Year | Average Daily Invested Balance | Total Earned Interest Posted on Investments | Calculated Yield | Benchmark | Variance | Calculated Variance | Disposition (refer to B-1) |
|---|---|---|---|---|---|---|---|
| 1978 | $214,837.70 | $4,002.96 | 1.86 % | 7.67 % | (5.81)% | ($12,482.07) | BI |
| 1979 | $148,470.38 | ($3,073.36) | (2.07)% | 10.41 % | (12.48)% | ($18,529.10) | BI |

——————— Summary for this Account ———————

| | |
|---|---|
| Average Annual Invested Balance | $181,654.04 |
| Average Annual Interest Posted | $464.80 |
| Weighted Average Yield | .26 % |
| Weighted Average Benchmark | 8.79 % |

Attachment B Part 2 to Boswell Declaration

0688

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF TREASURY INTEREST RECALCULATION PROCEDURES

### PROCEDURES

The following procedures were applied to Fiscal Years 1978 through 1992. General ledger income/cost codes needed to determine whether a transaction is interest related were not available for years prior to Fiscal Year 1978 and, therefore, interest receipts could not be identified for comparison.

We recalculated Treasury Overnighter interest earnings and statutory Treasury interest earnings received by the Tribe on the daily cash balance in each of the Tribe's Trust accounts using the applicable Treasury interest rates and daily balances provided by the Bureau.

### SUPPLEMENTAL INFORMATION

Arthur Andersen LLP recalculated interest earnings on uninvested cash balances for comparison to actual interest postings. The recalculation was based on Bureau historical treatment of cash balance interest allocations, which was a simple interest calculation at statutory rates through December 31, 1984. As of January 1, 1985, interest was compounded daily based on applicable Treasury posted rates. Assumptions derived from the Bureau historical calculations were used by Arthur Andersen LLP to develop a computer program to perform the recalculations.

The recalculations represent a detailed estimate of what should have been posted to an account, applying the same theory the Bureau used historically. However, certain historical events and data quality limitations prevent an exact recalculation and comparison, such as:

- Bureau delays in the posting of actual interest created timing differences in the comparisons (i.e., cash versus accrual calculation differences). In some cases, the delays were significant and overlapped several calculation periods.

- Transaction dates were not available for all transactions and were derived based on certain assumptions in order to prepare a mathematically valid calculation.

- Beginning in January 1985, the Bureau's historical internal allocation method did not calculate interest retroactively to the effective date of the transaction when the transaction was not posted on a timely basis (i.e., the transaction was posted after Treasury interest had been calculated for the period to which the transaction pertained). The date of data entry of a transaction is not available in the data provided by the Bureau to Arthur Andersen LLP. The recalculations are retroactive to the effective date of the transaction.

Following is a summary of the basic assumptions included in the recalculations:

- Cash balances used as a basis for recalculations were derived by taking the current cash balance at the beginning of the fiscal year and adjusting for posted transactions affecting cash during the year.

Attachment B Part 2 to Boswell Declaration

0689

SAMPLE
For Discussion Purposes On

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF TREASURY INTEREST RECALCULATION PROCEDURES

- The daily average cash balance was recalculated considering all proposed date changes identified in the Basic Reconciliation.

- Interest was recalculated on the average cash balance for all accounts, including negative cash balances that resulted in negative interest recalculations.

- The following priority was used in determining the dates used in the Treasury Interest Recalculation where the original effective date was not available or was determined to be inaccurate through the reconciliation process.

  o Basic Reconciliation proposed date changes to the general ledger based on financial source documents, concurred with by the Bureau.

  o Effective date obtained from investment/MoneyMax reports for investment transactions greater than or equal to $50,000 which lack effective dates in the general ledger, and certain transactions less than $50,000 represented by the same investment document reference researched.

  o Effective date obtained from the Bureau manual interest calculation ledgers for unreconciled transactions greater than or equal to $50,000 which lack effective dates in the general ledger.

  o Effective date obtained from source documents provided by the Bureau for unreconciled transactions greater than or equal to $50,000 which lack effective dates in the general ledger and could not be resolved through research of investment/MoneyMax reports.

  o Approximate transaction dates were derived from the document reference. The Bureau has historically utilized the transaction month or Julian date in its coding convention for document references. Julian dates were converted, or when available, the month was identified from the document reference, and the transaction was assigned an effective date of the 15th of that month.

  o Approximate transaction dates were derived based on the month a transaction first appeared in the general ledger. Based on research of monthly hard copy reports, a transaction was assigned the 15th day of the month it first appeared.

  o Interest calculated for Fiscal Year 1992 includes a calculation of interest for transactions posted in Fiscal Year 1993 with effective dates on or prior to September 30, 1992.

- Interest, for the appropriate time periods, was recalculated as follows:

  ### July 1978 - December 1984

  o Statutory rates of four (4) percent or five (5) percent were utilized for simple interest calculated every six (6) months on average cash balances. Four (4) or five (5) percent applied to principal account balances only (i.e., no interest applied to appropriations 7500 through 7999 or 9500 through 9999, which are interest accounts) as provided by U.S. Code Title 25 § 161a.

Attachment B Part 2 to Boswell Declaration

0690

SAMPLE
For Discussion Purposes On.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF TREASURY INTEREST RECALCULATION PROCEDURES

### January 1985 - September 1992

o  Daily posted Treasury rates (provided by the Bureau) were compounded daily based on each day's average cash balance for all accounts.  Principal and interest accounts were combined for comparison (i.e., all 7XXX and 9XXX accounts).

•  The calculated interest amounts for each account and each year were compared to the total actual overnighter interest postings identified as those transactions with a document description containing a "BB" with a "Z" or "AW" and an element component (revenue code) of 9701, with the one exception of document TT05Z0002 posted in Fiscal Year 1982, which was also determined to have been used to post overnighter interest, and certain AW's and element component of 9701 posted to Alaska Native Fund determined not to be overnighter.

Below are specific laws related to investments and rates of interest of Tribal funds held in Trust.

UNITED STATES CODE TITLE 25 INDIANS

SUBCHAPTER III - DEPOSIT, CARE, AND INVESTMENT ON INDIAN MONEYS

25 § 161a.    Tribal funds in trust in Treasury Department; rate of interest

All funds with account balances exceeding $500 held in Trust by the United States and carried in principal accounts on the books of the Treasury Department to the credit of Indian Tribes, upon which interest is not otherwise authorized by law, shall bear simple interest at the rate of 4 per centum per annum.

(Feb. 12, 1929, C. 178 § 1, 45 Stat. 1164; June 13, 1930, c. 483, 46 Stat. 584.)

25 § 161a.    Tribal funds in trust in Treasury Department; investment by Secretary of the Treasury; maturities; interest

That all funds held in Trust by the United States and carried in principal accounts on the books of the United States Treasury to the credit of Indian tribes shall be invested by the Secretary of the Treasury, at the request of the Secretary of the Interior, in public debt securities with maturities suitable to the needs of the fund involved, as determined by the Secretary of the Interior, and bearing interest at rates determined by the Secretary of the Treasury, taking into consideration current market yields on outstanding marketable obligations of the United States of comparable maturities.

(As amended Oct. 4, 1984, Pub. L. 98-451, § 1, 98 Stat. 1729.)

Attachment B Part 2 to Boswell Declaration

0691

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF TREASURY INTEREST RECALCULATION PROCEDURES

### FINDINGS

See Attachment B-2a for "Summary of Treasury Interest Recalculation Results for the Tribe".

### Adjustments

Any resulting adjustments affecting the Tribe are reported in the accompanying Tribal Account Statements.

Attachment B Part 2 to Boswell Declaration

0692

SAMPLE
For Discussion Purposes Only

U.S DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF TREASURY INTEREST RECALCULATION RESULTS FOR THE TRIBE

| Fiscal Year | Recalculated Interest (3) | Interest Posted (2) | Recalculated Greater Than Posted (4) | Recalculated Less Than Posted (4) | Net Proposed Adjustment (5) | Interest Impact of Adjustment (1) | Total Adjustment Plus Interest Impact (5) |
|---|---|---|---|---|---|---|---|
| 78 | ($3,911.00) | $89.00 | $.00 | ($4,000.00) | ($4,000.00) | ($12,925.00) | ($16,925.00) |
| 79 | ($233.00) | $127.00 | $175.00 | ($535.00) | ($360.00) | ($1,020.00) | ($1,380.00) |
| 80 | $48.00 | $122.00 | $178.00 | ($252.00) | ($74.00) | ($179.00) | ($253.00) |
| 81 | $328.00 | $.00 | $339.00 | ($11.00) | $328.00 | $650.00 | $978.00 |
| 82 | $201.00 | $1,821.00 | $201.00 | ($1,821.00) | ($1,620.00) | ($2,598.00) | ($4,218.00) |
| 83 | ($651.00) | ($11,187.00) | $13,601.00 | ($13,065.00) | $10,536.00 | $14,207.00 | $24,743.00 |
| 84 | $2,802.00 | $10,804.00 | $24,491.00 | ($32,493.00) | ($8,002.00) | ($8,998.00) | ($17,000.00) |
| 85 | $19,120.00 | $1,051.00 | $27,312.00 | ($9,243.00) | $18,069.00 | $16,775.00 | $34,844.00 |
| 86 | $17,155.00 | $15,675.00 | $25,191.00 | ($23,711.00) | $1,480.00 | $1,154.00 | $2,634.00 |
| 87 | $38,639.00 | $15,456.00 | $26,425.00 | ($3,242.00) | $23,183.00 | $15,224.00 | $38,407.00 |
| 88 | $14,996.00 | $.00 | $14,997.00 | ($11.00) | $14,996.00 | $8,093.00 | $23,089.00 |
| 89 | $19,336.00 | $64,698.00 | $463.00 | ($45,845.00) | ($45,362.00) | ($18,773.00) | ($64,135.00) |
| 90 | $33,220.00 | $59,187.00 | $5,000.00 | ($30,967.00) | ($25,967.00) | ($7,783.00) | ($33,750.00) |
| 91 | $24,767.00 | $25,451.00 | $3,175.00 | ($3,859.00) | ($684.00) | ($142.00) | ($826.00) |
| 92 | $147,985.00 | $171,082.00 | $129,853.00 | ($152,950.00) | ($23,097.00) | ($3,007.00) | ($26,104.00) |
| Totals | $313,802.00 | $354,376.00 | $271,421.00 | ($311,995.00) | ($40,574.00) | $678.00 | ($39,896.00) |

(1) This is the interest impact of the Fiscal Year Treasury interest recalculation. The interest computed was based on Bureau provided Benchmark rates based upon the overall yield for all Tribes' investments (see Attachment B-1) and assumed annual compounding. Benchmarks are not necessarily representative of any single Tribe's investment yields. The Benchmark rates were applied to the individual adjustments at the end of each Fiscal Year through September 30, 1994.

(2) Includes interest of $1,698.00 posted on 10/1/92 (Fiscal Year 1993) identified as interest earned in Fiscal Year 1992.

(3) Includes interest of $1.00 calculated on transactions posted in Fiscal Year 1993 with effective dates prior to September 30, 1992.

(4) These columns represent the gross positive or negative variances calculated for all appropriations.

(5) Combined (net) adjustment for all appropriations within the Fiscal Year.

Note: The daily average cash balance was recalculated considering all proposed date changes identified in the Basic Reconciliation.

-40-

Attachment B Part 2 to Boswell Declaration

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF PRO FORMA PROCEDURES

### PROCEDURES

The following procedures were applied to Fiscal Years 1978 through 1992. General ledger income/cost codes needed to determine whether a transaction is interest related were not available for years prior to Fiscal Year 1978 and, therefore, interest receipts could not be identified for comparison.

We performed, for informational purposes only, pro forma calculations of interest income on uninvested funds for Fiscal Years 1978 through 1992 for all of the Tribe's Trust accounts. This calculation is an estimate of what might have been earned had uninvested funds yielded returns comparable to the Benchmark rates. The calculation is an automated calculation of interest based on Bureau provided general ledger reported balances and the Benchmark rates.

### SUPPLEMENTAL INFORMATION

The following summary compares the pro forma calculated interest to Bureau postings of interest for actual earnings on cash balances. The calculation and comparison is for informational purposes only, provided at the request of the Bureau. It is a theoretical estimation of what might have been earned on cash balances, had the funds been invested at the investment rates provided. No investigation was made to explain variations or resolve timing differences of cash basis interest postings. Variances do not represent exceptions resulting in proposed adjustments.

### FINDINGS

See Attachment B-3a for "Summary of Pro Forma Results for the Tribe".

SAMPLE
For Discussion Purposes Only

U.S DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF PRO FORMA RESULTS FOR THE TRIBE

| Fiscal Year | Calculated Interest (3) | Interest Posted (2) | Calculated Greater Than Posted (4) | Calculated Less Than Posted (4) | Net Variance (1) |
|---|---|---|---|---|---|
| 78 | ($8,964.00) | $89.00 | $1,911.00 | ($10,964.00) | ($9,053.00) |
| 79 | $719.00 | $127.00 | $5,342.00 | ($4,750.00) | $592.00 |
| 80 | $1,161.00 | $122.00 | $1,453.00 | ($414.00) | $1,039.00 |
| 81 | $896.00 | $.00 | $3,078.00 | ($2,182.00) | $896.00 |
| 82 | $758.00 | $1,821.00 | $6,860.00 | ($7,923.00) | ($1,063.00) |
| 83 | ($1,755.00) | ($11,187.00) | $16,455.00 | ($7,024.00) | $9,431.00 |
| 84 | $6,647.00 | $10,804.00 | $29,667.00 | ($33,824.00) | ($4,157.00) |
| 85 | $26,116.00 | $1,051.00 | $34,621.00 | ($9,556.00) | $25,065.00 |
| 86 | $17,881.00 | $15,675.00 | $27,510.00 | ($25,304.00) | $2,206.00 |
| 87 | $45,088.00 | $15,456.00 | $32,977.00 | ($3,345.00) | $29,632.00 |
| 88 | $13,663.00 | $.00 | $13,663.00 | $.00 | $13,663.00 |
| 89 | $13,951.00 | $64,698.00 | $117.00 | ($50,864.00) | ($50,747.00) |
| 90 | $33,467.00 | $59,187.00 | $5,403.00 | ($31,123.00) | ($25,720.00) |
| 91 | $26,503.00 | $25,451.00 | $4,688.00 | ($3,636.00) | $1,052.00 |
| 92 | $243,811.00 | $171,082.00 | $225,899.00 | ($153,170.00) | $72,729.00 |
| Totals | $419,941.00 | $354,376.00 | $409,644.00 | ($344,079.00) | $65,565.00 |

(1) Combined (net) variance for all appropriations within the Fiscal Year.
(2) Includes interest of $1,698.00 posted on 10/1/92 (Fiscal Year 1993) identified as interest earned in Fiscal Year 1992.
(3) Includes interest of $.00 calculated on transactions posted in Fiscal Year 1993 with effective dates prior to September 30, 1992.
(4) These columns represent the gross positive or negative variances calculated for all appropriations.

-42-

Attachment B Part 2 to Boswell Declaration

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF ANALYTICAL REVIEW PROCEDURES

### PROCEDURES

We prepared graphs for non-investment and non-judgment receipt and disbursement transactions (see Attachments A-1 and A-2 for "Summary of Basic Reconciliation Results for All Tribes" and "Summary of Basic Reconciliation Results for the Tribe") for Fiscal Years 1978 through 1992 (see Attachment C-1 for "Analytical Review Graphs for the Tribe", if applicable).

In addition, for fifteen (15) tribes selected by the Bureau, we investigated unusual fluctuations in receipts and disbursements activity (see Attachment C-2 for "Summary of Analytical Review Procedures and Reportable Conditions for the Tribe", if applicable).

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## ANALYTICAL REVIEW GRAPHS FOR THE TRIBE

This Tribe did not have non-investment and non-judgment receipts and disbursement transactions for Fiscal Years 1978 through 1992.



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

ANALYTICAL REVIEW GRAPHS FOR THE TRIBE

GRAPH A

Total Receipt Dollars
(FY's 1978 - 1992)

-45-

SAMPLE
For Discussion Purposes Only

Attachment B Part 2 to Boswell Declaration



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT

FOR

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

ANALYTICAL REVIEW GRAPHS FOR THE TRIBE

GRAPH B

Other Receipt Dollars
(FY's 1978 - 1992)

-46-

SAMPLE
For Discussion Purposes Only

Attachment B Part 2 to Boswell Declaration



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT

FOR

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

ANALYTICAL REVIEW GRAPHS FOR THE TRIBE

GRAPH C

Oil and Mineral Receipt Dollars
(FY's 1978 - 1992)



-47-

SAMPLE
For Discussion Purposes Only

Attachment B Part 2 to Boswell Declaration

0700



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT

FOR

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

ANALYTICAL REVIEW GRAPHS FOR THE TRIBE

GRAPH D

Timber Receipt Dollars
(FY's 1978 - 1992)

-48-

SAMPLE
For Discussion Purposes Only

Attachment B Part 2 to Boswell Declaration



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

ANALYTICAL REVIEW GRAPHS FOR THE TRIBE

GRAPH E

Surface Receipt Dollars
(FY's 1978 - 1992)

-49-



SAMPLE
For Discussion Purposes Only

Attachment B Part 2 to Boswell Declaration

0702



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

ANALYTICAL REVIEW GRAPHS FOR THE TRIBE

GRAPH F

Interest Receipt Dollars
(FY's 1978 - 1992)

-50-

SAMPLE
For Discussion Purposes Only



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

ANALYTICAL REVIEW GRAPHS FOR THE TRIBE

GRAPH G

Total Disbursement Dollars
(FY's 1978 - 1992)

-51-

SAMPLE
For Discussion Purposes Only

Attachment B Part 2 to Boswell Declaration



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT

FOR

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

ANALYTICAL REVIEW GRAPHS FOR THE TRIBE

GRAPH H

Total Receipt - Disbursement Comparison Dollars
(FY's 1978 - 1992)

-52-

SAMPLE
For Discussion Purposes Only

Attachment B Part 2 to Boswell Declaration

0705



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

ANALYTICAL REVIEW GRAPHS FOR THE TRIBE

GRAPH I

Comparison of Aggregate
Receipt and Disbursement Dollars
(FY's 1978 - 1992)

SAMPLE
For Discussion Purposes Only

-53-

Attachment B Part 2 to Boswell Declaration

0706

# ATTACHMENT B

# TO BOSWELL

# DECLARATION

# PART 3

SAMPLE
For Discussion Purposes Only

ATTACHMENT C-2
Page 1 of 1

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
**SAMPLE**
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF ANALYTICAL REVIEW PROCEDURES AND REPORTABLE CONDITIONS FOR THE TRIBE

This Tribe was not selected for performance of Analytical Review Procedures.

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF ANALYTICAL REVIEW PROCEDURES AND REPORTABLE CONDITIONS FOR THE TRIBE

### PROCEDURES

We reviewed the Tribe's account statement detail of transactions (for Fiscal Years 1978 through 1992, as income/cost codes were not available for years prior to Fiscal Year 1978) discussed in the "Basic Reconciliation Transactions" and investigated judgmentally identified unusual fluctuations in receipts and disbursements. Below are the general procedures that were performed:

- Reviewed statement histories for Tribe's accounts and documented potential problem areas (i.e., unusual fluctuations in receipts, disbursements, etc.).
- Followed-up with the Bureau or Tribe personnel and reviewed supporting documentation as appropriate for items identified above.
- Depending on the type of receipt being tested and documents being reviewed, documented any unusual or questionable transactions or documents such as:

  o Unexplainable fluctuations in receipts
  o Unusually large or small receipts
  o Unusually large or inconsistent disbursements
  o Inconsistent transaction volumes
  o Misclassification of receipt types

In order to apply analytical review procedures, we have identified a number of assumptions which we believe can reasonably be applied to the data. In general, it is assumed that the vast majority of the transactions for the Tribe are regular and recurring, and of relatively similar dollar amounts based on the fact that almost all of the Tribe's revenues are from annual lease agreements. Therefore, logical relationships between information fields have been established by applying the following procedures. By applying these procedures we have identified conditions where the expected relationship is not apparent.

- Summarized the receipt and disbursement data in graphic and table form to identify trends and any unusual deviations. Noted any situation that appeared to be unusual or inconsistent to us and required further explanation.
- Investigated the causes of the situations discovered during summary review. Attempted to resolve each condition by examining the individual transactions and source documents, if available.
- For each finding not satisfactorily resolved by examining transaction detail and source documents, we presented the results of our investigation to the Bureau for further review.
- Documented and reported all findings, regardless of resolution.

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
**SAMPLE**
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF ANALYTICAL REVIEW PROCEDURES AND REPORTABLE CONDITIONS FOR THE TRIBE

### SUPPLEMENTAL INFORMATION

An analytical review of the Tribe's non-judgment award accounts                was conducted for anomalies such as unusual fluctuations in receipts, large disbursements, etc. that may indicate potential problem areas with the collection and posting of receipts and disbursements.

Analytical review is a high-level process to identify whether data and identified relationships are reasonable in relation to trends and other expectations. Analytical review procedures are intended to enhance an overall understanding of the data and to reveal apparent inconsistencies that may not be identified through the use of detailed testing.

Analytical review is by nature, a judgmental task. No standard list of procedures exists to apply to every situation. As such, the results of actual services performed are reported for the Bureau's consideration and acceptance. Analytical review procedures are intended to supplement substantive procedures performed; they cannot be expected to uncover all existing or potential problems. Inconsistencies and abnormalities in the transaction data are not always caused by inappropriate or improper actions, nor do all inappropriate or improper actions cause significant fluctuations in expected data relationships.

The Bureau has directed Arthur Andersen LLP to apply analytical review procedures to the receipt and disbursement transaction data from Fiscal Years 1978 through 1992 (i.e., income/cost codes not available prior to Fiscal Year 1978) for the Tribe. Interest receipts were included in the graphical data in order to accurately compare disbursements with receipts. The source documentation for the procedures was the general ledger transaction data supplied by the Bureau.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF ANALYTICAL REVIEW PROCEDURES AND REPORTABLE CONDITIONS FOR THE TRIBE

As a result of our analytical review procedures, below is a list of conditions that were determined to be unusual and, therefore, reportable.

| Description of Conditions | Results of Arthur Andersen LLP Follow-Up/ Bureau Response |
|---|---|
| A) "Other Receipts" increased in Fiscal Years 1981, 1982, 1985, 1988 and 1989 compared to other years presented (see Graph B). | We reviewed six (6) receipts totaling $179,252 for the Fiscal Years 1981, 1982, 1985, 1988, and 1989. Five (5) receipts included miscellaneous income from Tribal office for deposit to Tribal Treasury; payments for right-of-way; transfer of Indian Money Proceeds of Labor Escrow account funds to treasury trust accounts; crossing permit for sheep; land lease rental; and royalties for vanadium concentrates from phosphate shale, respectively. One (1) receipt (BB11K0001) for $41,380 in Fiscal 1988 was not provided to us for review. |
| B) "Oil and Mineral Receipts" increased in Fiscal Years 1981, 1982, 1984, 1985, 1987 and 1989, decreased in Fiscal Years 1983, 1986, 1988, 1990, 1991 and 1992 compared to other years presented and there were no receipts in Fiscal Years 1978, 1979 and 1980 (see Graph C). | We reviewed seventeen (17) receipts totaling $4,927,114 from Fiscal Years 1978 through 1992. All were mineral related (i.e., properly classified). From the documentation available, no explanation can be provided for the condition. |
| C) "Surface Receipts" increased in Fiscal Years 1981, 1982 and 1985 compared to other years presented and there were no receipts in Fiscal Years 1978, 1979 and 1980 (see Graph E). | We reviewed nine (9) receipts totaling $1,587,290 from Fiscal Years 1978 through 1982 and 1985. Eight (8) receipts were surface lease related (i.e., correctly classified). One (1) receipt for $130,576 was to transfer funds from the Individual Indian Money accounts to Tribal Trust account. There was no indication as to the purpose of this transfer. From the documentation available, no explanation can be provided for the condition. |
| D) "Total Disbursements" exceeded "Total Receipts" by approximately 20% in Fiscal Year 1983, 11% in Fiscal Year 1986, 14% in Fiscal Years 1987 and 1988, 12% in Fiscal Year 1989 and 9% in Fiscal Year 1992 (see Graphs G and H). | No explanation could be provided for the conditions. |

Attachment B Part 3 to Boswell Declaration

0710

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
**SAMPLE**
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF MONEYMAX SYSTEM TO FINANCE SYSTEM RECONCILIATION PROCEDURES

### PROCEDURES

We reconciled the MoneyMax System (Bureau investment subsidiary detail) investment balances to the Finance System (general ledger) investment balances for all Tribes as of September 30, 1992, with the exception of certain investment transactions affecting several tribes which were reconciled internally by the Bureau. Any adjustments resulting from such internal reconciliations are not reflected in this report or in the accompanying Tribal account statements. Following is a list of tribes for which the Bureau proposed and/or posted adjustments subsequent to September 30, 1992 as a result of internal reconciliation efforts:

| | |
|---|---|
| Sioux | San Luis Rey Tribal Development |
| Comanche Tribe of Oklahoma | Hoopa Valley Tribe |
| Fort Belknap Indian Community | Pueblo of Laguna |
| Tlingit - Haida Alaska | Southern Ute Tribe |
| Lac Courte Oreilles Band of Chippewa Indians | Ute Mountain Ute Tribe |
| Tohono O' Odham Nation of Arizona | Mescalero Apache Tribe |
| Salt River Pima - Maricopa Indian Community | The Navajo Tribe |
| San Carlos Apache Tribe | Nez Perce Tribe of Idaho |
| Confederated Tribes of Grande Ronde Community | Confederated Tribes of Warm Springs Reservation |
| TE - Moak Band of Western Shoshone | Houlton Band of Maliseet Indians of Maine |
| Hopi Tribe of Arizona | Spokane Tribe of Indians |
| Three Affiliated Tribes of the Fort Berthold Reservation | Confederated Tribes and Bands of the Yakama Indian Nation |
| Assiniboine and Sioux Tribes of Ft. Peck Indian Reservation | Ute Indian Tribe Uintah and Ouray Reservation, Utah |

We performed MoneyMax System to Finance System reconciliations by performing the following procedures:

- We researched all reconciling items that were not timing differences to establish the need for any adjustments to either system.

- We prepared, documented and recorded the necessary adjustments.

- For months showing significant variations, we compared the transactions from the MoneyMax monthly journals to the Finance System General Ledger Detail List or Monthly Journals of Transactions for the month, if available.

- We requested supporting documents from the Bureau in order to reconcile the items identified. Reconciling items for which the Bureau could not locate supporting documents or for which the Bureau determined to be immaterial were reported as unsupported variances (see Attachment D-1a for "Summary of MoneyMax System to Finance System Reconciliation Results for All Tribes").

Attachment B Part 3 to Boswell Declaration

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF MONEYMAX SYSTEM TO FINANCE SYSTEM RECONCILIATION PROCEDURES

We delivered to the Bureau a Summary of System Balances for Fiscal Year 1992, if applicable, with a detailed list of reconciling items, and a Summary of Proposed Reconciliation Adjustments for Fiscal Year 1992 with copies of supporting documents.

## SUPPLEMENTAL INFORMATION

The objectives have been included here as supplemental information to the reader. No conclusions have been made regarding the achievement of these objectives by applying the agreed-upon procedures.

### Contract Objectives

The primary objective of the reconciliation project was to reconstruct historical transactions, to the extent practicable, for all years where records were available for all Tribal Trust accounts managed by the Bureau.

### Objectives

- To ensure that transactions and balances recorded in the MoneyMax System agree with balances recorded in the Finance System.

- To ensure that required adjusting entries are posted to the respective systems in a timely manner.

## FINDINGS

See Attachment D-1a and D-1b for "Summary of MoneyMax System to Finance System Reconciliation Results for All Tribes" and "Summary of MoneyMax System to Finance System Reconciliation for the Tribe", respectively.

SAMPLE
For Discussion Purposes Only

(Revised)
**ATTACHMENT D-1a**
Page 1 of 1

# U.S. DEPARTMENT OF THE INTERIOR
## BUREAU OF INDIAN AFFAIRS
### TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
**SAMPLE**
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF MONEYMAX SYSTEM TO FINANCE SYSTEM RECONCILIATION RESULTS
## FOR ALL TRIBES
## (REVISED)

Summary of the Tribal Variance

| | |
|---|---:|
| Finance System Balance | $ 1,340,172,625 |
| MoneyMax System Balance | 1,351,185,808 |
| Variance | $ 11,013,183 |
| Proposed Adjustments to Increase Fund Balance (1) | $ 8,587,295 |
| Proposed Adjustments to Decrease Fund Balance (1) | (1,039,861) |
| Proposed Reclassification Adjustments (2) | 1,706,592 |
| Proposed MoneyMax System Adjustments | (102,841) |
| Bureau Proposed Adjustments (4) | 1,865,611 |
| Unsupported Variances (5) | (3,613) |
| Total Variances | 11,013,183 |

(1) Proposed adjustments representing an increase or decrease to the Tribes' net assets.

(2) Proposed adjustments representing a reclassification between cash and investment balances for the Tribes and do not result in an increase or decrease in the Tribes' net asset balances.

(3) These are proposed adjustments to the investment subsidiary records used by the Bureau. These corrections did not affect the Tribes' reported account statement balances.

(4) These are adjustments proposed by the Bureau as a result of internal reconciliation efforts. These adjustments are not included in the accompanying Tribal account statements.

(5) These are unsupported variances for which no adjustments were proposed as requested by the Bureau due to insignificance of amounts.

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF MONEYMAX SYSTEM TO FINANCE SYSTEM RECONCILIATION RESULTS FOR THE TRIBE

Any resulting adjustments affecting the Tribe are reported in the accompanying Tribal Account Statements.

Attachment B Part 3 to Boswell Declaration

0714

**SAMPLE**
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF U.S. TREASURY SYSTEM TO FINANCE SYSTEM RECONCILIATION PROCEDURES

### PROCEDURES

We reconciled Fiscal Year 1992 Bureau cash transactions reported by the U.S. Treasury (Treasury) to the Bureau's Finance System (General Ledger System Reconciliation) and reports submitted to the Treasury (Treasury Reporting Reconciliation). The resulting variances were investigated for tribal trust funds (Appropriation 8365) and resolved, to the extent supporting documentation was provided by the Bureau.

#### General Ledger System Reconciliation

1.  We matched Fiscal Year 1992 cash transactions from the Bureau's general ledger system with the individual cash transactions processed by the Treasury for all Bureau funds as reported on the Treasury's Government On-Line Accounting Link System (GOALS) reports and other Treasury reports.

2.  We requested supporting documents from the Bureau for all reconciling variances relating to tribal trust funds (appropriation 8365). We proposed general ledger adjusting entries for those tribal variances having supporting documentation and concurred with by the Bureau. Tribal variances for which the Bureau could not locate supporting documents were noted as unresolved and no adjusting entries to the general ledger were proposed.

#### Treasury Reporting Reconciliation

1.  We matched the tribal trust general ledger cash transactions for Fiscal Year 1992 to transactions reported to Treasury on the SF224 reports and summarized by Treasury on TFS 6653 reports.

2.  We requested supporting documents from the Bureau for all reconciling variances relating to Tribal Trust Funds (appropriation 8365). We proposed SF224 reporting corrections for those Tribal Trust variances having supporting documentation and concurred with by the Bureau.

### SUPPLEMENTAL INFORMATION

The objectives have been included here as supplemental information to the reader. No conclusions have been made regarding the achievement of these objectives by applying the agreed-upon procedures.

#### Contract Objectives

The primary objective of the reconciliation project was to reconstruct historical transactions, to the extent practicable, for all years where records were available for all Tribal Trust accounts managed by the Bureau.

SAMPLE
For Discussion Purposes Only

ATTACHMENT D-2
Page 2 of 2

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF U.S. TREASURY SYSTEM TO FINANCE SYSTEM RECONCILIATION PROCEDURES

### Objectives

- To ensure that transactions recorded in the U.S. Treasury System agree with transactions recorded in the general ledger.
- To ensure that proposed reconciliation adjustments are documented and presented to the Bureau.

### FINDINGS

See Attachments D-2a and D-2b for "Summary of U.S. Treasury System to Finance System Reconciliation Results for All Tribes" and "Summary of U.S. Treasury System to Finance System Reconciliation Results for the Tribe", respectively.

Attachment B Part 3 to Boswell Declaration

0716

SAMPLE
For Discussion Purposes Only

ATTACHMENT D-2a
Page 1 of 2

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF U.S. TREASURY SYSTEM TO FINANCE SYSTEM RECONCILIATION RESULTS FOR FISCAL YEAR 1992 FOR ALL TRIBES

### Summary of the General Ledger System Reconciliation (all Fund Groups)

| | | |
|---|---|---:|
| Treasury System net 1992 Cash Transactions | $ | 17,638,536 |
| Unadjusted Bureau General Ledger net 1992 Cash Transactions | | 27,976,142 |
| Adjustments: | | |
| Plus - net Timing Differences (1) | | 12,758,779 |
| Less - net Non-U.S. Treasury Transactions (2) | | 10,128,964 |
| Adjusted Bureau General Ledger net 1992 Cash Transactions | | 30,605,957 |
| Net Variance between U.S. Treasury System and Adjusted General Ledger | $ | 12,967,421 |

Net Reconciliation Results:

| | | |
|---|---|---:|
| Non-Tribal Variances | $ | 14,341,193 |
| Tribal Variances | | (1,366,356) |
| Unresolved Variances (5) | | (7,416) |
| Net Variance | $ | 12,967,421 |

Summary of Net Tribal Variance:

| | | |
|---|---|---:|
| Adjustments Proposed as a Result of Other Reconciliation Efforts (3) | $ | (378,824) |
| Date Exceptions (4) | | (258,731) |
| Adjustments Due From Tribes | | (769,744) |
| Adjustments Due To Tribes | | 40,943 |
| Net Variance | $ | (1,366,356) |

(1) The general ledger transactions were adjusted to include only transactions with Fiscal Year 1992 effective dates. Transactions with effective dates outside of Fiscal Year 1992 would need to be considered in their respective years.

(2) Amounts included in the general ledger but not included in the Treasury System Reports previously defined. These transactions were included in the reconciliation of transactions reported to the Treasury (see Reporting Variances in the findings section).

Attachment B Part 3 to Boswell Declaration

SAMPLE
For Discussion Purposes Only

ATTACHMENT D-2a
Page 2 of 2

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF U.S. TREASURY SYSTEM TO FINANCE SYSTEM RECONCILIATION RESULTS FOR FISCAL YEAR 1992 FOR ALL TRIBES

(3) This includes adjustments that were identified in Treasury System reconciliation efforts, but were already identified and proposed as adjustments under Basic Reconciliation, MoneyMax Reconciliation or Yield Analysis.

(4) This represents the value of tribal transactions which have incorrect effective dates. The interest impact of these transactions has been considered in our overnighter recalculation and the adjustments reported in Attachment B-2a, if applicable.

(5) These transactions represent differences that could not be resolved based upon the available documentation. No adjustments to the general ledger were proposed.

### Summary of the Treasury Reporting Reconciliation

Following is a summary of the results of our procedures to match the Tribal Trust general ledger cash transactions for Fiscal Year 1992 to transactions reported to Treasury on the SF224 reports and summarized by Treasury on the TFS 6653 reports.

| | | |
|---|---|---|
| Net Tribal Trust General Ledger Transactions | $ | 59,560,949 |
| Net Tribal Trust Transactions Reported to Treasury | | 45,900,102 |
| Total Reporting Variance Reconciled | $ | 13,660,847 |
| Adjustments/Exceptions Identified as a Result of General Ledger System Reconciliation (see Attachment D-2a, Page 1 of 2) | $ | (1,366,356) |
| Reporting Corrections needed to SF224 Reports (1) | | 15,027,203 |
| | $ | 13,660,847 |

(1) This amount represents errors in amounts reported to Treasury on SF224 reports. This amount does not result in adjustments to the general ledger.

Attachment B Part 3 to Boswell Declaration

0718

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF U.S. TREASURY SYSTEM TO FINANCE SYSTEM RECONCILIATION RESULTS FOR FISCAL YEAR 1992 FOR THE TRIBE

Any resulting adjustments affecting the Tribe are reported in the accompanying Tribal Account Statements.

SAMPLE
For Discussion Purposes Only

ATTACHMENT E
Page 1 of 1

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF DEPOSIT LAG TIME PROCEDURES

### PROCEDURES

We compared, for informational purposes only, the lag time from the apparent date of receipt of funds to the deposit date posted to the general ledger accounts and summarized the results.

### SUPPLEMENTAL INFORMATION

Deposit lag times represent the number of days from the date funds are received (by the Bureau) to the date funds are deposited into a Federal Depository (the bank). The date funds are actually received is not always clearly documented on a receipt document (collection vouchers, field receipts, etc.). Thus, priorities for selecting these dates were established by the Bureau. These dates do not necessarily represent the date funds were actually received. The criteria for selecting the "receipt date" in order of priority are as follows:

1. The "receipt date" on the collection voucher, if clearly indicated.

2. The date on the collection voucher that is the most recent date subsequent to the check date, if a check date is indicated. This apparent date of receipt could be represented by:

   - A stamp date indicating when the collection voucher was processed.
   - The date the collection voucher was prepared.
   - The date the collection voucher was signed as approved.

3. The bank accomplished date of the deposit ticket.

The date of deposit into the bank is defined as the effective date of the transaction posted to the general ledger.

These deposit lag times have been accumulated and reported for informational purposes only and have not been treated as exceptions or adjustments.

### FINDINGS

See Attachment E-1 and E-2 for "Summary of Deposit Lag Time Results for All Tribes" and "Summary of Deposit Lag Time Results for the Tribe". Included in the zero days deposit lag time numbers are transactions in which a receipt date was not indicated on the Bill for Collection, therefore, the date prepared (per deposit ticket) was used.

The schedule summarizes lag times identified for collections transactions (CT's) at the Bureau Area/Agency office level that were reconciled from July 1, 1972 through September 30, 1992. The schedule excludes any CT's that net to zero (i.e., reversals/corrections).

Attachment B Part 3 to Boswell Declaration

SAMPLE
For Discussion Purposes Only

ATTACHMENT E-2
Page 1 of 1

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF DEPOSIT LAG TIME RESULTS FOR
THE TRIBE

| Fiscal Year | 0 Days Transactions | 0 Days Amount | 1 to 3 Days Transactions | 1 to 3 Days Amount | 4 to 6 Days Transactions | 4 to 6 Days Amount | 7 to 10 Days Transactions | 7 to 10 Days Amount | 11 to 30 Days Transactions | 11 to 30 Days Amount | Over 30 Days Transactions | Over 30 Days Amount | Total Transactions | Total Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1973 | 1 | $2,000 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | 1 | $2,000 |
| 1981 | 1 | $42 | 32 | $246,437 | 48 | $30,253 | 10 | $1,114 | 2 | $45,514 | 0 | $0 | 93 | $323,360 |
| 1982 | 3 | $357 | 25 | $965,312 | 72 | $703,999 | 71 | $256,227 | 13 | $434,644 | 11 | $113,029 | 195 | $2,473,568 |
| 1983 | 1 | $17,630 | 45 | $687,336 | 58 | $1,094,171 | 34 | $638,374 | 8 | $3,192 | 2 | $50 | 148 | $2,440,753 |
| 1984 | 1 | $50 | 25 | $920,009 | 63 | $1,311,737 | 35 | $227,003 | 2 | $23,389 | 1 | $389,010 | 139 | $2,871,198 |
| 1985 | 0 | $0 | 46 | $740,571 | 70 | $1,689,862 | 42 | $1,407,719 | 8 | $139,122 | 13 | $146 | 161 | $3,977,420 |
| 1986 | 1 | $10 | 55 | $1,384,344 | 71 | $1,508,493 | 11 | $305,860 | 4 | $3,915 | 7 | $480 | 149 | $3,203,082 |
| 1987 | 0 | $0 | 69 | $1,274,467 | 80 | $1,699,674 | 18 | $660,202 | 3 | $55,420 | 1 | $327 | 171 | $3,680,090 |
| 1988 | 1 | $163 | 54 | $896,989 | 54 | $862,301 | 23 | $982,264 | 8 | $263,658 | 0 | $0 | 140 | $2,985,275 |
| 1989 | 1 | $238 | 65 | $677,741 | 55 | $992,863 | 33 | $1,107,516 | 8 | $395,112 | 0 | $0 | 162 | $3,173,410 |
| 1990 | 4 | $26,582 | 66 | $503,740 | 68 | $634,885 | 25 | $638,776 | 6 | $528,381 | 0 | $0 | 169 | $2,332,364 |
| 1991 | 0 | $0 | 51 | $300,734 | 81 | $834,460 | 25 | $1,045,675 | 2 | $203,047 | 2 | $161 | 168 | $2,384,097 |
| 1992 | 3 | $17,965 | 55 | $557,797 | 60 | $818,724 | 26 | $576,346 | 8 | $222,842 | 0 | $0 | 152 | $2,193,674 |
| Total | 17 | $64,917 | 588 | $9,155,477 | 780 | $12,171,442 | 360 | $7,827,076 | 66 | $2,318,236 | 37 | $503,203 | 1,948 | $32,040,351 |

Note: Zero (0) Days lag time numbers also include    0 EFT-type receipts totalling    $0 and receipts for which no actual receipt date could be determined.

-69-

Attachment B Part 3 to Boswell Declaration

0721

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

### SUMMARY OF FILL THE GAP PROCEDURES

## PROCEDURES

On a sample basis, we verified (i.e., traced and agreed) receipt amounts posted to the general ledger to original lease agreements, sales agreements, contracts, permits or other documentation as appropriate, to the extent provided, to determine that the amounts received and the allocation of such amounts to general ledger accounts were properly recorded based on such documentation.

Following are the scopes and other procedures applied in testing surface leases and timber sales as defined by the Bureau.

### Surface Lease Scopes

#### Five Tribes Pilot Project
The Five Pilot Tribes consisted of Flathead, Yakama, Hopi, Fort Berthold and Fort Peck. At the direction of the Bureau, we judgmentally selected 922 surface leases either from a manual listing maintained by the Tribe/Agency or from the surface lease database created by Arthur Andersen LLP in an attempt to produce an audit trail from the general ledger to the leases by identifying and summarizing lease information from collection vouchers. The results of this testing are included in the "Summary of Fill the Gap Results for All Tribes" (see Attachment F-1).

#### All Tribes (excluding Five Tribes above)
Per the original contract, as modified, we identified 6,446 leases with annual collections greater than $5,000 from the surface lease database. However, due to time constraints, the Bureau directed us to select a number of leases that could be tested given the revised time table (i.e., completion by December 31, 1995), therefore, we judgmentally selected 1,399 surface leases from the original 6,446 leases. Ultimately, 755 lease files were provided by the Bureau prior to discontinuing their efforts due to scope reductions and time constraints. Arthur Andersen LLP tested 692 leases but was unable to test 63 leases due to the following: twenty-six (26) leases contained income or other performance-based provisions that are beyond the scope of our contract and thirty-seven (37) lease files contained insufficient documentation necessary to complete testing. The results of this testing are included in the "Summary of Fill the Gap Results for All Tribes" (see Attachment F-1).

### Surface Lease Procedures

The following procedures were applied to each lease chosen in our sample selection:     0722

- We determined amounts due from the lease agreements and verified (i.e., traced and agreed) amounts to receipt documentation (i.e., collection vouchers, Tribal receipts, etc.) and to general ledger postings.

- We recalculated lease fees based on the methods described in the Code of Federal Regulations, if applicable.

- We calculated late fees based on the contract provisions provided in each lease, if applicable.

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF FILL THE GAP PROCEDURES

### Timber Sale Scopes

#### Five Tribes Pilot Project
At the direction of the Bureau, we judgmentally selected and tested 196 timber sales for 499 production periods for Flathead and Yakama (i.e., Hopi, Fort Berthold and Fort Peck had no timber sales). The results of this testing are included in the "Summary of Fill the Gap Results for All Tribes" (see Attachment F-1).

#### All Tribes (excluding Five Tribes above)
At the Bureau's direction, we judgmentally selected 200 production periods for 200 different timber sales for five (5) Tribes (i.e., Hoopa, Makah, Spokane, Colville and Warm Springs) with significant timber revenue. In total, we tested 227 production months for 213 timber sales. The results of this testing are included in the "Summary of Fill the Gap Results for All Tribes" (see Attachment F-1).

### Timber Sale Procedures

The following procedures were applied to each sale chosen in our sample selection:

#### Value Verification

- We verified (i.e., traced and agreed) prices paid per species for the selected production months to original timber sale contracts and price adjustment worksheets for subsequent periods (if applicable).

#### Volume Verification

- We tested volume by tracing volumes from weight tickets, Reports of Timber Cut (ROTC), or similar documents to scaling sheet summaries and scaling tickets (if applicable) on a sample basis.

#### Net Sales Value Calculation

Net Volume per Species  X  Price per Species  =  Net Sales Value

- We verified (i.e., traced and agreed) timber revenues for the selected sales and production periods for which documentation was available by tracing calculated revenues (Net Sales Value) from log scale records to general ledger postings.

Attachment B Part 3 to Boswell Declaration

0723

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
**SAMPLE**
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF FILL THE GAP PROCEDURES

### SUPPLEMENTAL INFORMATION

The objectives have been included here as supplemental information to the reader. No conclusions have been made regarding the achievement of these objectives by applying the agreed-upon procedures.

### Contract Objectives

The primary objective of the reconciliation project was to reconstruct historical transactions, to the extent practicable, for all years where records were available for the Tribal Trust accounts managed by the Bureau.

### Objectives

- To gain reasonable assurance that amounts received for payment of leases/contracts were proper.

- To gain reasonable assurance that funds received in payment of leases/contracts were credited to the appropriate Tribal account.

- To gain reasonable assurance that the allocation of funds received in payment of leases/contracts between Tribal and Non-Tribal was accurate.

- To gain reasonable assurance that all payments for leases/contracts with Tribal ownership interests were collected.

### FINDINGS

See Attachments F-1, F-2 and F-3 for "Summary of Fill the Gap Results for All Tribes", "Summary of Surface Lease Results for the Tribe" and "Summary of Timber Sales Results for the Tribe", respectively, if applicable.

### Adjustments

Any resulting adjustments affecting the Tribe are reflected in the accompanying Tribal Account Statements.

SAMPLE
For Discussion Purposes Only

ATTACHMENT F-1
Page 1 of 1

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF FILL THE GAP RESULTS FOR ALL TRIBES

| Type of Receipts | Number of Leases / Contracts | Number of Production Periods | Tribal Trust Amounts Due (1) | Amounts Verified (2) | Difference (3) | Percent Verified (4) |
|---|---|---|---|---|---|---|
| Surface Leases | 1,614 | N/A | $187,307,350 | $185,449,370 | $1,857,980 | 99.01 |
| Timber Sales | 409 | 714 | 341,894,047 | 340,846,006 | 1,048,041 | 99.69 |
| Oil and Mineral Sales | 227 | 490 | 79,317,929 | 74,513,874 | 4,804,055 | 93.94 |
| Totals | 2,250 | 1,204 | $608,519,326 | $600,809,250 | $7,710,076 | 98.73 % |

(1) **Tribal Trust Amounts Due** - In the case of surface leases, amounts represent rental amounts, bonus payments, administrative fees and/or late fees due in accordance with the contractual terms of the lease agreements. In the case of timber sales and oil and minerals sales, amounts represent production due per our calculation of net sales value (i.e., volume verified to source documents multiplied by value verified to source documents).

(2) **Amounts Verified** - Represent the Tribal Trust Amounts Due that were verified (i.e. traced and agreed) to the Tribal Trust general ledger.

(3) **Difference** - Represents amounts for which the collection or the posting of the amount due could not be verified due to inadequate audit trail and/or inadequate documentation. Although summarized as a finding, adjustments were not proposed for these differences, with the exception of those tribes included in the Five Tribe Pilot Project for which different procedures were applied.

(4) **Percent Verified** - Represents the percent of the amounts due for the specific leases selected and tested that were verified (i.e., traced and agreed) to the Tribal Trust general ledger.

Attachment B Part 3 to Boswell Declaration

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT


AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
**SAMPLE**
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992


## SUMMARY OF SURFACE LEASE RESULTS FOR THE TRIBE


This Tribe was not selected for Surface Lease Testing.

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

SUMMARY OF SURFACE LEASE RESULTS FOR THE TRIBE

| Lease Number | Lease Amount Due (1) | Per Billing/Collection Documentation (2) | | | Total Per Billing/ Collection Documents (6) | Difference (7) | Tribal Trust Collections Verified To General Ledger | | | Percent Verified (10) |
| | | Tribal Trust (3) | IIM (4) | Other (5) | | | Tribal Trust (3) | Amount Verified To General Ledger | Difference (9) | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9174 | $191,436 | $142,220 | $48,866 | $0 | $191,086 | $350 | $142,220 | $142,220 | $0 | 100% |
| 91-43 | 46,578 | 18,780 | 27,546 | 0 | 46,326 | 252 | 18,780 | 18,780 | 0 | 100% |
| 2013 | 137,595 | 54,938 | 82,657 | 0 | 137,595 | 0 | 54,938 | 54,938 | 0 | 100% |
| 2164 | 211,590 | 54,800 | 137,171 | 0 | 191,971 | 19,619 | 54,800 | 54,800 | 0 | 100% |
| 88215 | 94,354 | 94,104 | 250 | 0 | 94,354 | 0 | 94,104 | 94,104 | 0 | 100% |
| 8939 | 505,165 | 44,348 | 358,470 | 97,395 | 500,213 | 4,952 | 44,348 | 44,348 | 0 | 100% |
| 9134 | 76,674 | 14,438 | 60,762 | 0 | 75,200 | 1,474 | 14,438 | 14,438 | 0 | 100% |
| 2950 | 157,500 | 109,772 | 16,028 | 30,874 | 156,674 | 826 | 109,772 | 109,772 | 0 | 100% |
| 9252 | 86,163 | 11,816 | 73,228 | 250 | 85,294 | 869 | 11,816 | 11,816 | 0 | 100% |
| 2941 | 839,483 | 142,475 | 387,125 | 163,461 | 693,061 | 146,422 | 142,475 | 142,475 | 0 | 100% |
| 8818 | 144,464 | 17,562 | 86,438 | 0 | 104,000 | 40,464 | 17,562 | 17,562 | 0 | 100% |
| 8929 | 116,947 | 0 | 1,109 | 250 | 1,359 | 115,588 | 0 | 0 | 0 | 0% |
| 9267 | 40,161 | 17,048 | 21,521 | 0 | 38,569 | 1,592 | 17,048 | 17,048 | 0 | 100% |
| 91-45 | 128,878 | 22,348 | 101,120 | 0 | 123,468 | 5,410 | 22,348 | 22,348 | 0 | 100% |
| 88-52 | 107,146 | 38,280 | 67,754 | 0 | 106,034 | 1,112 | 38,280 | 38,280 | 0 | 100% |
| 8913 | 53,587 | 28,910 | 24,673 | 0 | 53,583 | 4 | 28,910 | 28,910 | 0 | 100% |
| 8888 | 147,994 | 73,872 | 74,122 | 0 | 147,994 | 0 | 73,872 | 73,872 | 0 | 100% |
| 2906 | 92,990 | 92,750 | 0 | 240 | 92,990 | 0 | 92,750 | 74,200 | 18,550 | 80% |

0727

Attachment B Part 3 to Boswell Declaration

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF SURFACE LEASE RESULTS FOR THE TRIBE

| | Lease Number | Lease Amount Due (1) | Per Billing/Collection Documentation (2) | | | Total Per Billing/Collection Documents (6) | Difference (7) | Tribal Trust Collections Verified To General Ledger | | | Percent Verified (10) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tribal Trust (3) | IIM (4) | Other (5) | | | Tribal Trust (3) | Amount Verified To General Ledger | Difference (9) | |
| 19 | 88100 | $224,076 | $223,826 | $0 | $250 | $224,076 | $0 | $223,826 | $223,826 | $0 | 100% |
| 20 | 9151 | 169,218 | 0 | 0 | 0 | 0 | 169,218 | 0 | 0 | 0 | 0% |
| 21 | 87208 | 86,438 | 51,726 | 4 | 223 | 51,953 | 34,485 | 51,726 | 51,726 | 0 | 100% |
| 22 | 89136 | 54,334 | 18,639 | 34,038 | 234 | 52,911 | 1,423 | 18,639 | 18,639 | 0 | 100% |
| 23 | 2019 | 106,855 | 33,970 | 72,885 | 0 | 106,855 | 0 | 33,970 | 33,970 | 0 | 100% |
| 24 | 2026 | 104,990 | 41,896 | 63,094 | 0 | 104,990 | 0 | 41,896 | 41,896 | 0 | 100% |
| 25 | 2875 | 70,430 | 70,200 | 0 | 230 | 70,430 | 0 | 70,200 | 70,200 | 0 | 100% |
| 26 | 2224 | 116,225 | 61,935 | 54,290 | 0 | 116,225 | 0 | 61,935 | 61,935 | 0 | 100% |
| 27 | 2223 | 120,250 | 69,900 | 48,250 | 0 | 118,150 | 2,100 | 69,900 | 69,900 | 0 | 100% |
| 28 | 8859 | 346,906 | 346,656 | 250 | 0 | 346,906 | 0 | 346,656 | 346,656 | 0 | 100% |
| 29 | 2963 | 135,213 | 134,400 | 250 | 0 | 134,650 | 563 | 134,400 | 134,400 | 0 | 100% |
| 30 | 2164A | 48,525 | 48,400 | 125 | 0 | 48,525 | 0 | 48,400 | 48,400 | 0 | 100% |
| 31 | 88105 | 190,985 | 149,766 | 250 | 0 | 150,016 | 40,969 | 149,766 | 149,766 | 0 | 100% |
| 32 | 2127 | 105,645 | 35,068 | 70,577 | 0 | 105,645 | 0 | 35,068 | 35,068 | 0 | 100% |
| 33 | 87-31 | 76,469 | 38,112 | 0 | 38,112 | 76,224 | 245 | 38,112 | 38,112 | 0 | 100% |
| 34 | 2795 | 358,234 | 152,295 | 202,191 | 250 | 354,736 | 3,498 | 152,295 | 152,295 | 0 | 100% |
| 35 | 2840 | 129,460 | 111,070 | 14,190 | 3,375 | 128,635 | 825 | 111,070 | 103,610 | 7,460 | 93% |
| 36 | 2847 | 184,661 | 183,795 | 0 | 250 | 184,045 | 616 | 183,795 | 183,795 | 0 | 100% |

0728

Attachment B Part 3 to Boswell Declaration

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF SURFACE LEASE RESULTS FOR THE TRIBE

| | Lease Number | Lease Amount Due (1) | Per Billing/Collection Documentation (2) | | | Total Per Billing/ Collection Documents (6) | Difference (7) | Tribal Trust Collections Verified To General Ledger | | | Percent Verified (10) |
| | | | Tribal Trust (3) | IIM (4) | Other (5) | | | Tribal Trust (3) | Amount Verified To General Ledger | Difference (9) | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 37 | 2870 | $208,275 | $174,650 | $33,375 | $250 | $208,275 | $0 | $174,650 | $174,650 | $0 | 100% |
| 38 | 2873 | 290,395 | 232,116 | 0 | 58,279 | 290,395 | 0 | 232,116 | 232,116 | 0 | 100% |
| 39 | 2874 | 234,699 | 187,560 | 0 | 47,139 | 234,699 | 0 | 187,560 | 187,560 | 0 | 100% |
| 40 | 2923 | 178,555 | 104,716 | 36,414 | 250 | 141,380 | 37,175 | 104,716 | 104,716 | 0 | 100% |
| 41 | 89-25 | 62,716 | 49,068 | 13,440 | 0 | 62,508 | 208 | 49,068 | 49,068 | 0 | 100% |
| 42 | 92-70 | 10,837 | 6,468 | 4,208 | 161 | 10,837 | 0 | 6,468 | 6,468 | 0 | 100% |
| 43 | 8893 | 144,250 | 144,000 | 250 | 0 | 144,250 | 0 | 144,000 | 144,000 | 0 | 100% |
| 44 | 92-51 | 23,208 | 21,168 | 1,789 | 0 | 22,957 | 251 | 21,168 | 21,168 | 0 | 100% |
| 45 | 8915 | 58,329 | 10,466 | 28,254 | 19,499 | 58,219 | 110 | 10,466 | 10,466 | 0 | 100% |
| 46 | 92-28 | 24,161 | 6,536 | 16,188 | 0 | 22,724 | 1,437 | 6,536 | 6,536 | 0 | 100% |
| 47 | 8944 | 34,894 | 11,567 | 11,576 | 11,639 | 34,782 | 112 | 11,567 | 11,567 | 0 | 100% |
| 48 | 2233 | 55,688 | 32,226 | 23,508 | 0 | 55,734 | (46) | 32,226 | 32,226 | 0 | 100% |
| 49 | 9232 | 15,790 | 6,214 | 8,534 | 250 | 14,998 | 792 | 6,214 | 6,214 | 0 | 100% |
| 50 | 9210 | 25,101 | 8,985 | 14,467 | 0 | 23,452 | 1,649 | 8,985 | 8,985 | 0 | 100% |
| 51 | 2688 | 12,855 | 12,674 | 0 | 181 | 12,855 | 0 | 12,674 | 12,674 | 0 | 100% |
| 52 | 92-35 | 20,533 | 11,435 | 8,018 | 0 | 19,453 | 1,080 | 11,435 | 11,435 | 0 | 100% |
| 53 | 8943 | 40,322 | 10,241 | 16,368 | 13,308 | 39,917 | 405 | 10,241 | 10,241 | 0 | 100% |
| 54 | 1349 | 236,078 | 28,920 | 207,148 | 0 | 236,068 | 10 | 28,920 | 28,920 | 0 | 100% |

SAMPLE
For Discussion Purposes Only

-77-

0729

Attachment B Part 3 to Boswell Declaration

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT

FOR

SAMPLE

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF SURFACE LEASE RESULTS FOR THE TRIBE

| | Lease Number | Lease Amount Due (1) | Per Billing/Collection Documentation | | | Total Per Billing/Collection Documents (6) | Difference (7) | Tribal Trust Collections Verified To General Ledger | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tribal Trust (3) | IIM (4) | Other (5) | | | Tribal Trust (3) | Amount Verified To General Ledger | Difference (9) | Percent Verified (10) |
| 55 | 87167 | $112,680 | $32,163 | $80,266 | $250 | $112,679 | $1 | $32,163 | $32,163 | $0 | 100% |
| 56 | 86119 | 88,915 | 28,060 | 53,629 | 0 | 81,689 | 7,226 | 28,060 | 28,060 | 0 | 100% |
| 57 | 86107B | 102,475 | 75,225 | 6,551 | 250 | 82,026 | 20,449 | 75,225 | 75,225 | 0 | 100% |
| 58 | 87101 | 118,750 | 117,574 | 1,172 | 250 | 118,996 | (246) | 117,574 | 117,574 | 0 | 100% |
| 59 | 8799 | 118,550 | 92,800 | 23,865 | 250 | 116,915 | 1,635 | 92,800 | 92,800 | 0 | 100% |
| 60 | 3071/8539 | 97,364 | 23,470 | 73,876 | 248 | 97,594 | (230) | 23,470 | 23,470 | 0 | 100% |
| 61 | 9155 | 17,907 | 0 | 0 | 0 | 0 | 17,907 | 0 | 0 | 0 | 0% |
| 62 | 1859 | 88,342 | 4,032 | 84,146 | 0 | 88,178 | 164 | 4,032 | 4,032 | 0 | 100% |
| 63 | 8737 | 209,566 | 40,011 | 168,096 | 250 | 208,357 | 1,209 | 40,011 | 40,011 | 0 | 100% |
| 64 | 8736 | 107,185 | 28,368 | 14,406 | 21,637 | 64,411 | 42,774 | 28,368 | 28,368 | 0 | 100% |
| 65 | 8759 | 809,300 | 104,799 | 699,184 | 5,317 | 809,300 | 0 | 104,799 | 104,799 | 0 | 100% |
| 66 | 8730 | 121,425 | 48,730 | 72,040 | 251 | 121,021 | 404 | 48,730 | 48,730 | 0 | 100% |
| 67 | 8550 | 83,725 | 83,625 | 250 | 222 | 84,097 | (372) | 83,625 | 83,625 | 0 | 100% |
| 68 | 2896 | 99,815 | 99,565 | 0 | 250 | 99,815 | 0 | 99,565 | 99,565 | 0 | 100% |
| 69 | 8908 | 101,332 | 29,401 | 4,023 | 270 | 33,694 | 67,638 | 29,401 | 29,401 | 0 | 100% |
| 70 | 92.50 | 11,786 | 5,840 | 5,591 | 169 | 11,600 | 186 | 5,840 | 5,840 | 0 | 100% |
| 71 | 86141 | 71,712 | 24,122 | 15,220 | 26,814 | 66,156 | 5,556 | 24,122 | 24,122 | 0 | 100% |
| 72 | 88104 | 278,794 | 80,186 | 99,694 | 250 | 180,130 | 98,664 | 80,186 | 80,186 | 0 | 100% |

SAMPLE
For Discussion Purposes Only

0730

Attachment B Part 3 to Boswell Declaration

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT

FOR

SAMPLE

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF SURFACE LEASE RESULTS FOR THE TRIBE

| Lease Number | Lease Amount Due (1) | Per Billing/Collection Documentation (2) | | | Total Per Billing/Collection Documents (6) | Difference (7) | Tribal Trust Collections Verified To General Ledger | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Tribal Trust (3) | IIM (4) | Other (5) | | | Tribal Trust (3) | Amount Verified To General Ledger | Difference (9) | Percent Verified (10) |
| 8740 | $130,135 | $64,949 | $64,877 | $0 | $129,826 | $309 | $64,949 | $64,949 | $0 | 100% |
| 2830 | 237,815 | 83,600 | 153,960 | 0 | 237,560 | 255 | 83,600 | 83,600 | 0 | 100% |
| 2103 | 119,130 | 69,993 | 49,132 | 0 | 119,125 | 5 | 69,993 | 69,993 | 0 | 100% |
| 8753 | 89,844 | 15,764 | 20,078 | 35,593 | 71,435 | 18,409 | 15,764 | 15,764 | 0 | 100% |
| 2854 | 239,010 | 237,894 | 0 | 250 | 238,144 | 866 | 237,894 | 237,894 | 0 | 100% |
| 86108 | 331,050 | 28,680 | 283,000 | 9,810 | 321,490 | 9,560 | 28,680 | 28,680 | 0 | 100% |
| 2572 | 152,910 | 34,285 | 118,375 | 500 | 153,160 | (250) | 34,285 | 34,285 | 0 | 100% |
| 2108 | 60,580 | 24,162 | 36,418 | 0 | 60,580 | 0 | 24,162 | 24,162 | 0 | 100% |
| 2109 | 67,231 | 26,538 | 40,716 | 0 | 67,254 | (23) | 26,538 | 26,538 | 0 | 100% |
| 2701 | 95,525 | 95,280 | 0 | 245 | 95,525 | 0 | 95,280 | 95,280 | 0 | 100% |
| Totals | $11,647,158 | $5,408,241 | $4,721,086 | $589,676 | $10,719,003 | $928,155 | $5,408,241 | $5,382,231 | $26,010 | 100% |

-79-

0731

SAMPLE
For Discussion Purposes Only

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

### SUMMARY OF SURFACE LEASE RESULTS FOR THE TRIBE

The following is a column by column description for the "Summary of Surface Lease Results For The Tribe" beginning on page 1, Attachment F-2.

(1) **Lease Amount Due** - Represents bonus payments, minimum rental payments and any administrative fees due in accordance with the contractual terms of the lease agreements. Amounts also include late fee assessments that could be calculated, provided documentation was available. The "Lease Amount Due" does not include royalty payments or any other performance-based payments.

(2) **Per Billing/Collection Documentation** - The "Tribal Trust", "IIM" and "Other" amounts represent all collections that could be supported by available billing/collection documentation (i.e., Collection Vouchers, Bills for Collection, Journal Vouchers, Public Vouchers or other). See (3), (4) and (5) below for detail explanations.

(3) **Tribal Trust** - Represents collections due to the Tribe's Trust account(s), per review of available billing/collection documentation (i.e., Collection Vouchers, Bills for Collection, Journal Vouchers, Public Vouchers or other).

(4) **IIM** - Represents collections due to "IIM" per review of available (e.g., within the lease file) billing/collection documentation (i.e., Collection Vouchers, Bills for Collection, Journal Vouchers, Public Vouchers or other). Such collections include deposits to IIM accounts, Tribal IIM accounts and Suspense accounts.

(5) **Other** - Represents direct payments made to the Tribe and collections made to an unknown account based on review of available billing/collection documentation (i.e., Collection Vouchers, Bills for Collection, Journal Vouchers, Public Vouchers or other). Collections were considered as being due to an unknown account if, based on collection posting documentation, allocation of amounts could not be determined.

(6) **Total Per Billing/Collection Documents** - Represents the sum of collections due to "Tribal Trust", "IIM" and "Other" accounts based on review of available (i.e. within the lease file) collection vouchers.

Attachment B Part 3 to Boswell Declaration

0732

SAMPLE
For Discussion Purposes Only.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF SURFACE LEASE RESULTS FOR THE TRIBE

(7)  **Difference** - Represents the difference between the "Lease Amount Due" in column (1) and total collections "Per Billing/Collection Documentation" (i.e., Collection Vouchers, Bills for Collection, Journal Vouchers, Public Vouchers or other) in column (6). These differences represent amounts for which the collection or the posting of the amount due could not be verified due to inadequate audit trail and/or inadequate documentation. Although summarized as a finding, adjustments were not proposed for these differences.

(8)  **Amount Verified to General Ledger** - Represents "Tribal Trust" collections identified on billing/collection documentation (i.e., Collection Vouchers, Bills for Collection, Journal Vouchers, Public Vouchers or other) for the specific leases selected and tested that were verified (i.e., traced and agreed) to the Tribal Trust general ledger.

(9)  **Difference** - Represents the difference between the "Tribal Trust" collections in column (3) and the "Amount Verified to the General Ledger" in column (8). These differences represent amounts for which the collection or the posting of the amount due could not be verified due to inadequate audit trail and/or inadequate documentation. Although summarized as a finding, adjustments were not proposed for these differences.

(10) **Percent Verified** - This is the percent of the "Tribal Trust" collections in column (3) for the specific leases selected and tested that were verified (i.e., traced and agreed) to the Tribal Trust general ledger in column (8).

- 81 -

Attachment B Part 3 to Boswell Declaration

0733

SAMPLE
For Discussion Purposes Only

ATTACHMENT F-3
Page 1 of 1

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF TIMBER SALES RESULTS FOR THE TRIBE

This Tribe was not selected for Timber Sales Testing.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

### SUMMARY OF TIMBER SALES RESULTS FOR THE TRIBE

| Logging Unit | Production Period (1) | Amount Due To Tribe (2) | Amounts Verified (3) | Difference (4) | Percent Verified (5) |
|---|---|---|---|---|---|
| "Name" | 10/78 | $ 335,181 | $ 335,181 | $ - | 100.0 % |
| "Name" | 9/76 | 218,989 | 218,989 | - | 100.0 |
| "Name" | 12/87 | 432,460 | 432,460 | - | 100.0 |
| "Name" | 10/91 | 69,201 | 69,201 | - | 100.0 |
| "Name" | 12/77 | 75,756 | 75,756 | - | 100.0 |
| "Name" | 12/78 | 87,246 | 87,246 | - | 100.0 |
| "Name" | 1/91 | 335,054 | 335,054 | - | 100.0 |
| "Name" | 8/76 | 71,014 | 71,014 | - | 100.0 |
| "Name" | 11/76 | 150,547 | 150,547 | - | 100.0 |
| "Name" | 5/89 | 61,751 | 61,751 | - | 100.0 |
| "Name" | 5/87 | 63,476 | 63,476 | - | 100.0 |
| "Name" | 7/88 | 274,374 | 274,374 | - | 100.0 |
| "Name" | 7/90 | 141,102 | 141,099 | 3 | 100.0 |
| "Name" | 9/77 | 197,871 | 197,871 | - | 100.0 |
| "Name" | 5/87 | 30,064 | 30,064 | - | 100.0 |
| "Name" | 1/88 | 113,018 | 113,018 | - | 100.0 |
| "Name" | 6/87 | 268,300 | 268,300 | - | 100.0 |
| "Name" | 7/74 | 149,516 | 149,516 | - | 100.0 |
| "Name" | 10/87 | 53,424 | 53,424 | - | 100.0 |
| "Name" | 10/77 | 33,014 | 33,014 | - | 100.0 |
| "Name" | 9/77 | 390,381 | 390,381 | - | 100.0 |
| "Name" | 11/91 | 52,828 | 52,828 | - | 100.0 |
| "Name" | 12/87 | 312,873 | 312,873 | - | 100.0 |
| "Name" | 6/75 | 31,586 | 31,586 | - | 100.0 |
| "Name" | 12/78 | 490,592 | 490,182 | 410 | 99.9 |
| "Name" | 12/76 | 59,380 | 59,380 | - | 100.0 |
| "Name" | 9/76 | 179,823 | 180,027 | (204) | 100.0 |
| "Name" | 8/76 | 119,542 | 119,736 | (194) | 100.0 |
| "Name" | 5/92 | 85,067 | 85,067 | - | 100.0 |
| "Name" | 7/74 | 153,319 | 153,311 | 8 | 100.0 |
| "Name" | 8/76 | 74,033 | 74,033 | - | 100.0 |
| "Name" | 6/89 | 100,472 | 100,472 | - | 100.0 |
| "Name" | 6/75 | 47,779 | 47,780 | (1) | 100.0 |
| "Name" | 6/92 | 315,328 | 315,328 | - | 100.0 |
| "Name" | 6/91 | 158,927 | 158,927 | - | 100.0 |
| "Name" | 9/74 | 101,378 | 101,813 | (435) | 100.0 |
| "Name" | 9/89 | 245,773 | 245,773 | - | 100.0 |
| "Name" | 9-10/86 | 360,283 | 360,283 | - | 100.0 |
| "Name" | 5/77 | 163,371 | 163,371 | - | 100.0 |

Attachment B Part 3 to Boswell Declaration

0735

SAMPLE
For Discussion Purposes Only

ATTACHMENT F-3
Page 2 of 5

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF TIMBER SALES RESULTS FOR THE TRIBE

| Logging Unit | Production Period (1) | Amount Due To Tribe (2) | Amounts Verified (3) | Difference (4) | Percent Verified (5) |
|---|---|---|---|---|---|
| "Name" | 5/89 | $ 88,654 | $ 88,654 | $ - | 100.0 % |
| "Name" | 12/91 | 444,186 | 444,186 | - | 100.0 |
| "Name" | 6/89 | 15,104 | 15,104 | - | 100.0 |
| "Name" | 2/79 | 717,027 | 717,027 | - | 100.0 |
| "Name" | 11/89 | 70,360 | 70,360 | - | 100.0 |
| "Name" | 6/76 | 150,061 | 150,061 | - | 100.0 |
| "Name" | 2/79 | 83,381 | 83,381 | - | 100.0 |
| "Name" | 11/78 | 133,386 | 133,386 | - | 100.0 |
| "Name" | 9/77 | 302,856 | 302,856 | - | 100.0 |
| "Name" | 8/89 | 130,204 | 130,204 | - | 100.0 |
| "Name" | 7/91 | 99,849 | 99,849 | - | 100.0 |
| "Name" | 9/78 | 270,055 | 270,055 | - | 100.0 |
| "Name" | 8/83 | 177,720 | 177,720 | - | 100.0 |
| "Name" | 9/87 | 161,281 | 169,363 | (8,082) | 100.0 |
| "Name" | 12/88 | 328,721 | 328,721 | - | 100.0 |
| "Name" | 1/79 | 242,139 | 242,139 | - | 100.0 |
| "Name" | 6/92 | 486,098 | 486,098 | - | 100.0 |
| "Name" | 1/79 | 308,903 | 308,903 | - | 100.0 |
| "Name" | 6/75 | 50,164 | 51,612 | (1,448) | 100.0 |
| "Name" | 5/89 | 440,098 | 440,098 | - | 100.0 |
| "Name" | 10/76 | 134,602 | 134,602 | - | 100.0 |
| "Name" | 10/78 | 340,142 | 340,142 | - | 100.0 |
| "Name" | 5/89 | 45,385 | 45,385 | - | 100.0 |
| "Name" | 6/76 | 47,988 | 47,988 | - | 100.0 |
| "Name" | 6/76 | 110,777 | 110,777 | - | 100.0 |
| "Name" | 9/78 | 135,248 | 135,248 | - | 100.0 |
| "Name" | 12/86 | 764,857 | 764,857 | - | 100.0 |
| "Name" | 10/75 | 91,295 | 91,295 | - | 100.0 |
| "Name" | 7/87 | 176,750 | 176,750 | - | 100.0 |
| Totals | | $ 13,151,384 | $ 13,161,327 | $ (9,943) | 100.0 % |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

### SUMMARY OF TIMBER SALES RESULTS FOR THE TRIBE

The following is a column by column description for the "Summary of Timber Sales Results for the Tribe" beginning on page 1 of Attachment F-3.

(1) **Production Period** - Represents the production period (i.e., month, quarter, billing period, etc.) judgementally selected and tested.

(2) **Amount Due To Tribe** - Represents amount due per Arthur Andersen LLP calculation of Net Sales Value (i.e., volume verified to source documents X value verified to source documents).

(3) **Amounts Verified** - Represents the Tribal Trust Amounts Due that were verified (i.e., traced and agreed) to collection documentation and the Tribal Trust general ledger.

(4) **Difference** - Represents the difference between "Amounts Due to Tribe" and "Amounts Verified" resulting in proposed adjustments. See "Detail of Timber Sales Proposed Adjustments" on page 5 of 5.

(5) **Percent Verified** - Represents the percent of the "Amounts Due to Tribe" for the specific leases selected and tested that were verified (i.e., traced and agreed) to collection documentation and the Tribal Trust general ledger.

SAMPLE
For Discussion Purposes Only

ATTACHMENT F-3
Page 4 of 5

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF TIMBER SALES RESULTS FOR THE TRIBE

Summary of Timber Sales Proposed Adjustments

|  | Due To Account | Due From Account | Net |
|---|---|---|---|
| Principal | $        433 | $      (10,376) | $      (9,943) |
| Interest (1) | 1,316 | (14,798) | (13,482) |
| Net Amount Due To (From) Account | $      1,749 | $      (25,174) | $      (23,425) |

(1)  Interest - Represents interest from the effective date of the adjustment through September 30, 1994. The interest impact was based on Bureau provided Benchmark rates (see Attachment B-1) based upon the overall yield of the invested pool and assumes annual compounding. Benchmarks are not representative of any single tribe's actual investment yields.

SAMPLE
For Discussion Purposes Only

ATTACHMENT F-3
Page 5 of 5

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
SAMPLE
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF TIMBER SALES RESULTS FOR THE TRIBE

### Detail of Timber Sales Proposed Adjustments

| Number | Logging Unit | Production Period | Type(1) | Proposed Adjustments Due To | Proposed Adjustments Due From |
|--------|--------------|-------------------|---------|-----------------------------|-------------------------------|
| 1 | "Name" | 7/90 | B | $      3 | $      - |
| 2 | "Name" | 12/78 | A | 410 | - |
| 3 | "Name" | 9/76 | A | - | (204) |
| 4 | "Name" | 8/76 | A | - | (194) |
| 5 | "Name" | 7/74 | B | 8 | - |
| 6 | "Name" | 6/75 | B | - | (1) |
| 7 | "Name" | 9/74 | A | - | (435) |
| 8 | "Name" | 9/87 | B | 12 | - |
| 9 | "Name" | 9/87 | C | - | (4,188) |
| 10 | "Name" | 9/87 | C | - | (3,906) |
| 11 | "Name" | 6/75 | A | - | (1,447) |
| 12 | "Name" | 6/75 | B | - | (1) |
| | Totals | | | $    433 | $  (10,376) |
| | Net Amount Due From Account | | | | $   (9,943) |

(1)  **Type** - Type A indicates proposed adjustment is the result of an exception noted during our value verification procedures, Type B indicates proposed adjustment is the result of an exception noted during our volume verification procedures and Type C indicates proposed adjustment is the result of an exception noted during our net sales value calculation procedures.

Attachment B Part 3 to Boswell Declaration

0739

# ATTACHMENT B

# TO BOSWELL

# DECLARATION

# PART 4

**Enclosure III**

# Account Holders Distribution List

# ABERDEEN AREA (16)

1.) Jessie Taken Alive
Standing Rock Sioux Tribal Council
Agency Avenue
Ft. Yates, ND 58538
701-854-7202
Fax 701-854-7299

2.) Elmer White, Sr, Chairman
Devils Lake Sioux Tribal Council
Tribal Office / Main Street
Ft. Totten, ND 58335
701-766-4221
Fax 701-766-4126

3.) Twila Martin-Kekahbah, Chairperson
Turtle Mt. Band of Chippewa
Turtle Mt. Tribal Office
Community Center Bldg
Belcourt, ND 58316
701-477-6451/5198 Fax 701-477-6836

4.) Gregg Bourland, Chairman
Cheyenne River Sioux Tribal Council
Tribal Office / Main Street
Eagle Butte, SD 57625
605-964-4155
Fax 605-964-4151

5.) Richard Allen, President
Flandreau Santee Sioux Executive
Committee / Tribal Office
603 West Broad
Flandreau, SD 57028
605-997-3891 Fax 605-997-3878

6.) Duane Big Eagle, Sr, Chairman
Crow Creek Sioux Tribal Council
Tribal Office
Ft. Thompson, SD 57339
605-245-2221/22
Fax 605-245-2470

7.) Michael Jandreau, Chairman
Lower Brule Sioux Tribal Council
Tribal Office
Sitting Bull Street
Lower Brule, SD 57548
605-473-5561
Fax 605-473-5606

8.) Wilbur Between Lodges, President
Oglala Sioux Tribal Council
Red Cloud Bldg.
Pine Ridge, SD 57770
605-867-5821
Fax 605-867-5659

9.) William Kindle, President
Rosebud Sioux Tribal Council
Rosebud Tribal Council Office
11 Legion Avenue
Rosebud, SD 57570
605-747-2381
Fax 605-747-2243

10.) Darrell Drapeau, Chairman
Yankton Sioux Tribe Business
& Claims
Main Street
Marty, SD 57361
605-384-3804/3641
Fax 605-384-5687

11.) Andrew Grey, Chairman
Sisseton-Wahpeton Sioux Tribal
Council / Tribal Headquarters
1000 Veterans Memorial Drive
Agency Village, SD 57262

12.) Gary Lasey, Chairman
Omaha Tribal Council
Tribal Office
100 Main Street
Macy, NE 68039
402-837-5391

13.) Fred Leroy, Chairman
Ponca Tribe of Nebraska
Tribal Office
252-1 Spruce Ave
Niobrara, NE 68760
402-857-3391
Fax 402-857-3736

14.) Arthur Denny, Chairman
Santee Sioux Tribal Council
Tribal Office
Box 163
Niobrara, NE 68760
402-857-2302
Fax 402-857-2307

15.) John Blackhawk, Chairman
Winnebago Tribal Council
Blackhawk Community Center
Hwy 77
Winnebago, NE 68071
402-878-3100
Fax 402-878-2963

16.) Little Shell Tribe-Chippewa of Montana
Pat Maki, Office Manager
Little Shell Chippewa Indians of Montana
105 Smelter Ave NE
Great Falls, MT  59404

Attachment B Part 4 to Boswell Declaration

0743

# ANADARKO AREA (25)

1.) Charles Surveyor, Chairman
Cheyenne-Arapaho Business Committee
100 Red Moon Circle
Concho, OK 73022
405-262-0345
Fax 405-262-0745

2.) Kiowa Comanche & Apache
Tribes of Indians
Kiowa-Comanche-Apache Intertribal
Land Use Committee
Attn: Executive Director
1401 Lawrie Tatum Rd (FSIS)
Lawton, OK 73502
405-248-6300

3.) Ruey Darrow, Chairperson
Fort Sill Apache Business Committee
Attn: Sherella Romonce
2 1/2 mi. N. of Apache, Hwy 281
Ft. Sill Apache Tribal Complex
Route 2, Box 121
Apache, OK 73006
405-588-2298
Fax 405-588-3133

4.) Gary McAdams, President
Wichita & Affiliated Tribal Executive Committee
1 mi. N. of Anadarko, Hwy 281
1/4 mi. West
Anadarko, OK 73005
405-247-2425
Fax 405-247-2430

5.) Wichita/Caddo/Delaware Indians
Wichita & Affiliated Tribes
Executive Committee
Attn: President
1 mi. N. of Anadarko
1/4 mi. West
Anadarko, OK 73005
405-247-2425

6.) Wallace E. Coffey, Chairman
Comanche Business Committee
Attn: Lynn Waugua
N. of Lawton, 8 mi. on I-44
W. 1 mi. on Hwy 49 N. 1/2 mi. to
Comanche Complex
Lawton, OK 73502
405-492-4988
Fax 405-492-4981

7.) Henry Kostzula, Chairman
Apache Business Committee
Attn: Bobby Jay
620 E. Colorado
Anadarko, OK 73005
405-247-9493
Fax 405-247-7511

8.) Wanda Stone, Chairperson
Kaw Executive Council
698 Grandview Dr.
Kaw City, OK 74641
405-269-2552
Fax 405-269-2301

9.) Raymond Butler, Chairman
Otoe-Missouria Tribal Council
Route 1, Box 62
Red Rock, OK 74651
405-723-4466
Fax 405-723-4273

10.) Elizabeth Blackowl, President
Pawnee Business Council
Agency Road, Bldg. 64
Pawnee, OK 74058
918-762-3621
Fax 918-762-2389

11.) Vernon Hunter, Acting Chairman
Caddo Tribal Council
Intersection of Hwys 152 & 281
Binger Y
Binger, OK 73009
405-656-2344
Fax 405-656-2892

12.) Billy Evans Horse, Chairman
Kiowa Business Committee
Hwy 9 W. of Carnegie
Carnegie, OK 73015
405-654-2300
Fax 405-654-2188

13.) Lawrence, F. Snake
Delaware Executive Committee
Hwy 281 N. 2 mi. of Anadarko
Anadarko, OK 73005
405-247-2448
Fax 405-247-9393

14.) Larry Nuckolls, Governor
Absentee-Shawnee Executive Committee
2025 S. Gordon Cooper Drive
Shawnee, OK 74801
405-275-4030
Fax 405-275-5637

15.) John A. Barrett, Chairman
Citizen Band Potawatomi Business Committee
Attn: Ed Herndon
1901 S. Gordon Cooper Drive
Shawnee, OK 74801
405-275-3121
Fax 405-275-0198

16.) Lawrence P. Murray, Chairman
Iowa of OK Business Committee
Route 1, Box 721
Perkins, OK 74059
405-547-2403
Fax 405-547-5294

17.) Kendall Scott, Chairman
Kickapoo of OK Business Committee
2 mi. N. of McCloud off Hwy 102
McLoud, OK 74851
405-964-2075  FAX 405-964-2745

18.) Genevieve Pollack, Chairperson
Ponca Business Committee
5 mi. S. of Ponca City, Hwy 177
Ponca City, OK 74601
405-762-8104
Fax 405-762-7436

19.) Richard Cornell, President
Tonkawa Tribal Committee
2 mi. E. of Tonkawa Hwy 60
1 mi. S. on Allen Drive
Tonkawa, OK 74653
405-628-2561
Fax 405-628-3375

20.) Leon Campbell, Chairman
Iowa of Kansas Executive Committee
Route 1, Box 58A
White Cloud, KS 66094
913-595-3258
Fax 913-595-6610

21.) Fred Thomas, Chairman
Kickapoo of Kansas Tribal Council
Route 1, K20 Hwy
Horton, KS 66439
913-486-2131
Fax 913-486-2801

22.) Mamie Rupricki, Chairperson
Prairie Band Potawatomi Tribal Council
Attn: Mary Mitchell
14880 K. Road
Mayetta, KS 66509
913-966-2255
Fax 913-966-2144

23.) Corbin Shuckahorse, Chairman
Sax & Fox of Missouri Tribal Council
Route 1, Box 60
Reserve, KS 66434
913-742-7471
Fax 913-742-3785

24.) Dora Young, Principal Chief
Sac & Fox Nation of OK Business Commi
Attn: Mary Maitlin
Route 2, Box 246
Stroud, OK 74079
918-968-3526
Fax 918-968-3887

Page 4

0745

Attachment B Part 4 to Boswell Declaration

25.) Rolando A. Poncho, Chairman
Alabama-Coushatta Tribal Council
Attn: Donna Dickens
Route 3, Box 640
Livingston, TX 77351
409-563-4391  FAX 409-563-4397

Attachment B Part 4 to Boswell Declaration

0746

# BILLINGS AREA (8)

1.) Earl Old Person, Chairman
Blackfeet Tribal Business Council
Agency Square
Browning, MT 59417
406-338-7276
Fax 406-338-7530

2.) Clara Nomee, Madam Chairman
Crow Tribal Council
Hwy 212 & I-90
Crow Agency, MT 59022
406-638-2601
Fax 406-638-7283

3.) Tracy C. King, President
Ft. Belknap Indian Community
RR 1, Box 66
Harlem, MT 59526
406-353-2205
Fax 406-353-2797

4.) John SunChild, Chairman
Chippewa Cree Business Committee
RR 1, Box 544
Box Elder, MT 59521
406-395-4282
Fax 406-395-4497

5.) Llevando Fisher, President
Northern Cheyenne Tribal Council
128 Little Coyote Drive
Lame Deer, MT 59043
406-477-8284
Fax 406-477-6210

6.) Attn: John Capture, Chairman
Gros Ventre Treaty Committee
RR 1, Box 66
Harlem, MT 59526
406-353-2205
Fax 406-353-2797

7.) Richard Branner, Chairman
Arapahoe Business Council
533 Ethete Rd
Ethete, WY 82520
307-332-3120
Fax 307-332-7543

8.) Alfred Ward, Chairman
Shoshone Business COuncil
15 North Fork Rd.
Ft. Washakie, WY 82514
307-332-3532
Fax 307-332-3055

Page 6

# JUNEAU AREA (3)

1.) Edward Thomas, President
    Tlingit & Haida Central Council
    C/O David Harrison & Associates
    505 Marquette NW, Suite 1
    Albuquerque, NM  87102
    505-843-8698

2.) James Showalter, Tribal Chairman
    Kenaitz Indian Tribe
    255 N. Ames St.
    Kenai, AK  99611
    907-283-3633

3.) Native Village of Tetlin Alaska
    Attn:  Tribal Chairman
    General Delivery
    Tribal Administration Bldg
    Tetlin, AK  99779
    907-456-0222

Attachment B Part 4 to Boswell Declaration                     0748

# MINNEAPOLIS AREA (32)

1.) Roger Prescott, President
Lower Sioux Indian Community Council
Rural Route 1, Box 308
Morton, MN 56270
507-697-6185
Fax 507-697-6110

2.) Curtis Campbell Sr., President
Prairie Island Community Council
Minnesota Medewakanton Sioux
5636 Sturgeon Lake Rd
Welch, MN 55089
612-385-2554
Fax 612-388-1576

3.) Gary Donald, Chairman
Nett Lake Reservation Business
Bois Forte Band of Chippewa
5344 Lake Shore Dr
Nett Lake, MN 55772
218-757-3261
Fax 218-757-3166

4.) Robert (Sonny) Peacock, Chairman
Fond Du Lac Chippewa Business Committee
105 University Rd
Cloque, WI 55720
218-879-4593
Fax 218-879-4146

5.) Norman Deschamps, Chairman
Grand Portage Chippewa Business Committee
Hwy 61 North
Grand Portage, MN 55605
218-475-2277
Fax 218-475-2284

6.) Alfred R. Pemberton, Chairman
Leech Lake Chippewa Business Committee
Route 3, Box 100
Cass Lake, MN 56633
218-335-8200
Fax 218-335-8309

7.) Darrell Wadens, Chairman
White Earth Chippewa Business Committee
Tribal Council Office Hwy 224
White Earth, MN 56591
218-983-3285
Fax 218-983-3641

8.) Bobby Whitefeather, Chairman
Red Lake Band of Chippewa Indians
MN Tribal Council, Hwy 1
Redlake, MN 56671
218-679-3341
Fax 218-679-3378

9.) Majorie Anderson, Chairperson
Mille Lacs Chippewa Business Committee
HCR 67 Box 194
Onamio, MN 56359
612-532-4181
Fax 612-532-4209

10.) Stanley Crooks, Chairman
Shakopee Sioux Community Council
2330 Sioux Tribal NW
Prior Lake, MN 55372
612-445-8900
Fax 612-445-8906

11.) Brotherton Indians - Wisconsin
Brotherton Nation
Attn: President
2848 Witches Lake Rd
Arbor Vitae, WI 54568
715-542-3913

12.) John Wilmer Sr., Chairman
Bad River Band of Chippewa Tribal Council
Old School Bldg
County Trunck A
Odanah, WI 54861
715-682-7111

13.) Alfred Trepanier, Chairman
Lac Courte Oreilles Band of Chippewa
Trepania Rd
Hayward, WI 54843
715-634-8934
Fax 715-634-4797

14.) Thomas Maulson, President
Lac Du Flambeau Tribal Council
418 Little Dines
Lac Du Flambeau, WI 54538
715-588-3303
Fax 715-588-7930

15.) Deborah Doxtator, Chairperson
Oneida Tribal Council
N 7210 Seminary Rd
Oneida, WI 54155
414-869-2214
Fax 414-869-2194

16.) Phil Shopodock, Chairman
Forest County Potawatomi
Executive Council, Tribal Office
Potawatomi Trail
Crandon, WI 54520
715-478-2903
Fax 715-478-5280

17.) Rose Gurnoe, Chairperson
Red Cliff Band of Chippewa Tribal Council
Administration Bldg
Hwy 13
Bayfield, WI 54814
715-779-3700
Fax 715-779-3704

18.) Lewis Taylor, President
St Croix Chippewa Tribal Council
Tribal Council Office
24663 Angeline Ave
Hertel, WI 54845
715-349-2195
Fax 715-349-5768

19.) Arlyn Ackley, Chairman
Sokaogan Chippewa Tribal Council
Tribal Council Office
Route 1, Box 625
Crandon, WI 54520
715-478-2604
Fax 715-478-5275

20.) Virgil Murphy, President
Stockbridge-Munsee Mohicans Tribal Council
N 8476 Moh He Con Nuck Rd
Bowler, WI 54416
715-793-4111
Fax 715-793-4299

21.) Frederick Dakota, President
Keweenaw Bay Tribal Council
795 Michigan Ave
Baraga, MI 49908
906-353-6623
Fax 906-353-7540

22.) Chloris A. Lowe Jr., Chairman
Ho-Chunk Nation of Wisconsin
(formerly known as Wisconsin Winnebago Tribe)
Tribal Council Office
W 9814 Airport Rd
Black River Falls, WI 54615
715-284-9343
Fax 715-284-1760

23.) John Teller, Chairman
Menominee Indian Tribe of Wisconsin
Tribal Office Loop Rd
Hwy 47 & Hwy 55
Keshena, WI 54135
715-799-5100
Fax 715-799-4525

24.) Norman Deschampe, President
Minnesota Chippewa Tribal Executive Committee
Track 33, Facility Center
Cass Lake, MN 56633
218-335-8581
Fax 218-335-6562

25.) Jeff Parker, President
Bay Mills Executive Council
Tribal Office
Route 1, Box 313
Brimley, MI 49715
906-248-3241
Fax 906-248-3283

26.) Kenneth Meshiguad, Chairman
Hannahville Indian Community Council
N 14911 Hannahville Blvd Rd
Wilson, MI 49896-9728
906-466-2342
Fax 906-466-2933

27.) Phillip G. Peters Sr., Tribal Chief
Saginaw Chippewa Tribal Council
Tribal Office
7070 E Broadway Rd
Mt. Pleasant, MI 48858
517-772-5700
Fax 517-772-3508

28.) Joseph B. Winchester, Chairman
Pokogon Band of Potawatomi Indian of Michigan
714 N Front Rd
Dowagiac, MI 49047
616-782-6323
Fax 616-782-9625

0750

29.) Joseph C. Raphael, Chairman
Grand Traverse Tribal Council
Peshawbetown Community Center
2605 NW Bayshore Dr
Suttons Bay, MI  49682
616-271-3538
Fax 616-271-4861

30.) John C. McGeshick, Chairman
Lac Vieux Desert Band of Lake Superior
Chippewa Indians of Michigan
E 23968 Choate Rd
Watersmeet, MI  49969
906-358-4577
Fax 906-358-4785

31.) Gailey Wanatee, Chief
Sac & Fox Tribal Council
3137 F Ave
Tama, IA  52339
515-484-4678/5358
Fax 515-484-5424

32.) Ann Bolton, Superintendent
Ottawa & Chippewa of Michigan
c/o Michigan Agency
2901.5 I-75 Business Spur
Sault Ste. Marie, MI  49783
906-632-6809

**Page 10**

Attachment B Part 4 to Boswell Declaration                    0751

# MUSKOGEE AREA (17)

1.) Cherokee-Shawnee Business Council
   Don Green Feather, Chairman
   424 Main Street
   Jay, OK  74346
   918-456-0671
   Fax 918-456-6485

2.) Curt Zunighn, Chairman
   Delaware Tribe of Oklahoma Indians
   Delaware Indian Business Center
   108 South Seneca
   Bartlesville, OK  74003
   918-336-5272
   Fax 918-336-5513

3.) Duke Harjo, Chief
   Alabama-Quassarte Tribal Town
   111 North 6th
   Henryetta, OK  74437
   918-652-8708

4.) Chas. O. Tillman, Principal Chief
   Osage Nation of Oklahoma Tribal Council
   813 Grandview
   Pawhuska, OK  74056
   918-287-2495
   Fax 918-287-2257

5.) Charley McGerh, Town King
   Thlopthlocco Tribal Town
   Interstate 40 #227, Clearview
   exit, go 2 blks. on right & into
   Driveway, Bldg is there
   Okemah, OK  74859
   918-623-2620 Fax 918-623-0419

6.) Joe Byrd, Principal Chief
   Cherokee Nation of Oklahoma
   3 1/2 mi. S of Tahlequah on Hwy 62
   Tahlequah, OK  74464
   918-456-0671
   Fax 918-456-6485

7.) Bill Anoatubby, Governor
   Chickasaw Nation of Oklahoma
   520 E. Arlington
   Ada, OK  74820
   405-436-2603 FAX 405-436-4287

8.) Hollis E. Roberts, Chief
   Choctaw Nation of Oklahoma
   16th & Locust Street
   PO Drawer 1210
   Durant, OK  74701-1210
   405-924-8280 Fax 405-924-1150

9.) Perry Beaver, Principal Chief
   Creek Nation of Oklahoma
   Hwy 75 & Loop 56
   Okmulgee, OK  74447
   918-756-8700
   Fax 918-756-2911

10.) Jerry Haney, Principal Chief
   Seminole Nation of Oklahoma
   NE Corner Hwy 270 & 56 Junction
   Wewoka, OK  74884
   405-257-6287 Fax 405-257-6205

11.) Grace Goodeagle, Chairman
   Quapaw Tribe of Oklahoma
   Quapaw Tribal Business Committee
   2 1/2 mi. E of Quapaw on Future Farmer Rd
   Quapaw, Ok  74363
   918-542-1853 Fax 918-542-4594

12.) George J (Buck) Captain, Chief
   Eastern Shawnee Tribe of Oklahoma
   127 W. Oneida
   Seneca, MO  64865
   918-666-2435
   Fax 918-666-3325

13.) Charles Dawes, Chief
   Ottawa Tribe of Oklahoma
   811 3rd Avenue NE
   Miami, OK  74355
   918-540-1536
   Fax 918-542-3214

14.) Terry Whitetree, Chief
   Seneca-Cayuga Tribe of Oklahoma
   R 2301 E. Steve Owers Blvd.
   Miami, OK  74354
   918-542-6609 Fax 918-542-3684

15.) Leaford Bearskin, Chief
     Wyandotte Tribe of Oklahoma
     Hwy 60
     Wyandotte, OK  74370
     918-678-2297
     Fax 918-678-2944

16.) Floyd Leonard, Chief
     Miami Tribe of Oklahoma
     202 S. 8 Tribe Trail
     Miami, OK  74354
     918-542-1445
     Fax 918-542-7260

17.) Donald E. Giles, Chief
     Peoria Indian Tribe of Oklahoma
     118 S. 8 Tribe Trail
     Miami, OK  74354
     918-540-2535
     Fax 918-540-2536

Page 12

# PHOENIX AREA (35)

1.) Alvin Moyle, Chairman
Paiute-Shoshone Tribe of Fallon
8955 Mission Road
Fallon, Nevada 89406
Phone: 702/423-6075
Fax: 702/423-5202

2.) Theodore Smith, Sr., Chairman
Yavapai-Apache Com. Council
Smith & Shaw Avenue
Camp Verde, Arizona 86322
Phone: 602/567-3649
Fax: 602/567-3994

3.) Peter Soto, Chairman
Cocopah Tribal Council
County 15 & Avenue G
Somerton, Arizona 85746
Phone: 520/627-2102
Fax: 520/627-3173

4.) Daniel Eddy, Jr., Chairman
Colorado River Tribal Council
2nd Avenue & Mohave Road
Parker, Arizona 85344
Phone: 520/669-9211
Fax: 520/669-5675

5.) Patricia Madueno, Chairperson
Fort Mojave Tribal Council
500 Merriman Avenue
Needles, California 92363
Phone: 619/326-4591
Fax: 619/326-2468

6.) Rex Tilousi, Chairman
Havasupai Tribal Council
Tribal Administration Office
Supai, Arizona 86435
Phone: 520/448-2961
Fax: 520/448-2551

7.) Delbert Havatone, Chairman
Hualapai Tribal Council
941 Hualapai Way
Peach springs, Arizona 86434
Phone: 520/769-2216
Fax: 520/769-2343

8.) C/O Jeri Johnson, Chairperson
Payson Indian Band
Tonto Apache Tribal Council
Tonto Reservation # 30
Payson, Arizona 85541
Phone: 520/474-5000
Fax: 520/474-9125

9.) Sylvester Liston, Chairman
Tohono O'Odham Nation
Papago Agency/BIA
Circle Dr.,Bldg. 49
Sells, Arizona 85634
Phone: 520/383-2221
Fax: 520/383-3379

10.) Austin Nunez, Chairman
San Xavier Indians
2018 West San Xavier Road
Tucson, Arizona 85746
Phone: 520/294-5727

11.) Martin J. Antone, Sr., Chairman
Ak Chin Indian Community
42507 W. Peters & Nall Road
Maricopa, Arizona 85239
Phone: 520/568-2227
Fax: 520/254-6133

12.) Clinton Pattea, President
Fort McDowell Mohave-Apache
Tribal Administration Building
Fountain Hill, Arizona 85268
Phone: 602/837-5121
Fax: 602/837-1630

13.) Mary V. Thomas, Governor
Gila River Indian Community Council
Corner Pima & Main
Sacaton, Arizona 85247
Phone: 520/562-3311 & 963-4323
Fax: 520/562-3422

14.) Ivan Makil, President
Salt River Pima Community Council
10005 East Osborn Road
Scottsdale, Arizona 85256
Phone: 602/941-7277
Fax: 602/949-2909

Attachment B Part 4 to Boswell Declaration

0754

15.) Ronnie Lupe, Chairman
White Mountain Apache Tribe
202 East Walnut Street
Whiteriver, Arizona 85941
Phone: 520/338-4345
Fax: 520/338-4778

16.) Gloria Bulletts-Benson, Chairperson
Kaibab Paiute Tribal Council
250 North Pipe Spring Road
Fredonia, Arizona 86022
Phone: 520/643-7245
Fax: 520/643-7260

17.) Stan Rice, President
Yavapai-Prescott Indians
530 East Merritt Street
Prescott, Arizona 86301-2038
Phone: 520/445-8790
Fax: 520/778-9445

18.) Dale S Malotte, Chairman
Tribal Council of the Te-Moak
Western Tribe
525 Sunset Street
Elko, Nevada 89801
Phone: 702/738-9251
Fax: 702/738-2345

19.) Wilson Crutcher, Chairman
Ft. McDermitt Pauite & Northern Pauite
Tribal Council
111 North Road
McDermittt, Nevada 89421
Phone: 702/532-8259
Fax: 702/532-8913

20.) Rosalyn Mike, Chairperson
Moapa Pauite Business Council
# 1 Lincoln
Moapa, Nevada 89025
Phone: 702/865-2787
Fax: 702/865-2875

21.) Norman Harry, Chairman
Pyramid Lake Paiute Tribal Council
C/O Tribal Building
Nixon, Nevada 89424
Phone: 702/574-1000
Fax: 702/574-1008

22.) Harrison Talgo, Sr, Chairman
San Carlos Apache Tribal Council
Administration Building
San Carlos Avenue
San Carlos, Arizona 85550
Phone: 520/475-2361
Fax: 520/475-2567

23.) Irwin E. Miller, Chairman
Walker River Paiute Tribal Council
Tribal Complex # 1
Schurz, Nevada 89427
Phone: 702/773-2306
Fax: 702/773-2585

24.) A. Brian Wallace, Chairman
Washoe Tribal Council
919 Highway 395 South
Gardnerville, Nevada 89410
Phone: 702/265-4191 & 883-1446
Fax: 702/265-6240

25.) Jeri Johnson, Chairperson
Tonto Apache Tribal Council
Tonto Reservation # 30
Payson, Arizona 85541
Phone: 520/474-5000
Fax: 520/474-9125

26.) Harlen Pete, Chairman
Goshute Business Council
Goshute Tribal Headquarters
Ibapah, Utah 84034
Phone: 801/234-1136
Fax: 801/234-6211

27.) C/O Beverly Slack, Project Assistant
Skull Valley Band of Goshute
8 East Broadway, Suite 735
Salt Lake City, Utah 84111
Phone: 801/722-2406

28.) Evelyn James, President
Southern Paiute Nation
Grey Hills High School
Dorm 1, Rm 133
Tuba City, Arizona 86045
Phone: 520/283-4583/4587
Fax: 520/283-5761

Attachment B Part 4 to Boswell Declaration

0755

29.) Arlan Melendez, Chairman
Reno-Sparks Tribal Council
98 Colony Road
Reno, Nevada   89502
Phone: 702/329-2936
Fax:  702/329-8710

30.) Robert Sam, Chairman
Summit Lake Paiute Tribal Council
655 Anderson Street
Winnemucca, Nevada 89445-3657
Phone: 702/623-5151
Fax:  702/623-0558

31.) Matthew Leivas, Sr., Chairman
Chemehuevi Tribal Council
1990 Palo Verde Drive
Havasu Lake, California 92363
Phone: 619/858-4301 & 4219
Fax:  619/858-5400

32.) Fritz Brown, President
Quechan Indian Tribal Council
350 Picacho Road
Winterhaven, California 92283
Phone: 619/572-0213
Fax: 619/572-2102

33.) Stacey Stahl, Chairperson
Yerington Paiute Tribal Council
171 Cambell Lane
Yeringtyon, Nevada 89447

34.) Ruby Atnine, Chairperson
Uintah & Ouray Tribal Bus. Com.
988 South 7500 East
Fort Duchesne, Utah 84026
Phone: 801/722-5141
Fax:  801/722-2374

35.) Alex Shepard, Chairman
Paiute Tribe of Utah
Paiute Tribal Council
600 North 100 East Paiute Drive
Cedar City, Utah 84720
Phone: 801/586-1112
Fax: 801/586-7388

Attachment B Part 4 to Boswell Declaration                    0756

# SACRAMENTO AREA (52)

1.) Richard M. Milanovich
Agua Caliente Tribal Council
110 N. Indian Canyon Drive
Palm Springs, CA 92262
619-325-5673
Fax 619-325-0593

2.) Lawrence Cantrell, Chairman
Indians of the Big Bend Henderson Rancheria
Pit River Tribal Council
20258 Tamarack Ave
Burney, CA 96013
916-335-5421

3.) Jennifer Fred, Acting Chairman
Cold Springs Rancheria
32861 Sycamore Road
Tollhouse, CA 93667
209-855-5043
Fax 209-855-8359

4.) Delbert Benjamin, Chairman
Colusa Rancheria
50 Wintun Rd, Council Bldg
Colusa, CA 95932-0008
916-458-8231
Fax 916-458-2018

5.) Attn: Chairman
Fort Bidwell Indian Community
Off Bridge Street
Fort Bidwell, CA 96112
916-279-6310
Fax 916-279-2233

6.) Daryl E. Burrows, Chairman
Grindstone Rancheria
County Rd 305
Elk Creek, CA 95939-0063
916-968-5365
Fax 916-968-5366

7.) Carmen Ochoa, Chairperson
Laytonville Rancheria
301 Oak Drive
Laytonville, CA 95454
707-468-1336
Fax 707-468-5615

8.) Richard Wilder, Chairman
Fort Independence Indians
131 N. Hwy 395
Independence, CA 93526
619-878-2126
Fax 619-878-2311

9.) Arthur Lopez, Interim Chairman
Manchester/Point Arena Rancheria
1351 Vineyard Court
Santa Rosa, CA 95407
707-527-2786
Fax 707-882-4142

10.) Marcel Simon, Chairman
Middletown Rancheria
22223 Hwy 29, Rancheria Road
Middletown, CA 95461-0789
707-987-3670
Fax 707-987-0375

11.) Donna Duckey, Chairperson
The Big Pine Paiute Tribe
841 S. Main Street
Big Pine, CA 93513-0700
619-938-2003
Fax 619-938-2942

12.) Lawrence Cantrell, Chairman
Pit River Tribal Council
20258 Tamarack Avenue
Burney, CA 96013
916-335-5421
Fax 916-335-5241

13.) Joseph Russ, Sr., President
Round Valley Tribe
77826 Covelo Road
Covelo, CA 95428
707-983-6126
Fax 707-983-6128

14.) Paula Lorenzo, Chairperson
Rumsey Indian Rancheria
14189 Winton Road
Brooks, CA 95606-0018
916-796-3400
Fax 916-796-2143

Attachment B Part 4 to Boswell Declaration    0757

15.) Clarence Atwell, Jr., Chairman
Santa Rosa Rancheria
16835 Alkali Drive
Lemoore, CA 93245
209-924-1278
209-924-3583

16.) W. David Murry, Sr., Chairman
Shingle Springs Rancheria
5281 Honpie Road
PLacerville, CA 95667
916-676-8010
Fax 916-626-8033

17.) Allen Summers, Chairman
Bishop Indian Tribal Council
50 Tusu Lane
Bishop, CA 93514
619-873-3584
Fax 619-873-4143

18.) Nicolas J. Padilla, Chairman
Susanville Rancheria
745 Joaquin Street
Susanville, CA 96130
916-257-6264
Fax 916-257-7986

19.) Duane Garfield, Chairperson
Tule River Tribe
340 Indian Reservation Road
Porterville, CA 93258
209-781-4271
Fax 209-781-4610

20.) Donald McCovey, President
Resighini Rancheria
151 E. Klamath Beach Road
Klamath, CA 95548
707-482-2431
Fax 707-482-3425

21.) Dale Risling, Chairman
Hoopa Valley Tribe
Hwy 96, Neighborhood Facility Bldg
Hoopa, CA 95546-1348
916-625-4211
Fax 916-325-4594

22.) Josephine Leo, Vice-Chairperson
Inaja & Cosmit Band of Mission Indians
924 Main Street Apt 2
Ramona, CA 92065
619-789-8581

23.) Susie L. Long, Chairperson
Yurok Tribe
1034 6th Street
Eureka, CA 95501
707-444-0433
Fax 707-444-0437

24.) Maryann Martin, Chairperson
Augustine Indians
1185 N. Hargrave Street
Banning, CA 92220
909-922-9727

25.) John A. James, Chairman
Cabazon Indians
84-245 Indio Springs Drive
Indio, CA 92201
619-342-2593
Fax 619-347-7880

26.) Michelle Salgado, Spokesperson
Cahuilla Band of Mission Indians
52701 Hwy 371
Anza, CA 92539
909-763-5549

27.) Ralph Goff, Chairman
Campo Band of Mission Indians
36190 Church Road, Suite 1
Campo, CA 91906
619-478-9046
Fax 619-478-5818

28.) Captain Grande Band of Diegueno
Mission Indians
Southern California Agency
C/O Nancy Rosales
3600 Line St, Suite 722
Riverside, CA 92501

29.) Clifford M. Lachappa, Sr., Chairman
Barona Indians (General Business)
1095 Barona Road
Lakeside, CA 92040
619-443-6612/6613

30.) Mark Macarro, Spokesman
Pechanga Band of Mission Indians
12784 Prechangs TD
Temecula, CA 92593
909-676-2768 Fax 909-699-6983

Page 17

31.) Janet Weeks, Chairperson
La Jolla Band of Mission Indians
Hwy 76
Pauma Vally, CA  92061
619-742-3771
Fax 619-742-1704

32.) Gwendolyn Paroda, Chairperson
(Frank Lachappa, Tribal Secretary)
La Posta Band of Mission Indians
1064 Barona Road
Lakeside, CA  92040
619-478-5239

33.) Carlos Guassac, Chairperson
Mesa Grande Band of Mission Indians
4040 30th Street #204
San Diego, CA  92104
619-282-9650

34.) Mary Ann Andreas, Chairperson
Morongo Band
11581 Potrero Road
Banning, CA  92220
909-849-4697
Fax 909-849-4698

35.) Robert Smith, Chairman
Pala Band of Mission Indians
Pala Temecula Rd. Bldg 12
Pala, CA  92059
619-742-3784
Fax 619-742-3785

36.) Samuel J. Powvell, Chairman
Pauma Band of Mission Indians
Pauma Tribal Offices
1010 Pauma Reservation Road
Pauma Valley, CA  92061-0086
629-742-1289
Fax 619-742-3422

37.) Robert J. Salgado Sr., Chairman
Soboba Band of Mission Indians
23904 Soboba Road
San jacinto, CA  92583
909-654-2765
Fax 909-654-4198

38.) Mary E. Belardo, Chairperson
Torres-Martinez Band of Mission Indians
66-725 Martinez Road
Thermal, CA  92274
619-397-8144
Fax 619-397-0300

39.) Robert Calac, Chairman
Ricon Band of Mission Indians
1 W Tribal Road
Valley Center, CA  92082
619-749-1051
Fax 619-749-8901

40.) Lynn R. LeRoy, Chairperson
San Manuel Band of Mission Indians
Indeon Service Road
Highland, CA  92346
909-864-8933

41.) Dorothy Tavul, Chairperson
San Pasqual Band
27458 N. Lake Wohlford Rd
Valley Center, CA  92082
619-749-3200

42.) Anthony Largo, Spokesperson
Santa Rosa Indians 325 N W Ave
Hemet, CA  92343
909-652-2570

43.) David Dominquez, Chairperson
Santa Ynez Band of Mission Indians
Hwy 246
Santa Ynez, CA  93460-0517
805-688-7997
Fax 805-688-8005

44.) Ben Scerato, Chairman
Santa Ysabel Band of Diequeno
Sch House Canyon Rd off Hwy 79
Santa Ysabel, CA  92070
619-765-0846
Fax 619-765-0320

45.) Sandra Madrigal, Fiscal Officer
Sherwood Valley Rancheria
190 Sherwood Hill Dive
Willits, CA  95490
707-459-9690
Fax 707-459-6936

46.) Thomas Brown, Chairman
Elem Indian Colony of Pomo Indians
C/O Central Calitomia Agency
1824 Tribute Road, Suite J
Sacramento, CA  95815
916-566-7121

Page 18

47.) Dean Mike, Chairperson
Twenty-Nine Palms Band of Mission Indians
46-200 Harrison Place
Coachella, CA  92236
619-775-5566

48.) Anthony Pico, Chairman
Viejas Tribal Council
Route 1 Viejas Grade Road
Alpine, CA  91901
619-445-3810
Fax 619-445-5337

49.) Sandra Jefferson Yonge, Chairperson
Lone Pine Paiute-Shoshone Tribe
Lone Pine Reservation, CA  93545
619-876-5658

50.) Zandra Biets, Chairperson
Tuolumne Me-Wuk Rancheria
19595 Miwa Street
Tuolumne, CA  95379
209-928-3475 Fax 209-928-1677

51.) Rose Marie Bane, Chairperson
Benton Paiute Reservation
Benton Station, NW Corner of Jct
Hwy 120
Benton, CA  93512
619-933-2321
Fax 619-933-2412

52.) San Luis Rey Indian Water Authority
Hwy 76, Pauma Reservation Road
Pauma Tribal Complex
Pauma Valley, CA  92061

# ALBUQUERQUE AREA (23)

1.) Leonard Atole, President
Jicarilla Apache Tribe
Hwy 64 Hawks Dr
Directly to Tribal Offices
Dulce, NM 87528
505-759-3242
Fax 505-759-3005

2.) Wendall Chino, President
Mescalero Apache Tribe
101 Central Mescalero
Mescalero, NM 88340-0176
505-671-4495
Fax 505-671-9191

3.) Ronald Shutiva, Governor
Pueblo of Acoma
W. on I-40, Exit 102, go S. across
railrd. tracks, W. on Sky City Rd
follow signs to Acoma Tribal Bldg 5 miles
Acomita, NM 87304-0309
505-552-6604 Fax 505-552-6600

4.) Isaac Herrera, Governor
Pueblo of Cochiti
N. I-25 Exit @LaBajada Hill, W.
Hwy 16 (below Dam) go S. to Y,
right @ Y, go left at Stop Sign to
Yellow Tribal Bldg.
Cochiti, NM 87072-0070
505-465-2244 Fax 505-465-2245

Alvino Lucero, Governor
5.) Pueblo of Isleta
Tribal Rd #40, Bldg 117A
Isleta, NM 87022-1270
505-869-3111 Fax 505-869-4236

Paul Chinana, Governor
6.) Pueblo of Jemez
N. I-25 to Bernalillo, Exit to Hwy 44
N. @San Ysidro on Hwy 4, Tribal
Bldg (Lg) on L. side going N.(pine
trees)
Jemez, NM 87024-0100
505-834-7359 Fax 505-834-7331

7.) Roland E Johnson, Governor
Pueblo of Laguna - W I-40 Exit
114 (old 66)left @ Laguna Mart,
right @ Y, use E. entrance of
Tribal Bldg
Laguna, NM 87026-0194
505-552-6654   Fax 505-552-6941

8.) Tony B Vigil, Governor
Pueblo of Nambe
N. I-25 to Hwy 285 past Pojoaque
Gaming area to Traffic light, go R.
on State Rd 503, 8 mi. to Tribal
Bldg , Route, Box 117-B
Santa Fe, NM 87501
505-455-2036 Fax 505-455-2038

9.) Gerald Nailor, Governor
Pueblo of Picuris
Hwy 68, turn off @ Dixon Junct.75-
15 mi., left @ 1st turn, office in
middle of village
Penasco, NM 87553-0127
505-587-2519 Fax 505-587-1071

Jacob Viarrial, Governor
10.) Pueblo of Pojoaque
N. I-25 to Hwy 285 to the Tribal Bldg
Route 11 Box 71
Santa Fe NM 87501
505-455-2278/79
Fax 505-455-2950/3363

Alex Lujan, Governor
11.) Pueblo of Sandia
N. 1-25 to Tramway Blvd, S to Intersection of
Tramway & Hwy 85, N. on Hwy 85 to Pueblo
turn off - across tracks
Bernalillo, NM 87004
505-867-3317 Fax 505-867-9235

Calvin Garcia, Governor
12.) Pueblo of San Felipe
N. I-25 Exit 252, go W, @ 4 way
stop then go over railrd tracks,
pass bridge, pavement ends @ Y
go left passed church, Tribal bldg on S. side
San Felipe, NM 87001
505-867-3381 Fax 505-867-3383

13.) Elmer Torres, Governor
Pueblo of San Ildefonsio
Hwy 85, to Hwy 502 W,
6 mi Civic Center @ Y, go L. to church
on W side/Tribal Bldg Route 5
Box 315-A
Santa Fe, NM 87501
505-455-2273 Fax 505-455-7351

14.) Joe Garcia, Governor
Pueblo of San Juan
From Santa Fe to state Rd 74 going
N.past post office to church,Tribal
Bldg on right side of church
San Juan Pueblo, NM 87566-1099
505-852-4400/4210 Fax 505-852-4820

15.) Ernest J. Lujan, Governor
Pueblo of Santa Ana
2 Dove Rd
Bernalillo, NM 87004
505-867-3301 Fax 505-867-3395

16.) Edwin Tafoya, Governor
Pueblo of Santa Clara
Kee St in Espanola
Espanola, NM 87532
505-753-7326
Fax 505-753-8988

17.) Bennie Star, Governor
Pueblo of Santo Domingo
N. I-25, Exit 259, go W across
bridge, turn left, Tribal office in
middle of village
Santo Domingo, NM 87052-0099
505-465-2214/15 FAx 505-465-2688

18.) David Gomez, Governor
Pueblo of Taos
N. Pueblo Rd, main Hwy 2 mi from
Taos, Governors office on L. side
Taos,NM 87571-1846
505-758-9593
Fax 505-758-4604

19.) Herman Vigil, Governor
Pueblo of Tesuque
Hwy 285 Pass Carpet store &
Casino, Left side of Rd, route 5
Box 360-T/Santa Fe, NM 87501
505-983-2667 Fax 505-982-2331

20.) Stanley Pino, Governor
Pueblo of Zia
135 Capital Square Dr
Zia Pueblo, NM 87053-6013
505-867-3304
Fax 505-867-3308

21.) Donald Eriacho, Governor
Pueblo of Zuni
1203-B State Hwy 53
Zuni, NM 87327-0339
505-782-4481
Fax 505-782-2700

22.) Leonard C Burch, Chairman
Southern Ute Tribe
116 Capoti Dr
Ignacio, CO 81137-0737
303-563-0100
Fax 303-563-0396

23.) Judy Knight-Frank, Chairperson
Ute Mountain Ute Tribe
N.Hwy 666 from Shiprock to Tribal
office-Mike Wash Rd
Towaoc, CO 81334
970-565-3751
Fax 970-565-7412

0762

Attachment B Part 4 to Boswell Declaration

# NAVAJO AREA (2)

1.) Dolores Apache, Chapter House
President/Canoncito Chapter House
W. on I-40, Exit #131, 6 mi. North pass the
water tank, Office is between the
water tank & BIA School
Canoncito, NM  86026
505-836-4221

2.) Albert Hale, President
The Navajo Nation
Hwy 264, Tribal Hill Drive
Window Rock, AZ  86515
520-871-6352
Fax 520-871-4025

Attachment B Part 4 to Boswell Declaration                    0763

# PORTLAND AREA (43)

1.) Jack L Booth, Sr, Mayor
Metlakatla Indian Community Council
8th Upper Milton ST
Metlakatla, AK 99926
907-886-4441
Fax 907-886-7997

2.) Sue Sahaffer, Chairwoman
Cow Creek Bank of Umpqua Indians
2400 Stewart Parkway, STE 300
Roseburg, OR 97470-1563
(541)672-9405
Fax (541)673-0432

3.) Mathew Dick, Jr., Chairman
Colville Business Council
Main St. Indian Agcy Campus
Nespelem, WA 99155
(509)634-4711
Fax (509)634-4116

4.) Warren Seyler, Chairman
Spokane Business Council
6208 Fort Wellpinit Road
Wellpinit, WA 99040
(509)258-4581
(509)838-3465
Fax (509)258-9243

5.) Glen Nenema, Chairman
Kalispel Business Committee
1981 N LeCleric Road
Usk, WA 99180
(509)445-1147
Fax (509)445-1705

6.) Melvin Youckton, Chairman
Chehalis Business Council
420 Howanut Road
Oakville, WA 98568
(360)374-6582
FAX(360)374-6549

7.) Mary Leicka, Vice-Chairperson
Hoh Tribal Business Council
2464 Lower Hoh Road
Forks, WA 98331
(360)374-6582
Fax (360)374-6549

8.) Hubert Markishtum, Chairman
Makah Tribal Council
Hwy 112
Neah Bay, WA 98357
(360)645-2201 EXT36
Fax (360)645-2323

9.) Virginia Cross, Chairperson
Muckleshoot Tribal Council
39015 172nd Street SE
Auburn, WA 98002
(206)939-3311
Fax (206)939-5311

10.) Michael Stepetin, Chairman
Nisqually Indians
4820 She-Nah-Num Drive SE
Olympia, WA 98503
(360)456-5221
Fax (360)407-0125

11.) Joe Johnson, Chairman
Nooksack Indian Tribal Council
5048 Mt Baker Hwy
Deming, WA 98244
(360)592-5176

12.) Gerald J. Jones, Chairman
Port Gamble S'Klallam Tribe
31912 Little Boston Road NE
Kingston, WA 98346
(360)297-2646
Fax (360)297-7097

13.) Roleen Hargrove, Chairwoman
Puyallup Tribal Council
2002 E 28th Street
Tacoma, WA 98404
(206)597-6200
Fax (206)848-7341

14.) Douglas Woodruff, Sr., Chairman
Quileute Tribal Council
River & Main
Lapush, WA 98350
(360)374-6163
Fax (360)374-6311

Attachment B Part 4 to Boswell Declaration        0764

15.) Henry Cagey, Chairman
Lummi Business Council
2616 Kwina Road
Bellingham, WA 98226
(360)734-8180
FAX(360)384-4737

16.) Gorden James, Chairman
Skokomish Tribal Council
N 80 Tribal Center Rd
Shelton, WA 98584
(360)426-4232
Fax (360)877-5148

17.) David Lopeman, Chairman
Squaxin Island Tribe
SE 70, Squaxin Lane
Shelton, WA 98584
(360)426-9781
FAX(360)426-3971

18.) Robert Joe, Sr., Chairman
Swinomish Tribal Committee
950 Moorage Way
Laconner, WA 98257
(360)466-3163/5309
Fax (360)466-4047

19.) Stanley Jones, Sr., Chairman
Tulalip Board of Directors
6700 Totem Beach Road
Marysville, WA 98270
(360)653-4585
Fax (360)653-0255/0278

20.) Francis G. Charles, Chairperson
Lower Elwha Community Council
2851 Lower Elwha Road
Port Angeles, WA 98362
(360)452-8471
Fax (360)452-4848

21.) William R. Allen, Chairman/Exec
Jamestown S'Klallam Tribal Council
1033 Old Blyn Hwy
Sequim, WA 98382
(360)683-1109
Fax (360)683-4366
(360)681-4643 (Tim)

22.) Pearl Capoeman Baller, Chairperson
Quinault Business Committee
1214 Aalis
Taholah, WA 98587
(360)276-8211
Fax (360)276-4682

23.) Herbert "Ike" Whitish, Chairman
Shoalwater Bay Tribal Council
2373 Old Tokeland Hwy
Tokeland, WA 98590
(360)267-6766
Fax (360)267-6778

24.) John Barnett, Chairman
Cowlitz Indian Tribe
1417 15th Ave, #5
PO Box 2547
Longview, WA 98632
(360)577-8140
FAX(360)577-7432

25.) Gail Greger, Chairman
Stillaquamish Board of Directors
3439 Stoluckquamish Lane
Arlington, WA 98223
(360)652-7362
Fax (360)435-2204

26.) Margaret Green, Chairperson
Samish Tribe of Indians
C/O Puget Sound Agency
Federal Building
3006 Colby Ave
Everett, WA 98201-4080
(360)258-2651

27.) Lyle Emerson George, Chairman
Suquamish Tribal Council
15838 Sandy Hook Road
Suquamish, WA 98392
(360)598-3311
Fax (360)598-4666

28.) Arnold Libby, Chairman
Kikiallus Tribe
4500 E Division Street
Mt Vernon, WA 98273
(206)428-2690

**Page 24**

29.) Tim Tarabochia, Chairman
Chinook Indian Tribe Inc.
Hwy 101, Mi. Post 5
Old Chinook School Bldg
Chinook, WA 98614
(360)777-8303
Fax (360)777-8100

30.) Floyd Williams, Chairman
Upper Skagit & Skagit Tribal Council
2284 Community Plaza
Sedro Wooley, WA 98284
(360)856-5501
Fax (360)856-3175

31.) Mark Mercier, Chairman
Confederated Tribe of the Grand Ronde
9615 Grand Ronde Road
Grand Ronde, OR 97347
(503)879-5211
Fax (503)879-5964

32.) Delores Pigsley, Chairperson
Siletz Tribal Council
201 SE Swan
Siletz, OR 97380
(541)444-2513/2532
Fax (541)444-2307

33.) Donald Sampson, Chairman
Umatilla Board of Trustees
Old Mission Hwy 30
Pendleton, OR 97801
(541)276-3165
Fax (541)276-3095

34.) Bruce M. Brunoe, Sr., Chairman
Confederated Tribes of Warm Springs
Reservation
1233 Veterans Street
Warm Springs, OR 97761
(541)553-1161
Fax (541)553-1924

35.) Delbert Farmer, Chairman
Fort Hall Business Council
Pima Drive
Fort Hall, ID 83203
(208)238-3700
Fax (208)237-0797

36.) Cecile Hansen, Chairperson
Duwamish Tribe
140 Rainier Ave S., Suite 7
Renton, WA 98055
(206)226-5185
Fax (206)226-5240

37.) Snohomish Tribe
Attn: Tribal Accountant
C/O Puget Sound Agency
Federal Building
3006 Colby Ave
Everett, Wa 98201
(360)258-2651

38.) Marvin Garcia, Chairman
Klamath General Council
Hwy 97
Williamson Business Park
Chiloquin, OR 97624
(503)783-2219  1-800-524-9787
Fax (503)783-2029

39.) George Worley, Chairman
Northwestern Band of Shoshoni Indians
31 W Bridge
Blackfoot, ID 83221
(208)785-7401
Fax (208)785-2206

40.) Samuel N. Penney, Chairman
Nez Perce Tribal Exec. Committee
Main Street & Beaver Grade
Lapwai, Idaho 83540
Attn: Barry Baker 208-873-7318
(208)843-2253
Fax (208)843-7354

41.) Velma Bahe, Chairperson
Kootenai Tribal Council
County Road 38A
Booners Ferry, ID 83805
(208)267-3519
Fax (208)267-2960

42.) Joan Ortiz
Steilacoom Tribe D-208
1515 Layfayette
Steilacoom, WA 98388
206-584-6308

43.) Ernest Stensgar, Chairman
     Coeur D'Alene Tribal Council
     Route 1 Coeur D'Alene
     Tribal Administration Building
     Plummer, ID  83851
     (208)686-1800
     Fax (208)686-1182

Attachment B Part 4 to Boswell Declaration                    0767

# EASTERN AREA (18)

1.) Joyce Dugan, Principal Chief
Eastern Band of Cherokee Indians
Sequoyah Trail
Cherokee, NC 28719
704-497-2771
Fax 704-497-2952

2.) Dennis Bowen, President
Seneca Nation of Indians
3582 Center Road - Plummer Bldg
Salamanca, NY 14779
716-532-4900
Fax 716-532-9132

3.) James Billie, Chairman
Seminole Tribe of Florida
6300 Sterling Rd
Hollywood, FL 33024
954-966-6300
Fax 954-967-3486

4.) Leon Shenandoah, Sr, Head Chief
Onondaga Nation
RR 1, Box 270-A
Nedrow, NY 13120
315-469-8507

5.) Bernie Parker, Chief
Tonawanda Band of Senecas
7027 Meadville Rd
Basom, NY 14013
716-542-4244
Fax 716-542-9692

6.) Arnold Hewitt, Chief
Tuscarora Nation
5616 Walmore Rd
Lewiston, NY 14092
716-297-4990

7.) Raymond Halbritter, Nation Rep.
Oneida Indian Nation of NY
223 Genesee ST
Oneida, NY 13421
315-361-6300
Fax 315-361-6333

8.) Vernon Isaac, Chief
Cayuga Nation
44 W. Maine
Gowanda, NY 14070
716-532-4847
Fax 716-532-5417

9.) John Stevens, Tribal Governor
Passamaquoddy Tribe of Maine
Indian Township Reservation
Route 1
Princeton, Maine 04668
207-796-2301
Fax 207-796-5256

10.) Richard Hamilton, Tribal Governor
Penobscot Nation
6 River Rd - Indian Island
Old Town, Maine 04468
207-827-7776
Fax 207-827-6042

11.) Clair Sabattis, Chief
Houlton Band of Maliseet Indians
Route 3, Box 450
Bell Road
Houlton, Maine 04370
207-532-4273
Fax 207-532-2660

12.) Richard A Hayward, Chairman
Mashantucket Pequot Tribe
Indiantown Road
Ledyard, CT 06339
203-536-2681
Fax 203-572-0421

13.) Billy Cypress, Chairman
Miccosukee Tribe
Tamiami Trial (mile marker 70 US
41)
Miami, FL 33199
305-223-8380
Fax 305-223-1011

14.) Eddie Tullis, Chairman
Poarch Band Creek & Eastern Creek Indians
5811 Jacksprings Rd
Atmore, AL 36502
205-368-9136
Fax 205-368-4502

15.) Beverly Wright, Chairperson
Wampanoag Tribal Council of Gay
Head
20 Black Brook Rd
Gay Head, MA 02535
508-645-9265
Fax 508-645-3790

16.) Ralph Darden, Chairman
Chitimacha Tribe
155 Chitimacha Loop RD
Charenton, LA 70526
318-923-7215
Fax 318-923-7791

17.) Lovelin Poncho, Chairman
Coushatta Tribe
Powell Rd (3 mi N. of Elton)
Elton, LA 70532
318-584-2261
Fax 318-584-2998

18.) Phillip Martin, Tribal Chief
Mississippi Band of Choctaw
Indians
Hwy 16
Philadelphia, MI 39350
601-656-5251
Fax 601-656-1992

**Page 28**

# FIVE TRIBES (5)

1.) Jerry Meninick, Chairman
Yakama Tribal Council
401 Fort Road
Toppenish, WA 98948
509-865-5121
Fax 50-865-5528

2.) Michael T. Pablo, Chairman
Confederated Salish & Kootenai
Tribal Council
Hwy 93, Tribal Complex
Pablo, MT 59855
406-675-2700
Fax 406-675-2806

3.) Chairman
Assiniboine & Sioux of Ft. Peck
Indian Reservation
Ft. Peck Tribes
605 Indian Ave
Poplar, MT 59255

4.) Russell Mason, Chairman
Three Affiliated Tribes Business Council
Tribal Administration Bldg
Hwy 23W, HC 3, Box 2
New Town, ND 58763
701-627-4781/82
Fax 701-627-3805

5.) Ferrell Secakuku, Chairman
Hopi Tribal Council
Main Street Administration Bldg
Kykotsmoni, AZ 86039
520-734-2441
Fax 520-734-2435

Page 29

# Currently Non-Federally Recognized

1.) Acting Chief-Francis Dunnagan
    Miami Nation of Indiana
    80 W. 6th St.
    P. O. Box 41
    Peru, Indiana  46970

Attachment B Part 4 to Boswell Declaration          0771

**Enclosure IV**

# National Meeting

## OFFICE OF TRUST FUNDS MANAGEMENT
## TRIBAL TRUST FUNDS RECONCILIATION PROJECT

### Tribal Meetings Summary

| Albuquerque National Meeting February 14-15, 1996 | Tribes | Representatives |
|---|---|---|
| **Aberdeen Area**: Devils Lake, Oglala, Rosebud Standing Rock, Three Affiliated, Turtle Mountain | 6 | 16 |
| **Albuquerque Area**: Acoma, Isleta, Laguna Jicarilla, Sandia, Taos | 6 | 11 |
| **Anadarko Area**: Alabama-Couchatta, Absentee Shawnee, Apache, Cheyenne-Arapaho, Citizen Band of Potawatomi, Comanche, Delaware of Oklahoma, Fort Sill, Iowa, Kiowa, KCA Committee, Pawnee, Ponca, Prairie Band of Potawatomi, Sac & Fox, Wichita | 16 | 32 |
| **Billings Area**: Arapahoe, Assiniboine Treaty Committee, Assiniboine & Sioux, Blackfeet, Gros Ventre, Chippewa Cree, Ft. Belknap, Shoshone | 8 | 11 |
| **Eastern Area**: Chitimacha, Poarch Creek | 2 | 2 |
| **Juneau Area**: Tlingit & Haida | 1 | 1 |
| **Minneapolis Area**: Bois Forte, Brotherton, Forest County Potawatomi, Grand Traverse, Keweenaw Bay, Lac du Flambeau, Onedia, St. Croix | 8 | 11 |
| **Muskogee Area**: Cherokee, Chickasaw, Choctaw, Muscogee, Delaware, Osage, Quapaw, Seminole, Thlopthlocco | 9 | 17 |
| **Navajo Area**: Navajo Nation | 1 | 2 |
| **Phoenix Area**: Chemehuevi, Ft. McDermitt, Hopi, Hualapai, Kaibab, San Carlos, Summit Lake, Tohono O'odham | 8 | 13 |
| **Portland Area**: Colville, Salish & Kootenai, Muckleshoot, Klamath, Shoshone-Bannock, Yakama | 6 | 8 |
| **Sacramento Area**: Big Pine, Capitan Band, Hoopa, Resighini, Pit River, Santa Ysabel, Tule River, Yurok | 8 ___ | 13 ___ |
| **Total** | 79 | 137 |

# ATTACHMENT B

# TO BOSWELL

# DECLARATION

# PART 5

**Enclosure V**

# Regional Meetings

# OFFICE OF TRUST FUNDS MANAGEMENT
# TRIBAL TRUST FUNDS RECONCILIATION PROJECT

## Tribal Meetings Summary

| | Tribes | Representatives |
|---|---|---|
| **Sacramento Regional Meeting**<br>**March 19-22, 1996** | | |
| **Aberdeen Area:** Turtle Mountain | 1 | 6 |
| **Albuquerque Area:** Acoma Pueblo | 1 | 2 |
| **Phoenix Area:** Colorado River, Fallon-Paiute, Hualapai, Kaibab, Pyramid Lake, Salt River, San Carlos, Summit Lake, Te-Moak, Northern Ute, Walker River, White Mountain | 12 | 24 |
| **Sacramento Area:** Big Pine, Hoopa, Middleton, Morongo, Pala, Resighini, Round Valley, Yurok | 8 | 26 |
| **Total** | 22 | 58 |
| **Portland Regional Meeting**<br>**April 9-11, 1996** | | |
| **Anadarko Area:** Fort Sill Apache, Kickapoo, Kiowa | 3 | 7 |
| **Juneau Area:** Tlingit & Haida | 1 | 2 |
| **Minneapolis Area:** Oneida of Wisconsin | 1 | 5 |
| **Portland Area:** Colville, Coeur d'Alene, Grand Ronde, Hoh, Kalispel, Klamath/Modoc, Kootenai, Muckleshoot, Nez Perce, Puyallup, Quinault, Skokomish, Spokane, Umatilla, Warm Springs, Yakama | 16 | 35 |
| **Total** | 21 | 49 |

**Enclosure VI**

R E S O L U T I O N

T-70-96

WHEREAS, the Yakama Indian Nation is a federally recognized Tribe pursuant to the Treaty of June 9th, 1855 (12 Stat. 951), and

WHEREAS, the Yakama Tribal Council is the governing body of the Confederated Tribes and Bands of the Yakama Indian Nation of the Yakama Reservation, Toppenish, Washington, by the authority delegated by Resolution T-36-56, and

WHEREAS, the Yakama Tribal Council is charged with the duty and responsibility to protect and preserve the health, security, general welfare, and resources of the Yakama Indian Nation, and

WHEREAS, the Budget and Finance Committee of the Yakama Tribal Council has participated in numerous meetings with the BIA regarding reorganization, budget development and priority setting, and

NOW, THEREFORE, BE IT RESOLVED, by the Yakama Tribal Council meeting in regular session at the Governmental Offices of the Confederated Tribes and Bands of the Yakama Indian Nation, Toppenish, Washington, with a quorum being present, hereby approve the following policy statements and recommendations of the Budget and Finance Committee and requests that the BIA take immediate measures to meet the local needs and priorities of the Yakama Indian Nation based on the principle of returning decision making to the local level:

1. All delegations and decision making be returned to the agency/tribe level;

2. All funds saved from these downsizing and reorganizing efforts be added directly to the agency/tribe TPA program only;

3. The Office of Special Trustee be eliminated and the funds be restored back to the TPA programs; If this office is to exist, that it be funded with funds other than BIA appropriations;

4. The Office of Self-Governance, Education, Law Enforcement Services, Branch of Forest Resource Planning (BOFRP), and Facility Management be eliminated at the Central Office and their functions be absorbed by the respective Area Offices;

5. The Portland Area Plan be approved and implemented;

6. The Yakama Indian Nation strongly opposes moving the Realty, Forestry, Irrigation and other trust functions to the Office of Trust Management;

7. The Yakama Indian Nation strongly requests that IIM be restored back to the Yakama Agency consistent with decentralizing the BIA and allowing tribes to reorganize BIA programs and services based on local tribal needs and priorities.

8. The Yakama Nation request the BIA to make available Central Office and Area Office Tribal Shares to the Agency/Tribe TPA programs.

BE IT FURTHER RESOLVED, that the Yakama Indian Nation does not waive, alter, or otherwise diminish their "sovereign immunity" whether expressed or implied by virtue of accepting or managing this contract, for any and all administrative or legal action which may arise directly or indirectly from the same. Nor does the Yakama Indian Nation waive, alter, or otherwise diminish the rights, privileges, remedies, or services guaranteed by the Treaty of 1855.

DONE AND DATED on this 13th day of March, 1996, by the Yakama Tribal Council by a vote of 5 for, 2 against, and no Abstentions.

Jerry Meninick, Chairman
Yakama Tribal Council

ATTEST:

Arlen Washines, Secretary
Yakama Tribal Council

Attachment B Part 5 to Boswell Declaration

**Enclosure VII**

*Acknowledgement*
*required by*
*Sec. 304(2) of P.L. 103-412*
(Please Return by April 19, 1996)

Tribe Name   **Confederated Salish & Kootenai Tribes**

Address      **PO Box 278**

             **Pablo MT 59855**

Contact
Person       **Vern L. Clairmont, Exec. Treasurer**   (606 ) **675-2700**   Ext **413**
                        (Name)                              (Telephone)

The Tribe has reviewed the Agreed-Upon Procedures and Findings Report resulting from the Tribal Trust Fund Accounts Reconciliation Project for the 20-year period of 1972-1992 and the Summary and Detail of Trust Funds Report for the 3-year period of FY 1993, FY 1994 and FY 1995 provided by the Bureau of Indian Affairs by Letter Dated January 15, 1996 and provides the following attestation as required by the American Indian Trust Fund Management Reform Act of 1994, Public Law 103-412 Section 304.

<u>Complete Appropriate boxes</u>     **SEE ATTACHMENT "A"**

☐     The Tribe requires additional time to review the report and has no response for acceptance or dispute.

☐     The Secretary has provided the account holder with as full and complete accounting as possible of the account holder's funds to the earliest possible date, and that the account holder accepts the balance of the following accounts as reconciled by the Secretary:

_____   _____   _____   _____   _____

_____   _____   _____   _____   _____

☐     The account holder disputes the balance of the account holder's account as reconciled by the Secretary as explained below:

Account Number _____   Balance  $_____   As of Date _____

Explanation of Disputed balance (Provide explanation as an attachment if following space is insufficient or more than one account balance is disputed) _____

_____
_____
_____
_____

☐     The Tribe requests an individual meeting with the BIA to discuss their tribal-specific questions or concerns regarding the Reconciliation Report at a Regional Meeting as indicated below.

☐ Phoenix, March 19-22   ☐ Portland, April 9-12   ☐ Tulsa, June 4-7

☐ Nashville, June 18-21   ☐ Albuquerque, July 16-19

                                                          0781

Tribal Official _~Rhonda R. Swaney~_                      4/18/96
                Signature - Title **RHONDA R. SWANEY,**        Date
                              **CHAIRWOMAN**

Attachment B Part 4 to Boswell Declaration

## ATTACHMENT "A"

### Acknowledgment of Tribal Trust Funds
### Reconciliation Project

The Confederated Salish and Kootenai tribes, upon review of the report resulting from the Tribal Trust Fund Accounts Reconciliation Project for the 20 year period of 1972 to 1992 and the Summary and Detail of Trust Funds report for the three year period of FY 1993, FY 1994 and FY 1995 provided by the Bureau of Indian Affairs by letter dated January 15, 1996, hereby provides notice to the Bureau of Indian Affairs that we are not in agreement as to the proposed balances of our Trust Fund Accounts held by the Bureau as Trustee. That said reports including proposed balance adjustments do not provide any sense of assurance of accuracy of the account balances and therefore are unacceptable to use as accurate account balances.

The reports fail to provide any such assurance due in part to the following:

1. The Bureau of Indian Affairs' own acknowledgment that their present system was, is and continues to be unable to furnish an accurate and full accounting of trust funds.

2. The inability of the Bureau of verify that account balances as of 1972 can be relied upon as accurate.

3. The inability of the Bureau to verify that funds owed to the Tribes were ever collected, due to the lack of any accounts receivable system.

4. The lack of an adequate archives and records keeping system which has resulted in a massive loss of lease and contract records and the consequent inability to do acceptable audits and reconciliations.

5.  The lack of coordination between functions of the overall system beginning with lease or contract initiation to collections, to receipting, to depositing, to investing and to advances to local status that results in the inability to determine the accuracy of any account balance on any given day as there have not been any systems in place to insure that all postings and procedures are complete and accurate.

6.  The scope of the reconciliation project did not, and probably never could, furnish any sense of accuracy of the Tribe's account balances, but instead pointed out, one more time, the fact that the Bureau of Indian Affairs has been grossly negligent in it's trust role of Tribal Trust Funds.

Because of these and numerous other reasons, the Confederated Salish and Kootenai Tribes are not in agreement with the proposed balances of our Trust Accounts as provided in the reconciliation reports.

We would therefore request that to resolve this issue a meeting of Tribal officials and appropriate Bureau of Indian Affairs and/or other Federal Government officials begin meetings to attempt a negotiated settlement to bring this most important issue to a close.

We await your response.

Respectfully,

CONFEDERATED SALISH & KOOTENAI TRIBES

Rhonda R. Swaney
Chairwoman

**Enclosure VIII**

# FORT PECK TRIBES
## Assiniboine & Sioux

### Statement of the

Assiniboine and Sioux Tribes
of the Fort Peck Reservation

### April 30, 1996

We appreciate this opportunity to comment on Fort Peck's experience with the BIA's trust funds reconciliation project. In our view, the trust funds reconciliation project has been a waste of time and resources. It is time for the reconciliation project to be terminated, and for the government to turn its attention to providing a real accounting of trust assets.

For many years now, the Fort Peck Tribes have expressed the view that every tribe and every individual Indian with a trust account is entitled to a full accounting of their trust assets. As trustee, the United States has a legal obligation to account for our trust funds. Congress reaffirmed this in the American Indian Trust Fund Management Reform Act of 1994, 25 U.S.C. 4001 et seq. The Trust Fund Reform Act requires the Secretary to account for the daily and annual balance of all funds held in trust for tribes or Indians, to provide quarterly performance reports to all account holders, and to provide an annual audit of trust funds. These are essentially the minimal obligations of any trustee with respect to the management of trust money. We support the full implementation of the Trust Fund Reform Act, including its requirement of periodic statements and audits for account holders.

While Congress has now clarified this longstanding obligation to account for trust money, it has not yet provided an effective remedy for past mismanagement of trust funds by the BIA. Congress has -- at the request of the Fort Peck Tribes and others -- provided that the statute of limitations will not run as to claims relating to trust fund management, until a full accounting is provided. This is important to assure that the passage of time does not limit our court remedies against the BIA for mismanagement of our funds. While this is important, it is still not enough to protect our right to an accounting to make sure that we recover for past wrongs. Congressional action in tolling the statute of limitations prevents claims from being lost, but does not assure us that our claims are uncovered by means of an effective accounting.

Over the past few years, the BIA has contracted with Arthur Anderson to undertake the trust funds reconciliation project. As we see it, the reconciliation has served as little more than the BIA's excuse for not providing an accounting to tribes. By promoting the reconciliation as a large, ongoing project, the BIA has tried to deflect Congressional attention from the need to provide a meaningful accounting. Apparently, the BIA takes the view that as long as it is doing <u>something</u> regarding mismanagement of trust funds, that would suffice, and Congress would not require more fundamental action.

At Fort Peck, we have long warned that the reconciliation was not a useful project, as it was not designed to answer the question

2

0786

that needs answering -- particularly, how much money have the tribes and individual Indians lost as a result of the government's mismanagement of trust funds. The reconciliation was deigned merely to compare various records of the BIA against various other records of the BIA -- as though the issue was the consistency of the BIA's records, rather than the losses that the tribes may have suffered. By failing to focus on the proper issues, the reconciliation became an exercise without a valid purpose.

Throughout the reconciliation process, the Fort Peck Tribes expressed our concerns about the reconciliation, and we continued to stress the need for a full accounting. Our concerns have again been shown to be warranted, by the recent report submitted by Arthur Anderson regarding the reconciliation project.

The Arthur Anderson report is entitled "U.S. Department of the Interior, Bureau of Indian Affairs, Tribal Trust Funds Reconciliation Project, Five Tribes Fill the Gap/Special Procedures, Agreed-Upon Procedures and Findings Report for Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, July 1, 1972 through September 30, 1992." The only thing clear from the title of the report is that it is not an accounting. Throughout the report, Arthur Anderson stresses the limitations of their work. For example, the report states that "Phase I of the Reconciliation Project substantiated that not all records would be available for a full accounting of such funds." Report, p. 1. In

other words, necessary records were not available for the reconciliation project. This lack of records severely undercut the project.

Furthermore, the scope of the project was based, not on normal audit or accounting procedures, but merely on "agreed-upon procedures." These procedures reflected not even Arthur Anderson's standards, but only "the bureau's standard of reasonableness." Report, p.1. In other words, Arthur Anderson only did what the Bureau -- which mismanaged the trust funds in the first place -- told them to do, under procedures only the Bureau determined to be reasonable.

Arthur Anderson included in the report a most remarkable disclaimer. They state:

> Because the above procedures do not constitute an audit made in accordance with generally accepted auditing standards, we do not express an opinion on any of the elements referred to above. Had we performed additional procedures or had we made an audit of the financial statements of the Trust Funds managed by the Bureau in accordance with generally accepted auditing standards, other matters might have come to our attention that would have been reported to you. In addition, this work was

more limited than would be necessary to express an opinion on the Bureau's internal control structure taken as a whole and furthermore, would not necessarily disclose all material weaknesses in the structure. Accordingly, we are unable to, and do not, express an opinion on the internal control structure of the Bureau takn as a whole. Further, it is beyond our professional competence to provide advice regarding legal matters. Accordingly, we cannot and do not make any representations regarding any legal issues raised in conjunction with performing our procedures.

Report pp. 5-6. Essentially, Arthur Anderson states that it did not use normal procedures on the reconciliation, that it can not issue any opinion even on the matters it looked at, that there may be problems it did not identify, that it can not comment on the BIA's controls over trust money, and it can not comment on whether there were any breaches of legal duties. Clearly this is not a report that fulfills the government's trust responsibility, or even one that should be relied on for any purpose.

The Bureau has been given more than a fair chance to produce something worthwhile from the reconciliation process. The Arthur

Anderson report, by its own terms, is worthless.  It is time to end this wasteful process and end the reconciliation.

There may be many approaches worth considering with respect to providing tribes with a meaningful remedy regarding the mismanagement of trust funds.  Tribes may have varying suggestions based on their particular circumstances.  In our view, we would support federal funds being made available for tribes to retain their own accountants to examine specific trust funds issues and to provide the accounting that have so long been denied us.

We look forward to working with other tribes, and with the Office of the Special Trustee, to find a remedy that makes us whole for the losses we suffered at the hands of the federal government.

**Enclosure IX**

*Acknowledgement
required by*
*Sec. 304(2) of P.L. 103-412*
(Please Return by April 19, 1996)

Tribe Name _____

Address _____

_____

_____

Contact
Person _____   (     ) _____ Ext _____
                (Name/Title)                        (Telephone)

The Tribe has reviewed the Agreed-Upon Procedures and Findings Report resulting from the Tribal Trust Fund Accounts Reconciliation Project for the 20-year period of 1972-1992 and the Summary and Detail of Trust Funds Report for the 3-year period of FY 1993, FY 1994 and FY 1995 provided by the Bureau of Indian Affairs by Letter Dated January 15, 1996 and provides the following attestation as required by the American Indian Trust Fund Management Reform Act of 1994, Public Law 103-412 Section 304.

<u>Complete Appropriate boxes</u>

☐    The Tribe requires additional time to review the report and has no response for acceptance or dispute.

☐    The Secretary has provided the account holder with as full and complete accounting as possible of the account holder's funds to the earliest possible date, and that the account holder accepts the balance of the following accounts as reconciled by the Secretary:

_____   _____   _____   _____   _____   _____

_____   _____   _____   _____   _____   _____

☐    The account holder disputes the balance of the account holder's account as reconciled by the Secretary as explained below:

Account Number _____   Balance $_____   As of Date _____

Explanation of Disputed balance (Provide explanation as an attachment if following space is insufficient or more than one account balance is disputed) _____

_____

_____

_____

☐    The Tribe requests an individual meeting with the BIA to discuss their tribal-specific questions or concerns regarding the Reconciliation Report at a Regional Meeting as indicated below.

☐ Sacramento, March 19-22    ☐ Portland, April 9-12    ☐ Tulsa, June 4-7

☐ Billings, June 18-21    ☐ Albuquerque, July 16-19

Tribal Official_____   _____
                Signature - Title                    Date

Attachment B Part 5 to Boswell Declaration

0792

**Enclosure X**

# OFFICE OF TRUST FUNDS MANAGEMENT
## PAST RECONCILIATION PROJECT

### TRIBAL ATTESTATION ACKNOWLEDGEMENTS - AS OF MAY 3, 1996

| TRIBE/ADDRESS | DATE OF ACKNOWL | ATTESTATIONS | | | |
|---|---|---|---|---|---|
| | | Requested Additional Time | Accepted Account Balance | Disputed Account Balance | Requested Individual Meeting |
| **ABERDEEN AREA** | | | | | |
| Devils Lake Sioux Tribe<br>Fort Totten, North Dakota | 4-22-96 | X | | | X |
| Oglala Sioux Tribe<br>Pine Ridge, South Dakota | 4-19-96 | X | | | |
| Ponca Tribe of Nebraska<br>Niobrara, Nebraska | 4-18-96 | X | | | |
| Standing Rock Sioux Tribe<br>Fort Yates, North Dakota | 2-1-96 | X | | | X |
| Three Affiliated Tribes of the Fort Berthold Reservation<br>New Town, North Dakota | 2-1-96 | X | | | |
| Turtle Mountain Band of Chippewa Indians<br>Belcourt, North Dakota | 4-16-96 | | | (*) | |
| Winnebago Tribe of Nebraska<br>Winnebago, Nebraska | 4-19-96 | X | | | |
| | | | | | |
| **ALBUQUERQUE AREA** | | | | | |
| Pueblo of Acoma<br>Acoma, New Mexico | 4-17-96 | X | | | |
| Pueblo of Jemez<br>Jemez Pueblo, New Mexico | 4-24-96 | X | | | |
| Pueblo of Laguna<br>Laguna, New Mexico | 4-22-96 | X | | | X |
| Pueblo of Santa Ana<br>Bernalillo, New Mexico | 4-18-96 | | X | | |
| Taos Pueblo<br>Taos, New Mexico | 4-10-96 | X | | | |

1

Attachment B Part 5 to Boswell Declaration

0794

| TRIBE/ADDRESS | DATE OF ACKNOWL. | ATTESTATIONS | | | |
|---|---|---|---|---|---|
| | | Requested Additional Time | Accepted Account Balance | Disputed Account Balance | Requested Individual Meeting |
| Pueblo of Zia<br>Zia Pueblo, New Mexico | 4-18-96 | X | | | |
| Pueblo of Zuni<br>Zuni, Mexico | 4-19-96 | X | | | X |
| | | | | | |
| **ANADARKO AREA** | | | | | |
| Caddo Tribe of Oklahoma<br>Binger, Oklahoma | 4-18-96 | X | | | X |
| Cheyenne-Arapaho Tribes of Oklahoma<br>Concho, Oklahoma | 4-18-96 | X | | | X |
| Delaware Tribe of Western Oklahoma<br>Anadarko, Oklahoma | 4-22-96 | X | | | X |
| Kickapoo Tribe of Kansas<br>Horton, Kansas | 4-19-96 | X | | | |
| Kickapoo Tribe of Oklahoma<br>McLoud, Oklahoma | 3-19-96 | X | | | X |
| Kiowa Tribe of Oklahoma<br>Carnegie, Oklahoma | 4-13-96 | X | | | |
| Pawnee Tribe of Oklahoma<br>Pawnee, Oklahoma | 4-18-96 | X | | | X |
| Ponca Tribe of Oklahoma<br>Ponca City, Oklahoma | 1-19-96 | X | | | X |
| Prairie Band of Potawatomi Indians of Kansas<br>Mayetta, Kansas | 2-16-96 | | | | X *** |
| Wichita and Affiliated Tribes<br>Anadarko, Oklahoma | 4-22-96 | X | | | |
| | | | | | |
| **BILLINGS AREA** | | | | | |
| Arapahoe Tribe - Wind River Reservation<br>Fort Washakie, Wyoming | 4-18-96 | X | | | X |

2

Attachment B Part 5 to Boswell Declaration

0795

| TRIBE/ADDRESS | DATE OF ACKNOWL. | ATTESTATIONS | | | |
|---|---|---|---|---|---|
| | | Requested Additional Time | Accepted Account Balance | Disputed Account Balance | Requested Individual Meeting |
| Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation Poplar, Montana | 2-7-96 4-19-96 | X | | X | |
| Blackfeet Tribe Browning, Montana | 4-19-96 | X | | X | |
| Chippewa Cree of the Rocky Boy Reservation Box Elder, Montana | 4-16-96 | | | (*) | |
| Crow Tribe Crow Agency, Montana | 4-19-96 | X | | | X |
| Fort Belknap Community Council Harlem, Montana | 4-18-96 | X | | | |
| Shoshone Tribe - Wind River Reservation Fort Washakie, Wyoming | 4-18-96 | X | | | X |
| | | | | | |
| **EASTERN AREA** | | | | | |
| Coushatta Tribe Elton Louisiana | 4-18-96 | X | | | |
| Eastern Band of Cherokee Indians Cherokee, North Carolina | 4-23-96 | X | | | |
| Mississippi Band of Choctaws Philadelphia, Mississippi | 4-29-96 | X | | | |
| Passamaquoddy Tribe (Pleasant Point) Perry, Maine | 4-19-96 | X | | | |
| Penobscot Indian Nation Old Town, Maine | 4-19-96 | X | | | |
| Seneca Nation of Indians Salamanca, New York | 4-13-96 | X | | | |
| Saint Regis Mohawk Tribe Hogansburg, New York | 4-23-96 | X | | | |
| Wampanoag Tribe of Gay Head Gay Head, Massachusetts | 4-19-96 | X | | | |

3

Attachment B Part 5 to Boswell Declaration                    0796

| TRIBE/ADDRESS | DATE OF ACKNOWL | ATTESTATIONS | | | |
|---|---|---|---|---|---|
| | | Requested Additional Time | Accepted Account Balance | Disputed Account Balance | Requested Individual Meeting |
| **JUNEAU AREA** | | | | | |
| Central Council Tlingkit & Haida Indians Juneau, Alaska | 4-9-96 | X | | | X |
| | | | | | |
| **MINNEAPOLIS AREA** | | | | | |
| Bad River Band of Lake Superior Chippewa Indians Odanah, Wisconsin | 4-19-96 | X | | | X |
| Bois Forte Band of Chippewa Nett Lake, Minnesota | 4-8-96 | | | | X ••• |
| Keweenaw Bay Indian Community Baraga, Michigan | 2-8-96 | X | | | |
| Lower Sioux Indian Community Morton, Minnesota | 4-19-96 | X | | | |
| Red Lake Band of Chippewa Red Lake, Minnesota | 4-8-96 | | | | X ••• |
| | | | | | |
| **MUSKOGEE AREA** | | | | | |
| Cherokee Nation of Oklahoma Tahlequah, Oklahoma | 2-8-96 | X | | | X |
| Chickasaw Nation of Oklahoma Ada, Oklahoma | 4-17-96 | X | | | X |
| Creek Nation of Oklahoma Olmulgee, Oklahoma | 4-19-96 | X | | | X |
| Delaware Tribe of Eastern Oklahoma Bartlesville, Oklahoma | 2-6-96 | X | | | X |
| Peoria Tribe of Oklahoma Miami, Oklahoma | 4-22-96 | X | | | X |
| Osage Nation Pawhuska, Oklahoma | 4-17-96 | X | | | X |

4

| TRIBE/ADDRESS | DATE OF ACKNOWL | ATTESTATIONS | | | |
|---|---|---|---|---|---|
| | | Requested Additional Time | Accepted Account Balance | Disputed Account Balance | Requested Individual Meeting |
| Seminole Nation of Oklahoma<br>Wewoka, Oklahoma | 1-26-96 | X | | | X |
| Seneca-Cayuga Tribe<br>Miami, Oklahoma | 4-30-96 | X | | | X |
| Wyandotte Tribe of Oklahoma<br>Wyandotte, Oklahoma | 2-7-96 | | X | | |
| | | | | | |
| **NAVAJO AREA** | | | | | |
| | | | | | |
| **PHOENIX AREA** | | | | | |
| Chemehuevi Indian Tribe<br>Havasu Lake, California | 2-9-96 | X | | | X |
| Hualapai Tribe<br>Peach Springs, Arizona | 2-8-96 | - X | | | |
| Kaibab Band of Paiute Indians<br>Fredonia, Arizona | 1-30-96 | X | | | X |
| Paiute Indian Tribe of Utah<br>Cedar City, Utah | 4-18-96 | X | | | X |
| | | | | | |
| **PORTLAND AREA** | | | | | |
| Coeur d'Alene Tribe<br>Plummer, Idaho | 4-11-96 | X | | | |
| Confederated Salish & Kootenai Tribes<br>of the Flathead Reservation<br>Pablo, Montana | 4-18-96 | | | X | |
| Kalispel Tribe<br>Usk, Washington | 4-25-96 | X | | | |
| Klamath & Modoc Tribes<br>Chiloquin, Oregon | 2-12-96 | X | | | X |

5

| TRIBE/ADDRESS | DATE OF ACKNOWL. | ATTESTATIONS | | | |
|---|---|---|---|---|---|
| | | Requested Additional Time | Accepted Account Balance | Disputed Account Balance | Requested Individual Meeting |
| Kootenai Tribe of Idaho<br>Bonners Ferry, Idaho | 3-25-96 | X | | | X |
| Muckleshoot Indian Tribe<br>Auburn, Washington | 2-14-96 | X | | | |
| Northwestern Band of Shoshoni<br>Blackfoot, Idaho | 4-19-96 | X | | | X |
| Quinault Tribe<br>Taholah, Washington | 3-1-96 | X | | | X |
| Skokomish Indian Tribe<br>Shelton, Washington | 4-9-96 | X | | | |
| Shoshone Bannock<br>Fort Hall, Idaho | 4-22-96 | X | | | |
| Spokane Tribe of Indians<br>Wellpinit, Washington | 4-23-96 | X | | | |
| | | | | | |
| **SACRAMENTO AREA** | | | | | |
| Bishop Paiute Tribe (Owens Valley Indians of Bishop Community)<br>Bishop, California | 4-18-96 | X | | | |
| Fort Bidwell Indian Community of Paiute Indians<br>Fort Bidwell, California | 4-20-96 | X | | | |
| Hoopa Valley Tribe<br>Hoopa, California | 4-19-96 | X | | | |
| Pit River Tribe<br>Burney, California | 4-19-96 | X | | | |
| Resighini Rancheria Indians<br>Klamath, California | 1-26-96 | X | | | |
| Round Valley Indian Tribes<br>Covelo, California | 3-28-96 | X | | | |
| Soboba Band of Mission Indians<br>San Jacinto, California | 4-24-96 | X | | | |

Attachment B Part 5 to Boswell Declaration

0799

| TRIBE/ADDRESS | DATE OF ACKNOWL | ATTESTATIONS | | | |
|---|---|---|---|---|---|
| | | Requested Additional Time | Accepted Account Balance | Disputed Account Balance | Requested Individual Meeting |
| Yurok Tribe Eureka, California | 4-24-96 | X | | | |
| * No direct communication from the tribes involved. The letter dated 4-16-96 was signed by an attorney on their behalf of Turtle Mountain Band of Chippewa and the Chippewa Cree of the Rocky Boy Reservation (also included the Little Shell Tribe of Chippewa Indians). For the purpose of this interim report these tribes were not counted in this report. | | | | | |
| Total Respondents -   77 | | 69 | 2 | 3 | 33 |
| | | | | | |

**     Includes response from 30 account holders who also requested additional time.

***     Requested only meeting (3)

7

Attachment B Part 5 to Boswell Declaration

0800

**Enclosure XI**

# Account Holders Accepting Balances

04-08-1996 16:54   CENTRAL COUNCIL   5075080570   P.02
APR-18-1996  16:54

**Acknowledgement**
**required by**
**Sec. 304(2) of P.L. 103-412**
(Please Return by April 19, 1996)
Office of Trust Funds Management
505 Marquette N.W., Suite 1000, Albuquerque, NM 87102

Tribe Name  *PUEBLO OF SANTA ANA*

Address  *02 DOVE RD*

*BERNALILLO, NEW MEXICO 87007*

Contact
Person  *LEISA ISOWERS (GIV. OFF.)*          (FAX) *867-3310/EXT. 16*
          (Name/Title)                               (Telephone)

The Tribe has reviewed the Agreed-Upon Procedures and Findings Report resulting from the Tribal Trust Fund Accounts Reconciliation Project for the 20-year period of 1972-1992 and the Summary and Detail of Trust Funds Report for the 3-year period of FY 1993, FY 1994 and FY 1995 provided by the Bureau of Indian Affairs by Letter Dated January 16, 1996 and provides the following attestation as required by the American Indian Trust Fund Management Reform Act of 1994, Public Law 103-412 Section 304.

Complete Appropriate boxes

___   The Tribe requires additional time to review the report and has no response for acceptance or dispute.

[✓]   The Secretary has provided the account holder with as full and complete accounting as possible of the account holder's funds to the earliest possible date, and that the account holder accepts the balance of the following accounts as reconciled by the Secretary;

_____

_____

_____

[ ]   The account holder disputes the balance of the account holder's account as reconciled by the Secretary as explained below;

Account Number _____   Balance $_____   As of Date _____

Explanation of Disputed balance (Provide explanation as an attachment if following space is insufficient or more than one account balance is disputed) _____

_____

_____

_____

[ ]   The Tribe requests an individual meeting with the BIA to discuss their tribal-specific questions or concerns regarding the Reconciliation Report at a Regional Meeting as indicated below.

[ ] Sacramento, March 19-22   [ ] Portland, April 9-12   [ ] Tulsa, June 4-7

[ ] Billings, June 18-21   [ ] Albuquerque, July 16-19

Tribal Official _____   Tribal Administrator
                    Signature - Title

0803

TOTAL P.02

Attachment B Part 5 to Boswell Declaration

RECEIVED

FEB 08 1996

DIA/OTFM
DIV. OF REPORTING/RECONCILIATION

**Acknowledgement required by Sec. 304(2) of P.L. 103-412** (Please Return by April 19, 1996)

**Tribe Name** Wyandotte Tribe of Oklahoma

**Address** PO Box 250

Wyandotte, OK 74370

**Contact Person** Donna Mercer (Name)   (918) 628-2297 Ext. (Telephone)

The Tribe has reviewed the Agreed-Upon Procedures and Findings Report resulting from the Tribal Trust Fund Accounts Reconciliation Project for the 20-year period of 1972-1992 and the Summary and Detail of Trust Funds Report for the 3-year period of FY 1993, FY 1994 and FY 1995 provided by the Bureau of Indian Affairs by Letter Dated January 15, 1996 and provides the following attestation as required by the American Indian Trust Fund Management Reform Act of 1994, Public Law 103-412 Section 304.

**Complete Appropriate boxes**

☐  The Tribe requires additional time to review the report and has no response for acceptance or dispute.

☑  The Secretary has provided the account holder with as full and complete accounting as possible of the account holder's funds to the earliest possible date, and that the account holder accepts the balance of the following accounts as reconciled by the Secretary:

All _____  _____  _____  _____  _____

_____  _____  _____  _____  _____

☐  The account holder disputes the balance of the account holder's account as reconciled by the Secretary as explained below:

Account Number _____  Balance $ _____  As of Date _____

Explanation of Disputed balance (Provide explanation as an attachment if following space is insufficient or more than one account balance is disputed) _____

_____

_____

_____

☐  The Tribe requests an individual meeting with the BIA to discuss their tribal-specific questions or concerns regarding the Reconciliation Report at a Regional Meeting as indicated below.

☐ Phoenix, March 19-22   ☐ Portland, April 9-12   ☐ Tulsa, June 4-7

☐ Nashville, June 18-21   ☐ Albuquerque, July 16-19     0804
  Billing

Tribal Official  Donna Mercer, Actg Dir   2-7-96
              Signature - Title              Date

**Enclosure XII**

Attachment B Part 5 to Boswell Declaration

Attachment B Part 4 to Boswell Declaration

*Acknowledgement*
*required by*
*Sec. 304(2) of P.L. 103-412*
(Please Return by April 19, 1996)

Tribe Name    **Blackfeet Indian Tribe**

Address    **P.O. Box 850**

**Browning, MT 59417**

Contact
Person    **Elouise C. Cobell**    (406 ) 338-2992    Ext
        (Name)                    (Telephone)

The Tribe has reviewed the Agreed-Upon Procedures and Findings Report resulting from the Tribal Trust Fund Accounts Reconciliation Project for the 20-year period of 1972-1992 and the Summary and Detail of Trust Funds Report for the 3-year period of FY 1993, FY 1994 and FY 1995 provided by the Bureau of Indian Affairs by Letter Dated January 15, 1996 and provides the following attestation as required by the American Indian Trust Fund Management Reform Act of 1994, Public Law 103-412 Section 304.

<u>Complete Appropriate boxes</u>

☒    The Tribe requires additional time to review the report and has no response for acceptance or dispute.

☐    The Secretary has provided the account holder with as full and complete accounting as possible of the account holder's funds to the earliest possible date, and that the account holder accepts the balance of the following accounts as reconciled by the Secretary:

_____    _____    _____    _____

_____    _____    _____    _____

☐    The account holder disputes the balance of the account holder's account as reconciled by the Secretary as explained below:

Account Number _____ Balance $_____ As of Date _____

Explanation of Disputed balance (Provide explanation as an attachment if following space is insufficient or more than one account balance is disputed) _____

_____

_____

_____

☐    The Tribe requests an individual meeting with the BIA to discuss their tribal-specific questions or concerns regarding the Reconciliation Report at a Regional Meeting as indicated below.

☐ Phoenix, March 19-22    ☐ Portland, April 9-12    ☐ Tulsa, June 4-7

☐ Nashville, June 18-21    ☐ Albuquerque, July 16-19

0806

Tribal Official _____ Earl OldPerson        4-18-96
            Signature - Title  Chairman        Date

# BLACKFEET NATION
## P.O. BOX 850
## BROWNING, MONTANA 59417
### (406) 338-7179
### FAX 338-7530

EXECUTIVE COMMITTEE

EARL OLD PERSON, CHAIRMAN
TOM THOMPSON, VICE CHAIRMAN
GABE GRANT , SECRETARY
ELAINE GUARDIPEE, TREASURER

BLACKFEET TRIBAL BUSINESS COUNCIL

EARL OLD PERSON
TOM THOMPSON
GABE GRANT
MARLENE BEAR WALTER
CHARLES CONNELLY
GENE DURRAY
GEORGE KICKING WOMAN
ROGER RUNNING CRANE
TED WILLIAMSON

Via Fax:  (505) 248-5741

April 19, 1996

Mr. Joe Christie
Project Manager
Office of Trust Funds Management
505 Marquette NW, Suite 1000
Albuquerque, NM  87102

Dear Mr. Christie:

The Blackfeet Tribe requests additional time to review the account statements and Arthur Andersen report.  Furthermore, we do not agree with the account balances because of the failure to perform or present critical data required to determine acceptance.

The Blackfeet Tribe submits the following concerns for your consideration:

1) As you stated several times at the National meeting in Albuquerque, New Mexico this report and work is not an audit.  You and your contractors have performed a reconstruction of the books and records.  During this process 14% of the records for "non-investment" transactions could not be located.  Investment transactions were primarily excluded from this process.

2) No efforts or work was performed on transactions or balances prior to 1972.

3) Certain procedures could not be performed from 1972 through 1977, because revenue source codes were not maintained in the general ledger system.  One item excluded from the report for this time period is the treasury interest recalculation.

4) The reports are prepared on a cash basis and do not include what should have been earned or collected.  The Bureau does not have an accounts receivable system to determine the appropriate balances.

5) The reports include interest at a stationary interest rate of 4% or 5% rather than what may have been earned. The report does not indicate why investments earned less than the average rate other than "all investments were at rates lower than the average." No interest was paid on interest accounts from 1972 through 1984.

6) The report does not include Tribal IIM accounts or Special Deposit accounts. These accounts are often used as clearing accounts to sort the collections by owner and should be included in the Tribal report.

7) No work was done to determine if the MMS or BLM were collecting or managing the trust resources to obtain maximum revenue and conserve the trust asset. Can you or your contractors state that our Tribe received all of the minerals revenue due us?

   Were the Timber assets managed appropriately? Were any funds from the 10% Bureau administration fee returned to the Bureau?

8) Treasury (bank) was not reconciled to the general ledger except for 1992. The Treasury cannot report the Bureau's cash balance. Therefore, the reconciliation must be performed on an annual basis using transactions posted by the Treasury compared to postings by the Bureau.

In summary, these are our primary concerns. After we have reviewed the reports in greater detail, we will forward additional questions. If you have any questions, please contact Elouise C. Cobell at (406) 338-2992.

Sincerely,

Earl Old Person
Blackfeet Tribal Business Council

# ATTACHMENT C

# TO BOSWELL

# DECLARATION

# PART 1



THE SECRETARY OF THE INTERIOR

WASHINGTON

DEC 1 1 1996

Honorable John McCain
Chairman, Committee on Indian Affairs
United States Senate
Washington, D.C. 20510

Dear Mr. Chairman:

I am pleased to transmit to Congress the Department of the Interior's Proposed Legislative
Options in Response to the Tribal Trust Fund Reconciliation Project Results. This submission is
made as required by Section 304 of the Indian Trust Funds Management Reform Act of 1994 (25
U.S.C. § 4044), which provides that the Secretary shall outline efforts he will undertake to
resolve disputed Tribal trust fund account balances.

This report marks a milestone in the Federal Government's efforts to address longstanding
inadequacies in the management of Tribal trust accounts. Having completed a five-year study of
Tribal account transactions for the period 1972-1992, we now turn to the task of working in
collaboration with Congress and the Tribes to address what to do about our findings. As our
report indicates, we believe a legislative settlement is the most effective, expeditious, economical
and equitable way to go. While this report begins to define our views on what form that
legislation might take, we have more work to do. We will be consulting with Tribes in the
weeks to come to solicit their views on various settlement options, particularly with respect to
claims based on the unreconciled transactions and claims that may arise outside the time period
and scope of the 20-year reconciliation period. We plan to submit our final recommendations in
April 1997.

The issues that Congress, the Tribes and the Administration must confront in constructing a
settlement are not easy; there are no clear answers. Our overriding objective for this settlement
process must be to achieve fairness, recognizing the limitations of what has occurred in the past.
Our efforts must be principled and undertaken in good faith, paying those to whom money is
owed with due regard to our fiduciary obligation, while protecting the taxpayers where little or
no reasonable likelihood of actual loss exists.

The Office of Management and Budget advises that there is no objection to the presentation of
this report from the standpoint of the Administration's program.

We look forward to working with you in developing this settlement proposal. An identical letter
is being sent to Congressman Don Young.

Sincerely

cc:    Honorable Daniel Inouye, Ranking Minority Member
       Honorable Ben Nighthorse Campbell, Chairman-elect

0546



THE SECRETARY OF THE INTERIOR

WASHINGTON

DEC 11 1996

Honorable Don Young
Chairman, Committee on Resources
House of Representatives
Washington, D.C. 20515

Dear Mr. Chairman:

I am pleased to transmit to Congress the Department of the Interior's Proposed Legislative Options in Response to the Tribal Trust Fund Reconciliation Project Results. This submission is made as required by Section 304 of the Indian Trust Funds Management Reform Act of 1994 (25 U.S.C. § 4044), which provides that the Secretary shall outline efforts he will undertake to resolve disputed Tribal trust fund account balances.

This report marks a milestone in the Federal Government's efforts to address longstanding inadequacies in the management of Tribal trust accounts. Having completed a five-year study of Tribal account transactions for the period 1972-1992, we now turn to the task of working in collaboration with Congress and the Tribes to address what to do about our findings. As our report indicates, we believe a legislative settlement is the most effective, expeditious, economical and equitable way to go. While this report begins to define our views on what form that legislation might take, we have more work to do. We will be consulting with Tribes in the weeks to come to solicit their views on various settlement options, particularly with respect to claims based on the unreconciled transactions and claims that may arise outside the time period and scope of the 20-year reconciliation period. We plan to submit our final recommendations in April 1997.

The issues that Congress, the Tribes and the Administration must confront in constructing a settlement are not easy; there are no clear answers. Our overriding objective for this settlement process must be to achieve fairness, recognizing the limitations of what has occurred in the past. Our efforts must be principled and undertaken in good faith, paying those to whom money is owed with due regard to our fiduciary obligation, while protecting the taxpayers where little or no reasonable likelihood of actual loss exists.

The Office of Management and Budget advises that there is no objection to the presentation of this report from the standpoint of the Administration's program.

We look forward to working with you in developing this settlement proposal. An identical letter is being sent to Senator John McCain.

Sincerely,

cc:    Honorable George Miller, Ranking Minority Member



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

DEC 11 1996

Dear Tribal Leader:

Enclosed you will find a document entitled "Proposed Legislative Options in Response to Tribal Trust Fund Reconciliation Project Results" (Options Paper), which the Department submitted to the U.S. Congress today. The Department prepared the Options Paper in response to Section 304 of the American Indian Trust Fund Management Reform Act of 1994, which directs the Secretary of the Interior to provide Congress with a report describing the Tribal trust fund reconciliation and a statement outlining efforts the Secretary will undertake to resolve disputes regarding Tribal trust fund account balances arising from the reconciliation.

Considering the number of disputed account balances, the high cost of litigation, and our desire to resolve any disputes efficiently and fairly, we believe that a legislative resolution of tribal trust fund disputes is in the best interest of all parties. The Options Paper proposes specific approaches to correct accounts where the reconciliation project identified specific errors. For other claims, namely, claims arising from unreconciled transactions (transactions where BIA could not locate supporting documentation in the reconciliation) and claims outside the scope and time frame of the project, the Options Paper discusses concepts for possible resolution, but does not make any specific recommendations. For these claims, we seek the Tribes' ideas before we make any proposals to Congress about how to resolve them.

Because of the complexity of the problem and potential solutions, as well as the potential impact that any proposed solutions may have on the Tribes, we are providing the Options Paper to all Tribes, not only Tribes that have been identified as Trust Account Holders. The Executive Summary provides a good overview of the issues, but we ask that you carefully review the entire Paper. We ask that you provide us with your comments on the concepts discussed in the Options Paper and the attachment, which contains the Special Trustee's Advisory Board's proposals, as well as any other ideas you may have for resolving all disputes involving Tribal trust fund account balances. Please submit three copies of your written comments to: Tribal Trust Fund Comments, U.S. Department of the Interior, Bureau of Indian Affairs, Public Information Office, Attn: Ralph Gonzales, Room 4546, M.S. MIB-4542, 1849 C Street, N.W., Washington, D.C. 20240, **on or before February 12, 1996.**

We also will be convening three regional consultation meetings in the coming month, in Portland, OR; Phoenix, AZ; and Denver, CO, to obtain Tribal input on resolution of Tribal trust fund claims. In addition, we will convene a meeting in Washington, D.C., to provide a further opportunity to consult with you. We will provide additional information on these consultation meetings as soon as it becomes available.

The Department wants to develop an overall solution that will resolve Tribal trust fund disputes fairly and efficiently. Your participation in this consultation process is vital to achieving that end. We will review and consider your comments in the process of developing more specific recommendations, and intend to submit them in a follow-up report to Congress in April 1997. Your participation is greatly appreciated.

Sincerely,

Ada E. Deer

Ada E. Deer
Assistant Secretary - Indian Affairs

# NEWS

## U.S. DEPARTMENT OF THE INTERIOR

**OFFICE OF THE SECRETARY**

**FOR IMMEDIATE RELEASE**
December 11, 1996

Contact Thomas W. Sweeney (202) 219-4150
Stephanie Hanna (202) 208-3171

## INTERIOR DEPARTMENT RECOMMENDS LEGISLATIVE OPTIONS TO RESOLVE TRIBAL TRUST FUND BALANCE DISPUTES

The Department of the Interior has presented to Congress an initial report that outlines proposed legislative settlement options for resolving disputed balances in Tribal trust accounts. The report and recommendations are in response to a five-year study by a national accounting firm which examined billions of dollars in Tribal trust funds transactions handled by the Bureau of Indian Affairs for a 20-year period beginning in 1972.

"We are committed to resolving these issues in a manner that is fair to the Tribes and fair to the public, and that does justice," said Secretary of the Interior Bruce Babbitt. "Where the government has been found to owe money, we will pay it, with interest."

Where the BIA was found to have made errors to the detriment of a Tribe, the Department proposes that funds be restored to the Tribe, with interest. Where a Tribe may owe the government money after netting all errors relating to that Tribe's account, the amount would be forgiven. For claims where a Tribe disputes a transaction based on the Tribe's own documentation, or for claims where a Tribe disputes the BIA's documentation used to reconcile a transaction, those claims would be addressed through mediation.

The overriding objective of these proposed legislative settlement options is to achieve fairness and justice with respect to Tribal trust account balances. The Interior Department was guided by the following objectives in formulating its legislative proposals:

- achieve a settlement that is fair

- achieve the most resource-efficient settlement of claims (in terms of conserving federal government and Tribal time, money, and staff, including attorneys' and expert witness fees)

- encourage settlement by providing incentives to settle and by providing disincentives to litigation

**-more-**

- use the most informal settlement processes available rather than litigation to encourage Tribal participation

- obtain funding for the settlement without reducing appropriations for the BIA budget and Tribal programs

- achieve final agreement on account balances through September 30, 1995 as required in the Act, as an agreed-upon starting point for the future

The study, which was completed in 1995 and undertaken for the BIA and by the national accounting firm Arthur Andersen, LLP, determined that 86 percent - or $15.3 billion - of the $17.7 billion the BIA handled in Tribal trust funds non-investment transactions from July 1972 to September 1992 could be reconciled, i.e., supporting documents could be located. Of the reconciled transactions, Arthur Andersen detected an error rate of only .01%. Other components of the project assessed the accuracy of other transactions, the reasonableness of investments, and the propriety of income collected. Overall, slightly less than half of the errors detected were to the detriment of the Tribes and the balance were to the benefit of the Tribes.

There were also transactions in the amount of $2.4 billion that could not be reconciled, meaning that during the course of the study, the BIA was not able to locate documentation to support the accuracy of the transaction as reflected in the BIA's books (known as the general ledger). The report indicates that with respect to three quarters of this amount, there is relatively little risk that a Tribe did not have use of its own money (although the funds conceivably could have been credited to the wrong account of that Tribe). As a result, settlement options with regard to the unreconciled transactions will focus on the remaining $575 million in transactions. Options to address these transactions, as well as any other claims that Tribes may have involving transactions outside the scope of the 20-year study, will be the focus of consultation efforts by the Department with the Tribes.

The Interior Department report was submitted by Secretary Babbitt to the Senate Committee on Indian Affairs and the House Committee on Natural Resources. The Department will be consulting with Tribes on the options contained in the report, including meetings in January in Portland, Oregon; Denver, Colorado; Phoenix, Arizona; and Washington, D.C. It will submit further proposals to Congress for settling Tribal trust fund account balances in April 1997. In addition, early next spring, the Special Trustee, appointed by the President to reform the Department's trust funds management systems, will submit his strategic plan to the Secretary and Congress for bringing the trust accounting and management functions up to industry standards.

**-DOI-**

News releases may be downloaded from the DOI Homepage at URL http://www.usgs.gov/doi/bia

## PROPOSED LEGISLATIVE OPTIONS IN RESPONSE TO TRIBAL TRUST FUND RECONCILIATION PROJECT RESULTS

### I. EXECUTIVE SUMMARY

For more than a century, the federal government has been the trustee of funds for Indian Tribes and individual Indians. Currently, the Secretary of the Interior, through the Office of the Special Trustee (OST), maintains approximately 1,500 accounts for 280 Tribes with assets in excess of $2.5 billion. Each year, more than $802 million passes through the Tribal trust funds system. In addition, the Secretary, through the OST, maintains over 300,000 individual Indian money (IIM) trust fund accounts with a current balance of $450 million. Each year, $300 million passes through the IIM system.

Concerns have been expressed for a number of years in Indian country, various quarters of the Executive branch, the General Accounting Office and Congress that the trust funds management and accounting systems have not kept pace with technological developments in the private sector. Questions have been raised about whether assets were being properly managed and funds accounted for. There have been calls for accountings of both Tribal and IIM funds and for additional investment by the federal government to upgrade its systems.

In response to these concerns and the direction of Congress, the Department contracted with Arthur Andersen, LLP to perform a reconciliation of the Tribal trust fund accounts. The five-year project covered transactions for the twenty-year period from 1972 to 1992, and cost $21 million to complete. The objective of the project was to reconstruct tribal accounts to the extent possible, to provide some assurance of the accuracy of transactions, reasonableness of investment earnings, and propriety of income collected. The results of the reconciliation project and the Department's approach to developing a settlement of disputed account balances are described in more detail below. In brief, the basic reconciliation portion of the project examined $17.7 billion in non-investment transactions, of which $15.3 billion -- about 86 percent -- were reconciled. For the reconciled transactions, approximately $1.87 million in transactions were in error -- an error rate of .01 percent.

The remaining 14 percent of transactions -- amounting to $2.4 billion --

were deemed by Arthur Andersen to be "unreconciled," meaning that the Office of Trust Funds Management (OTFM) was unable to locate source documents to verify the accuracy of the general ledger entry for the transactions. For example, the general ledger might list a receipt of $1,000 to a Tribal account in connection with a mineral lease of trust property; however the underlying documentation necessary to verify its accuracy could not be located with the time and resources available. While this does not mean that the $2.4 billion is lost or missing, it does mean that the poor condition of the records and systems did not allow the federal government to conduct an audit or provide the level of assurance to account holders that should be expected.

In addition, almost half of the unreconciled $2.4 billion related to transactions involving receipt of funds by the government on behalf of a Tribal account from third parties. An additional half billion dollars of unreconciled transactions involved transfers between different accounts of the same Tribe. With respect to these two categories of transactions, where the receipts or transfers to a particular Tribe's accounts were posted to the general ledger, it is likely that the Tribe had use of the funds even if it they were posted to the wrong account of that Tribe. Deducting these amounts from the $2.4 billion in unreconciled transactions, and based on other supplemental data, we believe the legislative settlement options to address unreconciled transactions should focus on the remaining $575.1 million (excluding interest).

This report reflects a milestone in the federal government's efforts to address these longstanding inadequacies. As described more fully below, the report contains our preliminary proposals for settling the disputed balances in the Tribal trust fund accounts based on the results of the five-year, $21 million reconciliation project. These concepts are provided in accord with the American Indian Trust Fund Management Reform Act of 1994, which provides that the Secretary shall outline efforts he will undertake to resolve disputed Tribal trust fund account balances. In addition, pursuant to the Act, the Special Trustee is making recommendations to implement improvements to trust management policies, practices, procedures and systems Department-wide. Some reforms already have been instituted, including conversion to a core trust accounting and investment system for tribal funds, publication of standardized procedures for the management of IIM accounting operations and reconciling all cash activity on a daily basis for both Tribal and IIM accounts. OTFM has published regulations providing procedures for Tribes to withdraw and manage their own funds should they so

2

choose. Between 1990 and the present, staffing of the OTFM has been increased five fold. Finally, the Administration has included in its budgets for 1996 and 1997, and will include in the outyears, funding to implement trust reform efforts.

We believe that legislation ultimately will be required to provide a settlement that will be fair to account holders. This report contains the Department's specific recommendations for addressing claims based on transactions where documentation indicates that errors were made. We refer to these as "Type I claims," and we recommend that where errors occurred to the detriment of Tribes, the government reimburse the account with simple interest computed at the Tribal benchmark rate. With respect to the Type 1 claims where errors inured to the benefit of the Tribe, the Department recommends netting those amounts against any amounts owed to the Tribe, and forgiving any remaining amount owed by the Tribe after netting is applied.

Where Tribes have additional documents to contest their account balance (we refer to these as "Type 2 claims"), we recommend that Tribes have an opportunity to present those claims to the Department. In the event the Department disagrees with the Tribe's position, the Tribe may request that the matter be submitted to a mediator who would be empowered to recommend a resolution of the claim.

There are two additional types of claims for which consultation with Tribes is necessary before we can develop any settlement recommendations. First, there are claims based on the $2.4 billion of unreconciled transactions, which we refer to as "Type 3 claims." Although we may be able to locate some documents, it is not possible to determine whether the Tribes suffered any money losses as a result of the Bureau of Indian Affair's (BIA) management and accounting practices. We believe that resolution of these questions by litigation would be time-consuming, expensive and not in the interest of either the government or the Tribes. Accordingly, we are soliciting Tribal input on how best to address these claims in settlement.

Second, some Tribal representatives assert that they are entitled to some form of redress for management and accounting practices involving transactions outside the scope and duration of the 20-year study. They argue that they will be unable to agree on a final account balance unless these issues are addressed in the settlement process.

3

The report outlines several possible "total" settlement options as a point of departure for our further discussions on these broader claims and the Type 3 claims. While the government does not endorse any of these specific proposals - and those described in this report by no means constitute all of the possible approaches - we nonetheless would like to consider Tribal views with respect to these and other proposals.

Our overriding objective for this settlement process is to achieve fairness and justice with respect to Tribal trust account balances. We are committed to doing the best job we can, recognizing the limitations of what has occurred in the past and the available information, to restore funds to Tribal trust accounts that have suffered losses as a result of inadequacies in the Department's management and accounting systems. The effort must be principled and undertaken in good faith, paying those to whom money is owed, with due regard to fiduciary obligations, while, at the same time, protecting the public fisc where little or no reasonable likelihood of loss exists.

We considered the following objectives in formulating the proposals and options for the proposed legislation:

- achieve a settlement that is fair

- achieve the most resource-efficient settlement of claims (in terms of conserving federal government and Tribal time, money, and staff, including attorneys' and expert witness fees)

- encourage settlement by providing incentives to settle and by providing disincentives to litigation

- use the most informal settlement processes available rather than litigation to encourage Tribal participation

- obtain funding for the settlement without reducing appropriations for the BIA budget and Tribal programs

- achieve final agreement on account balances through September 30, 1995, as required in the Act, as an agreed-upon starting point for the future

4

When the consultation process is complete, the Department will submit a final set of recommendations to Congress. Funding sources also will need to be identified. In order to provide time for consultation with Tribes, we plan to submit those recommendations to Congress in April 1997.

## II. BACKGROUND

### A. Overview

The Secretary of the Interior has the responsibility to ensure the proper accounting, investment and financial reporting of over 300,000 Indian Tribal and individual Indian money (IIM) trust fund accounts. The authority for management of Indian trust funds was delegated to the Assistant Secretary, Indian Affairs, and re-delegated to the BIA. Since February 1996, this authority has been delegated to the Office of the Special Trustee (OST) through the transfer of authority over the Office of Trust Funds Management (OTFM).

The American Indian Trust Fund Management Reform Act of 1994 (the Act) directs the Secretary of the Interior to prepare a report to Congress by May 31, 1996, to include a description of the procedures used for reconciliation of the Tribal trust fund accounts and a statement outlining efforts the Secretary will undertake to resolve disputes regarding Tribal account balances.[1] The reconciliation was carried out by the Bureau of Indian Affairs (BIA) in an effort called the Tribal Trust Funds Reconciliation Project (the Project). This report identifies for Congress the general approach the Secretary is contemplating for resolving account balance disputes and includes specific recommendations to resolve known errors. The Department will consult with the Tribes by circulating this report to Tribal account holders and seeking their comments on the various approaches to settlement and to the specific questions raised herein.

---

[1] Because most Tribes did not have sufficient time to review their reconciliation reports and inform the Department whether they disputed their account balances (known as "attestation responses") as of the May 31 deadline, the Secretary submitted to Congress an interim report describing the reconciliation procedures on May 31, and set a deadline of September 27, 1996, for submission of attestation responses. With the extension of the deadline for submitting attestation responses, the Secretary indicated that he would submit a supplemental report to Congress, including proposed legislative options to address disputed account balances later in the year.

5

This analysis incorporates many of the settlement recommendations of the Special Trustee's Advisory Board, which was created by Section 306 of the Act (hereinafter the "Advisory Board"). The Advisory Board's settlement proposals were submitted to the Secretary on September 24, 1996, and were the result of a series of consultations between the Special Trustee, his Advisory Board and several Tribes. As requested by the Special Trustee, the Advisory Board's recommendations are appended to this paper. In our recommendations, we describe where we agree and where we disagree with the Advisory Board's recommendations.

## B.  Tribal Accounts Versus Individual Indian Accounts

There are two general types of accounts which are administered by the OST.[2] First, there are Tribal trust fund accounts maintained on behalf of 301 account holders. Second, there are IIM accounts, maintained on behalf of over 300,000 individual Indians. The options outlined in this analysis address approaches for resolving account balances of Tribal accounts only, because Section 304 of the Act requires a report on only those accounts. While this report does not address resolution of IIM account balances, on June 10, 1996, a class action lawsuit, captioned Cobell v. Babbitt, was filed in U.S. District Court on behalf of the IIM account holders. Settlement discussions are proceeding between attorneys for the plaintiffs and the United States to attempt to resolve claims by the IIM account holders. Unlike the Tribal trust accounts, no historical reconciliation of the IIM accounts has been performed because of the inordinately high costs -- estimated in 1992 to be in the $108 million to $281 million range -- of conducting such a reconciliation. The settlement process in the litigation, if successful, may provide a more efficient means of estimating liability, if any.[3] Some components

---

[2]  All Indian trust fund accounts were historically administered by the Bureau of Indian Affairs ("BIA"). In February 1996, the Secretary re-delegated the responsibility for management of Indian trust fund accounts to the Office of the Special Trustee, through the transfer of authority over the Office of Trust Funds Management (OTFM).

[3]  The Advisory Board selected the $281 million amount simply because it was the upper end of an early estimate of Arthur Andersen L.L.P., for undertaking a reconciliation of the IIM accounts similar to the reconciliation already conducted for tribal accounts. The Advisory Board reasoned that rather than spending this sum "to produce what is likely to be an unsatisfactory result," that amount should be "used to compensate IIM account beneficiaries for any harm, damage or loss arising out of the government's inability to provide an accurate and timely accounting to IIM trust account holders." In our view, there is no demonstrable relationship between the "harm, damage or loss" that IIM account holders may have suffered and the cost to produce a reconciliation of the IIM accounts. Moreover, the Advisory Board's recommendations do not make

6

of the Tribal settlement legislation outlined in this report may also be appropriate for settling components of the IIM claims as well at issue in the Cobell litigation.[4]

## C. Legislation Versus Litigation

We believe that legislation rather than litigation would provide an orderly and efficient mechanism for resolution of the disputes over account balances arising out of the Project. The proposed legislative approach described here responds to the statutory directive that the Secretary outline efforts to resolve such disputes in his report to Congress. It would address only those claims arising from the Project, not individual Indian accounts or other funds. Case-by-case litigation would be wasteful, expensive and time-consuming. Given the inadequacy of the available records and the historical deficiencies in BIA's accounting and management systems, additional reconciliation efforts that would accompany litigation would, at best, produce only marginally more refined data. Moreover, some elements of a settlement policy, including forgiveness and offset of claims, might be desirable and legislation could define the parameters of the Department's authority to implement them. Legislation also could address funding sources for the settlement.

## D. Past Versus Future

This report addresses options for a legislative resolution of problems from the past -- the Tribal trust fund account balance disputes. On a separate track, the Secretary and the Congress, through the efforts of the Special Trustee, are evaluating approaches for comprehensive reform of the Department's management of trust systems for the future. The Special Trustee has completed an assessment of trust management policies, procedures, practices and systems as they apply to both IIM and Tribal accounts. He has produced a conceptual strategic plan to acquire and institutionalize new trust accounting and management systems. Through additional analysis and consultation with both Tribal and federal interests,

---

clear how IIM account holders would agree that the payment was in full satisfaction of their individual claims.

[4] The settlement recommendations of the Advisory Board include a proposal for settling IIM accounts which was developed prior to the filing of the Cobell litigation. The Advisory Board proposed, among other things, a payment of $281 million to be deposited in the IIM Investment Pool and subsequently invested for the benefit of IIM account holders. The payment would be a permanent fund, generating interest for IIM account holders, and also would serve as a reserve to pay claims successfully brought by individual account holders.

7

the conceptual plan will be transformed into a strategic plan as required by the Act and submitted to Congress. The President's annual budget requests for the Department include funds earmarked for implementing the Special Trustee's strategic plan.[5]

### E.    Structure of this Report

Part III of this report describes in detail the Department's role with respect to Tribal and IIM trust funds, deficiencies in the records concerning trust accounts and balances, and the Project which studied Tribal trust fund investment transactions for a 20-year period.

Part IV presents some options for settling Tribal claims based on errors, incomplete documentation or inaccurate accounting of trust funds during the reconciliation period, 1972-1992.[6] As noted, the Department needs to consult further with Tribes and with others in the Administration to develop an appropriate settlement proposal. This part of the analysis does not address issues relating to the individual Indian money accounts held by the United States on behalf of individual Indians or Tribal claims outside the scope of the Project.

Part V outlines options for Congress to structure any future litigation concerning Tribal claims based on alleged trust fund losses. While the idea behind the settlement proposal being developed by the Department is to encourage settlement through means other than litigation, we also envision that it will be necessary to provide those Tribes that choose not to settle a fair process to litigate their claims.

Part VI presents the concept of a "total settlement" that would resolve claims

---

[5] The Advisory Board proposed $147 million for implementation of the strategic plan as a component of a joint settlement for IIM and Tribal account holders. This amount is based on preliminary estimates, and includes approximately $20 million in annual operating costs over five years, and $47 million of one-time equipment and infrastructure costs. The Department proposes to continue to request funding of implementation costs as part of its annual budgets. The enacted FY 1997 Interior and Related Agencies Appropriations Act included $15,726,000 for implementation of the Special Trustee's strategic plan, including funding for immediate office staffing and the Advisory Board. Future Departmental requests will be based on the final approved strategic plan being developed by the Special Trustee in 1997.

[6] There is potential overlap between settlement options for the Tribal claims and the claims in the Cobell litigation. Certainly, Congress could consider a broader settlement package which addresses both Tribal and IIM claims.

8

beyond the scope and time frame of the Project and any claims that may relate to historical mismanagement of trust assets. Undertaking additional reconciliation efforts or litigating these claims could be particularly expensive. With the Tribes and Congress, and after further consultation within the Administration, we would like to explore possibilities for legislative resolutions that would resolve disputes on behalf of all or virtually all Tribes, and that would provide final account balances for Tribal trust funds as of September 30, 1995.

At this stage, the Department is merely exploring whether a "total settlement" is warranted and whether it would be fair to all concerned. We do not endorse at this time the concept of a "total settlement" or any of the specific alternatives presented for comment. As a result of additional consultation, other ideas could emerge which might produce a more equitable result for all involved. We also have tried to identify important questions about these options; many of these questions do not have obvious or easy answers.

## III. RECONCILIATION EFFORTS FOR TRIBAL TRUST FUND ACCOUNTS

### A. The Project

Over the past decade, operational reviews and financial audits have identified weaknesses in the control and oversight of Indian trust funds. A primary concern was the failure to reconcile the trust fund accounts regularly and to assure that account balances were accurate. Consequently, in 1988, 1989 and 1990, Congress directed BIA to take steps to reconcile Indian trust fund accounts as accurately as possible back to the earliest possible date. The FY 1990 appropriations language further required that "the results of such reconciliation [be] certified by an independent party as the most complete reconciliation of such funds as possible."

Pursuant to these directives, BIA commenced its Project in 1990. In the fall of 1990, an ad hoc Tribal advisory group[7] worked in conjunction with the BIA, the General Accounting Office (GAO) and the Department's Inspector General to develop a request for proposal for the reconciliation contract. In May 1991, the contract was awarded to a national accounting firm, Arthur Andersen, LLP.

---

[7] The ad hoc group constituted itself as the Intertribal Monitoring Association (ITMA).

9

Phase I of the contract was intended to determine what records were available, what procedures would be necessary, and the cost of a complete reconciliation for both Tribal trust and IIM accounts. This work was performed from June 1991 through January 1992. The results of Phase I disclosed that not all supporting documents could be located, but to the extent they could be located, they could be examined, and that some BIA trust policies, procedures, and systems had deficiencies. As a result, it was agreed, through discussions involving the Department, the Office of Management and Budget (OMB), Congress, and the Intertribal Monitoring Association (ITMA), that a conventional financial audit was not likely to produce meaningful results.

In view of this, the Department of the Interior, in consultation with OMB and ITMA, considered alternative methodologies and approaches with the goal of producing as accurate an accounting as practicable. As a result, the BIA modified the Arthur Andersen contract to incorporate the methodological procedures agreed upon by the Department, OMB and Tribal representatives. While the procedures do not constitute an audit in accordance with generally accepted auditing standards, they were deemed to be the best available approach and were therefore used to reconcile the Tribal trust fund accounts for the period July 1, 1972 through September 30, 1992. The year 1972 was selected as the starting point because it coincided with the date on which BIA assumed sole responsibility for Tribal trust fund accounting and recordkeeping to the account level. Prior to that time, the Department of the Treasury had accounts for individual Tribes listed within its systems, although BIA may have reported the amounts to be placed in the accounts (in contrast to the current practice where there is one combined account for all Tribes at Treasury).

In accord with the Congressional mandate that the Tribal trust fund reconciliation be certified by an independent third party, the BIA awarded a contract to perform the certification to Coopers and Lybrand in September 1993. Due to a projected cost that far exceeded available resources, BIA terminated the contract in October 1995, before the certification was completed. At BIA's request, Coopers and Lybrand provided a close-out letter summarizing the work performed prior to termination. In the letter, Coopers stated that it noted errors in certain aspects of Arthur Andersen's reconciliation work under the BIA contract, and that some, but not all, of these errors were reported to Arthur Andersen and BIA. The letter further stated, however, that no conclusions could be drawn from the preliminary information reported because Coopers did not

10

complete the certification work. Arthur Andersen investigated and cleared the reported errors and a record of these activities are on file at Arthur Andersen's office.

In 1994, while the Arthur Andersen reconciliation efforts were ongoing, Congress passed the American Indian Trust Fund Management Reform Act of 1994, 25 U.S.C. §§ 4001-4061, which established the Office of the Special Trustee for American Indians. Under this legislation, the Special Trustee is responsible for oversight, reform, and coordination of the policies, procedures, systems and practices used by various Departmental agencies in managing Indian trust assets.[8] The statute required that the Secretary transmit to Congress by May 31, 1996, a report that describes the methodology and results of the trust fund reconciliation process, includes Tribal attestations as to disputed account balances, and outlines efforts the Secretary will undertake to resolve such disputes. As noted, that report was submitted to Congress with a commitment to provide this supplemental report on the Secretary's recommendations for resolving account balance disputes.

In January 1996, the Department released a report to 301 Tribal trust fund account holders summarizing the results of its Project. The agreed-upon procedures used in the Project were intended to accomplish the following: (1) verify that non-investment financial transactions posted to the BIA's official accounting records are in agreement with supporting financial source documents; (2) assess the accuracy of investment income posted to Tribal accounts; (3) recalculate the U.S. Treasury interest earnings; (4) reconcile general ledger transactions with U.S. Treasury transactions; (5) verify that financial transactions posted to the accounting records are in agreement with the originating lease or sale agreements, permits, or contract terms (not completed for all transactions); and (6) determine the timeliness of the deposit of receipts (for informational purposes only). The Project report indicates that of the $17.7 billion (absolute value)[9] in non-investment transactions, $15.3 billion of transactions were reconciled, while $2.4 billion (absolute value) were unreconciled (that is, as of the time the Project was completed, financial source documents could not be located to support the

---

[8] While Title III of the Act vests this responsibility in the Special Trustee, the Act further provides that the Special Trustee "shall report directly to the Secretary." Section 302(a), 25 U.S.C. § 4042(a).

[9] The absolute value of transactions means disregarding the positive and negative values of the transactions.

11

accuracy of these transactions as entered on BIA's general ledger). For example, the general ledger might show a receipt of $1,000 to a Tribal account in connection with a mineral lease of trust property; however, the underlying documentation necessary to verify its accuracy could not be located. (See pages 21-22 for a more complete description of these unreconciled transactions).

The reconciliation procedures and the proposed adjustments to account balances are detailed in the Project report, and were explained to the Tribes at a national meeting on February 14 and 15 in Albuquerque, New Mexico. More detailed individual consultation was provided to account holders at a series of regional meetings held through July 1996. In August 1996, the Special Trustee sent out a request for all Tribes to submit attestations as to acceptance or dispute of their account balances on or before September 27, 1996.

As of November 1, 1996, the OST received attestation responses from 79 of 301 Tribal trust fund account holders. 33 Tribal account holders accepted the account balances as reflected in the Project, and 46 account holders disputed the balance. 49 account holders requested additional time for their response. 173 account holders filed no attestation response. Among the reasons given by those account holders which disputed their account balances were that the reconciliation procedures were inadequate, that they needed additional time, and that the records were inadequate. Other comments were more specific in nature and did not fall into one of these categories. Some account holders identified more than one reason for disputing their account balances.

Despite five years of effort and the expenditure of $21 million, the Project provides a less than complete accounting of the state of the Tribal trust funds. The inadequacy of the Department's trust management systems, policies, procedures and practices, the condition of the trust records, the fact that a substantial number of documents relating to the 20-year period could not be located as of the time the Project was completed, and funding constraints all contributed to the Department's inability to verify the accuracy of Tribal account balances.

The Project did identify specific errors which resulted in underpayments to Tribal trust fund account holders. These must be corrected and options to do so are outlined below. The Project also uncovered errors which resulted in overpayments to Tribes. Whether and how to recover these amounts is also discussed below. The most difficult issues, however, relate to (1) the unreconciled

transactions where there were no records located to support $2.4 billion of non-investment transactions for the 20-year period of the Project; and (2) those transactions outside the scope and period of time covered by the Project.

B.    <u>Types of Claims</u>

For purposes of this analysis, the three basic types of potential claims that may arise from the Project results are referred to as Type 1, Type 2, and Type 3 claims:

- Type 1 claims are based on errors specifically identified in the Project for which there was a documented loss to the Tribe or the government. Type 1 claims involve two types of circumstances; either funds are owed by the government to a Tribal account, or the Tribal account was overpaid and it owes funds to the government.

- Type 2 claims are those where a Tribe disputes its account balance from the Project based on additional documentation produced by the Tribe. Because no Tribes responded to a letter sent to them in January 1994, requesting any records in their possession relating to transactions on the general ledger, there may be few Type 2 claims. Nevertheless, there is a need to offer a means for addressing these claims, should they arise.

- Type 3 claims arise from unreconciled transactions, where neither the Tribe nor BIA could locate source documentation to support the account transactions or to support a conclusion that those transactions are in error. This is by far the largest category.

There also are claims arising from transactions that were outside the scope of the Project, or outside the 20-year period covered by the Project. It is impossible to estimate the amount of those claims or to identify the specific Tribe or account to which money may be owed. Should Congress conclude that it wants to address these types of claims, this analysis outlines several different approaches for doing so, in the form of "total settlement" options.

## IV. <u>OPTIONS FOR SETTLEMENT OF SPECIFIC CLAIMS</u>

13

0563

# ATTACHMENT C

# TO BOSWELL

# DECLARATION

# PART 2

## A.    Detailed Discussion of Options for Legislation

We are considering the following framework for legislation and options to settle the three types of Tribal claims:

### 1.    Payment of Type 1 Claims

● _Payment of All Claims._  Type 1 claims are those where the Arthur Andersen Project report indicates that there has been an error.  Because the Department has an obligation to correct its known errors, Tribes would be paid in full without regard to the Tribe's willingness to settle any other claims.  The Department recommends that the government pay the Tribe any principal amounts owed, plus interest as defined below.

Three types of claims fall within this category.  First, of the amounts reconciled in the Basic Reconciliation portion of the Project, approximately $1.87 million in transactions (excluding interest) were found to be in error -- an error rate of about .01 percent.  An additional $25.2 million (absolute value) in proposed adjustments were identified in the entire Project.[10]  These known errors include both underpayments and overpayments to Tribal trust fund account holders.

Second, some Tribes claim that interest is owed due to the lag time between when funds were paid to the BIA and when they were deposited.  While we agree that interest should be paid, there is a question as to when interest should begin to accrue.  For example, interest could begin to accrue after 1-3 days, 4-6 days, 7-10 days, 11-30 days or over 30 days.  The Department believes it is entitled to a commercially reasonable time to deposit checks in Tribal accounts (due to mailing, processing, check clearance, etc.), but that time should be limited and Tribes should receive interest only after that period has passed.  We recommend that interest be paid to Tribes beginning after six (6) days, whether or not the funds have actually been deposited.[11]  In addition, there are interest claims relating to lag time from when money was received by the Minerals Management Service (MMS)

---

[10]  The $1.87 million does not include adjustments of less than $1,000 that were accepted without further research, which are referred to as "scoped adjustments."  These scoped adjustments would also be considered known errors and would be paid as Type 1 claims.

[11]  Because reservations tend to be located in isolated and remote areas, reliance on mailing is typical.  During the 1972-1992 reconciliation period, approximately one-third of the payments were made electronically.

14

and when it was actually credited to the accounts by BIA. The Department believes that interest should be paid on these claims from the date the funds were received by MMS. If Congress adopts this policy for the reconciliation period, the government would owe $1.7 million in back interest [12]

The third type of Type 1 claims involve so-called "rollover amounts." These amounts result from end-of-accounting period balances in Tribal trust accounts in BIA's general ledger that do not always equal the balance recorded in the general ledger for the beginning of the subsequent accounting period. The Advisory Board proposes to forgive $26.1 million in principal plus interest in cases where an account balance increased, and to pay Tribes $17.5 million in principal plus interest where a Tribe's account balance decreased. These amounts assume netting of rollover increases against rollover decreases at the account level; and no netting of rollover adjustments against known errors.

These rollover discrepancies result from accounting entries that change the beginning balance of a Tribe's account for an accounting period. Although a transaction history does not show up in the BIA general ledger, the entries should appear in the BIA's monthly journal of transactions or other supporting documents. Because of time constraints imposed on the Project, research necessary to support these transactions could not be performed prior to the issuance of the final reconciliation reports to the Tribes.

The OST has recently begun an effort to research rollovers where a tribe's balance decreased from one accounting period to the next. To date, $5.2 in rollover decreases have been verified by the OST staff. OST will continue this research effort. To the extent that the Department is unable to reconcile rollover decreases, the Department agrees with the Advisory Board's proposal to pay Tribes principal plus interest in cases where account balances have decreased.[13] However, the Department proposes that these amounts be netted against known errors inuring to a Tribe's benefit.[14]

---

[12] $1.4 million is attributable to the BIA deposits and $.3 million is attributable to the MMS deposits.

[13] It should be noted that while the Department is proposing that unexplained rollover decreases be paid to Tribes, it has not been determined that an error, in fact, occurred in these instances.

[14] The Department does not agree with the Advisory Board's classification of rollover increases as amounts that need to be "forgiven." In order to determine whether rollover increases actually represent

- <u>Interest policy.</u>  An issue that must be resolved is how interest should be paid on amounts owed to Tribes.  There are two considerations in that regard: whether simple or compound interest should be paid, and what rate of interest should be used.

The Advisory Board proposes that interest payments be determined by computing compound interest at a blended Tribal benchmark rate.[15]   While the Tribal benchmark rate is skewed somewhat on the high side by a number of long-term instruments held in one account, it nevertheless has the advantage of being easily determined.   Against this is balanced the fact that the compound rate is greater than what a Tribe could likely recover in litigation; courts generally limit the interest on government trust funds to simple interest on principal only.[16] Accordingly, the Department recommends that simple -- not compound -- interest be paid at the blended Tribal benchmark rate.

- <u>Forgiveness and netting policy.</u>  The Project results indicate that in some cases, BIA errors resulted in overpayments or erroneous payments to a Tribe or to a particular Tribal account.   As a result, some Tribes owe the government money.   When interest is included, the amounts owed by Tribes to the federal government can be significant, and repayment would be a particular burden for Tribes with limited financial resources.   The Department has considered whether it should recommend to Congress that some or all of the amounts owed by Tribes to the government should be forgiven.   Although a policy of forgiving amounts

---

overpayments to Tribes, it would be necessary to perform research on the underlying transactions recorded in BIA's monthly journal of transactions or other supporting documents.  Absent that work being performed, it cannot be concluded that these rollover increases represent overpayments to Tribes.  However, to ensure that the issue of rollover increases is resolved by the settlement, the Department contemplates that settlement legislation will provide that unreconciled rollover increases to a Tribe's accounts be deemed accurate transactions.

[15]  The Tribal benchmark rate is the average annual yield of invested Tribal trust funds.

[16]  It is well settled that the Tribal owner of interest-bearing trust funds that are improperly disbursed by the federal government can recover only the amounts disbursed plus simple interest annually thereon (at the rate prescribed by statute to be paid on these funds).  <u>See</u>, <u>e.g.</u>, <u>United States v. Gila River Pima-Maricopa Indian Community</u>, 586 F.2d 209, 216 (Ct. Cl. 1978); <u>White Mountain Apache Tribe of Arizona v. United States</u>, 20 Cl. Ct. 371, 377 (1990).  And, where a statute or treaty provides for the payment of simple interest, compound interest is not recoverable.  <u>United States v. Mescalero Apache Tribe</u>, 518 F.2d 1309, 1331-33 (Ct. Cl. 1975), <u>cert. denied</u>, 425 U.S. 911 (1976).  In contrast, compound interest is frequently awarded in private sector litigation.

16

0566

owed from Tribes to the United States would deny the government potential revenue, forgiveness of a debt does not require the further expenditure of funds. Congressional authorization would define the parameters of the Department's authority to forgive the repayment of obligations due the government.

The Advisory Board believes that amounts owed by Tribes to the government as a result of errors should be forgiven, for the following reasons:

A.   These are known and admitted errors of the U.S. Government. Even though the Tribes apparently benefitted by these overpayments, they should not be asked to repay amounts which arose out of the U.S. Government's inability to provide an accurate and timely accounting.

B.   These admitted errors were made over a period of twenty years. The usual and customary standards for clearing similar exception items in the private sector is one accounting period, usually ninety days or less.[17]

C.   The overpayments were identified for reconciled items only. Had a full accounting been possible for the $2.4 billion in unreconciled non-investment transactions, or had a full accounting been possible verifying financial transaction to source documents (such as land leases and contracts), or had the Project covered different time periods, the net result for a particular Tribe may have been different.

D.   Tribes should not be asked to reimburse the government unless the government can document that no subsequent correcting entry was made.

There are various forms that a forgiveness policy could take. For example, amounts that are owed to and from a particular Tribal account, or to and from a particular Tribe (as explained below, some Tribes have several different accounts), could be offset against each other, or "netted." How the netting policy is structured has significant financial ramifications. It also could have important legal implications that would require a legislative resolution.

---

[17] While there may be regulatory requirements that exception items be cleared in one accounting period for regulatory or accounting purposes, this does not necessarily mean that a private sector institution would forgive an error in the customer's favor. Such practices vary by institution, amount at issue, type of customer and other relevant circumstances.

17

The Department maintains two basic categories of funds for Indian Tribes: Judgment funds and Indian Money Proceeds of Labor funds. Within these two major categories, various accounts may exist. For example, within the Judgment category there are accounts for specified purposes, such as education, economic development, burial, etc. Within the Proceeds of Labor category, there are accounts for the proceeds from various tribal resources, such as grazing, mineral leasing, and forestry. If a netting policy authorizes or requires offset or netting of funds among accounts of different types, then funding for the specified purposes of the accounts may be altered. The interests of specific classes of beneficiaries (e.g., all Tribal members, minors) in particular accounts would be altered. The Department believes that Congressional authorization may be required for such alterations.

There are several different options for netting discussed below. The estimated cost to the Treasury for each is based on the government paying Type I claims using the assumptions described above (simple interest based on the Tribal benchmark rate) and does not include adjustments for rollover amounts.

Under a *no-netting approach*, the government would forgive all amounts that were overpaid to Tribes and pay all amounts owed to Tribes, plus interest. This approach would require the greatest expenditure and forgiveness of public funds to pay claims, with actual payment of $13.1 million in principal and $11 million in interest, and forgiveness of $14.0 million in principal and $9.4 million in interest.

*Netting to the Tribal level* would provide for adding or subtracting of all amounts owed to or from a Tribe for all accounts owned by that Tribe (e.g., payment was made to one account of the Tribe when it should have been made to another, or payment was made in the wrong amount to a Tribe's account). In other words, all plus and minus adjustments for all of a Tribe's accounts would be netted together to arrive at a net amount due to or from a Tribe. Interest would also be netted to arrive at a net amount due to or from a Tribe. If this process resulted in a net amount (principal and interest) due to a Tribe, the government would pay that amount. If it resulted in a net amount (principal and interest) due from a Tribe, the government would forgive that amount. Netting to the Tribal level would result in the government paying $3.5 million in principal and $4.0 million in interest, and forgiving $4.4 million in principal and $2.2 million in interest.

18

*Netting to the Tribal account level* would provide for netting all amounts within one account owned by a Tribe, but would not net all accounts of that Tribe against each other. For example, if netting all amounts due to and from a Tribe's settlement fund accounts resulted in a net amount due to the Tribe, the government would pay that amount plus interest to the settlement fund accounts. If this method showed a net amount due from the Tribe, the government would forgive that amount. This approach would require payment of $10.7 million in principal and $9.5 million in interest, and forgiveness of $11.6 million in principal and $7.7 million in interest.

Even with a netting policy, a Tribe still may be found to owe the government money. If no additional forgiveness of the debt is granted, Tribes would be required to reimburse the government. Under the recently enacted Debt Collection Improvement Act, 31 U.S.C. § 3711, et seq. (DCIA), the government may offset payments to satisfy delinquent debts. Applied here, the DCIA could require the government to offset any funds that the government may pay the Tribe in the future against amounts owed by the Tribe to the government.[18] If additional forgiveness is granted, however, a Tribe whose debts are forgiven will have been treated more generously than a Tribe who did not need the additional forgiveness, simply because the amount owed by the Tribe to the government happened to be greater than the amount owed to the Tribe by the government.

The Department envisions that a forgiveness and netting policy should apply. We also anticipate that the settlement legislation should include provisions for netting at the Tribal level. Although the Advisory Board proposed netting at the Tribal account level, that approach fails to recognize that the Tribe already had the benefit of the funds, albeit not necessarily for their original intended purpose. Any legal infirmity due to the inadvertent mixing of funds among accounts would be remedied by the legislation authorizing the settlement. For example, to the extent payments are made to a Tribe, the legislation could authorize Tribes to direct the funds be allocated within their various accounts as the Tribes deem appropriate.

---

[18] Under the DCIA, any federal agency that is owed by a person a past due legally enforceable debt (other than taxes) that is over 180 days delinquent is required to notify the Secretary of the Treasury. The Secretary offsets the debt against certain amounts that may be owed to that person. Historically, the BIA has not considered an Indian Tribe to be a "person," although the Department has not yet reached a conclusion under the DCIA. If, however, a Tribe is deemed to be a "person" under the Act, the offset provisions would apply, subject to provisions of the DCIA prohibiting use of administrative offset for debts over ten years delinquent.

19

After the netting policy is applied, if a Tribe still owes the government money, the Department recommends that the debt be forgiven. This forgiveness policy would nullify application of the DCIA because there would no longer be a valid and legally due debt owed to the United States.

- Waiver/Review. We believe that Tribes which accept payment of Type 1 claims under this settlement process should be required to waive bringing any Type 1 claims as part of any subsequent litigation involving claims encompassed in the scope and time period of the Project. Therefore, we propose that legislation specify that Tribes choosing not to settle their Type 1 claims pursuant to the Type 1 claims procedures will not be entitled to the favorable standards governing netting interest rate or forgiveness that may ultimately be applied under the settlement procedure. In other words, we propose offering favorable rules on netting, interest rate, and forgiveness as an inducement to settle and avoid further litigation.

## 2.    Evaluation of Type 2 Claims

- Evaluation/Guidelines. Type 2 Claims involve one of two circumstances. First, there may be disputes about an account balance based on additional documentation in the Tribe's possession. The Department would evaluate those claims pursuant to the reconciliation standards employed by Arthur Andersen in the Project.[19] Second, there are so-called "passed adjustments" -- transactions

---

[19] In the course of the Project, approximately $6.035 billion in disbursement transactions were categorized as reconciled. Of this amount, about a third -- $1.925 billion in transactions -- were reconciled based on complete voucher packages. The balance -- $4.110 billion in transactions -- were reconciled based on disbursement voucher packages which may not have included, or may not have been required to include, all the supporting documentation described below. A complete disbursement package could include a series of transactional documents, including a signed Form SF-1166 (Authorization to Disburse); an accomplished copy, endorsed by the Treasury Department, of that same Form SF-1166; a Form SF-1034 (Request for Disbursement); and an accompanying Tribal resolution or other Tribal authorization, either authorizing a particular signatory for the SF-1034, or merely requesting payment of the funds. The Advisory Board concluded that "[b]ecause some degree of proof of payment exists and because the Tribes now have access to the images and the documentation for all these transactions, the burden of bringing a claim should fall on the Tribes." The Board estimated that the probability of a loss from incomplete disbursement voucher packages is most likely less than 10 percent. The Board proposed an aggregate settlement of $400 million (about 10 percent of total incomplete disbursement packages), $200 million of which would be used as part of the initial capital of an Indian Development bank (described below), and $200 million of which would be used to satisfy specific claims brought by the Tribes, with individual accounts capped at 5 percent of total incomplete disbursement packages for that Tribe. The Department disagrees with this proposal because these transactions have been reconciled pursuant to the procedures and standards of the Project.

20

which were deemed to be reconciled even though BIA and Arthur Andersen disagreed about the adequacy of the documentation to support the transaction. Claims based on passed adjustments would be handled by submitting them directly to the negotiation/mediation process described in the following paragraphs.

- Process. The Department, through the OST, would be authorized to negotiate with Tribes in good faith in an effort to resolve Type 2 claims. If the Department agrees that an adjustment should be made, resolution would be structured under the provisions for Type 1 claims (including interest rate, forgiveness, netting, etc.). If the new documentation is insufficient under the guidelines to categorize the claim as a Type 1 claim, the claim would be handled under the procedures adopted for Type 3 claims as described below.

In the event the Department and the Tribe are unable to agree on the disposition of a Type 2 claim, the Tribe could request that the matter be submitted to a mediator. The Federal Mediation and Conciliation Service would be requested to appoint a mediator skilled in dispute resolution who would seek to resolve the issue using alternative dispute resolution mechanisms. Resolutions could include categorizing the claim as a Type 1 or Type 3 claim to be settled under the legislated settlement process, proposing a cash settlement or concluding that the claim lacks merit. Mediation would be non-binding.

- Timing. The legislation should provide that Type 2 claims be submitted to the Department within a specified period -- perhaps two years. It is possible that a Type 2 claim would be recategorized as Type 1 after consideration by the Department or a mediator. If this could be done promptly enough, all Type 1 and Type 2 claims could be settled simultaneously. However, because the Tribes have no incentive to submit Type 2 claims in instances where they will owe the government money, and because the Department believes that it is important to resolve the Type 1 claims as promptly as possible, the Department would attempt to handle Type 1 and Type 2 claims together wherever possible, but sees no reason to delay resolution of the Type 1 claims until the Type 2 process is complete.

## 3.    Settlement of Type 3 Claims

During the course of the Project, 32,901 transactions totaling $2.4 billion (in absolute terms) were identified for which supporting documentation was not

21

located.[20] The Department estimates that the maximum potential claims against the government amount to approximately $575 million for the following reasons. Of the total $2.4 billion, $1.123 billion were transactions involving receipt of funds by the government on behalf of a Tribal account from third parties. The government can demonstrate that the unreconciled receipts were posted to the general ledger accounts of a particular Tribe. Accordingly, it is likely that those Tribes benefited from receipt of the funds and the chance of loss is relatively low. (While there is a possibility of a posting error, the Project demonstrated that posting errors in reconciled transactions for the basic reconciliation were extremely low - approximately .01 percent). If errors did occur, such as the funds being credited to the wrong Tribe or Tribal account, there is no way to determine which Tribe or account should have received the money and therefore, no way to direct a corrective deposit.

Similarly, $479.6 million of the unreconciled transactions were transfers of funds within different accounts of the same Tribe. For example, funds may have been erroneously credited to a Tribe's education account which should instead have gone to its burial account. In order to rectify the situation, the funds must be debited from the education account, and then credited to the burial account. In such a situation, there would be no net change in the amount of funds held for the Tribe's benefit. While there is no way to determine whether damage occurred to particular beneficiaries of specific accounts as a result of unreconciled transfers, it is clear that members of the intended Tribe benefited from these transfers even if they were placed in the wrong accounts.

Finally, there were $808.6 million in disbursement transactions for which there was no supporting documentation. Of that amount, $73.6 million are positive disbursements (i.e., receipts) where even had there been an error, it would have benefited the Tribe. An additional $40.5 million was for attorney and expert witness fees and $119.5 million were disbursements of settlement funds to Alaska Regional Corporations. It is reasonable to presume that attorneys, expert witnesses, and the Alaska Regional Corporations would have filed claims had the

---

[20] It is important to note that the lack of supporting documentation for $2.4 billion in transactions does not mean the money was lost, stolen, or otherwise misappropriated. It means that the BIA was unable to locate documents to support the accuracy of transactions reflected in the general ledger. An analogy in the general commercial banking sector would be if a bank were unable to locate copies of cancelled checks.

22

0572

payments not been made.[21]

As a result, deducting the positive disbursements, attorney fees, expert witness fees and Alaska Regional Corporation disbursement transactions, the Department believes that the settlement options should focus on the remaining $575.1 million of undocumented disbursements.

- _Settlement of claims._ Developing an equitable settlement for potential Type 3 claims is not a simple task. On the one hand, guidelines governing the Project indicated that a transaction would not be categorized as reconciled without certain documentation to support that funds were handled as reflected in the general ledger. On the other hand, there was no indication during the course of the Project that Tribal or IIM funds have been misappropriated, misdirected or lost, although the Project did not specifically examine fraud. And, as noted above, for the 86 percent of transactions which were reconciled, the error rate was extremely low -- .01 percent.

The Department intends to consult with Tribes on their recommendations on how to address Type 3 claims. We have no preconceived approach as we enter these consultations.

The Advisory Board proposes that with respect to undocumented disbursements, a total payment of $300 million would be distributed proportionately to all Tribes with trust accounts, based on the product of the percentage of the Tribe's unreconciled disbursements plus interest and the total of all unreconciled disbursements plus interest. According to the Advisory Board, this award equals 52 percent of total unreconciled disbursement exposure or 15.5 percent of total unreconciled disbursement exposure plus compound interest (it would be 23 percent based on simple interest). In addition, the Advisory Board proposed a general settlement amount of $300 million to be used to help capitalize a proposed Development Bank for American Indians, in settlement of unreconciled receipts, transfers and disbursements (not otherwise addressed in the settlement).

Under the Advisory Board's proposal, half of the amounts paid in settlement would be Tribe-specific, while the balance would go to the proposed Bank, for a

---

[21]  The General Accounting Office recently commenced an investigation to determine if the Alaska Regional Corporations suffered losses with respect to these unreconciled disbursement transactions.

23

total amount of $600 million. It is not clear, however, that the $600 million bears any relationship to any actual government liability for the unreconciled disbursement transactions; it should be noted that an unreconciled transaction does not necessarily mean that there was a loss.

The Department requires additional consultation on how to address the Type 3 claims before it makes a specific proposal to Congress. Among the issues on which we will seek the views of the Tribes are the following:

*On what basis does the Department compute the aggregate value of any settlement of Type 3 claims?*

*Do Tribes want the settlement of Type 3 claims to be paid directly to individual Tribes, to go towards some type of total settlement option such as the proposed Bank, or a combination approach such as the one proposed by the Advisory Board?*

*If claims are to be paid directly to Tribes, on what basis should the claims be valued? Should different types of claims be valued differently? How?*

*If claims are to be paid through some type of total settlement option aimed at benefitting Tribes generally, what options should be considered? (The issues raised by total settlement options are discussed on pages ___.)*

*What procedures should apply to settling the Type 3 claims?*

*How should the proposed settlement be affected in the event that some Tribes choose not to participate in the settlement?*

*How should the total amount of the settlement be determined?*

*What type of waiver of claims should be required of Tribes that opt to participate in the Type 3 settlement process?*

*What percentages should be used to calculate settlement amounts?*

*To the extent that compensation is paid for transactions for which no*

24

*documentation exists, how should it be distributed among the Tribes?*

## V.   <u>LITIGATION</u>

Tribes that do not settle their claims under the settlement procedure outlined above may wish to litigate those claims in court. In the past, similar litigation has often proved extremely costly and time-consuming for all the litigants. Given this history, we specifically want to avoid any litigation process that would resemble the Indian Claims Commission proceedings of years past. To avoid this result, we believe that legislation establishing the settlement procedures also must establish certain parameters for judicial litigation of claims of non-settlers. Such parameters are necessary to ensure that litigation proceeds in an orderly and efficient manner, to ensure that the beneficiaries of the claims, as opposed to their attorneys and accountants, are the persons who benefit from any amounts recovered in litigation, and to encourage settlement of as many claims as possible. The Department is considering several parameters including the following:

- <u>Statute of Limitations</u>: All claims for the period preceding September 30, 1995,[22] must be brought within two years of the date of enactment of the legislation or 90 days after the conclusion of the Type 2 claims process, whichever is later.

- <u>Burden of Proof</u>: The Tribal account holder will bear the burden of proof on damages, under applicable fiduciary standards. The burden of going forward will first be on the account holder, to present a prima facie case on liability. If that burden is satisfied, the burden of going forward then would shift to the government, to show that the Tribe's accounts are correct by some predetermined quantum of evidence appropriate in the circumstances. The account holder would then have the opportunity to produce evidence to respond to that showing.

---

[22] Although the Reconciliation Project covered the 1972-1992 time period, the Act provides that the Secretary's report shall identify for each Tribal trust fund account, a balance reconciled as of September 30, 1995. In response, OTFM has been internally reconciling Tribal trust fund accounts and providing statements to Tribal trust fund account holders since 1992. In order to bring some closure to the litigation process, we propose that all claims for the period preceding September 30, 1995, must be brought by Tribes who choose to litigate.

Attachment C Part 2 to Boswell Declaration
0575

• Waiver: At the conclusion of any such litigation, the court would adjudicate and declare as final the balance in the accounts which are the subject of the litigation as of September 30, 1995. Any claims of mismanagement of the underlying trust assets also would have to be brought simultaneously or would be barred.

The purpose of these parameters is to achieve a final balance in Tribal accounts as of September 30, 1995, much like the Indian Claims Commission legislation, which also established a baseline date from which to look forward.

## VI.  TOTAL SETTLEMENT ALTERNATIVES

The settlement process outlined above concerns resolution of claims arising within the scope and period of the Project. It does not address claims that Tribes may have arising from the period preceding or subsequent to the reconciliation period, or for claims related to deficiencies in other aspects of the Department's trust asset management outside the scope of the Project (including management of the underlying trust assets).

In order to arrive at settlement that would truly put to rest all trust management and accounting issues predating September 30, 1995, Congress may also want to address all of these other potential claims through what we refer to as a "total settlement" approach. A settlement of this type conceivably could encompass IIM claims as well. In many respects, developing an equitable approach to a total settlement is even more challenging than crafting a resolution of Type 3 claims. There has been no methodical analysis of the nature and scope of deficiencies, if any, that would be addressed in a total settlement approach, although Tribes have long criticized various aspects of the Department's management of their assets.

Moreover, assuming that some type of programmatic settlement is adopted, a number of issues arise, including: criteria for participation (should participation be limited to Tribes whose claims meet specified criteria, or be available to any Tribe with Tribal accounts); what form participation would take (e.g., if an education fund were established, would each Tribe be eligible for a one-time payment in a certain amount for educational purposes, or would Tribal members be entitled to apply for scholarships); how participation in this component would

26

fit in with the payment of individual Tribe's specific claims (e.g., would this replace or be in addition to payments to settle specific claims, would there be offsets, cumulative limits to the settlement, etc.); what is the relationship between access to the benefits of the programmatic settlement and the amount of potential claims a Tribe may have; and the source of funding.

Yet, the prospect of achieving some degree of finality on trust asset issues is attractive for both the Department and Tribes alike. It will allow us to focus on prospective reforms that will result in more accurate and productive management of Tribal resources. Moreover, a total settlement option could encourage further the settlement of claims based on the Project, and settle claims relating to trust issues that fall outside the scope or time period of the Project. This approach would only be successful, however, if most Tribes agreed to participate in the program and specifically agreed to waive all Tribal trust claims through September 30, 1995.

As with Type 3 claims, the Department has not adopted a position on whether a total settlement approach is either in the public interest or is workable. Moreover, it endorses no particular approach to a total settlement option should we decide to recommend a total settlement component. Both matters will be the subject of further consultations with the Tribes. However, for purposes of discussion and illustration only, we outline several possible approaches for Tribal consideration. These generally are intended to advance economic development in Indian country and are structured to meet the policy objectives of the Tribes themselves, rather than those of the government. Moreover, these are not the only possible total settlement options. Over the next several months, as we engage in Tribal consultations, we will be considering other initiatives that may serve as an appropriate mechanism.

## A.    Advisory Board Proposal - Development Bank

One option proposed by the Advisory Board consists of the establishment of a development bank for American Indians with certain capital and assurances provided by the United States Government. The Advisory Board proposal envisions the United States forming and capitalizing a federal Development Bank for American Indians to serve as a nationwide financial institution providing a dependable source of lending to American Indians and Tribes and a dependable source of funds for investment in American Indian enterprises. The Advisory

27

0577

Board would allow all IIM and Tribal account holders to participate in the Bank, in settlement of all potential claims arising out of the Project not covered by the other components of the Advisory Board's settlement proposal, as well as any past potential liability for trust management practices in general. Under the Advisory Board's approach, the Bank would be partially capitalized by the proceeds of two general settlement components for all Tribes with trust accounts, to address all unreconciled transactions arising from the Project ($300 million) and some potential liability for all reconciled disbursements with incomplete disbursement voucher packages ($200 million). Shares would be distributed to all federally recognized Tribes on some equitable basis set forth in the legislation. In total, the United States would provide the following capital and guarantees for the Bank:

| | | |
|---|---|---|
| Equity Capital | - | $500 million |
| Borrowing Capacity guaranteed by U.S. | - | 10 times equity capital |
| Initial Borrowing from U.S. | - | $3 billion for 30 years at 30-year Treasury Rate |

The Bank would provide access to long-term loans and investments for economic development and would provide access to low interest rates on loans, made possible by the Bank's tax-free status and its access to funding in the Nation's capital markets at rates commensurate with those paid by the U.S. Government. The Bank would be a for-profit financial institution and would not receive appropriated funds for operating expenses. It would receive appropriated funds for lifeline financial services and other specific programs as approved by Congress. The Bank would be authorized to invest up to 25 percent (initially $125 million) of its permanent capital in eligible Indian businesses and projects.

The Bank would also be allowed to invest up to $300 million in the purchase, holding, financing and sale of fractionated realty interests in Indian allotted lands. According to the Advisory Board, such purchases and financing would be made on "prudential terms" to eligible individuals and Tribes. Fractionated heirship activities would be governed by rules in the legislation to resolve the fractionated heirship problem, and would be administered to achieve the consolidation of existing fractional interests and to prevent or substantially reduce future fractionation. The fractionated heirship problem is discussed more fully below on pages 30-31.

28

As with any total settlement option, the Advisory Board Development Bank proposal would have the advantage of finally resolving all claims arising out of the United States' management of Tribal trust funds (other than those which Tribes choose to litigate). The Advisory Board recommends extending the Bank settlement option to resolve IIM claims as well. It is unclear whether smaller Tribes or individuals would be likely to support or take advantage of the Development Bank settlement option; their interests might be better served by providing more direct access to funding for other purposes. It also is unclear whether the Advisory Board proposal would provide access to the Development Bank to non-Indian IIM account holders.

There are many unanswered questions about the Advisory Board's proposal for a Development Bank, including the relationship between the Bank and non-Indian IIM account holders, how membership in the Bank should be determined, mechanisms for accountability and control of the Bank and the status of Tribes which choose to litigate rather than settle their claims. Moreover, as a general policy, the Treasury Department strongly opposes Federal entities having authority to borrow in the credit markets. In short, the Department has many questions about this proposal and, at this point in time, specifically does not endorse it. However, the Advisory Board's proposal warrants consideration and has been included in this report to generate additional thought and discussion.

## B.    General Program for Trust Resource Management or Other Activities

A second option for a total settlement of claims would be some type of general settlement grant or other program providing access to funds for Tribal economic development purposes. The terms and conditions for such a program would be defined in authorizing legislation and would conform to longstanding federal financial policies. The intention would be to provide a source of funding for types of initiatives for which no other funding is readily available.

For example, in settlement of all potential outstanding Tribal trust management claims, legislation could establish a permanent or temporary grant or other program to provide Tribes with access to financial support for Tribally-owned businesses or other Tribal economic development projects. Administration of the program could be performed by the Secretary of the Interior, the Attorney

29

General, or other appropriate official. The program could be financed and made available to all federally recognized Tribes on an ongoing basis, with criteria governing eligibility, appropriate projects, the amount available to each Tribe in a given year or time period, total funding available, repayment obligations, etc. This approach would provide Tribes with direct access to funding to undertake and support American Indian businesses and projects, as opposed to the ability to borrow money to pursue these concerns provided in the Advisory Board's Development Bank proposal. Alternatively, a fund could be established and claims would be made against the fund, with acceptance of payments considered to be in full satisfaction of any claims on behalf of a Tribe, similar to the claims procedure used in other restitution funds administered by the United States. A Tribe's acceptance of such a total settlement proposal would extinguish all of its outstanding Tribal trust fund claims.

## C.   Fractionated Heirship Land Acquisition Program

A third option for a total settlement of claims would be an initiative to address the fractionated heirship problem, which is a major cause of the difficulties in the administration of the BIA's trust fund management systems and BIA's inability to obtain more productive returns for the use of trust lands. As noted above, the Advisory Board's Development Bank proposal would direct some funds toward resolving this issue. It could, however, be addressed in any number of ways, with or without the existence of the Bank.

Fractionated heirship is an indirect result of the 1887 General Allotment Act, which directed the division of Tribal lands and allotment of them to individual Indians. Allotted or individually-owned trust lands comprise approximately 11 million acres. As originally envisioned, allotments were to be held in trust by the United States for their Indian owners for no longer than 25 years, after which the land would be conveyed in fee simple to the Indian owners. Many allottees died without wills during the 25-year trust period, and it also became evident that many allottees' land continued to need federal trust protection. Consequently, Congress enacted limited probate laws and authorized the President to extend the trust period for those individuals who were not competent to manage their lands. The presumption was, however, that at some point in the then-foreseeable future the lands would be conveyed to their Indian owners free of federal restrictions. Nevertheless, Congress continued to extend the period of trust protection but did not amend the probate laws. Under the Indian probate laws, as individuals died

30

without wills, their property descended to their heirs as undivided fractional interests in the allotment. As the years passed, fractionation has expanded geometrically to the point where there are hundreds of thousands of tiny fractional interests in Indian Trust property. Without action, this problem will become even more severe.

Congress attempted to address the fractionation problem with passage of the Indian Land Consolidation Act (ILCA) in 1984. The ILCA authorized the buying, selling and trading of fractional interests. Most importantly, it provided for the escheat to Tribes of interests of less than 2 percent. Although over 55,000 of the 2 percent-or-less fractional interests have escheated since 1984, the fractionation problem continues to worsen. Maintaining heirship and land records and administering the land is inordinately expensive, and the administration of the records pertaining to the moneys earned by each individual allottee is equally expensive and difficult. This is a major cause of the problem with maintaining individual Indian trust accounts.[23] Equally important, utilization and conveyance of the fractionated property by the numerous owners is difficult because of the need to secure the numerous consents required.

The Department believes that legislation which would consolidate the large number of existing fractionated interests and prevent further fractionation would benefit the Tribes by promoting self-determination, and by removing a significant obstacle to the efficient administration of Indian trust funds.[24] The legislation would have to specify the criteria for participation, whether the Department would commit to buying a certain number of interests for each Tribe, whether there would be cumulative limits to the settlement funding, and other issues. The fractionated heirship land acquisition proposal could comprise or be a portion of a broader total settlement proposal to resolve all Tribal trust fund claims.

---

[23] Over 170,000 IIM accounts -- about 55 percent of all accounts -- have a balance of less than $10.

[24] We recognize that fractionation is one major cause of the current state of trust funds management. In order to prevent further fractionation, it will be necessary to change inheritance laws relating to Indian allotments. Currently, however, the constitutionality of the Indian Land Consolidation Act (25 U.S.C. § 2206) is before the United States Supreme Court in the case of Babbitt v. Youpee, Case No. 95-1595. In Youpee v. Babbitt, 67 F.3d 194 (9th Cir. 1995) the appellate court held that the ILCA violates the right of certain Indians to convey their allotment interests freely. We anticipate that the Supreme Court's resolution of this case, which was argued earlier this month, will provide needed insight into the best means for balancing the need to control fractionation with the inheritance rights of individual Indians.

31

D.    Consultation

Because of the complexity of these proposals, the need to generate near universal support among Tribes in order for the total settlement approach to be successful, and the Administration's policy on government-to-government relations with Tribes, the Department believes additional consultation on all these ideas is required.    The Department intends to circulate this analysis to all Tribes and interested parties who may have Tribal trust fund claims to solicit their ideas for a total settlement initiative and explore their willingness to waive their own claims if one were to be implemented.  The Department will submit a supplemental report to the Congress in April 1997, with its findings and additional recommendations.

## VII.  OTHER TRUST FUNDS ISSUES

### A.  Restoration of Overdraft Interest Clearing Accounts and Settlement of Miscellaneous Losses

There are two additional issues that might be addressed by legislation. These issues relate to the restoration of overdraft interest clearing accounts (which apply only to IIM accounts) and settlement of miscellaneous losses (which apply to both Tribal and IIM accounts).

In the course of reviewing IIM accounts, OST staff determined that there is $42.2 million in unidentified Overdraft Interest Clearing accounts in the detailed IIM subsidiary ledger.  Overdraft interest clearing accounts are control accounts that are used when interest is posted to the underlying individual accounts.  When interest is credited to the underlying accounts, the control account is debited. When interest is funded the control accounts are credited.  The amounts debited and credited, in theory, should be equal.  The current debit balances in these accounts are likely the result of either the non-posting of interest in the IIM subsidiary ledger that was funded, or interest credited to individual account holders in excess of what was actually earned/funded.   Research on these accounts is continuing.

The Advisory Board proposes that $42.2 million be appropriated to restore these accounts, as the practical effect of these overdrafts is that current IIM account holders are deprived of approximately $2 million in interest income

32

annually.  This assertion is not entirely accurate, as the total assets actually invested in the IIM account pool exceed the balance in the IIM subsidiary ledger. The Department agrees that these discrepancies need to investigated, and if necessary, rectified.  However, it is not clear at this time how much funding, if any, is needed.

The review also identified $28.3 million in other miscellaneous losses, broken down as follows:

|  | (millions of dollars) |
|---|---|
| Loss and associated interest | $10.0 |
| To bring subsidiary (IRMS) and Control Account (OMNI) into balance | 10.8 |
| Budget suspense accounts | 1.0 |
| Clean-up remaining General Ledger Accounts | 6.5 |
| Total | $28.3 |

The Advisory Board proposes that $28.3 million be restored to the IIM accounts.

Although the Department agrees that these discrepancies need to be rectified, it is not clear how much funding is necessary to do so.  In some cases, simple accounting adjustments might be sufficient.  Over the next several months, the OST will prepare a detailed analysis of all accounts in the trust fund general ledger and subsidiary ledgers which (1) explains how the accounts correspond to the actual underlying assets and liabilities; (2) quantifies the resultant deficiency/equity of the trust fund as a whole; and (3) explains the efforts that have been undertaken to rectify these variances.  The Department also recommends that legislation provide general authority to clear trust fund subsidiary and general ledger account discrepancies.  This authority could be exercised after reports on the nature of the discrepancies and descriptions of efforts taken to resolve those discrepancies are submitted to and approved by the Office of Management and Budget.

**B.    Funding of the Settlement Legislation**

33

The Advisory Board proposes that claims be paid from the Judgment Fund[25] although it does not identify a specific reason for this position.

Any of these proposals would require the government to pay significant amounts of money. Some Tribes have pointed out that to the extent that settlement would be funded from Departmental funds and scored against the BIA budget, the settlement would effectively be funded from programs for which the Tribal beneficiaries are otherwise the intended beneficiaries. Tribes with small or no trust fund claims also might conclude that they are helping to fund payment of claims to other Tribes through the reduction in funding of the programs that are intended to benefit them. Tribes with trust funds could also claim that they lost twice: initially through the incorrect management of their trust funds, and a second time by a reduction in programs and services to the Tribes and their members that a reduction in BIA funding would necessarily entail. Moreover, some Tribes have pointed out that similar major liability claims against the government, such as those arising from the failure of federally insured savings and loan institutions, were not scored against a particular agency.

If these claims were to be settled through litigation rather than legislation, judgments would likely be paid through the Judgment Fund. In enacting settlement legislation, we urge that the Congress take steps to ensure that any payments to resolve these areas of difference not be made in a manner that would jeopardize current levels of service to Tribes and individuals who, collectively, have experienced the lowest level of economic recovery of any group in the Nation and for whom the government has pledged a special trust relationship emanating from treaties and compacts entered into on a government-to-government basis. The Department's final recommendations will address a source of funding for the settlement.

---

[25] The Judgment Fund is administered by the Secretary of the Treasury, and is funded by a permanent, indefinite appropriation.

34

# ATTACHMENT C

# TO BOSWELL

# DECLARATION

# PART 3

# Advisory Board Proposals In Response to Tribal Trust Fund Reconciliation Project

PROPOSED LEGISLATION
IN RESPONSE TO TRIBAL TRUST FUND RECONCILIATION RESULTS
AND TO ADDRESS SOLUTIONS TO THE MAJOR TRUST MANAGEMENT
PROBLEMS

## INTRODUCTION AND PURPOSE

This paper presents a proposal for legislation in response to the Bureau of Indian Affairs' (BIA) Tribal Trust Fund Reconciliation Project (Reconciliation Project), to major problems affecting American Indian trust management and to the statutory requirements of the American Indian Trust Fund Management Reform Act of 1994 (Reform Act of 1994).

The Reform Act of 1994 provides that the Secretary of the Interior (Secretary) shall prepare a report which must include a description of the procedures used for reconciliation of the Tribal trust fund accounts and a statement outlining efforts the Secretary will undertake to resolve disputes regarding Tribal account balances arising out of the Tribal trust fund reconciliation process. The Secretary provided an interim report to Congress on May 31, 1996.

As the Secretary's Report indicates, commencing in January 1996, each tribal account holder was provided a report on the reconciliation of its accounts along with account statements that show account balances, reconciled transactions, and proposed adjustments. Subsequent to the distribution of the reconciliation report and account statements, a national meeting, to which all account holders were invited, was held in Albuquerque, New Mexico, to explain the reconciliation methodology and the report and account statement format, content and terminology. A series of five (5) regional meetings were also scheduled during the spring and summer of 1996 to work directly with each account holder to address questions and issues on its specific report and account statements.

Through April 30, 1996, seventy-seven (77) of the 280 tribes involved in the reconciliation project have responded. Specifically, two (2) account holders have accepted and three (3) account holders have disputed their account balances. Because by the end of May all of the scheduled meetings had not been held to receive and discuss account holder issues and comments and since many account holders had not communicated their acceptance or dispute of their account balances, only an interim report on the account holders' attestations was provided in the Secretary's Report. The Department of the Interior (Department) testified in June that it will be in a position to propose a mechanism to resolve any disputes sometime during the fall of 1996 and that a final report on account holder attestations and a mechanism to resolve any disputes will be submitted to the Congress by November 15, 1996. The mechanism to resolve any disputes will almost certainly take the form of proposed legislation. Legislation would provide an orderly and efficient mechanism for resolution of the disputes over account balances arising out of the Tribal trust fund account reconciliation process, would respond to the statutory directive that the Secretary outline efforts to resolve such disputes and because claims arising out of the Reconciliation Project will probably substantially exceed the Department's financial resources.

1

## Need for a Comprehensive Settlement and Solution to Trust Management Problems

This proposal presents a comprehensive set of settlements and initiatives which are designed to compensate American Indian trust beneficiaries for damages from past trust management practices and assure an accurate and timely accounting to trust account holders in the future.

In October 1995 the Office of the Special Trustee for American Indians (OST) commenced an assessment of the U. S. Government's trust management policies, procedures, practices and systems as they apply to individual American Indian and American Indian tribal accounts.

By February 1996 the OST completed the preliminary assessment and produced a conceptual Strategic Plan to acquire and institutionalize specified systems. Implementation of this plan will permit and ensure that the U. S. Government establishes appropriate policies and procedures, develops necessary systems and takes the affirmative actions necessary to provide an accurate and timely accounting to American Indian trust beneficiaries. In this manner the proper discharge of the Secretary's trust responsibilities finally can be accomplished. The Assessment and Phase I of the Strategic Plan are attached in a document entitled "Special Trustee for American Indians, Assessment and Strategic Plan Principles, Phase I, February 1996" (Special Trustee's Assessment or Special Trustee's Strategic Plan).

In December 1995 the Department's Bureau of Indian Affairs (BIA) substantially completed a multi-year "Tribal Trust Funds Reconciliation Project" (Reconciliation Project) and issued an "Agreed-Upon Procedures and Findings Report" for the period July 1, 1972 through September 30, 1992.

In August 1995 the Department substantially completed a study of the trust management systems relating to Individual Indian Monies (IIM) accounts and issued a report entitled "IIM Related Systems Improvement Project Report." The findings of this report are substantially incorporated in the Special Trustee's Assessment.

The Special Trustee's Assessment, the Reconciliation Project reports, the IIM Related System Improvement Project Report and earlier reports issued by the General Accounting Office all confirm that the U. S. Government's trust management systems, policies, procedures and practices coupled with the condition of the trust records and, notably, large numbers of missing documents, effectively prevent:

1. a proper, accurate and timely accounting for trust account balances, collections, disbursements and investments and the maximization of the return on investments.

2. the preparation of accurate and timely reports to trust account holders regarding all collections, disbursements, investments and return on investments.

2

3.  an audit under generally accepted auditing standards.

4.  any further reconciliation efforts, since the costs of such efforts would substantially exceed the benefits and at the same time would probably yield unsatisfactory and inconclusive results.

The past and present undeniably poor quality of the trust management systems, the condition of the historical records and the U. S. Government's inability to provide an accurate and timely accounting prevent any reasonably accurate determination of the extent of harm, damage or loss to American Indian trust beneficiaries. For example, the Reconciliation Project disclosed there were no records located to support $2.4 billion out of $17.7 billion for the twenty year period (1972 - 1992) for one category of transactions (non-investment transactions). In addition, it appears that the condition of the records and the quality of the trust management systems were much worse for periods prior to 1972. Therefore, it is reasonable to assume that several billion dollars more in unlocated documents and substantially more harm, damage and loss would have been disclosed had a full reconciliation or full accounting been possible for periods prior to 1972.

It is undeniable that some compensation is due the American Indian account beneficiaries for the U. S. Government's inability to provide an accurate and timely accounting and such compensation could be justified in the billions of dollars. But, even if the damages could be reasonably estimated, there would remain the question of which American Indians were harmed and damaged? There is no complete answer to that question and since there is not, any settlement of claims, present and prospective, arising out of the U. S. Government's inability to render an accurate and timely accounting or the Reconciliation Project or both, necessarily must start with the settlement of known and quantifiable harm, damage and loss and proceed to a subjective, common sense settlement process for the other harm, damage and loss which may have accrued to trust account holders over many, many years.

Any settlement process would also be inadequate unless it addressed the root causes of the Government's inability to provide an accurate and timely accounting to American Indian trust beneficiaries. That is why the Special Trustee's Strategic Plan is an integral part of the settlement process. Implementation of this plan will ensure that the U. S. Government establishes appropriate policies and procedures, develops necessary systems and takes the affirmative actions necessary to provide an accurate and timely accounting to American Indian trust beneficiaries in the future. In this manner the proper discharge of the Secretary's trust responsibilities finally can be accomplished.

Consistent with the general approach just described, the following pages describe specific settlement terms and amounts, the criteria to be used and the rationale for each general settlement.

3

## II. BACKGROUND

The Secretary of the Interior has been designated by Congress as the trustee of the funds held by the federal government for Indian Tribes and individual American Indians. Therefore, the Secretary has a responsibility to ensure the proper accounting, investment and financial reporting of approximately 300,000 Tribal and IIM trust accounts.

Accordingly, the Department of the Interior through the Bureau of Indian Affairs and the Office of the Special Trustee for American Indians has a responsibility to ensure that the trust accounts are properly maintained and invested in accordance with applicable laws, and that accurate and complete accountings and reports are periodically provided to fund owners.

Over the past decade, operational reviews and financial audits have identified weaknesses in the control and oversight of Indian trust funds. A primary concern was the failure to reconcile the trust fund accounts regularly. Accordingly, in 1988, 1989 and 1990, Congress directed BIA to take steps to reconcile Indian trust fund accounts as accurately as possible back to the earliest practical date. The FY 1990 appropriations language further specified the requirement that "the results of such reconciliation have been certified by an independent party as the most complete reconciliation of such funds as possible."

Pursuant to these directives, BIA commenced its reconciliation project in 1990. In the fall of 1990, an ad hoc Tribal advisory group worked in conjunction with the General Accounting Office (GAO) and the Department's Inspector General to develop a request for proposal for the reconciliation contract. In May 1991, the contract was awarded to a national accounting firm, Arthur Andersen, L.L.P. The ad hoc group constituted itself as the Intertribal Monitoring Association (ITMA).

Phase I of the contract was intended to determine what records were available, what procedures would be necessary, and what was the cost of a complete reconciliation for both the Tribal trust and IIM accounts. This work was performed from June 1991 through January 1992. The results of Phase I disclosed that all supporting documents could not be located, but to the extent they could be located, they could be examined. Because some records could not be located, it was resolved that an audit would not produce meaningful results.

In view of this, the Department of the Interior, in consultation with the Office of Management and Budget (OMB) and ITMA, considered alternative methodologies and approaches with the goal of producing as accurate an accounting as practicable. As a result, the BIA modified the Arthur Andersen contract to incorporate the agreed-upon procedures methodology, which does not constitute an audit in accordance with generally accepted auditing standards but was used to reconcile the Tribal trust fund accounts back to 1973.

The Reconciliation Project did not address IIM accounts because it was determined that a similar reconciliation effort for IIM accounts would cost $108 to $281 million.

4

In accord with the Congressional mandate that the Tribal trust reconciliation be certified by an independent third party, the BIA awarded a contract to perform the certification to Coopers and Lybrand in September 1993. Due to difficulties with the contractor and a projected cost for completion of the certification that far exceeded initial estimates, BIA terminated the contract in October 1995, before the certification was completed. At BIA's request, Coopers and Lybrand provided a close-out letter summarizing the work performed prior to termination. In the letter, Coopers states that it noted errors in certain aspects of Arthur Andersen's reconciliation work under the BIA contract, and that some but not all of these errors were reported to Arthur Andersen and BIA. The letter further states, however, that no conclusions can be drawn from the preliminary information reported because Coopers did not complete the certification work or finalize the results.

While the BIA reconciliation efforts were ongoing, in 1994, Congress passed the American Indian Trust Fund Management Reform Act, 25 U.S.C. 4001-4061, which established the Office of the Special Trustee for American Indians. The Special Trustee, who reports directly to the Secretary, is responsible for oversight, reform, and coordination of the policies, procedures, systems and practices used by various Departmental agencies in managing Indian trust monies. The statute also required that the Secretary transmit to Congress by May 31, 1996, a report that describes the methodology and results of the trust fund reconciliation process, includes Tribal attestations as to disputed account balances, and outlines efforts the Secretary will undertake to resolve such disputes.

In January 1996, OTFM released to approximately 280 Tribes a report summarizing the results of its Tribal Trust Funds Reconciliation Project. The agreed-upon procedures used in the reconciliation were intended to accomplish the following: (1) verify that financial transactions posted to the accounting records are in agreement with the originating lease or sale agreements, permits, or contract terms (not completed for all transactions); (2) determine the timeliness of the deposit of receipts (for informational purposes only); (3) verify that non-investment financial transactions posted to the BIA's official accounting records are in agreement with supporting financial source documents; (4) assess the reasonableness of investment income posted to Tribal accounts; (5) assess the reasonableness of U.S. Treasury interest calculations; and (6) reconcile accounting systems and general ledger balances with U.S. Treasury balances. The report indicated that there were some $2.4 billion in unreconciled non-investment transactions (transactions for which supporting financial source documents cannot be located). The procedures and the proposed adjustments to account balances are detailed in the Reconciliation Report, and were explained to the Tribes at a national meeting on February 14 and 15 in Albuquerque, New Mexico. More detailed follow-up was provided at a series of regional meetings with individual Tribes.

As noted, the Department has indicated it will be in a position to propose a mechanism to resolve any disputes sometime during the fall of 1996 and that a final report on account holder attestations and a mechanism to resolve any disputes will be submitted to the Congress by November 15, 1996.

5

0590

## III. TYPES OF CLAIMS AND SETTLEMENTS

For purposes of this paper, the two basic types of potential claims that may arise from the Reconciliation Project or otherwise are referred to as Type 1 or Type 2 claims.

Type 1 claims are claims based on exceptions or errors for which the government has adequate documentation and agrees that either funds are owed to a Tribal account or that funds are owed from a Tribal account to the government. These claims are described in the Reconciliation Project Reports or otherwise as set forth in the legislation.

Type 1 claims also include claims where a Tribe disputes its account balance from reconciliation and brings a claim which can be negotiated, mediated or arbitrated. These claims can be based on additional documentation produced by the Tribe or the government in addressing Reconciliation Project issues, other claims of a similar nature or certain reconciled disbursement transactions without complete disbursement packages which can be quantified to some extent and examined for reasonableness.

Type 2 claims are claims arising from all other circumstances and include unreconciled transactions, where neither the Tribe nor BIA can locate adequate source documentation to support the account transactions or balance or to support a conclusion that those transactions or balances are in error. Type 2 claims would address not only those claims arising from BIA's Tribal trust fund reconciliation, but would include claims and settlement amounts arising from other trust management issues that need to be addressed and resolved. These include claims arising from the IIM accounts for all periods up to settlement and from the Tribal accounts outside the 20-year tribal reconciliation period, as well as issues pertaining to the Department's existing trust management practices and the OST's reform efforts.

Settlements involve payment for both specific and general claims and deficiencies. Settlement proceeds include direct distribution to Tribes or IIM account holders where specific settlements can be reasonably supported based on the factual situation. Where damages cannot be reasonably estimated for particular individuals or Tribes, settlement proceeds are distributed to remedy trust management deficiencies or to provide for other initiatives which will benefit substantially all trust beneficiaries.

## IV. PROPOSALS FOR SETTLEMENT OF SPECIFIC CLAIMS

### A. General Framework

The general framework for resolution of claims arising from the reconciliation must be legislative. The legislative options described below would provide for the expedited payment of claims from the Judgment Fund or otherwise as specified for particular settlements.

All agreed Type 1 claims would be paid in full with interest, and with forgiveness of any amounts that may be owed by Tribes, and without regard to the settlement of Type 2 or any other

6

claims. Payments would be made promptly after the legislation takes effect in accordance with procedures and guidelines set forth in the legislation.

Type 2 claims would be settled and paid based on specific and general settlements and guidelines set by the legislation.

Tribes that settled their Type 2 claims pursuant to the legislative procedure would waive all claims related to Tribal trust funds administered by the BIA for the period prior to September 30, 1995. Account balances, adjusted by the agreed claim amounts, would be accepted as of September 30, 1995 and would be used as the basis for future accountings. The government subsequently would not be required to perform further accountings or reconciliation exercises for periods prior to September 30, 1995. Nor would the government be liable for past damages arising from trust management practices prior to September 30, 1995. Tribes that did not resolve their claims pursuant to the legislative procedure would be able to bring their claims in court, consistent with certain parameters for those claims set out in the legislation but would not be able to participate in the Type 2 settlements. Settlement for IIM damages or losses would be as of a certain date specified in the legislation with IIM balances deemed to be accepted as accurate as of that date. Such a date would be used as a basis for future accountings.

## B.  Detailed Discussion of Proposed Settlement for Legislation

It is clear from an examination of existing authorities regarding settlement of claims, forgiveness and offset of claims, payment of interest and available funding that a legislative solution is necessary to address Tribal claims arising from the reconciliation results and other trust management issues. The following framework should be considered to settle the two types of Tribal claims:

## General Payment Policies

**Payment of All Agreed Claims.** All agreed claims will be settled under policies and guidelines where the government agrees to pay specific settlement amounts to the Tribes. These include all Proposed and Scoped Adjustments. Roll-forward Adjustments and interest on deposits due to lag times between collection and deposit as set forth in the Reconciliation Project Reports. Other agreed Type 1 claims which have been settled by negotiation, mediation or arbitration will also be paid directly to the Tribes. Also included will be specific payments to beneficiaries with unreconciled disbursements as set forth in the legislation. All agreed settled claims should be paid promptly within a specified period of time set forth in the legislation. The government would pay the Tribe any principal amounts owed, plus interest, compounded from the date of the error to the date the payment is made or otherwise as set forth in legislation.

**Interest Policy.** There are various ways to compute interest. The fairest method with parallels in the private sector would determine interest payments by computing compound interest at a blended Tribal benchmark rate. This interest payment would be

7

greater than what a tribe could likely recover in court, because the courts have limited the interest amount on trust funds to simple interest on principal only, and because the Tribal benchmark rate is skewed somewhat by a number of long-term instruments held by one tribe. Other market indexed rates may also be used for certain time periods and in particular circumstances.

**Forgiveness Policy.** The reconciliation results indicate that in some cases errors resulted in overpayments or erroneous payments to a tribe or a particular Tribal account. One option is to require tribes to reimburse BIA for amounts erroneously credited to their accounts, with or without interest. However, forgiveness of the entire amount is proposed for the following reasons:

A. These are known and admitted errors of the U. S. Government. Even though the tribes apparently benefitted by these overpayments, they should not be asked to repay amounts which arose out of the U. S. Government's inability to provide an accurate and timely accounting to tribal trust account beneficiaries.

B. These admitted errors were made over twenty years. The usual and customary standards for clearing similar exception items in the private sector is one accounting period, usually ninety days or less. After ninety days, private trust companies usually do not charge their customers for errors committed by the trust companies even though the customers may have benefitted from such errors. The U. S. Government should not adopt a lower standard for itself by seeking restitution from the tribes for these overpayments.

C. The overpayments were identified reconciled items, only. Had a full accounting been possible for the over $2.4 billion in unreconciled non-investment transactions (documentation which could not be located), or had a full accounting been possible in verifying financial transactions to source documents (such as land leases and contracts), or had the Reconciliation Project covered different time periods, the net results for particular tribes might have been different. Errors such as overpayments for particular tribes might have been offset in whole or in part by errors resulting in amounts due to the same tribes had a full accounting been possible or had the Reconciliation Project used different time frames.

D. Overpayments or other exceptions resulting in an amount due from tribes were not researched fully to determine whether a subsequent correcting entry was made by the BIA. Tribes should not be asked to reimburse the government for these amounts unless the government can document that no subsequent correcting entry was made.

8

0593

Given the conditions which have prevented the U. S. Government from rendering an accurate and timely accounting, the U. S. Government should not seek restitution for admitted errors which apparently benefited certain trust beneficiaries which are based on results from a Reconciliation Project with undeniable shortcomings.

No appropriated money will be required for this settlement.

**Netting Policy.** A significant policy consideration that would affect any of the settlement options described above is how the Department should account for amounts owed to a tribe based on the reconciliation results for one or more accounts versus amounts due the United States based on the reconciliation results of one or more different accounts of the same tribe.

Under a no-netting approach, the Department would forgive all amounts that were overpaid to tribes and pay all amounts owed to Tribes plus interest. This approach would require the greatest amount of funds to pay claims.

Under a netting to the tribal level approach, adjustments for all accounts of the same tribe would be netted against each other to arrive at the net amount due to or owed by a tribe. While the least costly approach from the government's point of view, this approach has the distinct disadvantage of netting accounts which may have been set up with a specific purpose in mind (e.g., general tribal funds and judgment funds) or which benefit a specific class of beneficiaries (e.g., all tribal members, specific tribal members, minors) against accounts of the same tribe with a different purpose or which benefit a different class of beneficiary.

The proposed approach would net all amounts owed to a tribe against all amounts due from a tribe for each account of the tribe, but would not net adjustments for all accounts of the same tribe against each other. This is obviously the fairest way to proceed in arriving at the net amount due to or owed by a tribe.

**Waiver/Review.** Tribes that accept payment of Type 2 claims under this settlement process would waive bringing any further claims as part of any subsequent litigation.

**Funding/Cost.** All claims should be paid from the Judgment Fund.

## 1. Payment of Type 1 Claims

Type 1 claims are those where the Department agrees to a specific settlement amount. These include all Proposed and Scoped Adjustments. Roll-forward Adjustments and interest on deposits due to lag times between collection and deposit as set forth in the Reconciliation Project Reports. Because the government has an obligation to correct its known errors, all such claims should be paid promptly within a specified period of time as set forth in legislation. The government would pay the tribe any principal amounts owed, plus compounded interest from the

9

date of the error to the date the payment is made or otherwise as set forth in legislation. The following is a summary and estimate of Type 1 claims and settlement estimates. In accordance with the general policy Type I claims due from tribes would be forgiven.

10

Type 1 Claims
Settlement Estimate
($ millions)

| Type 1 Settlement Category | Principal | Interest | Total |
|---|---|---|---|
| **1-1.  Due From Tribes: Forgiven** | | | |
| 1-1A.  Proposed Adjustments | 11.6 | 11.6 | 23.2 |
| 1-1B.  Rollover Amounts | 26.1 | 116.9 | 143.0 |
| Total Forgiven | 37.7 | 128.5 | 166.2 |

> Note:  Total Forgiven amount does not require appropriations or payment from the Judgment Fund.

| | Principal | Interest | Total |
|---|---|---|---|
| **1-2. Due to Tribes** | | | |
| 1-2A.  Proposed Adjustments | 10.6 | 14.5 | 25.1 |
| 1-2B.  Rollover Amounts | 17.5 | 92.1 | 109.6 |
| Sub-total | 28.1 | 106.6 | 134.7 |
| 1-2C.  Interest on Deposits Due to Lag Times Between Collection and Deposit (BIA) | | 8.2 | 8.2 |
| 1-2D.  Interest on Deposits Due to Lag Times Between Deposit at Treasury and Credit to  Account of Beneficiary (MMS) | ___ | .5 | .5 |
| Sub-Total Due to Tribes under Settlement 1-2 | 28.1 | 115.3 | 143.4 |

11

0596

## 2. Evaluation and Payment of Type 1 Claims Resulting From Disputes

**Evaluation/Guidelines and Payment of Agreed Claims.** The Department would evaluate any Type 1 claims where the tribe disputes the account balance. The Tribe would be required to initiate a claim based on additional Tribal documentation the tribes may have. To the extent practical such documentation should be pursuant to the reconciliation standards employed by Arthur Andersen in the Reconciliation Project. Claims could also be initiated based on an analysis of reconciled disbursements without complete disbursement voucher packages. Type 1 claims could include challenges to "Passed Adjustments" contained in the Reconciliation Project Reports and other challenges to the Reconciliation Report findings.

The Department shall negotiate in good faith with any account holder who initiates a Type 1 claim in an attempt to reach agreement on the account balance and any adjustments prior to a mediator being appointed. If agreement is reached, the agreed claim would be settled under the general payment policies and procedures for Type I claims, including interest, forgiveness, netting, funding, etc., as set forth above.

**Negotiation/Mediation/Arbitration.** The Department shall enter into mediation with any account holder who disputes the balance of the account holder's account as reconciled and reported in the Reconciliation Report and any other Type 1 claim. The Department shall negotiate in good faith with the account holder to reach agreement on the balance of the account holder's account. Negotiating sessions may take place at any site agreed upon by both the Department and the account holder. If agreement cannot be reached within a reasonable period of time, upon notification from the Department, the Director of the Federal Mediation and Conciliation Service shall appoint a mediator to mediate the dispute. The time and frequency of negotiating sessions shall be determined by agreement of the Department, the account holder, and the mediator. Six months from the date mediation commences, the Department shall record, and the account holder and any other party of interest shall accept, as the balance accurate as of September 30, 1995, for any accounts submitted to negotiations under mediation, the account balance reported by the Secretary to the Congress in the Reconciliation Report under section 304 of Public Law 103-412, 108 Stat. 4239, 4248 (1994), unless:

1. The Department and the account holder enter into an agreement, prior to that date, stipulating the correct balance of the account and any agreed adjustments to the account; or

2. The account holder or his agent, prior to or on that date, notifies the Department and the mediator that he has decided to submit the dispute to binding arbitration for resolution or has decided to litigate the matter.

If binding arbitration is chosen, both the Department and the account holder must agree to it. The Department must not unreasonably withhold its consent to binding arbitration. Any arbitration proceeding shall be conducted by a panel of three arbitrators under rules established by legislation.

12

0597

The panel of arbitrators, in resolving an account holder's dispute, shall decide the appropriate balance of the account holder's account, and shall award amounts to either party as necessary to adjust the balance of the account holder's account. Awards may be limited by type, by aggregate amount, by individual tribe or otherwise as set forth by the Congress in legislation. Any payment to the account holder by the United States as a result of the decision shall be paid from the Judgment Fund and may be enforced by a federal district court.

The government should pay the expenses of mediation and arbitration for both parties under terms and conditions set forth in the legislation.

### Treatment and Limitations on Claims based on Reconciled Disbursements Without Complete Disbursement Voucher Packages

The Reconciliation Project Reports sent to each tribe contains a summary of the basic reconciliation disbursement transaction results for each tribe. Codes were assigned to reconciled disbursement transactions indicating the level of supporting documentation. In the aggregate approximately $6,035 million were categorized as "Reconciled" transactions. Of this amount, only $1,925 million were in the category in which the complete disbursement voucher package was reconciled. $4,110 million involved reconciled transactions with incomplete disbursement voucher packages. Some of these incomplete disbursement packages may not constitute "proof of payment" as that term is understood in the private sector. As a result claims may be pursued by individual tribes seeking restitution for these poorly documented transactions. Because some degree of proof of payment exists and because the tribes now have access to the images and the documentation for all these transactions, the burden of bringing a claim should fall on the tribes. In addition, most of these transactions are supported by at least one valid authorization. The probability that the tribes suffered a loss or other damage from these incomplete disbursement voucher packages, while significant, is most likely less than 10%.

An aggregate settlement of $400 million seems appropriate. This is approximately 10% of the $4,110 million in reconciled transactions with incomplete disbursement packages. In addition, if an accounting were ordered to establish "proof of payment" for all reconciled transactions without complete disbursements packages, the government might have to spend similar amounts in the accounting alone. It is proposed that $200 million be earmarked as a general Type 2 claim settlement with the proceeds to be used as part of the initial capital of the development bank proposed as part of the Type 2-7A claims settlement proposal. $200 million should be earmarked to satisfy any individual claims brought by Tribes based on these transactions. Individual awards to a Tribe agreed to by the Department or compelled by the Arbitration process for Type 1 claims of this nature should be limited to no more than 5% of the total reconciled transactions with incomplete disbursement packages for that Tribe.

**Timing.** Evaluation of Type 1 claims would occur simultaneously with calculation of the Type 1 settlement amount, so that if a tribe presented adequate documentation to merit an agreed adjustment, that adjustment and other Type 1 claims could be included as part of the settlement of its Type 1 claims. However, payment of agreed Type 1 claims should not be delayed for

13

those tribes choosing to bring a claim under the procedures established for other Type 1 claims.

In keeping with general policy. Type 1 claims due from tribes for Passed Adjustments would be forgiven.

The following table is a summary of Type 1 Claims and Settlements arising from disputes.

14

0599

Type 1 Claims
Settlement Estimate
($ millions)

| Type 1 Settlement Category | | Principal | Interest | Total |
|---|---|---|---|---|
| 1-3.  Due From Tribes: Forgiven | | | | |
| Passed Adjustments: | | | | |
| Principal | 7.6 | | | |
| Interest | 25.4 | | | |
| Total | 33.0 | - | - | - |
| 1-4.  Due To Tribes: | | | | |
| Passed Adjustments: | | | | |
| Principal | 3.4 | | | |
| Interest | 5.7 | | | |
| Total | 9.1 | (1) | (1) | (1) |
| 1-5.  Disputed Claims Based on Additional Tribal Documentation and Due To Tribes Based on Negotiation, Mediation and Arbitration | | (1) | (1) | (1) |

1-6.  Reconciled Disbursements with Incomplete
Disbursement Voucher Packages

1-6A.  General Settlement of all potential liability for all reconciled
disbursements with incomplete disbursement voucher packages.
Proceeds will be used to capitalize partially the Development
Bank (See Settlement 2-7).                                    200

1-6B.  Reconciled Disbursements with Incomplete Disbursement
Voucher Packages and Due To Tribes Based on Negotiation,
Mediation and Arbitration.

| | | | | |
|---|---|---|---|---|
| Principal | 4,110 | (1) & (2) | (1) & (2) | 200 |
| Total Type 2 Exposure | | (1) & (2) | (1) &(2) | 400 |

(1) None unless tribes dispute the account balance and bring successful action and receive settlements
based on negotiation, mediation or arbitration.

(2) It is proposed that the legislation cap the potential liability for Type 1-6B claims at $200 million.
Individual awards to a tribe will be capped at 5% of the total reconciled transactions with incomplete
disbursement packages for that tribe.  The unused portion of the $200 million pool will be used to pay
other Type 1 claims with any remaining balance reverting to the U. S. Treasury.  General Settlement 1-6A
for $200 million will be used to capitalize the development bank described in Settlement 2-7.

Attachment C Part 3 to Boswell Declaration                                    0600

### 3. Settlement of Type 2 Claims

There are two approaches to settlement of Type 2 claims. Under the first approach, an amount would be paid that reflects a Congressionally-determined amount for the specific Type 2 claims described below. A second approach provides for a general settlement of Type 2 claims with all or most IIM account holders and Tribes for all other covered issues and claims defined in the legislation.

The following section discusses the rationale and the terms and conditions for each proposed settlement of Type 2 claims.

16

# SPECIFIC TYPE 2 CLAIMS SETTLEMENTS

## Type 2-1: IIM Account Holders Settlement Proposal

Settlement 2-1:    1. $281 million
                   2. **Tax Free Status for IIM Accounts**

This amount of money would be used to compensate IIM account beneficiaries for any harm, damage or loss arising out of the government's inability to provide an accurate and timely accounting to IIM trust account holders.

Rationale:

A full discussion and assessment of IIM trust management systems are contained in the report entitled "IIM Related Systems Improvement Project Report" and in the Special Trustee's Assessment. Generally, both reports point to:

1. the poor condition of the IIM data bases and the lack of integrated and adequate systems.

2. the dependence on outdated manual systems and inconsistent automated systems.

3. the lack of documentation supporting subjective management decisions.

4. failures to address adequately large and unacceptable numbers of suspense items; accounting and reconciling errors and exceptions; accounts with no address or an incorrect address; duplicate accounts; retention of funds for minors over 18 years of age; dormant special accounts; and undistributed closed estates.

5. poor internal controls and inconsistent policies and practices.

6. a lack of appropriate audit trails.

7. an inability to trace deposits and collections to source documents.

8. large numbers of missing documents.

9. systems and processes which are not capable of establishing up-to-date and accurate land title records, necessary to the lease management process.

10. no accounts receivable system to assure that all income due is collected or that it is collected in a timely manner.

11. an organizational alignment which is ineffective at times.

17

The following Table is illustrative of the type and depth of problems affecting IIM trust management:

| IIM Exposure | No. Accts. | Liability Principal | Exposure |
|---|---|---|---|
| Balance as of 2/96 | 308,000 | $509 million | |

1. **Problems**

   A. 54,921 accounts without a known address — $44.9 million — Unknown
      Whereabouts Unknown over 7 years — $7.8 million — Unknown

   B. 15,230 accounts for former minors over 21 — $21.8 million — Unknown

   C. Overdraft Interest Clearing Accounts
      (Non-earning assets which deprive current IIM
      account holders of over $2 million annually),
      as of 8/29/96. — $42.2 million — $2million/yr

   D. 1,493 closed estates not distributed to
      heirs over 4 years — $0.419 million — Unknown

   E. 55% of accounts (170,262) have balance
      less than $10 which are maintained
      at significant cost to taxpayer. — Taxpayer Cost

   F. 36,917 accounts have had no activity
      during last eighteen months and are
      maintained at significant cost to taxpayer. — Taxpayer Cost

   G. At OTFM there are $28.3 million in general ledger
      differences, suspense differences, balancing
      differences, overdraft losses and miscellaneous
      losses which have not been cleared, as of 8/29/96. — $28.3 million

2. Interest owed to IIM account holders for 1980's thrift losses $13 million

3. Cost to reconcile IIM accounts: Contractor's 1992 estimate: $108 to $281 million

4. Risk of court ordered accounting/reconciliation — Unknown

5. Past IMPL exposure — Unknown

6. Other:

| | No. Accts. | Liability Principal |
|---|---|---|
| Missing Social Security Numbers | 130,833 | $174,975,472 |
| Overdrafts IIM | 300 | 319,358 |
| Special Deposit Accounts | 26,087 | 135,987,085 |
| Special Deposit Accounts 0 Balance | 9,954 | |
| Special Deposit Overdrafts | 45 | 120,786 |
| Special Deposits - No Activity last 2 yrs. | 5,245 | 2,149,707 |
| J Accounts over 18 | 23,494 | 25,563,216 |
| J Accounts over 21 | 15,236 | 21,842,120 |

Whereabouts Unknown:

| | No. Accts. | Liability Principal |
|---|---|---|
| $0 Balance | 4,286 | 0 |
| $0 to 50 | 26,066 | 381,100 |
| 50 to 100 | 4,409 | 322,013 |
| 100 to 1,000 | 14,382 | 5,749,547 |
| 1,000 to 5,000 | 3,982 | 8,536,362 |
| Over $5,000 | 1,785 | 30,004,307 |

0603

Trust management system deficiencies and the poor condition of the records prevent a proper, accurate and timely accounting of IIM account balances, collections, deposits, disbursements, investments and return on investments.

Further, to conduct a reconciliation of the IIM accounts similar to that undertaken for tribal accounts during the recently completed Reconciliation Project would require between $108 million and $281 million according to estimates made by the Reconciliation Project primary contractor in 1992. This compares to approximately $20 million which was spent for the twenty year tribal Reconciliation Project. The reason the costs to reconcile are so much larger for IIM accounts is due to the large number of accounts and the fact that the IIM trust management systems and the condition of the IIM records are generally considered to be much worse than the systems and records applicable to tribal trust accounts. For example, substantially all of the IIM electronic financial records are missing prior to 1985. Therefore, even if a reconciliation effort were initiated for IIM accounts, it is unlikely that it would produce satisfactory or conclusive results or amount to an accounting sufficient to aid in the determination of harm, damage or loss to IIM account holders.

Rather than spend $108 million to $281 million to produce what is likely to be an unsatisfactory result, it is proposed that the larger amount or $281 million (Settlement 2-1) be specifically used to compensate IIM account beneficiaries for any harm, damage or loss arising out of the government's inability to provide an accurate and timely accounting to IIM trust account holders. This figure is not submitted as nor is it to be considered an appraisal of the actual damage and harm suffered by these account holders. This figure is based on the probable amount it would cost the trustee to produce an unsatisfactory reconcilement of these accounts. The actual damage figure may be materially different.

Since there is not a practical way equitably to allocate the settlement amount to individual account holders, past and present, it is proposed that all $281 million in principal be deposited in the IIM Investment Pool and subsequently invested for the benefit of IIM account holders. This would be a permanent fund and would also act as a reserve to pay claims successfully brought by individual account holders. Principal could not be withdrawn from the IIM Investment Pool, except to pay for individual claims successfully brought by IIM holders through litigation or otherwise.

Current and future IIM account holders would benefit by receiving the earnings on the permanent fund in the form of an increased yield on IIM account balances.

To further enhance their opportunity for higher yields on savings, to encourage savings and to allow previous IIM account holders an opportunity to participate, all IIM accounts will be converted to trust savings accounts with a checking account feature. Such accounts would retain all current account features, including the feature which permits disbursement of IIM deposits. IIM account holders would continue to receive all eligible disbursements as they do now or could elect to save all or a part of IIM monies to earn the extra yield provided by the $281 million permanent settlement fund. Voluntary deposits would be accepted from all current or past IIM account holders. Former IIM account holders could re-open accounts and deposit their savings to earn the higher yield as well. In addition all interest received by IIM account holders would be free of federal taxes by Act of Congress.

19

Type 2-2: Restoration of IIM Thrift Industry Losses

Settlement 2-2: $13 million, more or less.

This amount of money would restore to the IIM account holders $12.8 million, more or less, in interest that was not earned on over $5 million in principal that was lost as a result of failed investments by the BIA in the 1980s and not restored until recently.

Rationale:

The documentation for this settlement amount is contained in the Department of the Interior (Department) FY 1996 Budget Submission to Congress, wherein the Department requested appropriations of $12,668,000 to be used to restore interest that was not earned for IIM account holders because of principal that was lost as a result of investments from the IIM Investment Pool in uninsured obligations of failed credit unions and savings and loan associations.

The 12,668,000 is for the period from FY 1984 through FY 1995 and continues to increase at an amount of approximately $53,000 a month or about $636,000 annually.

Type 2-3: Restoration of Overdraft Interest Clearing Accounts

Settlement 2-3: $42.2 million, more or less.

Specific Settlement to restore $42.2 million in unidentified Overdraft Interest Clearing Accounts to the IIM Pool. Amount is equivalent to non-earning assets which deprive current IIM account holders of over $2 million in annual income.

Type 2-4: Settlement of Miscellaneous Losses at Office of Trust Funds Management

Settlement 2-4: $ 28.3 million:

| | |
|---|---|
| Losses and associated interest | $10.0 |
| To bring subsidiary (IRMS) and Control Acct (Omni) into balance | 10.8 |
| Budget Suspense Accts | 1.0 |
| To clean-up all remaining General Ledger Accts | 6.5 |
| | |
| **Approximate Total** | **$28.3** |

$28.3 million will clear known losses, aged suspense accounts, unreconciled general ledger entries and other accounting errors of the past which cannot be recovered.

The "Approximate Total" of $28.3 million is the best estimate of the funds that would be required to wipe the slate clean as of 8/29/96. This liability has accrued over numerous years and various accounting systems and conversions (from manual systems to automated systems). Just to reiterate this is the best estimate of the potential liability that continues to grow, and was derived

from numerous accounting systems that at best are very suspect as to their accuracy.

## Type 2-5 IIM and Tribal Account Holders Joint Settlement on Systems Improvements Implementation of the Special Trustee's Strategic Plan

Settlement 2-5: $147 million.

IIM account beneficiaries would share with tribal beneficiaries in the $147 million proposed by the Special Trustee to bring trust management policies, procedures, practices and systems up to a commercial standard within three years.

Rationale:

As noted, in February 1996 the OST produced a conceptual Strategic Plan to acquire and institutionalize specified systems. Implementation of this plan will ensure that the U. S. Government establishes appropriate policies and procedures, develops necessary systems and takes the affirmative actions necessary to provide an accurate and timely accounting to American Indian trust beneficiaries in the future. In this manner the proper discharge of the Secretary of the Interior's trust responsibilities finally can be accomplished. The Strategic Plan (attached) reads in part:

Phase I of the Strategic Plan is designed to bring the trust accounting and management systems up to commercial standards within three years. This, at a minimum, will involve acquiring, automating, updating, integrating, coordinating and consolidating to produce:

1. A trust resource/asset management delivery system.

2. An accounts receivable data and billing system that uses lease-contract and land and ownership information.

3. A trust, depository, payments and delivery system for Individual Indian Money (IIM) accounts.

4. A land records and title recordation and certification system.

5. A general ledger and general ledger accounting system.

6. A technology services center dedicated to trust resource and funds management.

7. A national archives and records center.

8. A risk management and control system.

9. An independent institutional structure.

This will involve consolidating trust resources, trust funds and land ownership and records management processes into a single, independent institutional unit with its own management

Attachment C Part 3 to Boswell Declaration

0606

structure to accommodate the restructuring and reorganization contemplated by Phase I of the Strategic Plan. The unit should be organized by function and dedicated exclusively to trust management. The unit should have agency or bureau status within the Department of the Interior or elsewhere.

The details are contained in the attached Special Trustee's Strategic Plan.

The details of the costs to implement the Strategic Plan are also in the attachment. The summary costs are as follows:

22

Cost of Special Trustee's Strategic Plan Phase I
( $ in thousands)

| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | Total |
|------|------|------|------|------|------|-------|
| 3,000 | 49,682 | 32,706 | 20,389 | 20,586 | 20,585 | 146,948 |

The implementation of the OST Strategic Plan will provide with reasonable assurance an accurate and timely accounting of the IIM and tribal trust account balances, collections, deposits, disbursements, investments and return on investments. For this reason, the OST Strategic Plan implementation and costs are an integral part of both the IIM settlement proposals and the tribal settlement proposals.

## 2-6: Settlement for Reconciliation Project Unreconciled Transactions

**Settlement 2-6A:**    **$300 million**

This is a general settlement of potential damages for all unreconciled transactions arising from the Reconciliation Project. Proceeds of this general settlement will be used to partially capitalize the Development Bank contemplated by Settlement 2-7.

**Settlement 2-6B:**    **$300 million**

This is a specific settlement for the following 32,901 transactions for which supporting documentation could not be located during the Reconciliation Project ($ millions, absolute value):

| | |
|---|---|
| Receipts: | 1,123.3 |
| Transfers: | 479.6 |
| Disbursements | 808.6 |
| Total | 2,411.5 |

Actual Disbursement Exposure can be computed as:

| | |
|---|---|
| Unreconciled ($ million, absolute value) | 808.6 |
| Less: Positive Disbursements | (73.6) |
| Attorney and Expert Witness Fees | (40.5) |
| Alaska Regional Corporations | 119.5 |
| Principal Disbursement Exposure | 575.1 |
| Interest on Principal | 1,361.8 |
| Total Disbursement Exposure | 1,936.9 |

$300 million will be disbursed to individual tribes with known unreconciled disbursements. The settlement for each tribe would equal the product of the percentage of each tribe's unreconciled disbursements plus interest (date of inception through 12/31/95) to total unreconciled disbursements

23

plus interest on the total times the settlement amount of $300 million. The excess principal and interest potential liability to the tribes will be considered satisfied by the 2-6A general settlement and by the 2-7 general settlement.

Rationale:

These aggregate settlements are to be awarded to tribal trust account beneficiaries based generally on the $2.2 billion of unreconciled non-investment transactions (excluding positive transactions and payment of attorney's and expert witness fees and expenses and certain other exclusions for which reasonable proof of payment exists) identified by the Reconciliation Project.

The disbursement errors and exceptions are of particular importance and concern since they represent known amounts which were charged against known tribal accounts, but for which the payee could not be determined during the Reconciliation Project. Therefore, proof of who benefitted from these disbursements cannot be established by the federal government. The unreconciled disbursements expose the government to the greatest potential liability and are treated accordingly in the allocation of the settlement amounts, both specifically to tribes and in the general settlement as well.

$575.1 million is a net amount representing unreconciled disbursements as defined above. Compounded interest from the date of the errors through December 31, 1995 is $1,361.8 million.

Distribution is based on the reasons stated below.

**Settlement 2-6A: $300 million**

It is proposed that this amount be distributed to all tribes with trust accounts in a general way. The proceeds will be used to provide part of the initial capital for the Development Bank described in Type 2-7.

The rationale for Settlement 2-6A is as follows. Had a full accounting been possible for the $575.1 million in unreconciled disbursements or had the Reconciliation Project covered previous or different reconciliation periods, different results might have occurred and tribes other than those covered in Settlement 2-6B might have suffered harm, damage or loss. Also, those tribes covered in Settlement 2-6B might have had different levels of harm, damage or loss as well. The general settlement is intended to cover any damages which may have occurred as a result.

In addition, it appears that the condition of the records and the quality of the trust management systems were much worse for periods prior to 1972. Therefore, it is reasonable to assume that substantially more unreconciled receipts, transfers and disbursements would have been exposed had the Reconciliation Project covered periods prior to 1972. Any harm or damage resulting is intended to be covered by the 2-6A general settlement of $300 million and general settlement 2-7.

The general settlements also compensate trust beneficiaries that may have been harmed as a

Attachment C Part 3 to Boswell Declaration

0609

result of mis-posted receipts and transfers which may have occurred in the universe of unreconciled receipts and disbursements. Receipts are mostly deposits. The government can demonstrate that the unreconciled receipts were posted to the general ledger accounts of particular tribes, so those tribes benefitted by the transactions and are unlikely to bring a claim as a result. The same is true, generally, for unreconciled transfers between accounts of the same tribe. There is no evidence of damage to these tribes, but if transfers were mis-posted and should have been posted to the account of a different tribe, damage to the other tribe may have resulted. There is simply no way to determine whether damage occurred to particular beneficiaries as a result of the unreconciled receipts or transfers, nor who these harmed beneficiaries were. The general settlements, however, are intended to cover any such unidentified harm or damage.

To partially compensate all eligible tribal trust account holders for the harm and damage which might have occurred as a result of the unreconciled transactions, $300 million will be awarded. The proceeds will be used to capitalize in part the Development Bank which will benefit all tribes.

**Settlement 2-6B: $300 million.** It is proposed that this amount be distributed to individual tribes with known unreconciled disbursements since these items represent the highest potential for actual harm and damage having occurred for Tribal trust beneficiaries.

The settlement for each tribe would be equal to the product of the percentage of each tribe's unreconciled disbursements plus interest (calculated from date of the transaction through December 31, 1995) to total unreconciled disbursements plus interest on the total unreconciled disbursements times the settlement amount of $300 million. While this may not cover all the potential damage which may have resulted from these unreconciled disbursements, the total award to the tribes covers 52% of total unreconciled disbursement exposure and 15.5% of total unreconciled disbursement exposure plus interest on those transactions from inception. Excess damage, if any, is intended to be covered by settlement 2-6A and by the general settlement 2-7.

**Type 2-7:    General Settlement for IIM and Tribal Account Holders Establishment of a Development Bank for American Indians**

**Settlement 2-7:    Establishment of a Development Bank for American Indians with the following capital and guarantees to be provided by the U. S. Government:**

|  |  |
|---|---|
| **2-7A. Equity Capital** | **$500 million** |
| **2-7B. Borrowing Capacity** | **10 x Equity Capital** |
| **2-7C. Initial Borrowing from U. S.** | **$3 billion for 30 yrs at 30 year T Rate** |

Settlement 2-7 is intended to settle all other potential claims arising out of the reconciliation project not covered by Type 1 claims and other Type 2 claims and past potential liability for trust mismanagement practices in general. A full explanation of the rationale on this settlement and

25

details on the Development Bank can be found in Appendix 1.

General Settlement 2-7 involves the creation of a federal Development Bank for American Indians (D-Bank) which will be formed and capitalized by the federal government and will be a nationwide financial institution providing a dependable source of lending to American Indians and American Indian Tribes and their communities and a dependable source of investing in American Indian Enterprises.

D-Bank will provide access to long-term loans and investments for economic development, consistent with principles of self-determination, self-governance and self-sufficiency and will provide access to low interest rates on loans, made possible by D-Bank's tax free status and its access to funding in the nation's capital markets at rates commensurate with those paid by the U. S. Government and Agencies of the U. S. Government.

D-Bank will also be allowed to invest up to $300 million in the purchase, holding, financing and sale of fractionated realty interests in Indian allotment lands. Such purchases and financings will be made on prudential terms to eligible individuals and tribes. Such activities will be regulated by rules set forth in legislation to resolve the fractionated heirship issues and will be administered to achieve the consolidation of existing fractional interests and the prevention or substantial reduction of further fractionation.

D-Bank will be a for-profit financial institution and will not receive appropriated funds for operating expenses. It will receive appropriated funds for lifeline financial services and other specified programs as approved by Congress.

D-Bank will be authorized to invest up to 25% (initially $125 million) of its permanent capital in eligible individual Indian and Indian Tribe businesses and projects which will aid economic development of the American Indian communities. These investments include common and preferred stock and long-term subordinated draft investments in:

A.    Infrastructure Acquisition and Development Activities
B.    Project Financing
C.    Venture Capital Businesses
D.    Established Business

Attachment C Part 3 to Boswell Declaration                    0611

D-Bank's capital and funding will be provided by the federal government in the following amounts:

2-7A.  Equity Capital:                                                          500

Initial Equity Capital of $500 million will be provided by the federal government as part of Settlement 1-6A ($200 Million) and 2-6A ($300 million).  Shares will be distributed to all federally recognized tribes on some equitable basis set forth in legislation.

2-7B.  Loans from U. S. Government:                                            3,000

$3 billion in direct long-term loans will be provided to D-Bank for thirty years at the U. S. Treasury rate for 30 year obligations.

2-7C.  U. S. Government Guaranteed Obligations                                 5,000

Future funding of up to 10 times equity capital from the sale of bonds and notes in the nation's capital markets by D-Bank will be guaranteed by the full faith and credit of the United States.  Loans from the United States Government of $3 billion are included in this amount.

27

# ATTACHMENT C

# TO BOSWELL

# DECLARATION

# PART 4

The following is a summary of Type 2 Claims and Settlements:

Type 2 Claims
Settlement Estimate
(5 millions)

| Type 2 Settlement Category | Total |
|---|---|
| 2-1: IIM Account Holders Settlement Proposal | 281 |

Specific Settlement of Past Damages to IIM Holders

    1.  Amount is equal to estimated reconciliation costs for IIM Accounts.  Amount will be invested in IIM pool for benefit of all account holders, past, present and future who will receive a higher yield as a result.

    2.  Settlement also includes tax free status for future IIM accounts.

Tax Free Status

2-2: Restoration of IIM Thrift Industry Losses    13

Specific Settlement to restore interest lost by IIM account holders because of principal that was lost as a result of IIM Pool investments in obligations of failed thrifts in 1980s.

2-3: Restoration of Overdraft Interest Clearing Accounts    42.2

Specific Settlement to restore $42 million in unidentified Overdraft Interest Clearing Accounts to the IIM Pool. Amount is equivalent to non-earning assets which deprive current IIM account holders of over $2 million in annual income.

2-4: Miscellaneous OTFM General Ledger Losses    28.3

Specific Settlement to clear $28.3 million in general ledger differences, suspense amounts, balancing differences, overdraft losses and other losses.

28

Attachment C Part 4 to Boswell Declaration

Type 2 Claims Settlement Estimate ($millions) (continued)

| Type 2 Settlement Category | Total |
|---|---|
| 2-5: IIM and Tribal Account Holders Joint Settlement for Systems Improvements | 147 |

Specific Settlement to bring trust management systems up to commercial standards. Amount is the estimated cost to implement the Special Trustee's Strategic Plan over five years. Implementation will ensure that the government takes the actions necessary to provide an accurate and timely accounting to American Indian trust beneficiaries in the future. In this manner the proper discharge of the Secretary's trust responsibilities finally can be accomplished.

2-6: Settlement for Reconciliation Project Unreconciled Transactions

2-6A. General Settlement of potential damages for all unreconciled transactions arising from the Reconciliation Project. Proceeds of General Settlement will be used to partially capitalize Development Bank (See Settlement 2-7)    300

2-6B. Specific Settlement for the following 32,901 transactions for which supporting documentation could not be located during the Reconciliation Project ($ million, absolute value):    300

| | |
|---|---|
| Receipts: | 1,123.3 |
| Transfers: | 479.6 |
| Disbursements | 808.6 |
| Total | 2,411.5 |

Actual Disbursement Exposure can be computed as:

| | |
|---|---|
| Unreconciled ($ million, absolute value) | 808.6 |
| Less: Positive Disbursements | (73.6) |
| Attorney and Expert Witness Fees | (40.5) |
| Alaska Regional Corporations | 119.5 |
| Principal Disbursement Exposure | 575.1 |
| Interest on Principal | 1,361.8 |
| Total Disbursement Exposure | 1,936.9 |

Attachment C Part 4 to Boswell Declaration                    0614

Type 2 Claims Settlement Estimate ($millions) (continued)

Type 2 Settlement Category                                                            Total

$300 million will be disbursed to individual tribes with known unreconciled
disbursements. The settlement for each tribe would equal the product of the
percentage of each tribe's unreconciled disbursements plus interest (date of
inception through 12/31/95) to total unreconciled disbursements plus interest
on the total times the settlement amount of $300 million. The excess
principal and interest potential liability to the tribes will be considered
satisfied by the 2-6A general settlement and by the 2-7 general settlement.

2-7: General Settlement for IIM and Tribal Account Holders

Settlement 2-7 is intended to settle all other potential claims arising
out of the reconciliation project not covered by Type 1 claims and
other Type 2 claims and all past potential liability for trust
mismanagement to be defined by the legislation through the effective
date of settlement set by legislation.

General Settlement 2-7 involves the creation of a federal
Development Bank for American Indians (D-Bank) which will be
formed and capitalized by the federal government and will be a
nationwide financial institution providing a dependable source of
lending to American Indians and American Indian Tribes and their
communities and a dependable source of investing in American
Indian Enterprises.

D-Bank will provide access to long-term loans and investments for
economic development, consistent with principles of self-
determination, self-governance and self-sufficiency and will provide
access to low interest rates on loans, made possible by D-Bank's tax
free status and its access to funding in the nation's capital markets at
rates commensurate with those paid by the U. S. Government and
Agencies of the U. S. Government.

D-Bank will also be allowed to invest up to $300 million in the
purchase, holding, financing and sale of fractionated realty interests
in Indian allotment lands. Such purchases and financings will be
made on prudential terms to eligible individuals and tribes. Such
activities will be regulated by rules set forth in legislation to resolve
the fractionated heirship issues and will be administered to achieve
the consolidation of existing fractional interests and the prevention
or substantial reduction of further fractionation.

Attachment C Part 4 to Boswell Declaration                                    0615

Type 2 Claims Settlement Estimate ($millions) (continued)

### Type 2 Settlement Category

D-Bank will be a for-profit financial institution and will not receive appropriated funds for operating expenses. It will receive appropriated funds for lifeline financial services and other specified programs as approved by Congress.

D-Bank will be authorized to invest up to 25% (initially $125 million) of its permanent capital in eligible individual Indian and Indian Tribe businesses and projects which will aid economic development of the American Indian communities. These investments include common and preferred stock and long-term subordinated draft investments in:

A.    Infrastructure Acquisition and Development Activities
B.    Project Financing
C.    Venture Capital Businesses
D.    Established Business

D-Bank's capital and funding will be provided by the federal government in the following amounts:

2-7A.  Equity Capital:                                            500

Initial Equity Capital of $500 million will be provided by the federal government as part of Settlement 1-6A ($200 Million) and 2-6A ($300 million). Shares will be distributed to all federally recognized tribes on some equitable basis set forth in legislation.

2-7B.  Loans from U. S. Government:                               3,000

$3 billion in direct long-term loans will be provided to D-Bank for thirty years at the U. S. Treasury rate for 30 year obligations.

2-7C.  U. S. Government Guaranteed Obligations                   5,000

Future funding of up to 10 times equity capital from the sale of bonds and notes in the nation's capital markets by D-Bank will be guaranteed by the full faith and credit of the United States. Loans from the United States Government of $3 billion are included in this amount.

Attachment C Part 4 to Boswell Declaration          31

Type 2 Claims Settlement Estimate ($millions) (continued)

| Type 2 Settlement Category | Total |
|---|---|
| **Total Type 2 Claims:** | |
| 1. Direct Settlement Obligations: Settlements 2-1 through 2-7A | 1,611.5 |
| 2. Loans from U. S. Government: Settlement 2-7B | 3,000 |
| 3. U. S. Government Guaranteed Obligations of $5 billion, net of $3 billion Loan: Settlement 2-7C | 2,000 |
| Total Type 2 Claims | 6,611.5 |

## V. WAIVERS AND LITIGATION

If a tribe accepts payment of its Type 2 claims under the legislation's settlement process, the acceptance would constitute a full discharge of the United States with respect to all claims regarding Tribal trust fund accounts for the period prior to September 30, 1995. Settlements under the statute would not be reviewable in court. If a tribe did not accept settlement under these provisions, the tribe could litigate its claims, but none of the guidelines pertaining to the value of its claims would be applicable, nor would the tribe be able to participate in the Type 2 settlements.

Tribes that do not settle claims under the settlement procedure outlined above may seek to litigate those claims in court; however, such litigation is usually extremely costly and time-consuming for all the litigants. For these reasons, the Department has specifically rejected any litigation process that would resemble the Indian Claims Commission proceedings of years past, and believes that the legislation establishing the settlement procedures also must establish certain parameters for litigating the claims of non-settlers. Such parameters are necessary to ensure that litigation proceeds in an orderly and efficient manner, to ensure that the beneficiaries of the claims, as opposed to their attorneys and accountants, are the persons who benefit from any amounts recovered in litigation, and to encourage settlement of as many claims as possible. The Department may seek to establish parameters for the litigation of claims for those who do not avail themselves of the settlement opportunities in the legislation. Such parameters could address and resolve, for example, issues relating to statute of limitations, burdens of proof, standards of accounting, limitations on attorneys fees and forgiveness/interest policies. Congress should also consider requirements forcing the trustee (U.S. Government) to negotiate, litigate and arbitrate in good faith.

The IIM and tribal account balances will be set as of September 30, 1995, subject to individual changes as result of court procedures, error corrections, etc.

32

Attachment C Part 4 to Boswell Declaration

# APPENDIX 1

## ESTABLISHMENT OF A DEVELOPMENT BANK FOR AMERICAN INDIANS

Establishment of a Development Bank for American Indians with the following capital and guarantees to be provided by the U. S. Government:

| | |
|---|---|
| Equity Capital | $500 million |
| Borrowing Capacity | 10 x Equity Capital |
| Initial Borrowing from U. S. | $3 billion for 30 yrs |
| | at 30 year T Rate |

The American Indian Trust Fund Management Reform Act of 1994 requires, in part:

"(B) Provisions for opportunities for Indian tribes to assist in the management of their trust accounts and to identify for the Secretary options for the investment of their trust accounts, in a manner consistent with the trust responsibilities of the Secretary, in ways that will help promote economic development in their communities."

The Special Trustee is considering a phase two to the comprehensive strategic plan which will include a Development Bank for American Indians.

A Development Bank (D-Bank) will be formed and capitalized by the federal government. D-Bank will be a nationwide financial institution providing a dependable source of:

A. Lending to American Indians and American Indian tribes and their communities.

B. Investing in American Indian Enterprises.

D-Bank will provide the following principal benefits to American Indians and Indian tribes:

A. Access to long-term loans and investments for economic development, consistent with principles of self-determination, self-governance and self-sufficiency.

B. Access to low interest rates on loans, made possible by D-Bank's tax free status and its access to funding in the nation's capital markets at rates commensurate with those paid by the U. S. Government and Agencies of the U. S. Government.

D-Bank:

A. will be an instrumentality of the federal government and will be backed by the full faith and credit of the U. S. Government.

B. will be examined, supervised and regulated by an Agency of the U. S. Government, existing or to

1

be formed for this purpose.

C. will lend to and invest in various American Indian enterprises, infrastructure projects and other projects of a developmental nature.

D. will facilitate and implement efforts and initiatives to make individual American Indians and American Indian tribes economically more self-sufficient under established principles of self-determination and self-governance.

E. will be a for-profit financial institution and will not receive appropriated funds from the Federal Government for operating expenses. It will receive appropriated funds for lifeline banking services and other specified programs as approved by Congress.

F. may be used to facilitate the disbursement of appropriated funds for other governmental programs for American Indians and their tribes and communities.

G. will have a nationwide delivery network with branch offices located in or near major American Indian communities. The delivery system will also employ a state of the art telecommunications and electronic delivery system.

D-Bank's capital and funding will be provided by the federal government in the following amounts:

1. $500 million in equity contributions from appropriated or judgment funds.

2. $3 billion in direct, long-term loans from the federal government for thirty years at the U. S. Treasury interest rate on thirty year obligations.

3. Future funding of up to 10 times equity capital from the sale of bonds and notes in the nation's capital markets, guaranteed by the full faith and credit of the United States.

D-Bank's initial capital stock will be distributed to federally recognized American Indian tribes in proportion to the number of American Indians living on or near reservations as determined by the latest census information or by some other acceptable means. This permanent capital cannot be sold, traded or withdrawn. Each share will be vested with one voting right for purposes of electing D-Bank's Board of Directors or for voting on other corporate matters requiring shareholder approval.

Each borrower of D-Bank will generally be required to invest in capital stock or participation certificates of D-Bank, generally at the rate of two percent of the loan.

Dividends and patronage payments may be authorized by D-Bank's Board of Directors, subject to regulations that establish minimum at-risk capital standards.

D-Bank will have a corporate structure patterned after banks belonging to the Farm Credit System and will be an instrumentality of the federal government with the full faith and credit backing of the United States.

2

D-Bank's Board of Directors will consist of 10 to 20 members. the majority of whom must be American Indians. The Board will be diversified by tribe. area of the country, borrowing relationships and will include members from the public at large.

D-Bank's executive management and employees will be qualified bankers and will be exempt from federal government employment requirements. Compensation will be determined by the Board of Directors after taking into account general compensation and benefits schedules of the Farm Credit System banks.

D-Bank's lending, leasing, investment and financial services will be dedicated and restricted solely to making loans, leases , investments and financial services available to eligible and qualified American Indians and American Indian tribes and their communities in all areas of the country. Prudential, safe and sound lending and investment policies and practices will be strictly followed and enforced.

D-Bank will charge appropriate fees and interest rates for its financial services and products, sufficient to cover funding, operating and administrative expenses and to provide a reasonable return on shareholder's equity.

D-Bank will provide a full range of commercial, real estate and consumer loans to eligible American Indians, tribes and their communities.

## Investment in Community Development and American Indian Businesses: $125 million

D-Bank will be authorized to invest up to 25% (initially, $125 million) of its permanent capital in eligible individual Indian and Indian tribe business ventures and projects which will aid economic development of the American Indian communities. These investments will include common stock, preferred stock and long-term subordinated debt investments in:

    A. Infrastructure Acquisition and Development Activities

    B. Project Financing

    C. Venture Capital Businesses

    D. Established Businesses

## Investment in Fractionated Realty Interests: $300 million

D-Bank will be allowed to invest up to $300 million in the purchase, holding, financing and sale of fractionated realty interests in Indian allotment lands. Such purchases and financings will be made on prudential terms to eligible individuals and tribes. Such activities will be regulated by rules set forth in legislation to resolve the fractionated heirship issues which has as its principal purposes:

    A. The consolidation of existing fractional interests.

    B. The prevention or substantial reduction of further fractionation.

3

Attachment C Part 4 to Boswell Declaration

0620

D-Bank will be required to have an annual audit and report from an independent and qualified accounting firm.

D-Bank will be exempt from all federal and state taxes.

D-Bank's pro-forma balance sheet is as follows:

4

## D-BANK PRO-FORMA BALANCE SHEET
## BANKING OPERATIONS
### (Smillions)

| ASSETS | | *LIABILITIES | |
|---|---|---|---|
| Cash, Securities and Liquid Assets | 500 | Demand Deposits | 0 |
| | | Savings & CDS | 0 |
| | | Official Checks | 0 |
| Loans: | 2,500 | | |
| Commercial | | | |
| Consumer | | | |
| Real Estate | | | |
| Infrastructure | | | |
| Fractionated Realty Holdings: | 300 | Long-term Debt: | 3,000 |
| Loans to Facilitate | | Note to U. S. Treasury | |
| Investment Holdings | | 30 yrs.; 30 yr. T Rate | |
| Development Investments: | 125 | Other Debt: | 0 |
| Infrastructure Acquisition & | | Limited to 10 x Equity Capital, | |
| Development | | including long-term debt | |
| Project Financing | | | |
| Venture Capital to New | | | |
| Businesses | | | |
| Capital for Established | | | |
| Businesses | | | |
| Other | 75 | Equity Capital | 500 |
| Total Assets | 3,500 | Total Liabilities and Capital | 3,500 |

*All deposits and liabilities guaranteed by the United States

5

# D-BANK SUMMARY OF FINANCIAL SERVICES

**LOANS AND LEASES:**

| | | | |
|---|---|---|---|
| Commercial: | Small Business | Middle Market | Agriculture |
| Consumer: | Credit Card | Home Equity | Auto |
| | Mobile Home | Personal | |
| Real Estate: | Single Family | Multiple Family | Commercial |
| | Acquisition | Development | Construction |
| Infrastructure: | Acquisition | Development | Project Financing |

**FRACTIONATED REALTY HOLDINGS:**

| | | | |
|---|---|---|---|
| Purchases | Sales | Investments | Loans to Facilitate: Individual & Tribal |

**DEVELOPMENT INVESTMENTS:**

| | | | |
|---|---|---|---|
| Project Financing | Infrastructure Acquisition & Development | Venture Capital New Businesses | Capital to Existing Businesses |

**DEPOSITORY SERVICES:**

| | | | |
|---|---|---|---|
| Demand Deposits | Savings Deposits | Other Deposits | Certificates of Deposit |

**OTHER SERVICES:**

| | | | |
|---|---|---|---|
| ATM Access | Cash Management | Accounting | Statements & Reporting |
| Payments | Disbursements | Wire Transfer | Money Orders |
| Official Checks | Overdraft Protection | Discount Brokerage | Mutual Fund Sales |
| Insurance Sales | Annuity Sales | | |

6

OFFICE OF TRUST FUNDS MANAGEMENT
PRO-FORMA BALANCE SHEET AND TRUST SERVICES
($millions)

## TRUST OPERATIONS:

| Assets: | | Liabilities: | |
|---|---|---|---|
| Cash, Securities and Liquid Assets | 2,500 | Trust Accounts: | |
| | | Tribal | 2,000 |
| | | Individual Indian | 500 |
| | 2,500 | | 2,500 |

## TRUST SERVICES:

| | | |
|---|---|---|
| Managed Accounts | Agency Accounts | Custodial Accounts |
| Statements & Reporting | Accounting | Payments/Disbursements |
| Resource, Asset & Lease Management | Cash Management | Investment Services |
| IIM Deposits | Land Records & Ownership Management | Collections |

Attachment C Part 4 to Boswell Declaration

0624

APPENDIX 2

SETTLEMENT PROPOSAL SUMMARY

Type 1 Claims
Settlement Estimate
($ millions)

| Type 1 Settlement Category | Principal | Interest | Total |
|---|---|---|---|
| **1-1. Due From Tribes: Forgiven** | | | |
| 1-1A.  Proposed Adjustments | 11.6 | 11.6 | 23.2 |
| 1-1B.  Rollover Amounts | 26.1 | 116.9 | 143.0 |
| Total Forgiven | 37.7 | 128.5 | 166.2 |

Note:   Total Forgiven amount does not require
appropriations or payment from the
Judgment Fund.

| | Principal | Interest | Total |
|---|---|---|---|
| **1-2.  Due to Tribes** | | | |
| 1-2A.  Proposed Adjustments | 10.6 | 14.5 | 25.1 |
| 1-2B.  Rollover Amounts | 17.5 | 92.1 | 109.6 |
| Sub-total | 28.1 | 106.6 | 134.7 |
| 1-2C.  Interest on Deposits Due To Lag Times Between Collection and Deposit | | 8.2 | 8.2 |
| 1-2D.  Interest on Deposits Due to Lag Times Between Deposit At Treasury and Credit To  Account of Beneficiary | ___ | .5 | .5 |
| SubTotal Due to Tribes Settlement under 1-2 | 28.1 | 115.3 | 143.4 |

1

Type 1 Claims
Settlement Estimate
(S millions)

| Type 1 Settlement Category | | Principal | Interest | Total |
|---|---|---|---|---|
| 1-3. Due From Tribes: Forgiven | | | | |
| Passed Adjustments: | | | | |
| Principal | 7.6 | | | |
| Interest | 25.4 | | | |
| Total | 33.0 | | | |
| 1-4. Due To Tribes: | | | | |
| Passed Adjustments: | | | | |
| Principal | 3.4 | | | |
| Interest | 5.7 | | | |
| Total | 9.1 | (1) | (1) | (1) |
| 1-5. Disputed Claims Based on Additional Tribal Documentation and Due To Tribes Based on Negotiation, Mediation and Arbitration | | (1) | (1) | (1) |

1-6. Reconciled Disbursements with Incomplete
Disbursement Voucher Packages

   1-6A. General Settlement of all potential liability for all reconciled     (2) 200
   disbursements with incomplete disbursement voucher packages.
   Proceeds will be used to capitalize partially the Development
   Bank (See Settlement 2-7).

   1-6B. Reconciled Disbursements with Incomplete Disbursement
   Voucher Packages and Due To Tribes Based on Negotiation,
   Mediation and Arbitration.

| Principal | 4,110 | (1) & (2) | (1) & (2) | 200 |
|---|---|---|---|---|
| Total Type 1 Exposure Arising From Disputes | | (1) & (2) | (1) &(2) | 400 |

(1) None unless Tribes dispute the account balance and bring successful action and receive awards based on
negotiation, mediation or arbitration.

(2) It is proposed that the legislation cap the potential liability for Type 1-6B claims at $200 million. Individual
awards to a tribe will be capped at 5% of the total reconciled transactions with incomplete disbursement packages for
that tribe. The unused portion of the $200 million pool will be used to pay other Type 1 claims with any remaining
balance reverting to the U. S. Treasury. General Settlement 1-6A for $200 million will be used to capitalize the
development bank (See Settlement 2-7).

Type 2 Claims
Settlement Estimate
(S millions)

| Type 2 Settlement Category | Total |
|---|---|
| | |

**2-1: IIM Account Holders Settlement Proposal** — 281

Specific Settlement of Past Damages to IIM Holders

1. Amount is equal to estimated reconciliation costs for IIM Accounts. Amount will be invested in IIM pool for benefit of all account holders, past, present and future who will receive a higher yield as a result.

2. Settlement also includes tax free status for future IIM accounts. — Tax Free Status

**2-2: Restoration of IIM Thrift Industry Losses** — 13

Specific Settlement to restore interest lost by IIM account holders because of principal that was lost as a result of IIM Pool investments in obligations of failed thrifts in 1980s.

**2-3: Restoration of Overdraft Interest Clearing Accounts** — 42.2

Specific Settlement to restore S42 million in unidentified Overdraft Interest Clearing Accounts to the IIM Pool. Amount is equivalent to non-earning assets which deprive current IIM account holders of over S2 million in annual income.

**2-4: Miscellaneous OTFM General Ledger Losses** — 28.3

Specific Settlement to clear S28.3 million in general ledger differences, suspense amounts, balancing differences, overdraft losses and other losses.

Type 2 Claims Settlement Estimate ($millions) (continued)

| Type 2 Settlement Category | Total |
|---|---|

**2-5: IIM and Tribal Account Holders Joint Settlement for Systems Improvements** — 147

Specific Settlement to bring trust management systems up to commercial standards. Amount is the estimated cost to implement the Special Trustee's Strategic Plan over five years. Implementation will ensure that the government takes the actions necessary to provide an accurate and timely accounting to American Indian trust beneficiaries in the future. In this manner the proper discharge of the Secretary's trust responsibilities finally can be accomplished.

**2-6: Settlement for Reconciliation Project Unreconciled Transactions**

2-6A. General Settlement of potential damages for all Unreconciled Transactions arising from the Reconciliation Project. Proceeds of General Settlement will be used to partially capitalize Development Bank (See Settlement 2-7) — 300

2-6B. Specific Settlement for the following 32,901 transactions for which supporting documentation could not be located during the Reconciliation Project: — 300

| | |
|---|---|
| Receipts: | 1,123.3 |
| Transfers: | 479.6 |
| Disbursements | 808.6 |
| Total | 2,411.5 |

**Actual Disbursement Exposure can be computed as:**

| | |
|---|---|
| Unreconciled ($ million, absolute value) | 808.6 |
| Less: Positive Disbursements | (73.6) |
| Attorney and Expert Witness Fees | (40.5) |
| Alaska Regional Corporation | 119.5 |
| Principal Disbursement Exposure | 575.1 |
| Interest on Principal | 1,361.8 |
| Total Disbursement Exposure | 1,936.9 |

Type 2 Claims Settlement Estimate ($millions) (continued)

| Type 2 Settlement Category | Total |
|---|---|

$300 million will be disbursed to individual tribes with known unreconciled disbursements. The settlement for each tribe would equal the product of the percentage of each tribe's unreconciled disbursements plus interest (date of inception through 12/31/95) to total unreconciled disbursements plus interest on the total times the settlement amount of $300 million. The excess principal and interest potential liability to the tribes well be considered satisfied by the 2-6A general settlement and by the 2-7 general settlement.

**Type 2-7:**  General Settlement for IIM and Tribal Account Holders
Establishment of a Development Bank for American Indians

**Settlement 2-7:**  Establishment of a Development Bank for American Indians with the following capital and guarantees to be provided by the U. S. Government:

| | |
|---|---|
| 2-7A. Equity Capital | $500 million |
| 2-7B. Borrowing Capacity | 10 x Equity Capital |
| 2-7C. Initial Borrowing from U. S. | $3 billion for 30 yrs at 30 year T Rate |

Settlement 2-7 is intended to settle all other potential claims arising out of the reconciliation project not covered by Type 1 claims and other Type 2 claims and past potential liability for trust mismanagement practices in general. A full explanation of the rationale on this settlement and details on the Development Bank can be found in Appendix 1.

General Settlement 2-7 involves the creation of a federal Development Bank for American Indians (D-Bank) which will be formed and capitalized by the federal government and will be a nationwide financial institution providing a dependable source of lending to American Indians and American Indian Tribes and their communities and a dependable source of investing in American Indian Enterprises.

D-Bank will provide access to long-term loans and investments for economic development, consistent with principles of self-determination, self-governance and self-sufficiency and will provide access to low interest rates on loans, made possible by D-Bank's tax free status and its access to funding in the nation's capital markets at rates commensurate with those paid by the U. S. Government and Agencies of the U. S. Government.

D-Bank will also be allowed to invest up to $300 million in the purchase, holding, financing and sale of fractionated realty interests in Indian allotment lands. Such purchases and financings will be made on prudential terms to eligible individuals and tribes. Such activities will be regulated by rules set forth in legislation to resolve the fractionated heirship issues and will be administered to achieve the consolidation of existing fractional interests and the prevention or substantial reduction of further fractionation.

D-Bank will be a for-profit financial institution and will not receive appropriated funds for operating expenses. It will receive appropriated funds for lifeline financial services and other specified programs as approved by Congress.

D-Bank will be authorized to invest up to 25% (initially $125 million) of its permanent capital in eligible individual Indian and Indian Tribe businesses and projects which will aid economic development of the American Indian communities. These investments include common and preferred stock and long-term subordinated draft investments in:

| | |
|---|---|
| A. | Infrastructure Acquisition and Development Activities |
| B. | Project Financing |
| C. | Venture Capital Businesses |
| D. | Established Business |

D-Bank's capital and funding will be provided by the federal government in the following amounts:

2-7A.  Equity Capital:                                                                                          500

       Initial Equity Capital of $500 million will be provided by
       the federal government as part of Settlement 1-6A ($200
       Million) and 2-6A ($300 million). Shares will be
       distributed to all federally recognized Tribes on some
       equitable basis set forth in legislation.

2-7B.  Loans from U. S. Government:                                                                 3,000

       $3 billion in direct long-term loans will be provided to
       D-Bank for thirty years at the U. S. Treasury rate for
       30 year obligations.

2-7C.  U. S. Government Guaranteed Obligations                                           5,000

       Future funding of up to 10 times equity capital from the
       sale of bonds and notes in the nation's capital markets by
       D-Bank will be guaranteed by the full faith and credit
       of the United States. Loans from the United States Government
       of $3 billion are included in this amount.

---

Total Type 2 Claims:

       Direct Settlement Obligations: Settlements 2-1 through 2-7A          1,611.5

       Loans from U. S. Government: Settlement 2-7B                               3,000

       U. S. Government Guaranteed Obligations of $5 billion,
       net of $3 billion Loan: Settlement 2-7C                                        2,000

Total Type 2 Claims                                                                                     6,611.5

Attachment C Part 4 to Boswell Declaration

Summary of Type 1 and Type 2 Claims
Settlement Estimate
(S millions)

| Settlement Category | Principal | Interest | Total |
|---|---|---|---|
| 1-1. Due From Tribes: Forgiven | | | |
|     1-1A. Proposed Adjustments | 11.6 | 11.6 | 23.2 |
|     1-1B. Rollover Amounts | 26.1 | 116.9 | 143.0 |
|     Total Forgiven (Does not require appropriations) | 37.7 | 128.5 | 166.2 |
| | | | |
| 1-2. Due To Tribes: | | | |
|     1-2A. Proposed Adjustments | 10.6 | 14.5 | 25.1 |
|     1-2B. Rollover Amounts | 17.5 | 92.1 | 109.6 |
|     1-2C. Interest on Deposits Due to Lag Times | | 8.2 | 8.2 |
|     1-2D. Interest on Deposits Due to Lag Times (MMS) | ___ | .5 | .5 |
| | | | |
|     SubTotal Type 2 Claims Settlement | 28.1 | 115.3 | 143.4 |
| | | | |
| 1-3. Due From Tribes: Forgiven Passed Adjustments | - | | |
| 1-4. Due To Tribes: Passed Adjustments | (1) | (1) | (1) |
| 1-5. Disputed Claims Settled by Negotiation or Arbitration | (1) | (1) | (1) |
| 1-6. Reconciled Disbursements with Incomplete Packages | | | |
|     1-6A. General Settlement. Proceeds to D-Bank | | | 200 |
|     1-6B. Payable to Tribes after Negotiation/Arbitration | (1) | (1) | 200 |
| | | | |
|     SubTotal Type 1-3 through 1-6 Claims Settlements | - | - | 400 |
| | | | |
| 2-1. IIM Account Holders Settlement Proposal | 281 | | 281 |
| 2-2. Restoration of IIM Thrift Industry Losses | | 13 | 13 |
| 2-3. Restoration of Overdraft Interest Clearing Accounts | 42.2 | | 42.2 |
| 2-4. Miscellaneous OTFM General Ledger Losses | 28.3 | | 28.3 |
| 2-5. IIM and Tribal Account Holders Joint Settlement for | | | |
|     Implementation of Special Trustee's Strategic Plan | 147 | | 147 |
| 2-6. Settlement for Unreconciled Transactions | | | |
|     2-6A. General Settlement. Proceeds to D-Bank | 300 | | 300 |
|     2-6B. Payable to Individual Tribes. Capped at $300m. | 300 | | 300 |
| 2-7. General Settlement for IIM and Tribal Account Holders | | | |
|     2-7A. Equity Capital for Development Bank | | | |
|         provided by Settlements 1-6A & 2-6A | 500 | | 500 |
|     2-7B. Loans from U.S. Government | 3,000 | | 3,000 |
|     2-7C. U.S. Guaranteed obligations of D-Bank | | | |
|         of $5 billion, net of $3 billion loan | 2,000 | | 2,000 |
| | | | |
|     Total Type 2 Claims Settlement | 6,598.5 | 13 | 6,611.5 |

**Total All Claims Settlements**

| | Total |
|---|---|
| 1. Forgiven Amounts | 166.2 |
| | |
| 2. A. Total Type 1 and Type 2 Claims Settlement Direct Obligations, net of $500 million capital for D-Bank which was double counted.(See Settlements 1-6A, 2-6A & 2-7A) & net of U.S. Loans & Guarantees of $5 billion | 1,654.9 |
|     B. Loans $3,000 and guarantees $2,000 from U.S. | 5,000.0 |
| | |
| Total Claims Settlements including Forgiven Amounts | 6,821.1 |

(1) None unless tribes dispute account balance and bring successful negotiation/arbitration action.